# EXHIBIT  11

Recorded in Official Records, Orange County

Tom Daly, Clerk-Recorder

|||||||||||||||||||||||||||||||||||   **18.00**

**2011000420707 01:40pm 08/25/11**

93 401 S15 R01 1

0.00 0.00 0.00 0.00 0.00 0.00 0.00 0.00

Recording Requested By:
America's Wholesale Lender

When recorded mail document to:

NAME *DENNIS & LINDA BURK*

ADDRESS *184 E. LIBERTY AVE.*

CITY *ANAHEIM, CA 92801*
STATE & ZIP

APN NO. 326-151-27

Above Space for Recorder's Use Only

# SUBSTITUTION OF TRUSTEE AND FULL RECONVEYANCE

Whereas, <u>Dennis Burk and Linda Burk, Husband and Wife as Joint Tenant</u>_____was the Original

Trustor, <u>CTC Real Estate Services</u>_____, the original

Trustee, and <u>America's Wholesale Lender, a New York Corporation</u>_____,

Original beneficiary, under that certain Deed of Trust dated_____<u>MAY 19, 2005</u>

and recorded____<u>MAY 24, 2005</u>_____as Instrument No.____<u>2005000395457</u>

Book_____<u>xxx</u>_____Page____<u>xxxx</u>_____, Official Records of the County of ___<u>ORANGE</u>____

_____State of California and

WHEREAS, the undersigned present beneficiary desires to substitute a new Trustee under said Deed of
Trust in place and instead of
<u>CTC Real Estate Services</u>

Now therefore, the undersigned hereby substitutes himself/herself/themselves as Trustee under said Deed of Trust and does
hereby reconvey, without warranty, to the person or persons legally entitled hereto, the Estate now held by him thereunder.
Whenever the context hereof so requires, the masculine gender includes the feminine and/or neuter, and the singular numbers
includes the plural.
The undersigned hereby accepts said appointment as trustee under the above deed of trust, and as successor trustee, and
pursuant to the request of said owner and holder and in accordance with the provisions of said deed of trust, does hereby
RECONVEY WITHOUT WARRANTY, TO THE PERSONS LEGALLY ENTITLED THERETO, all the estate now held by it under
said deed of trust.

*AMERICAS WHOLESALE LENDER INC.*
*By Dennis Burk, Pres*

BENEFICIARY / NEW TRUSTEE
America's Wholesale Lender, Inc.

By: *DENNIS BERL, PRESIDENT*

Dated: *6-20-11* ✓

STATE OF *Kentucky*
COUNTY OF *McCracken*_____} SS.

ON *June 20 2011*_____before me, *Stan Watts*_____a Notary Public,
personally appeared *Dennis Bell*_____who proved to me on the basis of satisfactory
evidence to be the person(s) whose name(s) is/are subscribed to the within instrument and acknowledged to me that he/she/they
executed the same in his/her/their authorized capacity(ies), and that by his/her/their signature(s) on the instrument the person(s),
or the entity upon behalf of which the person(s) acted, executed the instrument.

I certify under PENALTY OF PERJURY under the laws of the State of *Kentucky*_____that
the foregoing paragraph is true and correct.

**WITNESS my hand and official seal.**

Signature _____ (seal)

OFFICIAL SEAL
RONALD STANLEY WATTS
NOTARY PUBLIC – KENTUCKY
McCRACKEN COUNTY
My Comm. Expires 07-23-2011

**EXHIBIT 11, PAGE 75**

# EXHIBIT  12

1  Advocates Law and Real Estate
   Diane Beall, Attorney (SBN 86877)
2  243 S. Escondido Blvd, #125
   Escondido, CA 92025
3  760-807-5417

4  Attorneys For Plaintiff

**FILED**
SUPERIOR COURT OF CALIFORNIA
COUNTY OF ORANGE
CENTRAL JUSTICE CENTER

JUN 21 2011

ALAN CARLSON, Clerk of the Court

BY N. DORFMAN

5

6

7

8   **SUPERIOR COURT OF THE STATE OF CALIFORNIA**
    **COUNTY OF ORANGE, CENTRAL JUSTICE CENTER**

9

10  MERRY B. WELLS                          Case No.        30-2011
    Plaintiff,
11                                          0 0 4 8 5 5 6 2
            vs.
12                                          COMPLAINT FOR:
    AMERICA'S WHOLESALE LENDER,
13  INC., a New York Corporation;           **FRAUD AND INTENTIONAL DECEIT;**
    MORTGAGE ELECTRONIC      DB             **VIOLATION OF THE BUSINESS AND**
14  REGISTRATION SYSTEMS, INC., aka         **PROFESSIONAL CODE § 17200;**
    Delaware Corporation; and DOES 1        **VIOLATION OF FINANCIAL CODE §**
15  through 100, inclusive.                 **50505.**

16              Defendants.
                                            JUDGE LUIS A. RODRIGUEZ
17

18

19
            COMES NOW, Plaintiff, MERRY B. WELLS by and through her counsel,
20
    and alleges:
21

22          1.     Plaintiff is, and at all times mentioned herein, was owner of real
23  property described hereunder.

24
            2.     Defendant AMERICAS WHOLESALE LENDER, INC. (hereinafter
25
    "AWL"), is, and at all times mentioned was a New York Corporation.
26

27

28

---

FRAUD AND INTENTIONAL DECEIT; VIOLATION OF THE BUSINESS AND PROFESSIONAL CODE § 17200; VIOLATION OF
FINANCIAL CODE § 50505.

**EXHIBIT 12, PAGE 76**

3.      Defendant MORTGAGE ELETRONIC REGISTRATION SYSTEMS, INC. (hereinafter "MERS"), is, and at all times mentioned was a Delaware corporation conducting <u>unauthorized</u> business in California at the time the loan originated.

4.      Defendants DOES 1 through 100, inclusive, has, or claims to have, an interest in the property, the exact nature of which is unknown to Plaintiff. Plaintiff is ignorant of the true names, interests, rights, and capacities of defendants sued as DOES 1 through 100, inclusive, and therefore sue these defendants by those fictitious names. Plaintiff will amend this complaint to allege their true names, rights, interests, and capacities when they are ascertained.

5.      On January 30, 2006, Plaintiff, for a valuable consideration, received a Grant Deed, which was recorded with the Orange County recorder, California.

6.      Such Grant Deed covers real property situated at 5369 Grandview Private,   Yorba Linda, CA. 92886, ("the property").

7. On or about January 30, 2006, Plaintiff entered into a written contract, by the terms of which, Plaintiff executed a promissory note (hereinafter "NOTE") in favor of Americas Wholesale Lender, a corporation organized and existing under the laws of New York.

8.      Such promissory note is secured by a Deed of Trust (hereinafter "DOT") recorded with the Orange County Recorder on or about January 30, 2006.

9.      The DOT purportedly named MERS as nominee for AWL and its successors and assigns.  MERS is further designated as beneficiary under the DOT even though it has no pecuniary interest in the NOTE.

10.     Plaintiff, upon information and belief, therefore allege that Defendants purposely ignored standards of appraisals, underwritings, including the

COMPLAINT  AGAINST  AWL  AND MERS

**EXHIBIT 12, PAGE 77**

fabrication of documents to finance Plaintiff' property for the express purpose of enriching themselves.

11.   AWL caused MERS to go on title as the "Nominee Beneficiary," of "Securitized Instruments" in order to hide the true identity of the "Successor Assignees" of the "Notes" and to avoid paying the Recording fees to the County Recorder.

12.   The "Securitization System" was designed to minimize the risks of "Predatory Lending", "Defaulting Loans", and other risks by "Insuring and Cross-Collateralizing" thousands of loans in a loan pool.  If a loan defaulted and resulted in a foreclosure, and foreclosure was pursued, the loan would be "paid-off in full" by insurance proceeds.

### FIRST CAUSE OF ACTION
### FRAUD AND INTENTIONAL DECEIT
[AGAINST ALL DEFENDANTS]

13.   Plaintiff re-alleges and incorporates the allegations contained in the preceding paragraphs as though set forth at length herein.

14.   An agent (loan advisor) and/or employee of defendant AWL, acting on behalf of and under the direction of ("AWL") held himself out as an expert of home loans and expressed his faith trust and confidence in "AWL".

15.   The acts and practices of said agent and/or employee of AWL and AWL as respect to the financing of Plaintiff's property were so commingled as to be considered inseverable.

16.   Defendants misrepresented the property address as Grandview Avenue when it should have been described as Grandview Private.

EXHIBIT 12, PAGE 78

17.     Plaintiff specified that she did not want a Prepayment penalty and Defendant's agent or employee represented that there would be no Prepayment penalty.

18.     On the day when Plaintiff was scheduled to sign the loan documents, she discovered that the documents contained a Prepayent penalty and she objected to signing the documents.

19.     Plaintiff was advised by Defendant's agent that if she did not sign the Loan documents "as is", that she would have to restart the process and that it would take time to prepare new documents.

20.     Plaintiff had a a scheduled closing date with the Seller of the property under the Purchase Agreement and she was afraid that if she didn't sign the Loan documents  with the Prepayment penalty then she would be in violation of the terms of the purchase agreement and lose the opportunity to buy the home, so she signed under pressure and duress despite the Pre-penalty provision that she had specifically objected to.

21.     Defendants never explained the loan to Plaintiff or the ramifications of a Negative Amortization loan or Balloon Payment.

22.     Days prior to January 30, 2006, an employee of Defendant "AWL" made the following representations to Plaintiff:

    a. That Plaintiff was receiving a fixed interest rate 30 year loan from AWL.

    b. That the agent and/or employee had proper documentation to support 100% financing of the proposed home price purchase.

COMPLAINT AGAINST AWL AND MERS

**EXHIBIT 12, PAGE 79**

c. That the loan information which Plaintiff conveyed via a telephone interview would be accurately transcribed into accurate loan documents.

d. That said agent and/or employee had exceptional skill obtaining proposed loans for others.

e. That Plaintiff could refinance in a few years with no difficulties.

23.   The representations made by said agent and/or employee on behalf of AWL were untruthful.  The actual facts were:

a.   Plaintiff's loan was not a fixed interest rate 30 year loan.

b.   Plaintiff had no idea that Countrywide was not her Lender. Plaintiff always understood that Countrywide was her Lender All payments went to Countrywide until the sale to Bank of America. Then all communications and payments went or came from Bank of America. Plaintiff also tried to do a Loan Modification through Bank of America.

c.   The Negative  Amortization –Pick a Pay Option ARM Program was never explained to Plaintiff and no one ever advised Plaintiff how this program actually worked.

d.   Plaintiff was never advised that paying the Negative Amortization payment would add to the Principal of the loan and that amount would end up being a balloon payment at the end of the 30 year term.

e.   Plaintiff was never advised that  there is a maximum amount she could can pay on a Neg Am payment and that hers was 115% Maximum Limit.

f.   Plaintiff had no idea that this was not a fixed rate and that there is an increasing payment schedule which increased from $3,198.71 to $7,782.22. Schedule shown TIL.

g.   Plaintiff was advised that she would not be charged a Pre-payment, however at the time of signing  she found out that she did have a prepayment penalty. Plaintiff requested at signing that this be corrected. The young lady signing her was not an actual Escrow Officer just an assistant, so she had to keep going out of the room to get help from the actual Officer that was suppose to help Plaintiff sign her documents. The Officer was tied up with another couple and there

-4-

COMPLAINT  AGAINST AWL  AND MERS

was two other offers on the house, so Plaintiff went ahead and signed because she was afraid that if she didn't she would lose the home.

    h.  Only payment options Plaintiff was told about was the Interest Only Option, Fully Amortized Payment, and 15 Year Amortized Payment.

    i.  Plaintiff requested an actually Officer and waited for nearly an hour. Plaintiff then just gave up and signed everything because she felt that she had no choice. There were other offers on the house and Plaintiff was given a date to have the loan done by or they would sell to another couple. So under pressure of losing the house and being at Escrow for nearly 4 hours Plaintiff went along with everything and signed for fear of losing the home.

    j.  There was not adequate documentation to support the loan.

    k.  That the loan application was manufactured by said agent and/or employee with misleading inputs for approvals.

    l.  That there was no refinancing available in two years.

24.    Defendants, through its "Loan Advisor" agent and/or employee had a "duty and obligation" to be truthful and failed in these duties and obligations.

25.    Defendants knew that Plaintiff was unaware of the truth, and could not have reasonably discovered material information about the loan transaction..

26.    Defendants and "Loan Advisor" agent and/or employee willfully and knowingly set forth a misleading scenario as to the foundations of the loan transaction they proposed to Plaintiff, to the harm and detriment of Plaintiff.

27.    When the "Loan Advisor" made these representations, Defendants and their "Alter Egos", along with the immediate supervisors of said agent and/or employee knew and should have known that these representations were untruthful and misleading.

**EXHIBIT 12, PAGE 81**

28.   These representations were made with the intention to deceive Plaintiff and to induce Plaintiff to act in reliance on these representations to his detriment, whereby the fruits of these inducements would inure to the enrichment and benefits of the defendants.

29.   Plaintiff was duped and subjected to an Interest only loan, drained of personal savings, and has been damaged in an amount to be proven at trial.

30.   The conduct of these defendants was an intentional misrepresentation, deceit, or concealment of material facts, and constituted despicable conduct that subjected Plaintiff to a cruel and unjust hardship and emotional distress.

31.   Plaintiff s audit indicates that "AWL" and its agents collected excessive amounts for its services, and undisclosed "Yield Spread Premiums".

32.   These despicable acts justify an award of compensatory, consequential, emotional distress, and punitive damages as well as injunctive relief pursuant to California CC § 1709, CC § 3294(a)(b)(3), CC § 3343.

**SECOND CAUSE OF ACTION**
**(VIOLATION OF B & P CODE § 17200 et. seq.)**
(AGAINST ALL DEFENDANTS)

33.   Plaintiff  re-alleges and incorporates the allegations contained in the preceding paragraphs as though set forth at length herein.

34.   The Defendants' Business Practices involves "Deceptive Lending".

35.   The B & P §17200 is designed to protect "Consumers".   The "Defendants" foreclosure conduct and unresponsive practices were clearly and substantially unfair and deceptive.

COMPLAINT AGAINST AWL AND MERS

36.   "AWL" violations of Financial Code §50505 demonstrates unfair business practices.   These practices are designed with the culpable state of mind and with the intent to "perpetrate falsities" upon unsophisticated consumers by "steering" and fully controlling the "Loan Process" to enhance profits at the expense, loss and injuries to Plaintiff.

37.   Defendant "AWL" misrepresented to Plaintiff that the original terms of the loans, the nature, and details of the transactions entered.  These included the "true costs of the loan", the "distribution of the loan proceeds", and if the loan was pre sold into a securitization trust, and if there were "undisclosed fees".

38.   "AWL" unfairly induced Plaintiff to enter into a mortgage loan transactions that it and others knew that Plaintiff was not able to pay.

39.   "AWL" misrepresented to Plaintiff that the "points and fees" payable from the proceeds of the mortgage were "bona fide" and "reasonably and necessary" for the extension of credit, when in fact they were not.

40.   "AWL" unfairly induced Plaintiff to execute and/or executing on behalf of Plaintiff  inaccurate documents in order to close his loan.

41.   "AWL" extended credit to Plaintiff on the basis of the "Value of the Premises", rather than on the basis of his documented or situational ability to pay,  in violation of law.

42.   Payment of brokerage fees that were in no way reasonably related to "brokerage services actually rendered".   These rather constituted "kickbacks" for the referral of deliberately deceptive induced loans.

43.   Through its agent, "AWL" engaged in high pressure sales tactics to induce Plaintiff to enter into a deceptive, unfair and unconscionable transaction.

COMPLAINT AGAINST AWL AND MERS

EXHIBIT 12, PAGE 83

44.   Plaintiff reasonably relied on above-identified "Deceptive Lender Acts and Practices", and entered into a  loan transaction that he would not otherwise have entered into, but for those "Deceptive Acts and Practices"

45.   Plaintiff is entitled to the equitable and monetary relief set by state statutes, and an order enjoining ("AWL") and its agents from continuing to engage in the unfair and deceptive lending practices described herein.

46.   Plaintiff was purposely mislead and continues to be mislead with incorrect statements and accountings.

47.   Defendant MERS has no beneficial interest in the obligation discussed herein.

48.   MERS, through its agent as a purported nominee Beneficiary, has no beneficial interest in the Note or underlying obligation under the Deed of Trust.

49.   Defendant MERS has full knowledge that it had no interest in the underlying obligation and is holding an invalid lien.

**WHEREFORE**, Plaintiff prays judgment as follows:

1.   For judgment quieting Plaintiff's title to the property against all defendants;
2.   For damages according to proof;
3.   For statutory penalties;
4.   For exemplary damages;
5.   For costs of suit and attorney fees herein incurred; and
6.   For such other and further relief as the court may deem proper.

DATED: 06/20/2011                    ADVOCATES LAW AND REAL ESTATE

                                     By: /s/ Diane Beall

                                     Diane Beall, Attorney for Plaintiff

— 8 —

COMPLAINT AGAINST AWL AND MERS

**EXHIBIT 12, PAGE 84**

# EXHIBIT  13

Advocates Law and Real Estate
Diane Beall
243 S. Escondido, Blvd. #125
Escondido, CA 92025
Attorneys for MERRY B. WELLS

**ELECTRONICALLY RECEIVED**
Superior Court of California,
County of Orange
**08/10/2011** at 12:15:50 PM
Clerk of the Superior Court
By Sonya Herrera Wilson, Deputy Clerk



FILED
SUPERIOR COURT OF CALIFORNIA
COUNTY OF ORANGE
CENTRAL JUSTICE CENTER

AUG 26 2011

ALAN CARLSON, Clerk of the Court

BY K PALACIOS

# SUPERIOR COURT OF THE STATE OF CALIFORNIA
## COUNTY OF ORANGE
### CENTRAL JUSTICE CENTER
### UNLIMITED JURISDICTION

MERRY B. WELLS,

        Plaintiff,

        vs.

AMERICA'S WHOLESALE
LENDER, MORTGAGE
ELECTRONIC REGISTRATION
SYSTEMS, INC.(MERS); DOES
1 TO 100,

        Defendants

CASE NO.: 30-2011-00485562


**SETTLEMENT AGREEMENT,
STIPULATION FOR ENTRY OF
JUDGMENT AND JUDGMENT**

**(filed concurrently Form JUD-100)**

Judge Rodriguez - C6


SETTLEMENT AGREEMENT, STIPULATION FOR
ENTRY OF JUDGMENT AND JUDGMENT.

Page 1

*Settlement Agreement, Stipulation for Entry of Judgment and Judgment*
*MERRY B. WELLS v. America's Wholesale Lender et al.*

This Stipulation for Entry of Judgment and Judgment ("Final Judgment") is entered into by Plaintiff, MERRY B. WELLS ("PLAINTIFF") and Defendant AMERICAS WHOLESALE LENDER, INC., a New York Corporation ("AWL").   For purposes of this Final Judgment, PLAINTIFF and AWL shall be referred to collectively as "Parties" and individually as "Party".   The Parties have stipulated and consented to the entry of this Final Judgment with the following stipulated fact and evidence herein.   The Parties also have waived their right to appeal and have agreed to settle the above-captioned matter without further litigation, as set forth below.

### INTRODUCTION

This matter arises from the dispute of a promissory note executed by MERRY B. WELLS in favor of AWL and secured by a Deed of Trust signed on January 25, 2006 and recorded with the Orange County Recorder as instrument number <u>2006000067191.</u>   Said Deed of Trust purportedly encumbered Plaintiff's real property known as 5369 Grandview Avenue, Yorba Linda, CA 92886. ("Subject Property").

Plaintiff  has filed a Complaint against the Defendants in the Orange County Superior Court alleging Fraud, Unfair Business Practice, Violation of Financial Code 50505.   Plaintiff sought to recover monetary damages as the result of alleged injuries caused by Defendants and its agents, employees or affiliates.

The Parties engaged in settlement negotiations prior to the filing of this Final Judgment.   In those settlement negotiations, Parties are represented by counsels.   The Parties have agreed to settle this matter without litigation pursuant to the terms of this Final Judgment.

### SETTLEMENT AGREEMENT AND JUDGMENT
### PURSUANT TO STIPULATED FINDING OF FACT

The Parties, after opportunity for review by their respective counsel, hereby stipulate and consent to the entry of this Final Judgment based on the following finding of facts as set forth below.

//

Page 2
*Settlement Agreement, Stipulation for Entry of Judgment and Judgment*
*MERRY B. WELLS  v. America's Wholesale Lender et al.*

EXHIBIT 13, PAGE 86

1. **JURISDICTION**

   1.1.    The Parties stipulate and agree that the Superior Court of California, County of Orange, has subject matter jurisdiction over the matters alleged in this action and personal jurisdiction over the Parties to this Final Judgment.

2. **STIPULATED AND FINDING OF FACTS**

   2.1.    Plaintiff Merry B. Wells is the Borrower of the promissory note in favor of America's Wholesale Lender made on January 25, 2006, covering the Subject Property. A true and correct copy of promissory note is attached herein as Exhibit 1.

   2.2.    Defendant AMERICA'S WHOLESALE LENDER, INC., a New York Corporation, is the Lender of the promissory note. A true and correct copy of the Deed of Trust is attached herein as Exhibit 2.

   2.3.    Defendant Mortgage Electronic Registration Systems, Inc. ("MERS") is a separate corporation that is acting solely as nominee for AWL, holding no interest in the subject promissory note as attached herein as Exhibit 1 or Deed of Trusts as attached herein as Exhibit 2.

   2.4.    Defendant AMERICA'S WHOLESALE LENDER, INC., a New York Corporation is the holder of the promissory note and deed of trusts identified herein and is currently in possession of the promissory note.

   2.5.    Defendant AMERICA'S WHOLESALE LENDER, INC., a New York Corporation, as the holder of the promissory note, has not made any endorsement.

   2.6.    Defendant AMERICA'S WHOLESALE LENDER, INC., a New York Corporation, as beneficiary of the Deed of Trust, has not assigned nor authorized any assignment of the Deed of Trust identified herein.

   2.7.    No person, party or entity, including trustee or nominee purporting to act on the behalf of AWL, is authorized to collect payment as identified in the promissory note, to initiate foreclosure or substitution of trustee as identified in the Plaintiff's complaint.

Page 3
*Settlement Agreement, Stipulation for Entry of Judgment and Judgment*
*MERRY B. WELLS v. America's Wholesale Lender et al.*



**EXHIBIT 13, PAGE 87**

2.8.   Any substitution of trustee, assignment of Deed of Trust, or demand for payment that was not executed by Defendant AWL was not authorized by AWL and is hereby VOID.

**3.   SETTLEMENT AGREEMENT**

3.1.   Pursuant to the Federal Mortgage Relief Act and other applicable reliefs, Parties agree to enter loan modification covering the Subject Property with legal description attached herein as <u>Exhibit 3.</u>

3.2.   Parties agree to loan modification as follows:

3.2.1.   AWL shall prepare and Plaintiffs will execute a new promissory note secured by a first Deed of Trust in the amount of $385,000.00.  Said note shall provide for simple interest per annum at the rate of 5.00% and amortized over a period of 30 years.

3.2.2.   In addition, Plaintiff will make a lump sum payment in the amount of $215,000.00 at the close of escrow payable to AWL.

3.2.3.   Upon execution of said note and Deed of Trust by Plaintiff and recordation thereof with the County Recorder of Orange, and lump sum payment, all sums due or past due on the promissory note identified and attached herein as <u>Exhibit 1</u> is hereby satisfied.

3.3.   AWL shall prepare and record a full reconveyance of the Deed of Trusts recorded with the Orange County Recorder as instrument number <u>2006000067191</u>.

3.4.   Parties agree to pay their own costs in this action.

3.5.   This settlement agreement is a compromise of this disputed claim and the loan modification agreements in 3.2 shall not be construed as an admission of liability by AWL.

3.6.   All parties shall cooperate in preparation and execution of all necessary documents and to take all action which may be necessary to give full force and effect to the term and intent of this agreement.

3.7.   AWL agrees to dismiss or not to file any related cross-complaint in this action.

//

//

Page 4

*Settlement Agreement, Stipulation for Entry of Judgment and Judgment*
*MERRY B. WELLS v. America's Wholesale Lender et al.*



4.   **ENFORCEMENT OF FINAL JUDGMENT AND PENALTIES.**

   **4.1.**   In the event that any person or entity, whether purportedly acting on the behalf of AWL or another entity initiate foreclosure, collection, recordation of document claiming any right or interest in, and to, the subject Deed of Trust as identified in <u>Exhibit 2</u>, AWL shall cause such action to be terminated by enforcement of this agreement and/or recording appropriate document as required to negate such action or enforcement at its own expense.

   **4.2.**   Except as provided in this agreement, nothing in this Final Judgment shall limit any rights of Plaintiff to seek any other relief or civil remedies provided by law against other parties related to the subject loan identified herein.

5.   **MATTERS COVERED BY THIS SETTLEMENT AGREEMENT, FINDING OF FACT AND JUDGMENT.**

   **5.1.**   The Court finds that on stipulation between Parties, all matters are factually accurate as supported by evidence attached herein and conclusively determined that AMERICA'S WHOLESALE LENDER, INC., New York Corporation, is the Lender and beneficial owner of the subject loan and no other party holds any interest in the subject property as described herein.

   **5.2.**   This settlement agreement and Final Judgment is a final and binding resolution and settlement of all "Covered Matters." As used in this Final Judgment, Cover Matters means all claims that have been alleged, or claims that could have been asserted within the scope of the allegations set forth, in the Complaint in this matter, stipulation and finding of facts as established by evidence attached herein.

   **5.3.**   Any claims, violations or causes of action against AWL or its officers that are not alleged in the Complaint, including, but not limited to, any violations of laws are hereby forever waived.

6.   **NOTICE.**

   All submissions and notices required by this agreement shall be sent to:

   For Plaintiff:



Page 5
*Settlement Agreement, Stipulation for Entry of Judgment and Judgment*
*MERRY B. WELLS  v. America's Wholesale Lender et al.*

**EXHIBIT 13, PAGE 89**

MERRY B. WELLS

5369 Grandview Avenue,

Yorba Linda, CA. 92866

Copy to Diane Beall, Advocates Law and Real Estate:

243 S. Escondido Blvd, #125

Escondido, Ca 92025

For America's Wholesale Lender, Inc.:

Attention: Executive Office

875 Avenue of the Americas, Ste 501

New York, NY 10001.

Any Party may change its notice name and address by informing the other party in writing, but no change is effective until it is received. All notices and other communications required or permitted under this agreement that are properly addressed as provided in this paragraph are effective upon delivery if delivered personally or by overnight mail, or are effective five (5) days following deposit in the United States mail, postage prepaid, if delivered by mail.

7.    APPLICATION OF AGREEMENT AND FINAL JUDGMENT.

This agreement and Final Judgment shall apply to and be binding upon the Plaintiff and upon Americas' Wholesale Lender, Inc., a New York Corporation and its successors and assigns.

8.    AUTHORITY TO ENTER AGREEMENT AND FINAL JUDGMENT.

Each signatory to this Agreement and Final Judgment certifies that he or she is fully authorized by the party he or she represents to enter into this Agreement and Final Judgment, to execute it on behalf of the party represented and legally to bind that party.

9.    INTERPRETATION.

This Agreement and Final Judgment was drafted equally by all Parties. The Parties agree that the rule of construction holding that ambiguity is construed against the drafting party shall not apply to the interpretation of this Agreement and Final Judgment.

Page 6

*Settlement Agreement, Stipulation for Entry of Judgment and Judgment*
*MERRY B. WELLS v. America's Wholesale Lender et al.*

EXHIBIT 13, PAGE 90

10.   COUNTERPART SIGNATURES.

This Agreement and Final Judgment may be executed by the Parties in counterpart.

11.   INTEGRATION.

This Agreement and Final Judgment constitutes the entire agreement between the Parties and may not be amended or supplemented except as provided for in this agreement.  No oral representations have been made or relied upon other than as expressly set forth herein.

12.   MODIFICATION.

This Agreement and Final Judgment may be modified only on noticed motion by a Party with approval of the Court, or upon written consent of the Parties and the approval of the Court.

13.   INCORPORATION OF EXHIBITS.

Each of the Exhibits is incorporated herein by reference.

IT IS SO STIPULATED.

//

//

For the Plaintiff, Merry B. Wells:

DATED: 7/28/2011

_MMBWells_

MERRY B. WELLS

//

//

Page 7

*Settlement Agreement, Stipulation for Entry of Judgment and Judgment*
*MERRY B. WELLS v. America's Wholesale Lender et al.*

For the Defendant, AMERICA'S WHOLESALE LENDER, INC.:

DATED: _JULY 18, 2011_

By: _MARRITS VAN ECK_

Title: _VICE - PRESIDENT_

For Advocates Law and Real Estate,

DATED: _July 19, 2011_

By: _Diane Beall_

Diane Beall (#86877)

Attorney for MERRY B. WELLS

Page 8

_Settlement Agreement, Stipulation for Entry of Judgment and Judgment_
_MERRY B. WELLS  v. America's Wholesale Lender et al._

**EXHIBIT 13, PAGE 92**

# EXHIBIT #1

**EXHIBIT 13, PAGE 93**

 

Prepared by: ADALYS THAN

LOAN #: 125015321

# ADJUSTABLE RATE NOTE
## (MTA - Twelve Month Average Index - Payment Caps)

THIS NOTE CONTAINS PROVISIONS THAT WILL CHANGE THE INTEREST RATE AND THE MONTHLY PAYMENT. THERE MAY BE A LIMIT ON THE AMOUNT THAT THE MONTHLY PAYMENT CAN INCREASE OR DECREASE. THE PRINCIPAL AMOUNT TO REPAY COULD BE GREATER THAN THE AMOUNT ORIGINALLY BORROWED, BUT NOT MORE THAN THE MAXIMUM LIMIT STATED IN THIS NOTE.

JANUARY 25, 2006          FULLERTON          CALIFORNIA
   [Date]                    [City]             [State]

5369 GRANDVIEW AVENUE, YORBA LINDA, CA 92886
[Property Address]

**1.   BORROWER'S PROMISE TO PAY**
In return for a loan that I have received, I promise to pay U.S. $ 994,500.00        (this amount is called "Principal"), plus interest, to the order of Lender. The Principal amount may increase as provided under the terms of this Note but will never exceed      115 percent of the Principal amount I originally borrowed. This is called the "Maximum Limit." Lender is AMERICA'S WHOLESALE LENDER

I will make all payments under this Note in the form of cash, check or money order.

I understand that Lender may transfer this Note. Lender or anyone who takes this Note by transfer and who is entitled to receive payments under this Note is called the "Note Holder."

**2.   INTEREST**
**(A) Interest Rate**
Interest will be charged on unpaid Principal until the full amount of Principal has been paid. Up until the first day of the calendar month that immediately precedes the first monthly payment due date set forth in Section 3 of this Note, I will pay interest at a yearly rate of     6.000 %.  Additional days interest collected prior to the first monthly payment due date is sometimes called "Per Diem" interest and is due at the time I close my loan. Thereafter until the first Interest Rate Change Date, defined below in Section 2(B), I will pay interest at a yearly rate of     1.000 %. This rate is sometimes referred to as the "Start Rate" and is used to calculate the initial monthly payment described in Section 3. The interest rate required by this Section 2 of this Note is the rate I will pay both before and after any default described in Section 7(B) of this Note.

**(B) Interest Rate Change Dates**
The interest rate I will pay may change on the first           day of MARCH, 2006         , and on that day every month thereafter. Each date on which my interest rate could change is called an "Interest Rate Change Date." The new rate of interest will become effective on each Interest Rate Change Date. The interest rate may change monthly, but the monthly payment is recalculated in accordance with Section 3.

**(C) Index**
Beginning with the first Interest Rate Change Date, my adjustable interest rate will be based on an Index. The "Index" is the "Twelve-Month Average" of the annual yields on actively traded United States Treasury Securities adjusted to a constant maturity of one year as published by the Federal Reserve Board in the Federal Reserve Statistical Release entitled "Selected Interest Rates (H.15)" (the "Monthly Yields"). The Twelve Month Average is determined by adding together the Monthly Yields for the most recently available twelve months and dividing by 12. The most recent Index figure available as of the date 15 days before each Interest Rate Change Date is called the "Current Index."

If the Index is no longer available, the Note Holder will choose a new index that is based upon comparable information. The Note Holder will give me notice of this choice.

**(D) Calculation of Interest Rate Changes**
Before each Interest Rate Change Date, the Note Holder will calculate my new interest rate by adding TWO & 40/100             percentage point(s)    2.400 % ("Margin") to the Current Index. The Note Holder will then round the result of this addition to the nearest one-eighth of one percentage point (0.125%). This rounded amount will be my new interest rate until the next Interest Rate Change Date. My interest rate will never be greater than     9.950 %. Beginning with the first Interest Rate Change Date, my interest rate will never be lower than the Margin.

**3.   PAYMENTS**
**(A) Time and Place of Payments**
I will make a payment every month.
I will make my monthly payments on the first           day of each month beginning on MARCH 01, 2006         . I will make these payments every month until I have paid all the Principal and interest and any

● PayOption ARM Note - MTA Index
2E306-XX (08/05)(d)                                  Page 1 of 4

 

*23991*

EXHIBIT 13, PAGE 94



LOAN #: 125015321

other charges described below that I may owe under this Note. Each monthly payment will be applied as of its scheduled due date and will be applied to interest before Principal. If, on   FEBRUARY 01, 2036   , I still owe amounts under this Note, I will pay those amounts in full on that date, which is called the "Maturity Date."

I will make my monthly payments at
P.O. Box 10219, Van Nuys, CA 91410-0219
or at a different place if required by the Note Holder.

**(B)  Amount of My Initial Monthly Payments**
Each of my initial monthly payments until the first Payment Change Date will be in the amount of U.S.
$ 3,198.71     , unless adjusted under Section 3(F).

**(C)  Payment Change Dates**
My monthly payment may change as required by Section 3(D) below beginning on the   first     day of
MARCH, 2007   , and on that day every 12th month thereafter. Each of these dates is called a "Payment Change Date." My monthly payment also will change at any time Section 3(F) or 3(G) below requires me to pay a different monthly payment. The "Minimum Payment" is the minimum amount Note Holder will accept for my monthly payment which is determined at the last Payment Change Date or as provided in Section 3(F) or 3(G) below. If the Minimum Payment is not sufficient to cover the amount of the interest due then negative amortization will occur.

I will pay the amount of my new Minimum Payment each month beginning on each Payment Change Date or as provided in Section 3(F) or 3(G) below.

**(D)  Calculation of Monthly Payment Changes**
At least 30 days before each Payment Change Date, the Note Holder will calculate the amount of the monthly payment that would be sufficient to repay the unpaid Principal that I am expected to owe at the Payment Change Date in full on the maturity date in substantially equal payments at the interest rate effective during the month preceding the Payment Change Date. The result of this calculation is called the "Full Payment." Unless Section 3(F) or 3(G) apply, the amount of my new monthly payment effective on a Payment Change Date, will not increase by more than   7.500% of my prior monthly payment. This
7.500%   limitation is called the "Payment Cap." This Payment Cap applies only to the Principal and interest payment and does not apply to any escrow payments Lender may require under the Security Instrument. The Note Holder will apply the Payment Cap by taking the amount of my Minimum Payment due the month preceding the Payment Change Date and multiplying it by the number   1.075 . The result of this calculation is called the "Limited Payment." Unless Section 3(F) or 3(G) below requires me to pay a different amount, my new Minimum Payment will be the lesser of the Limited Payment and the Full Payment.

**(E)  Additions to My Unpaid Principal**
Since my monthly payment amount changes less frequently than the interest rate, and since the monthly payment is subject to the payment limitations described in Section 3(D), my Minimum Payment could be less than or greater than the amount of the interest portion of the monthly payment that would be sufficient to repay the unpaid Principal I owe at the monthly payment date in full on the Maturity Date in substantially equal payments. For each month that my monthly payment is less than the interest portion, the Note Holder will subtract the amount of my monthly payment from the amount of the interest portion and will add the difference to my unpaid Principal, and interest will accrue on the amount of this difference at the interest rate required by Section 2. For each month that the monthly payment is greater than the interest portion, the Note Holder will apply the payment as provided in Section 3(A).

**(F)  Limit on My Unpaid Principal; Increased Monthly Payment**
My unpaid Principal can never exceed the Maximum Limit equal to ONE HUNDRED FIFTEEN     percent
(   115 %) of the Principal amount I originally borrowed. My unpaid Principal could exceed that Maximum Limit due to Minimum Payments and interest rate increases. In that event, on the date that my paying my Minimum Payment would cause me to exceed that limit, I will instead pay a new Minimum Payment. This means that my monthly payment may change more frequently than annually and such payment changes will not be limited by the Payment Cap. The new Minimum Payment will be in an amount that would be sufficient to repay my then unpaid Principal in full on the Maturity Date in substantially equal payments at the current interest rate.

**(G)  Required Full Payment**
On the   tenth     Payment Change Date and on each succeeding fifth Payment Change Date thereafter, I will begin paying the Full Payment as my Minimum Payment until my monthly payment changes again. I also will begin paying the Full Payment as my Minimum Payment on the final Payment Change Date.

**(H)  Payment Options**
After the first Interest Rate Change Date, the Note Holder may provide me with up to three (3) additional payment options that are greater than the Minimum Payment, which are called "Payment Options." The Payment Options are calculated using the new interest rate in accordance with Section 2(D). I may be given the following Payment Options:
    (i)   Interest Only Payment: the amount that would pay the interest portion of the monthly payment. The Principal balance will not be decreased by this Payment Option and it is only available if the interest portion exceeds the Minimum Payment.
    (ii)   Amortized Payment: the amount necessary to pay the loan off (Principal and interest) at the Maturity Date in substantially equal payments. This monthly payment amount is calculated on the assumption that the current rate will remain in effect for the remaining term.
    (iii)   15 Year Amortized Payment: the amount necessary to pay the loan off (Principal and interest) within a fifteen (15) year term from the first payment due date in substantially equal payments. This monthly payment amount is calculated on the assumption that the current rate will remain in effect for the remaining term.

**EXHIBIT 13, PAGE 95**




LOAN #: 125015321

These Payment Options are only applicable if they are greater than the Minimum Payment.

**4. NOTICE OF CHANGES**

The Note Holder will deliver or mail to me a notice of any changes in the amount of my monthly payment before the effective date of any change. The notice will include information required by law to be given to me and also the title and telephone number of a person who will answer any question I may have regarding the notice.

**5. BORROWER'S RIGHT TO PREPAY**

I have the right to make payments of Principal at any time before they are due. A payment of Principal only is known as a "Prepayment." When I make a Prepayment, I will tell the Note Holder in writing that I am doing so. I may not designate a payment as a Prepayment if I have not made all the monthly payments due under this Note.

I may make a full Prepayment or partial Prepayments without paying any Prepayment charge. The Note Holder will use my Prepayments to reduce the amount of Principal that I owe under this Note. If I make a partial Prepayment, there will be no changes in the due dates of my monthly payments. My partial Prepayment may reduce the amount of my monthly payments after the first Payment Change Date following my partial Prepayment. However, any reduction due to my partial Prepayment may be offset by an interest rate increase.

**6. LOAN CHARGES**

If a law, which applies to this loan and which sets maximum loan charges, is finally interpreted so that the interest or other loan charges collected or to be collected in connection with this loan exceed the permitted limits, then: (a) any such loan charge shall be reduced by the amount necessary to reduce the charge to the permitted limit; and (b) any sums already collected from me that exceeded permitted limits will be refunded to me. The Note Holder may choose to make this refund by reducing the Principal I owe under this Note or by making a direct payment to me. If a refund reduces Principal, the reduction will be treated as a partial Prepayment.

**7. BORROWER'S FAILURE TO PAY AS REQUIRED**

(A) Late Charges for Overdue Payments

If the Note Holder has not received the full amount of any Minimum Payment by the end of fifteen (15) calendar days after the date it is due, I will pay a late charge to the Note Holder. The amount of the charge will be        5.000 % of the Minimum Payment. I will pay this late charge promptly but only once on each late payment.

(B) Default

If I do not pay the full amount of each Minimum Payment on the date it is due, I will be in default.

(C) Notice of Default

If I am in default, the Note Holder may send me a written notice telling me that if I do not pay the Minimum Payment by a certain date, the Note Holder may require me to pay immediately the full amount of Principal that has not been paid and all the interest that I owe. The date must be at least 30 days after the date on which the notice is mailed to me or delivered by other means.

(D) No Waiver By Note Holder

Even if, at a time when I am in default, the Note Holder does not require me to pay immediately in full as described above, the Note Holder will still have the right to do so if I am in default at a later time.

(E) Payment of Note Holder's Costs and Expenses

If the Note Holder has required me to pay immediately in full as described above, the Note Holder will have the right to be paid back by me for all of its costs and expenses in enforcing this Note to the extent not prohibited by applicable law. These expenses include, for example, reasonable attorneys' fees.

**8. GIVING OF NOTICES**

Unless applicable law requires a different method, any notice that must be given to me under this Note will be given by delivering it or by mailing it by first class mail to me at the Property Address above or at a different address if I give the Note Holder a notice of my different address.

Unless the Note Holder requires a different method, any notice that must be given to the Note Holder under this Note will be given by delivering it or by mailing it by first class mail to the Note Holder at the address stated in Section 3(A) above or at a different address if I am given a notice of that different address.

**9. OBLIGATIONS OF PERSONS UNDER THIS NOTE**

If more than one person signs this Note, each person is fully and personally obligated to keep all the promises made in this Note, including the promise to pay the full amount owed. Any person who is a guarantor, surety or endorser of this Note is also obligated to do these things. Any person who takes over these obligations, including the obligations of a guarantor, surety or endorser of this Note, is also obligated to keep all the promises made in this Note. The Note Holder may enforce its rights under this Note against each person individually or against all of us together. This means that any one of us may be required to pay all the amounts owed under this Note.

**10. WAIVERS**

I and any other person who has obligations under this Note waive the rights of Presentment and Notice of Dishonor. "Presentment" means the right to require the Note Holder to demand payment of amounts due. "Notice of Dishonor" means the right to require the Note Holder to give notice to other persons that amounts due have not been paid.

**EXHIBIT 13, PAGE 96**

LOAN #: 125015321

**11. SECURED NOTE**

In addition to the protections given to the Note Holder under this Note, a Mortgage, Deed of Trust, or Security Deed (the "Security Instrument"), dated the same date as this Note, protects the Note Holder from possible losses that might result if I do not keep the promises that I make in this Note. That Security Instrument describes how and under what conditions I may be required to make immediate payment in full of all amounts I owe under this Note. Some of these conditions are described as follows:

Transfer of the Property or a Beneficial Interest in Borrower. As used in this Section. 18, "Interest in the Property" means any legal or beneficial interest in the Property, including, but not limited to, those beneficial interests transferred in a bond for deed, contract for deed, installment sales contract or escrow agreement, the intent of which is the transfer of title by Borrower at a future date to a purchaser.

If all or any part of the Property or any Interest in the Property is sold or transferred (or if Borrower is not a natural person and a beneficial interest in Borrower is sold or transferred) without Lender's prior written consent, Lender may require immediate payment in full of all sums secured by this Security Instrument. However, this option shall not be exercised by Lender if such exercise is prohibited by Applicable Law. Lender also shall not exercise this option if: (a) Borrower causes to be submitted to Lender information required by Lender to evaluate the intended transferee as if a new loan were being made to the transferee; and (b) Lender reasonably determines that Lender's security will not be impaired by the loan assumption and that the risk of a breach of any covenant or agreement in this Security Instrument is acceptable to Lender.

To the extent permitted by Applicable Law, Lender may charge a reasonable fee as a condition to Lender's consent to the loan assumption. Lender may also require the transferee to sign an assumption agreement that is acceptable to Lender and that obligates the transferee to keep all the promises and agreements made in the Note and in this Security Instrument. Borrower will continue to be obligated under the Note and this Security Instrument unless Lender releases Borrower in writing.

If Lender exercises the option to require immediate payment in full, Lender shall give Borrower notice of acceleration. The notice shall provide a period of not less than 30 days from the date the notice is given in accordance with Section 15 within which Borrower must pay all sums secured by this Security Instrument. If Borrower fails to pay these sums prior to the expiration of this period, Lender may invoke any remedies permitted by this Security Instrument without further notice or demand on Borrower.

WITNESS THE HAND(S) AND SEAL(S) OF THE UNDERSIGNED.

_____  7/28/2011
MERRY D. WELLS                          - Borrower

_____
                                        - Borrower

_____
                                        - Borrower

_____
                                        - Borrower

\* PayOption ARM Note - MTA Index
2E306-XX (08/08)                    Page 4 of 4

**EXHIBIT 13, PAGE 97**

# EXHIBIT #2

Recording Requested By:
M. CALDERON

Recorded in Official Records, Orange County
Tom Daly, Clerk-Recorder

|||||||||||||||||||||||||||||||||||   75.00

**2006000067191** 04:06pm 01/30/06
105 42 D11 24
6.00 0.00 0.00 0.00 69.00 0.00 0.00 0.00

After Recording Return To:
COUNTRYWIDE HOME LOANS, INC.

MS SV-79 DOCUMENT PROCESSING
P.O.Box 10423
Van Nuys, CA 91410-0423
Prepared By:
ADALYS THAN

49052130 DT

**FIDELITY NATIONAL TITLE**

[Space Above This Line For Recording Data]

5160102
[Escrow/Closing #]

00012501532101006
[Doc ID #]

## DEED OF TRUST

MIN 1000157-0006317844-2

### DEFINITIONS

Words used in multiple sections of this document are defined below and other words are defined in Sections 3, 11, 13, 18, 20 and 21. Certain rules regarding the usage of words used in this document are also provided in Section 16.

(A) "Security Instrument" means this document, which is dated JANUARY 25, 2006 , together with all Riders to this document.

(B) "Borrower" is          RONALD RAY CATT

MERRY B WELLS, AN UNMARRIED WOMAN, AND RON CATT, AN UNMARRIED MAN EACH AS
TO AN UNDIVIDED 50% INTEREST, AS          TENANTS IN COMMON



CALIFORNIA-Single Family-Fannie Mae/Freddie Mac UNIFORM INSTRUMENT WITH MERS

   -6A(CA) (0207)     CHL (08/05)(d)     VMP Mortgage Solutions, Inc. (800)521-7291
CONV/VA

Page 1 of 16

Form 3005 1/01

* 2 3 9 9 1 *

* 1 2 5 0 1 5 3 2 1 0 0 0 0 0 1 0 0 8 A *

**EXHIBIT 13, PAGE 99**

Borrower's address is

5369 GRANDVIEW AVENUE, YORBA LINDA, CA 92886          DOC ID #: 00012501532101006

Borrower is the trustor under this Security Instrument.

(C) "Lender" is
AMERICA'S WHOLESALE LENDER
Lender is a CORPORATION
organized and existing under the laws of NEW YORK
Lender's address is
4500 Park Granada MSN# SVB-314, Calabasas, CA 91302-1613

(D) "Trustee" is
CTC REAL ESTATE SERVICES
155 NORTH LAKE AVE., PASADENA, CA 91109 , ,

(E) "MERS" is Mortgage Electronic Registration Systems, Inc. MERS is a separate corporation that is acting solely as a nominee for Lender and Lender's successors and assigns. MERS is the beneficiary under this Security Instrument. MERS is organized and existing under the laws of Delaware, and has an address and telephone number of P.O. Box 2026, Flint, MI 48501-2026, tel. (888) 679-MERS.

(F) "Note" means the promissory note signed by Borrower and dated JANUARY 25, 2006 . The Note states that Borrower owes Lender
NINE HUNDRED NINETY FOUR THOUSAND FIVE HUNDRED and 00/100

Dollars (U.S. $ 994,500.00       ) plus interest. Borrower has promised to pay this debt in regular Periodic Payments and to pay the debt in full not later than FEBRUARY 01, 2036 .

(G) "Property" means the property that is described below under the heading "Transfer of Rights in the Property."

(H) "Loan" means the debt evidenced by the Note, plus interest, any prepayment charges and late charges due under the Note, and all sums due under this Security Instrument, plus interest.

(I) "Riders" means all Riders to this Security Instrument that are executed by Borrower. The following Riders are to be executed by Borrower [check box as applicable]:

| [X] Adjustable Rate Rider | [ ] Condominium Rider | [ ] Second Home Rider |
| [ ] Balloon Rider | [ ] Planned Unit Development Rider | [ ] 1-4 Family Rider |
| [ ] VA Rider | [ ] Biweekly Payment Rider | [ ] Other(s) [specify] |

(J) "Applicable Law" means all controlling applicable federal, state and local statutes, regulations, ordinances and administrative rules and orders (that have the effect of law) as well as all applicable final, non-appealable judicial opinions.

(K) "Community Association Dues, Fees, and Assessments" means all dues, fees, assessments and other charges that are imposed on Borrower or the Property by a condominium association, homeowners association or similar organization.

(L) "Electronic Funds Transfer" means any transfer of funds, other than a transaction originated by check, draft, or similar paper instrument, which is initiated through an electronic terminal, telephonic instrument, computer, or magnetic tape so as to order, instruct, or authorize a financial institution to debit or credit an account. Such term includes, but is not limited to, point-of-sale transfers, automated teller machine transactions, transfers initiated by telephone, wire transfers, and automated clearinghouse transfers.

(M) "Escrow Items" means those items that are described in Section 3.

(N) "Miscellaneous Proceeds" means any compensation, settlement, award of damages, or proceeds paid by any third party (other than insurance proceeds paid under the coverages described in Section 5) for: (i) damage to, or destruction of, the Property; (ii) condemnation or other taking of all or any part of the Property; (iii)

-6A(CA) (0207)          CHL (08/05)          Page 2 of 16          Form 3005  1/01

EXHIBIT 13, PAGE 100

DOC ID #: 00012501532101006

conveyance in lieu of condemnation; or (iv) misrepresentations of, or omissions as to, the value and/or condition of the Property.

(O) "Mortgage Insurance" means insurance protecting Lender against the nonpayment of, or default on, the Loan.

(P) "Periodic Payment" means the regularly scheduled amount due for (i) principal and interest under the Note, plus (ii) any amounts under Section 3 of this Security Instrument.

(Q) "RESPA" means the Real Estate Settlement Procedures Act (12 U.S.C. Section 2601 et seq.) and its implementing regulation, Regulation X (24 C.F.R. Part 3500), as they might be amended from time to time, or any additional or successor legislation or regulation that governs the same subject matter. As used in this Security Instrument, "RESPA" refers to all requirements and restrictions that are imposed in regard to a "federally related mortgage loan" even if the Loan does not qualify as a "federally related mortgage loan" under RESPA.

(R) "Successor in Interest of Borrower" means any party that has taken title to the Property, whether or not that party has assumed Borrower's obligations under the Note and/or this Security Instrument.

TRANSFER OF RIGHTS IN THE PROPERTY
The beneficiary of this Security Instrument is MERS (solely as nominee for Lender and Lender's successors and assigns) and the successors and assigns of MERS. This Security Instrument secures to Lender: (i) the repayment of the Loan, and all renewals, extensions and modifications of the Note; and (ii) the performance of Borrower's covenants and agreements under this Security Instrument and the Note. For this purpose, Borrower irrevocably grants and conveys to Trustee, in trust, with power of sale, the following described property located in the COUNTY of ORANGE
[Type of Recording Jurisdiction]                                    [Name of Recording Jurisdiction]
SEE EXHIBIT "A" ATTACHED HERETO AND MADE A PART HEREOF.

Parcel ID Number: 34814105

5369 GRANDVIEW AVENUE, YORBA LINDA                which currently has the address of
[Street/City]

California    92886    ("Property Address"):
[Zip Code]

TOGETHER WITH all the improvements now or hereafter erected on the property, and all easements, appurtenances, and fixtures now or hereafter a part of the property. All replacements and additions shall also be covered by this Security Instrument. All of the foregoing is referred to in this Security Instrument as the "Property." Borrower understands and agrees that MERS holds only legal title to the interests granted by Borrower in this Security Instrument, but, if necessary to comply with law or custom, MERS (as nominee for Lender and Lender's successors and assigns) has the right: to exercise any or all of those interests, including,

-6A(CA) (0207)        CHL (08/05)            Page 3 of 16                    Form 3005 1/01

**EXHIBIT 13, PAGE 101**

DOC ID #: 0001250153210100 6

but not limited to, the right to foreclose and sell the Property; and to take any action required of Lender including, but not limited to, releasing and canceling this Security Instrument.

BORROWER COVENANTS that Borrower is lawfully seised of the estate hereby conveyed and has the right to grant and convey the Property and that the Property is unencumbered, except for encumbrances of record. Borrower warrants and will defend generally the title to the Property against all claims and demands, subject to any encumbrances of record.

THIS SECURITY INSTRUMENT combines uniform covenants for national use and non-uniform covenants with limited variations by jurisdiction to constitute a uniform security instrument covering real property.

UNIFORM COVENANTS. Borrower and Lender covenant and agree as follows:

**1. Payment of Principal, Interest, Escrow Items, Prepayment Charges, and Late Charges.** Borrower shall pay when due the principal of, and interest on, the debt evidenced by the Note and any prepayment charges and late charges due under the Note. Borrower shall also pay funds for Escrow Items pursuant to Section 3. Payments due under the Note and this Security Instrument shall be made in U.S. currency. However, if any check or other instrument received by Lender as payment under the Note or this Security Instrument is returned to Lender unpaid, Lender may require that any or all subsequent payments due under the Note and this Security Instrument be made in one or more of the following forms, as selected by Lender: (a) cash; (b) money order; (c) certified check, bank check, treasurer's check or cashier's check, provided any such check is drawn upon an institution whose deposits are insured by a federal agency, instrumentality, or entity; or (d) Electronic Funds Transfer.

Payments are deemed received by Lender when received at the location designated in the Note or at such other location as may be designated by Lender in accordance with the notice provisions in Section 15. Lender may return any payment or partial payment if the payment or partial payments are insufficient to bring the Loan current. Lender may accept any payment or partial payment insufficient to bring the Loan current, without waiver of any rights hereunder or prejudice to its rights to refuse such payment or partial payments in the future, but Lender is not obligated to apply such payments at the time such payments are accepted. If each Periodic Payment is applied as of its scheduled due date, then Lender need not pay interest on unapplied funds. Lender may hold such unapplied funds until Borrower makes payment to bring the Loan current. If Borrower does not do so within a reasonable period of time, Lender shall either apply such funds or return them to Borrower. If not applied earlier, such funds will be applied to the outstanding principal balance under the Note immediately prior to foreclosure. No offset or claim which Borrower might have now or in the future against Lender shall relieve Borrower from making payments due under the Note and this Security Instrument or performing the covenants and agreements secured by this Security Instrument.

**2. Application of Payments or Proceeds.** Except as otherwise described in this Section 2, all payments accepted and applied by Lender shall be applied in the following order of priority: (a) interest due under the Note; (b) principal due under the Note; (c) amounts due under Section 3. Such payments shall be applied to each Periodic Payment in the order in which it became due. Any remaining amounts shall be applied first to late charges, second to any other amounts due under this Security Instrument, and then to reduce the principal balance of the Note.

If Lender receives a payment from Borrower for a delinquent Periodic Payment which includes a sufficient amount to pay any late charge due, the payment may be applied to the delinquent payment and the late charge. If more than one Periodic Payment is outstanding, Lender may apply any payment received from Borrower to the repayment of the Periodic Payments if, and to the extent that, each payment can be paid in full. To the extent that any excess exists after the payment is applied to the full payment of one or more Periodic Payments, such excess may be applied to any late charges due. Voluntary prepayments shall be applied first to any prepayment charges and then as described in the Note.

Any application of payments, insurance proceeds, or Miscellaneous Proceeds to principal due under the Note shall not extend or postpone the due date, or change the amount, of the Periodic Payments.

-6A(CA) (0207)        CHL (08/05)          Page 4 of 16                    Form 3005  1/01

**EXHIBIT 13, PAGE 102**

DOC ID #: 0001250153210100G

**3. Funds for Escrow Items.** Borrower shall pay to Lender on the day Periodic Payments are due under the Note, until the Note is paid in full, a sum (the "Funds") to provide for payment of amounts due for: (a) taxes and assessments and other items which can attain priority over this Security Instrument as a lien or encumbrance on the Property; (b) leasehold payments or ground rents on the Property, if any; (c) premiums for any and all insurance required by Lender under Section 5; and (d) Mortgage Insurance premiums, if any, or any sums payable by Borrower to Lender in lieu of the payment of Mortgage Insurance premiums in accordance with the provisions of Section 10. These items are called "Escrow Items." At origination or at any time during the term of the Loan, Lender may require that Community Association Dues, Fees, and Assessments, if any, be escrowed by Borrower, and such dues, fees and assessments shall be an Escrow Item. Borrower shall promptly furnish to Lender all notices of amounts to be paid under this Section. Borrower shall pay Lender the Funds for Escrow Items unless Lender waives Borrower's obligation to pay the Funds for any or all Escrow Items. Lender may waive Borrower's obligation to pay to Lender Funds for any or all Escrow Items at any time. Any such waiver may only be in writing. In the event of such waiver, Borrower shall pay directly, when and where payable, the amounts due for any Escrow Items for which payment of Funds has been waived by Lender and, if Lender requires, shall furnish to Lender receipts evidencing such payment within such time period as Lender may require. Borrower's obligation to make such payments and to provide receipts shall for all purposes be deemed to be a covenant and agreement contained in this Security Instrument, as the phrase "covenant and agreement" is used in Section 9. If Borrower is obligated to pay Escrow Items directly, pursuant to a waiver, and Borrower fails to pay the amount due for an Escrow Item, Lender may exercise its rights under Section 9 and pay such amount and Borrower shall then be obligated under Section 9 to repay to Lender any such amount. Lender may revoke the waiver as to any or all Escrow Items at any time by a notice given in accordance with Section 15 and, upon such revocation, Borrower shall pay to Lender all Funds, and in such amounts, that are then required under this Section 3.

Lender may, at any time, collect and hold Funds in an amount (a) sufficient to permit Lender to apply the Funds at the time specified under RESPA, and (b) not to exceed the maximum amount a lender can require under RESPA. Lender shall estimate the amount of Funds due on the basis of current data and reasonable estimates of expenditures of future Escrow Items or otherwise in accordance with Applicable Law.

The Funds shall be held in an institution whose deposits are insured by a federal agency, instrumentality, or entity (including Lender, if Lender is an institution whose deposits are so insured) or in any Federal Home Loan Bank. Lender shall apply the Funds to pay the Escrow Items no later than the time specified under RESPA. Lender shall not charge Borrower for holding and applying the Funds, annually analyzing the escrow account, or verifying the Escrow Items, unless Lender pays Borrower interest on the Funds and Applicable Law permits Lender to make such a charge. Unless an agreement is made in writing or Applicable Law requires interest to be paid on the Funds, Lender shall not be required to pay Borrower any interest or earnings on the Funds. Borrower and Lender can agree in writing, however, that interest shall be paid on the Funds. Lender shall give to Borrower, without charge, an annual accounting of the Funds as required by RESPA.

If there is a surplus of Funds held in escrow, as defined under RESPA, Lender shall account to Borrower for the excess funds in accordance with RESPA. If there is a shortage of Funds held in escrow, as defined under RESPA, Lender shall notify Borrower as required by RESPA, and Borrower shall pay to Lender the amount necessary to make up the shortage in accordance with RESPA, but in no more than 12 monthly payments. If there is a deficiency of Funds held in escrow, as defined under RESPA, Lender shall notify Borrower as required by RESPA, and Borrower shall pay to Lender the amount necessary to make up the deficiency in accordance with RESPA, but in no more than 12 monthly payments.

Upon payment in full of all sums secured by this Security Instrument, Lender shall promptly refund to Borrower any Funds held by Lender.

EXHIBIT 13, PAGE 103

DOC ID #: 0001250153210100G

**4. Charges; Liens.** Borrower shall pay all taxes, assessments, charges, fines, and impositions attributable to the Property which can attain priority over this Security Instrument, leasehold payments or ground rents on the Property, if any, and Community Association Dues, Fees, and Assessments, if any. To the extent that these items are Escrow Items, Borrower shall pay them in the manner provided in Section 3.

Borrower shall promptly discharge any lien which has priority over this Security Instrument unless Borrower: (a) agrees in writing to the payment of the obligation secured by the lien in a manner acceptable to Lender, but only so long as Borrower is performing such agreement; (b) contests the lien in good faith by, or defends against enforcement of the lien in, legal proceedings which in Lender's opinion operate to prevent the enforcement of the lien while those proceedings are pending, but only until such proceedings are concluded; or (c) secures from the holder of the lien an agreement satisfactory to Lender subordinating the lien to this Security Instrument. If Lender determines that any part of the Property is subject to a lien which can attain priority over this Security Instrument, Lender may give Borrower a notice identifying the lien. Within 10 days of the date on which that notice is given, Borrower shall satisfy the lien or take one or more of the actions set forth above in this Section 4.

Lender may require Borrower to pay a one-time charge for a real estate tax verification and/or reporting service used by Lender in connection with this Loan.

**5. Property Insurance.** Borrower shall keep the improvements now existing or hereafter erected on the Property insured against loss by fire, hazards included within the term "extended coverage," and any other hazards including, but not limited to, earthquakes and floods, for which Lender requires insurance. This insurance shall be maintained in the amounts (including deductible levels) and for the periods that Lender requires. What Lender requires pursuant to the preceding sentences can change during the term of the Loan. The insurance carrier providing the insurance shall be chosen by Borrower subject to Lender's right to disapprove Borrower's choice, which right shall not be exercised unreasonably. Lender may require Borrower to pay, in connection with this Loan, either: (a) a one-time charge for flood zone determination, certification and tracking services; or (b) a one-time charge for flood zone determination and certification services and subsequent charges each time remappings or similar changes occur which reasonably might affect such determination or certification. Borrower shall also be responsible for the payment of any fees imposed by the Federal Emergency Management Agency in connection with the review of any flood zone determination resulting from an objection by Borrower.

If Borrower fails to maintain any of the coverages described above, Lender may obtain insurance coverage, at Lender's option and Borrower's expense. Lender is under no obligation to purchase any particular type or amount of coverage. Therefore, such coverage shall cover Lender, but might or might not protect Borrower, Borrower's equity in the Property, or the contents of the Property, against any risk, hazard or liability and might provide greater or lesser coverage than was previously in effect. Borrower acknowledges that the cost of the insurance coverage so obtained might significantly exceed the cost of insurance that Borrower could have obtained. Any amounts disbursed by Lender under this Section 5 shall become additional debt of Borrower secured by this Security Instrument. These amounts shall bear interest at the Note rate from the date of disbursement and shall be payable, with such interest, upon notice from Lender to Borrower requesting payment.

All insurance policies required by Lender and renewals of such policies shall be subject to Lender's right to disapprove such policies, shall include a standard mortgage clause, and shall name Lender as mortgagee and/or as an additional loss payee and Borrower further agrees to generally assign rights to insurance proceeds to the holder of the Note up to the amount of the outstanding loan balance. Lender shall have the right to hold the policies and renewal certificates. If Lender requires, Borrower shall promptly give to Lender all receipts of

EXHIBIT 13, PAGE 104

DOC ID #: 0001250153210 1006

paid premiums and renewal notices. If Borrower obtains any form of insurance coverage, not otherwise required by Lender, for damage to, or destruction of, the Property, such policy shall include a standard mortgage clause and shall name Lender as mortgagee and/or as an additional loss payee and Borrower further agrees to generally assign rights to insurance proceeds to the holder of the Note up to the amount of the outstanding loan balance.

In the event of loss, Borrower shall give prompt notice to the insurance carrier and Lender. Lender may make proof of loss if not made promptly by Borrower. Unless Lender and Borrower otherwise agree in writing, any insurance proceeds, whether or not the underlying insurance was required by Lender, shall be applied to restoration or repair of the Property, if the restoration or repair is economically feasible and Lender's security is not lessened. During such repair and restoration period, Lender shall have the right to hold such insurance proceeds until Lender has had an opportunity to inspect such Property to ensure the work has been completed to Lender's satisfaction, provided that such inspection shall be undertaken promptly. Lender may disburse proceeds for the repairs and restoration in a single payment or in a series of progress payments as the work is completed. Unless an agreement is made in writing or Applicable Law requires interest to be paid on such insurance proceeds, Lender shall not be required to pay Borrower any interest or earnings on such proceeds. Fees for public adjusters, or other third parties, retained by Borrower shall not be paid out of the insurance proceeds and shall be the sole obligation of Borrower. If the restoration or repair is not economically feasible or Lender's security would be lessened, the insurance proceeds shall be applied to the sums secured by this Security Instrument, whether or not then due, with the excess, if any, paid to Borrower. Such insurance proceeds shall be applied in the order provided for in Section 2.

If Borrower abandons the Property, Lender may file, negotiate and settle any available insurance claim and related matters. If Borrower does not respond within 30 days to a notice from Lender that the insurance carrier has offered to settle a claim, then Lender may negotiate and settle the claim. The 30-day period will begin when the notice is given. In either event, or if Lender acquires the Property under Section 22 or otherwise, Borrower hereby assigns to Lender (a) Borrower's rights to any insurance proceeds in an amount not to exceed the amounts unpaid under the Note or this Security Instrument, and (b) any other of Borrower's rights (other than the right to any refund of unearned premiums paid by Borrower) under all insurance policies covering the Property, insofar as such rights are applicable to the coverage of the Property. Lender may use the insurance proceeds either to repair or restore the Property or to pay amounts unpaid under the Note or this Security Instrument, whether or not then due.

6. Occupancy. Borrower shall occupy, establish, and use the Property as Borrower's principal residence within 60 days after the execution of this Security Instrument and shall continue to occupy the Property as Borrower's principal residence for at least one year after the date of occupancy, unless Lender otherwise agrees in writing, which consent shall not be unreasonably withheld, or unless extenuating circumstances exist which are beyond Borrower's control.

7. Preservation, Maintenance and Protection of the Property; Inspections. Borrower shall not destroy, damage or impair the Property, allow the Property to deteriorate or commit waste on the Property. Whether or not Borrower is residing in the Property, Borrower shall maintain the Property in order to prevent the Property from deteriorating or decreasing in value due to its condition. Unless it is determined pursuant to Section 5 that repair or restoration is not economically feasible, Borrower shall promptly repair the Property if damaged to avoid further deterioration or damage. If insurance or condemnation proceeds are paid in connection with damage to, or the taking of, the Property, Borrower shall be responsible for repairing or restoring the Property only if Lender has released proceeds for such purposes. Lender may disburse proceeds for the repairs and restoration in a single payment or in a series of progress payments as the work is completed. If the insurance or condemnation proceeds are not sufficient to repair or restore the Property, Borrower is not relieved of Borrower's obligation for the completion of such repair or restoration.

EXHIBIT 13, PAGE 105

DOC ID #: 00012501532101006

Lender or its agent may make reasonable entries upon and inspections of the Property. If it has reasonable cause, Lender may inspect the interior of the improvements on the Property. Lender shall give Borrower notice at the time of or prior to such an interior inspection specifying such reasonable cause.

**8. Borrower's Loan Application.** Borrower shall be in default if, during the Loan application process, Borrower or any persons or entities acting at the direction of Borrower or with Borrower's knowledge or consent gave materially false, misleading, or inaccurate information or statements to Lender (or failed to provide Lender with material information) in connection with the Loan. Material representations include, but are not limited to, representations concerning Borrower's occupancy of the Property as Borrower's principal residence.

**9. Protection of Lender's Interest in the Property and Rights Under this Security Instrument.** If (a) Borrower fails to perform the covenants and agreements contained in this Security Instrument, (b) there is a legal proceeding that might significantly affect Lender's interest in the Property and/or rights under this Security Instrument (such as a proceeding in bankruptcy, probate, for condemnation or forfeiture, for enforcement of a lien which may attain priority over this Security Instrument or to enforce laws or regulations), or (c) Borrower has abandoned the Property, then Lender may do and pay for whatever is reasonable or appropriate to protect Lender's interest in the Property and rights under this Security Instrument, including protecting and/or assessing the value of the Property, and securing and/or repairing the Property. Lender's actions can include, but are not limited to: (a) paying any sums secured by a lien which has priority over this Security Instrument; (b) appearing in court; and (c) paying reasonable attorneys' fees to protect its interest in the Property and/or rights under this Security Instrument, including its secured position in a bankruptcy proceeding. Securing the Property includes, but is not limited to, entering the Property to make repairs, change locks, replace or board up doors and windows, drain water from pipes, eliminate building or other code violations or dangerous conditions, and have utilities turned on or off. Although Lender may take action under this Section 9, Lender does not have to do so and is not under any duty or obligation to do so. It is agreed that Lender incurs no liability for not taking any or all actions authorized under this Section 9.

Any amounts disbursed by Lender under this Section 9 shall become additional debt of Borrower secured by this Security Instrument. These amounts shall bear interest at the Note rate from the date of disbursement and shall be payable, with such interest, upon notice from Lender to Borrower requesting payment.

If this Security Instrument is on a leasehold, Borrower shall comply with all the provisions of the lease. If Borrower acquires fee title to the Property, the leasehold and the fee title shall not merge unless Lender agrees to the merger in writing.

**10. Mortgage Insurance.** If Lender required Mortgage Insurance as a condition of making the Loan, Borrower shall pay the premiums required to maintain the Mortgage Insurance in effect. If, for any reason, the Mortgage Insurance coverage required by Lender ceases to be available from the mortgage insurer that previously provided such insurance and Borrower was required to make separately designated payments toward the premiums for Mortgage Insurance, Borrower shall pay the premiums required to obtain coverage substantially equivalent to the Mortgage Insurance previously in effect, at a cost substantially equivalent to the cost to Borrower of the Mortgage Insurance previously in effect, from an alternate mortgage insurer selected by Lender. If substantially equivalent Mortgage Insurance coverage is not available, Borrower shall continue to pay to Lender the amount of the separately designated payments that were due when the insurance coverage ceased to be in effect. Lender will accept, use and retain these payments as a non-refundable loss reserve in lieu of Mortgage Insurance. Such loss reserve shall be non-refundable, notwithstanding the fact that the Loan is ultimately paid in full, and Lender shall not be required to pay Borrower any interest or earnings on such loss reserve. Lender can no longer require loss reserve payments if Mortgage Insurance coverage (in the amount and for the period that Lender requires) provided by an insurer selected by Lender again becomes available, is obtained, and Lender requires separately designated payments toward the premiums for Mortgage Insurance. If Lender required Mortgage Insurance as a condition of making the Loan and Borrower was required to make separately designated payments toward the premiums for Mortgage Insurance, Borrower

-6A(CA) (0207)        CHL (08/05)            Page 8 of 16                              Form 3005 1/01

**EXHIBIT 13, PAGE 106**

DOC ID #: 00012501532101006

shall pay the premiums required to maintain Mortgage Insurance in effect, or to provide a non-refundable loss reserve, until Lender's requirement for Mortgage Insurance ends in accordance with any written agreement between Borrower and Lender providing for such termination or until termination is required by Applicable Law. Nothing in this Section 10 affects Borrower's obligation to pay interest at the rate provided in the Note.

Mortgage Insurance reimburses Lender (or any entity that purchases the Note) for certain losses it may incur if Borrower does not repay the Loan as agreed. Borrower is not a party to the Mortgage Insurance.

Mortgage insurers evaluate their total risk on all such insurance in force from time to time, and may enter into agreements with other parties that share or modify their risk, or reduce losses. These agreements are on terms and conditions that are satisfactory to the mortgage insurer and the other party (or parties) to these agreements. These agreements may require the mortgage insurer to make payments using any source of funds that the mortgage insurer may have available (which may include funds obtained from Mortgage Insurance premiums).

As a result of these agreements, Lender, any purchaser of the Note, another insurer, any reinsurer, any other entity, or any affiliate of any of the foregoing, may receive (directly or indirectly) amounts that derive from (or might be characterized as) a portion of Borrower's payments for Mortgage Insurance, in exchange for sharing or modifying the mortgage insurer's risk, or reducing losses. If such agreement provides that an affiliate of Lender takes a share of the insurer's risk in exchange for a share of the premiums paid to the insurer, the arrangement is often termed "captive reinsurance." Further:

(a) Any such agreements will not affect the amounts that Borrower has agreed to pay for Mortgage Insurance, or any other terms of the Loan. Such agreements will not increase the amount Borrower will owe for Mortgage Insurance, and they will not entitle Borrower to any refund.

(b) Any such agreements will not affect the rights Borrower has - if any - with respect to the Mortgage Insurance under the Homeowners Protection Act of 1998 or any other law. These rights may include the right to receive certain disclosures, to request and obtain cancellation of the Mortgage Insurance, to have the Mortgage Insurance terminated automatically, and/or to receive a refund of any Mortgage Insurance premiums that were unearned at the time of such cancellation or termination.

11. Assignment of Miscellaneous Proceeds; Forfeiture. All Miscellaneous Proceeds are hereby assigned to and shall be paid to Lender.

If the Property is damaged, such Miscellaneous Proceeds shall be applied to restoration or repair of the Property, if the restoration or repair is economically feasible and Lender's security is not lessened. During such repair and restoration period, Lender shall have the right to hold such Miscellaneous Proceeds until Lender has had an opportunity to inspect such Property to ensure the work has been completed to Lender's satisfaction, provided that such inspection shall be undertaken promptly. Lender may pay for the repairs and restoration in a single disbursement or in a series of progress payments as the work is completed. Unless an agreement is made in writing or Applicable Law requires interest to be paid on such Miscellaneous Proceeds, Lender shall not be required to pay Borrower any interest or earnings on such Miscellaneous Proceeds. If the restoration or repair is not economically feasible or Lender's security would be lessened, the Miscellaneous Proceeds shall be applied to the sums secured by this Security Instrument, whether or not then due, with the excess, if any, paid to Borrower. Such Miscellaneous Proceeds shall be applied in the order provided for in Section 2.

In the event of a total taking, destruction, or loss in value of the Property, the Miscellaneous Proceeds shall be applied to the sums secured by this Security Instrument, whether or not then due, with the excess, if any, paid to Borrower.

In the event of a partial taking, destruction, or loss in value of the Property in which the fair market value of the Property immediately before the partial taking, destruction, or loss in value is equal to or greater than the amount of the sums secured by this Security Instrument immediately before the partial taking, destruction, or loss in value, unless Borrower and Lender otherwise agree in writing, the sums secured by this Security

EXHIBIT 13, PAGE 107

DOC ID #: 00012501532101006

Instrument shall be reduced by the amount of the Miscellaneous Proceeds multiplied by the following fraction: (a) the total amount of the sums secured immediately before the partial taking, destruction, or loss in value divided by (b) the fair market value of the Property immediately before the partial taking, destruction, or loss in value. Any balance shall be paid to Borrower.

In the event of a partial taking, destruction, or loss in value of the Property in which the fair market value of the Property immediately before the partial taking, destruction, or loss in value is less than the amount of the sums secured immediately before the partial taking, destruction, or loss in value, unless Borrower and Lender otherwise agree in writing, the Miscellaneous Proceeds shall be applied to the sums secured by this Security Instrument whether or not the sums are then due.

If the Property is abandoned by Borrower, or if, after notice by Lender to Borrower that the Opposing Party (as defined in the next sentence) offers to make an award to settle a claim for damages, Borrower fails to respond to Lender within 30 days after the date the notice is given, Lender is authorized to collect and apply the Miscellaneous Proceeds either to restoration or repair of the Property or to the sums secured by this Security Instrument, whether or not then due. "Opposing Party" means the third party that owes Borrower Miscellaneous Proceeds or the party against whom Borrower has a right of action in regard to Miscellaneous Proceeds.

Borrower shall be in default if any action or proceeding, whether civil or criminal, is begun that, in Lender's judgment, could result in forfeiture of the Property or other material impairment of Lender's interest in the Property or rights under this Security Instrument. Borrower can cure such a default and, if acceleration has occurred, reinstate as provided in Section 19, by causing the action or proceeding to be dismissed with a ruling that, in Lender's judgment, precludes forfeiture of the Property or other material impairment of Lender's interest in the Property or rights under this Security Instrument. The proceeds of any award or claim for damages that are attributable to the impairment of Lender's interest in the Property are hereby assigned and shall be paid to Lender.

All Miscellaneous Proceeds that are not applied to restoration or repair of the Property shall be applied in the order provided for in Section 2.

**12. Borrower Not Released; Forbearance By Lender Not a Waiver.** Extension of the time for payment or modification of amortization of the sums secured by this Security Instrument granted by Lender to Borrower or any Successor in Interest of Borrower shall not operate to release the liability of Borrower or any Successors in Interest of Borrower. Lender shall not be required to commence proceedings against any Successor in Interest of Borrower or to refuse to extend time for payment or otherwise modify amortization of the sums secured by this Security Instrument by reason of any demand made by the original Borrower or any Successors in Interest of Borrower. Any forbearance by Lender in exercising any right or remedy including, without limitation, Lender's acceptance of payments from third persons, entities or Successors in Interest of Borrower or in amounts less than the amount then due, shall not be a waiver of or preclude the exercise of any right or remedy.

**13. Joint and Several Liability; Co-signers; Successors and Assigns Bound.** Borrower covenants and agrees that Borrower's obligations and liability shall be joint and several. However, any Borrower who co-signs this Security Instrument but does not execute the Note (a "co-signer"): (a) is co-signing this Security Instrument only to mortgage, grant and convey the co-signer's interest in the Property under the terms of this Security Instrument; (b) is not personally obligated to pay the sums secured by this Security Instrument; and (c) agrees that Lender and any other Borrower can agree to extend, modify, forbear or make any accommodations with regard to the terms of this Security Instrument or the Note without the co-signer's consent.

**EXHIBIT 13, PAGE 108**

DOC ID #: 00012501532101006

Subject to the provisions of Section 18, any Successor in Interest of Borrower who assumes Borrower's obligations under this Security Instrument in writing, and is approved by Lender, shall obtain all of Borrower's rights and benefits under this Security Instrument. Borrower shall not be released from Borrower's obligations and liability under this Security Instrument unless Lender agrees to such release in writing. The covenants and agreements of this Security Instrument shall bind (except as provided in Section 20) and benefit the successors and assigns of Lender.

**14. Loan Charges.** Lender may charge Borrower fees for services performed in connection with Borrower's default, for the purpose of protecting Lender's interest in the Property and rights under this Security Instrument, including, but not limited to, attorneys' fees, property inspection and valuation fees. In regard to any other fees, the absence of express authority in this Security Instrument to charge a specific fee to Borrower shall not be construed as a prohibition on the charging of such fee. Lender may not charge fees that are expressly prohibited by this Security Instrument or by Applicable Law.

If the Loan is subject to a law which sets maximum loan charges, and that law is finally interpreted so that the interest or other loan charges collected or to be collected in connection with the Loan exceed the permitted limits, then: (a) any such loan charge shall be reduced by the amount necessary to reduce the charge to the permitted limit; and (b) any sums already collected from Borrower which exceeded permitted limits will be refunded to Borrower. Lender may choose to make this refund by reducing the principal owed under the Note or by making a direct payment to Borrower. If a refund reduces principal, the reduction will be treated as a partial prepayment without any prepayment charge (whether or not a prepayment charge is provided for under the Note). Borrower's acceptance of any such refund made by direct payment to Borrower will constitute a waiver of any right of action Borrower might have arising out of such overcharge.

**15. Notices.** All notices given by Borrower or Lender in connection with this Security Instrument must be in writing. Any notice to Borrower in connection with this Security Instrument shall be deemed to have been given to Borrower when mailed by first class mail or when actually delivered to Borrower's notice address if sent by other means. Notice to any one Borrower shall constitute notice to all Borrowers unless Applicable Law expressly requires otherwise. The notice address shall be the Property Address unless Borrower has designated a substitute notice address by notice to Lender. Borrower shall promptly notify Lender of Borrower's change of address. If Lender specifies a procedure for reporting Borrower's change of address, then Borrower shall only report a change of address through that specified procedure. There may be only one designated notice address under this Security Instrument at any one time. Any notice to Lender shall be given by delivering it or by mailing it by first class mail to Lender's address stated herein unless Lender has designated another address by notice to Borrower. Any notice in connection with this Security Instrument shall not be deemed to have been given to Lender until actually received by Lender. If any notice required by this Security Instrument is also required under Applicable Law, the Applicable Law requirement will satisfy the corresponding requirement under this Security Instrument.

**16. Governing Law; Severability; Rules of Construction.** This Security Instrument shall be governed by federal law and the law of the jurisdiction in which the Property is located. All rights and obligations contained in this Security Instrument are subject to any requirements and limitations of Applicable Law. Applicable Law might explicitly or implicitly allow the parties to agree by contract or it might be silent, but such silence shall not be construed as a prohibition against agreement by contract. In the event that any provision or clause of this Security Instrument or the Note conflicts with Applicable Law, such conflict shall not affect other provisions of this Security Instrument or the Note which can be given effect without the conflicting provision.

As used in this Security Instrument: (a) words of the masculine gender shall mean and include corresponding neuter words or words of the feminine gender; (b) words in the singular shall mean and include the plural and vice versa; and (c) the word "may" gives sole discretion without any obligation to take any action.

**17. Borrower's Copy.** Borrower shall be given one copy of the Note and of this Security Instrument.

-6A(CA) (0207)          CHL (08/05)                    Page 11 of 16                          Form 3005 1/01

**EXHIBIT 13, PAGE 109**

DOC ID #: 00012501532101006

**18. Transfer of the Property or a Beneficial Interest in Borrower.** As used in this Section 18, "Interest in the Property" means any legal or beneficial interest in the Property, including, but not limited to, those beneficial interests transferred in a bond for deed, contract for deed, installment sales contract or escrow agreement, the intent of which is the transfer of title by Borrower at a future date to a purchaser.

If all or any part of the Property or any Interest in the Property is sold or transferred (or if Borrower is not a natural person and a beneficial interest in Borrower is sold or transferred) without Lender's prior written consent, Lender may require immediate payment in full of all sums secured by this Security Instrument. However, this option shall not be exercised by Lender if such exercise is prohibited by Applicable Law.

If Lender exercises this option, Lender shall give Borrower notice of acceleration. The notice shall provide a period of not less than 30 days from the date the notice is given in accordance with Section 15 within which Borrower must pay all sums secured by this Security Instrument. If Borrower fails to pay these sums prior to the expiration of this period, Lender may invoke any remedies permitted by this Security Instrument without further notice or demand on Borrower.

**19. Borrower's Right to Reinstate After Acceleration.** If Borrower meets certain conditions, Borrower shall have the right to have enforcement of this Security Instrument discontinued at any time prior to the earliest of: (a) five days before sale of the Property pursuant to any power of sale contained in this Security Instrument; (b) such other period as Applicable Law might specify for the termination of Borrower's right to reinstate; or (c) entry of a judgment enforcing this Security Instrument. Those conditions are that Borrower: (a) pays Lender all sums which then would be due under this Security Instrument and the Note as if no acceleration had occurred; (b) cures any default of any other covenants or agreements; (c) pays all expenses incurred in enforcing this Security Instrument, including, but not limited to, reasonable attorneys' fees, property inspection and valuation fees, and other fees incurred for the purpose of protecting Lender's interest in the Property and rights under this Security Instrument; and (d) takes such action as Lender may reasonably require to assure that Lender's interest in the Property and rights under this Security Instrument, and Borrower's obligation to pay the sums secured by this Security Instrument, shall continue unchanged. Lender may require that Borrower pay such reinstatement sums and expenses in one or more of the following forms, as selected by Lender: (a) cash; (b) money order; (c) certified check, bank check, treasurer's check or cashier's check, provided any such check is drawn upon an institution whose deposits are insured by a federal agency, instrumentality or entity; or (d) Electronic Funds Transfer. Upon reinstatement by Borrower, this Security Instrument and obligations secured hereby shall remain fully effective as if no acceleration had occurred. However, this right to reinstate shall not apply in the case of acceleration under Section 18.

**20. Sale of Note; Change of Loan Servicer; Notice of Grievance.** The Note or a partial interest in the Note (together with this Security Instrument) can be sold one or more times without prior notice to Borrower. A sale might result in a change in the entity (known as the "Loan Servicer") that collects Periodic Payments due under the Note and this Security Instrument and performs other mortgage loan servicing obligations under the Note, this Security Instrument, and Applicable Law. There also might be one or more changes of the Loan Servicer unrelated to a sale of the Note. If there is a change of the Loan Servicer, Borrower will be given written notice of the change which will state the name and address of the new Loan Servicer, the address to which payments should be made and any other information RESPA requires in connection with a notice of transfer of servicing. If the Note is sold and thereafter the Loan is serviced by a Loan Servicer other than the purchaser of the Note, the mortgage loan servicing obligations to Borrower will remain with the Loan Servicer or be transferred to a successor Loan Servicer and are not assumed by the Note purchaser unless otherwise provided by the Note purchaser.

Neither Borrower nor Lender may commence, join, or be joined to any judicial action (as either an individual litigant or the member of a class) that arises from the other party's actions pursuant to this Security Instrument or that alleges that the other party has breached any provision of, or any duty owed by reason of, this Security Instrument, until such Borrower or Lender has notified the other party (with such notice given in

-6A(CA) (0207)        CHL (08/06)          Page 12 of 16          Form 3005 1/01

**EXHIBIT 13, PAGE 110**

DOC ID #: 00012501532101006

compliance with the requirements of Section 15) of such alleged breach and afforded the other party hereto a reasonable period after the giving of such notice to take corrective action. If Applicable Law provides a time period which must elapse before certain action can be taken, that time period will be deemed to be reasonable for purposes of this paragraph. The notice of acceleration and opportunity to cure given to Borrower pursuant to Section 22 and the notice of acceleration given to Borrower pursuant to Section 18 shall be deemed to satisfy the notice and opportunity to take corrective action provisions of this Section 20.

21. Hazardous Substances. As used in this Section 21: (a) "Hazardous Substances" are those substances defined as toxic or hazardous substances, pollutants, or wastes by Environmental Law and the following substances: gasoline, kerosene, other flammable or toxic petroleum products, toxic pesticides and herbicides, volatile solvents, materials containing asbestos or formaldehyde, and radioactive materials; (b) "Environmental Law" means federal laws and laws of the jurisdiction where the Property is located that relate to health, safety or environmental protection; (c) "Environmental Cleanup" includes any response action, remedial action, or removal action, as defined in Environmental Law; and (d) an "Environmental Condition" means a condition that can cause, contribute to, or otherwise trigger an Environmental Cleanup.

Borrower shall not cause or permit the presence, use, disposal, storage, or release of any Hazardous Substances, or threaten to release any Hazardous Substances, on or in the Property. Borrower shall not do, nor allow anyone else to do, anything affecting the Property (a) that is in violation of any Environmental Law, (b) which creates an Environmental Condition, or (c) which, due to the presence, use, or release of a Hazardous Substance, creates a condition that adversely affects the value of the Property. The preceding two sentences shall not apply to the presence, use, or storage on the Property of small quantities of Hazardous Substances that are generally recognized to be appropriate to normal residential uses and to maintenance of the Property (including, but not limited to, hazardous substances in consumer products).

Borrower shall promptly give Lender written notice of (a) any investigation, claim, demand, lawsuit or other action by any governmental or regulatory agency or private party involving the Property and any Hazardous Substance or Environmental Law of which Borrower has actual knowledge, (b) any Environmental Condition, including but not limited to, any spilling, leaking, discharge, release or threat of release of any Hazardous Substance, and (c) any condition caused by the presence, use or release of a Hazardous Substance which adversely affects the value of the Property. If Borrower learns, or is notified by any governmental or regulatory authority, or any private party, that any removal or other remediation of any Hazardous Substance affecting the Property is necessary, Borrower shall promptly take all necessary remedial actions in accordance with Environmental Law. Nothing herein shall create any obligation on Lender for an Environmental Cleanup.

NON-UNIFORM COVENANTS. Borrower and Lender further covenant and agree as follows:

22. Acceleration; Remedies. Lender shall give notice to Borrower prior to acceleration following Borrower's breach of any covenant or agreement in this Security Instrument (but not prior to acceleration under Section 18 unless Applicable Law provides otherwise). The notice shall specify: (a) the default; (b) the action required to cure the default; (c) a date, not less than 30 days from the date the notice is given to Borrower, by which the default must be cured; and (d) that failure to cure the default on or before the date specified in the notice may result in acceleration of the sums secured by this Security Instrument and sale of the Property. The notice shall further inform Borrower of the right to reinstate after acceleration and the right to bring a court action to assert the non-existence of a default or any other defense of Borrower to acceleration and sale. If the default is not cured on or before the date specified in the notice, Lender at its option may require immediate payment in full of all sums secured by this Security Instrument without further demand and may invoke the power of sale and any other remedies permitted by Applicable Law. Lender shall be entitled to collect all expenses incurred in pursuing the remedies provided in this Section 22, including, but not limited to, reasonable attorneys' fees and costs of title evidence.

**EXHIBIT 13, PAGE 111**

DOC ID #: 00012501532101006

If Lender invokes the power of sale, Lender shall execute or cause Trustee to execute a written notice of the occurrence of an event of default and of Lender's election to cause the Property to be sold. Trustee shall cause this notice to be recorded in each county in which any part of the Property is located. Lender or Trustee shall mail copies of the notice as prescribed by Applicable Law to Borrower and to the other persons prescribed by Applicable Law. Trustee shall give public notice of sale to the persons and in the manner prescribed by Applicable Law. After the time required by Applicable Law, Trustee, without demand on Borrower, shall sell the Property at public auction to the highest bidder at the time and place and under the terms designated in the notice of sale in one or more parcels and in any order Trustee determines. Trustee may postpone sale of all or any parcel of the Property by public announcement at the time and place of any previously scheduled sale. Lender or its designee may purchase the Property at any sale.

Trustee shall deliver to the purchaser Trustee's deed conveying the Property without any covenant or warranty, expressed or implied. The recitals in the Trustee's deed shall be prima facie evidence of the truth of the statements made therein. Trustee shall apply the proceeds of the sale in the following order: (a) to all expenses of the sale, including, but not limited to, reasonable Trustee's and attorneys' fees; (b) to all sums secured by this Security Instrument; and (c) any excess to the person or persons legally entitled to it.

23. **Reconveyance.** Upon payment of all sums secured by this Security Instrument, Lender shall request Trustee to reconvey the Property and shall surrender this Security Instrument and all notes evidencing debt secured by this Security Instrument to Trustee. Trustee shall reconvey the Property without warranty to the person or persons legally entitled to it. Lender may charge such person or persons a reasonable fee for reconveying the Property, but only if the fee is paid to a third party (such as the Trustee) for services rendered and the charging of the fee is permitted under Applicable Law. If the fee charged does not exceed the fee set by Applicable Law, the fee is conclusively presumed to be reasonable.

24. **Substitute Trustee.** Lender, at its option, may from time to time appoint a successor trustee to any Trustee appointed hereunder by an instrument executed and acknowledged by Lender and recorded in the office of the Recorder of the county in which the Property is located. The instrument shall contain the name of the original Lender, Trustee and Borrower, the book and page where this Security Instrument is recorded and the name and address of the successor trustee. Without conveyance of the Property, the successor trustee shall succeed to all the title, powers and duties conferred upon the Trustee herein and by Applicable Law. This procedure for substitution of trustee shall govern to the exclusion of all other provisions for substitution.

25. **Statement of Obligation Fee.** Lender may collect a fee not to exceed the maximum amount permitted by Applicable Law for furnishing the statement of obligation as provided by Section 2943 of the Civil Code of California.

-6A(CA) (0207)          CHL (08/06)          Page 14 of 16                    Form 3005  1/01

**EXHIBIT 13, PAGE 112**

BY SIGNING BELOW, Borrower accepts and agrees to the terms and covenants contained in this Security Instrument and in any Rider executed by Borrower and recorded with it.

DOC ID #: 00012501532101006

_____ (Seal)
MERRY B. WELLS                                          -Borrower

_____ (Seal)
RONALD RAY CATT                                        -Borrower

_____ (Seal)
                                                       -Borrower

_____ (Seal)
                                                       -Borrower

-6A(CA) (0207)        CHL (08/05)        Page 15 of 16        Form 3005 1/01

State of California
County of *Orange*

DOC ID #: 00012501532101006

On _1/26/2006_ before me, _Camille Caballero notary_
public
_ss._
personally appeared

_Merry B. Wells   and   Ronald Ray Catt_

(or proved to me on the basis of satisfactory evidence) to be the person(s) whose name(s) is/are subscribed to
the within instrument and acknowledged to me that he/she/they executed the same in his/her/their authorized
capacity(ies), and that by his/her/their signature(s) on the instrument the person(s) or the entity upon behalf of
which the person(s) acted, executed the instrument.

WITNESS my hand and official seal.

CAMILLE CABALLERO
COMM. # 1401776
NOTARY PUBLIC-CALIFORNIA
ORANGE COUNTY
COMM. EXP. FEB. 22, 2007

_____ (Seal)

-6A(CA) (0207)          CHL (08/05)          Page 16 of 16          Form 3005 1/01

**EXHIBIT 13, PAGE 114**

Place Government Code 27361-7
I certify under penalty of perjury that the notary
Acknowledgement on the document to which this
Statement reads as follows:

Name of notary.          Camille Caballero

Date commission expires.          2-27 07

County which bond is filed          Orange

Commission number #          1401776

Manufacture/vendor #          Meyel

Date          1-30-06

Place of Execution,Placentia Ca.
Fidelity National Title. Insurance.

**EXHIBIT 13, PAGE 115**

# ADJUSTABLE RATE RIDER
### (PayOption MTA Twelve Month Average Index - Payment Caps)

5160102
[Escrow/Closing #]

00012501532101006
[Doc ID #]

THIS ADJUSTABLE RATE RIDER is made this TWENTY-FIFTH day of JANUARY, 2006 , and is incorporated into and shall be deemed to amend and supplement the Mortgage, Deed of Trust, or Security Deed (the "Security Instrument") of the same date given by the undersigned ("Borrower") to secure Borrower's Adjustable Rate Note (the "Note") to AMERICA'S WHOLESALE LENDER

("Lender") of the same date and covering the property described in the Security Instrument and located at:

5369 GRANDVIEW AVENUE
YORBA LINDA, CA 92886
[Property Address]

THE NOTE CONTAINS PROVISIONS THAT WILL CHANGE THE INTEREST RATE AND THE MONTHLY PAYMENT. THERE MAY BE A LIMIT ON THE AMOUNT THAT THE MONTHLY PAYMENT CAN INCREASE OR DECREASE. THE PRINCIPAL AMOUNT TO REPAY COULD BE GREATER THAN THE AMOUNT ORIGINALLY BORROWED, BUT NOT MORE THAN THE MAXIMUM LIMIT STATED IN THE NOTE.

ADDITIONAL COVENANTS: In addition to the covenants and agreements made in the Security Instrument, Borrower and Lender further covenant and agree as follows:

A. INTEREST RATE AND MONTHLY PAYMENT CHANGES
The Note provides for changes in the interest rate and the monthly payments, as follows:

• PayOption MTA ARM Rider
1E310-XX (09/05)(d)

Page 1 of 6





## 2. INTEREST

DOC ID #: 0001250153210

**(A) Interest Rate**

Interest will be charged on unpaid Principal until the full amount of Principal has been paid. Up until the first day of the calendar month that immediately precedes the first monthly payment due date set forth in Section 3 of the Note, I will pay interest at a yearly rate of     6.000 %. Additional days interest collected prior to the first monthly payment due date is sometimes called "Per Diem" interest and is due at the time I close my loan. Thereafter until the first Interest Rate Change Date, defined below in Section 2(B), I will pay interest at a yearly rate of     1.000 %. This rate is sometimes referred to as the "Start Rate" and is used to calculate the initial monthly payment described in Section 3. The interest rate required by this Section 2 of the Note is the rate I will pay both before and after any default described in Section 7(B) of the Note.

**(B) Interest Rate Change Dates**

The interest rate I will pay may change on the first
MARCH, 2006                . and on that day every month thereafter. Each date on which my interest rate could change is called an "Interest Rate Change Date." The new rate of interest will become effective on each Interest Rate Change Date. The interest rate may change monthly, but the monthly payment is recalculated in accordance with Section 3.

**(C) Index**

Beginning with the first Interest Rate Change Date, my adjustable interest rate will be based on an Index. The "Index" is the "Twelve-Month Average" of the annual yields on actively traded United States Treasury Securities adjusted to a constant maturity of one year as published by the Federal Reserve Board in the Federal Reserve Statistical Release entitled "Selected Interest Rates (H.15)" (the "Monthly Yields"). The Twelve Month Average is determined by adding together the Monthly Yields for the most recently available twelve months and dividing by 12. The most recent Index figure available as of the date 15 days before each Interest Rate Change Date is called the "Current Index".

If the Index is no longer available, the Note Holder will choose a new index that is based upon comparable information. The Note Holder will give me notice of this choice.

**(D) Calculation of Interest Rate Changes**

Before each Interest Rate Change Date, the Note Holder will calculate my new interest rate by adding          TWO & 40/100 percentage point(s) (    2.400 %) ("Margin") to the Current Index. The Note Holder will then round the result of this addition to the nearest one-eighth of one percentage point (0.125%). This rounded amount will be my new interest rate until the next Interest Rate Change Date. My interest rate will never be greater than     9.950 %. Beginning with the first Interest Rate Change Date, my interest rate will never be lower than the Margin.

## 3. PAYMENTS

**(A) Time and Place of Payments**

I will make a payment every month.

\* **PayOption MTA ARM Rider**
**1E310-XX (09/05)**                    Page 2 of 6

DOC ID #: 00012501532101006

I will make my monthly payments on the FIRST day of each month beginning on March, 2006 . I will make these payments every month until I have paid all the Principal and interest and any other charges described below that I may owe under the Note. Each monthly payment will be applied as of its scheduled due date and will be applied to interest before Principal. If, on FEBRUARY 01, 2036 , I still owe amounts under the Note, I will pay those amounts in full on that date, which is called the "Maturity Date."

I will make my monthly payments at

P.O. Box 10219, Van Nuys, CA 91410-0219

or at a different place if required by the Note Holder.

**(B) Amount of My Initial Monthly Payments**

Each of my initial monthly payments until the first Payment Change Date will be in the amount of U.S. $ 3,198.71 , unless adjusted under Section 3 (F).

**(C) Payment Change Dates**

My monthly payment may change as required by Section 3(D) below beginning on the first day of MARCH, 2007 , and on that day every 12th month thereafter. Each of these dates is called a "Payment Change Date." My monthly payment also will change at any time Section 3(F) or 3(G) below requires me to pay a different monthly payment. The "Minimum Payment" is the minimum amount Note Holder will accept for my monthly payment which is determined at the last Payment Change Date or as provided in Section 3(F) or 3(G) below. If the Minimum Payment is not sufficient to cover the amount of the interest due then negative amortization will occur.

I will pay the amount of my new Minimum Payment each month beginning on each Payment Change Date or as provided in Section 3(F) or 3(G) below.

**(D) Calculation of Monthly Payment Changes**

At least 30 days before each Payment Change Date, the Note Holder will calculate the amount of the monthly payment that would be sufficient to repay the unpaid Principal that I am expected to owe at the Payment Change Date in full on the maturity date in substantially equal payments at the interest rate effective during the month preceding the Payment Change Date. The result of this calculation is called the "Full Payment." Unless Section 3(F) or 3(G) apply, the amount of my new monthly payment effective on a Payment Change Date, will not increase by more than 7.500% of my prior monthly payment. This 7.500% limitation is called the "Payment Cap." This Payment Cap applies only to the Principal and interest payment and does not apply to any escrow payments Lender may require under the Security Instrument. The Note Holder will apply the Payment Cap by taking the amount of my Minimum Payment due the month preceding the Payment Change Date and multiplying it by the number 1.075 . The result of this calculation is called the "Limited Payment." Unless Section 3(F) or 3(G) below requires me to pay a different amount, my new Minimum Payment will be the lesser of the Limited Payment and the Full Payment.

\* **PayOption MTA ARM Rider**
1E310-XX (09/05)                          Page 3 of 6

**EXHIBIT 13, PAGE 118**

**(E) Additions to My Unpaid Principal**    DOC ID #: 00012501532101006

Since my monthly payment amount changes less frequently than the interest rate, and since the monthly payment is subject to the payment limitations described in Section 3(D), my Minimum Payment could be less than or greater than the amount of the interest portion of the monthly payment that would be sufficient to repay the unpaid Principal I owe at the monthly payment date in full on the Maturity Date in substantially equal payments. For each month that my monthly payment is less than the interest portion, the Note Holder will subtract the amount of my monthly payment from the amount of the interest portion and will add the difference to my unpaid Principal, and interest will accrue on the amount of this difference at the interest rate required by Section 2. For each month that the monthly payment is greater than the interest portion, the Note Holder will apply the payment as provided in Section 3(A).

**(F) Limit on My Unpaid Principal; Increased Monthly Payment**

My unpaid Principal can never exceed the Maximum Limit equal to ONE HUNDRED FIFTEEN percent (        115 %) of the Principal amount I originally borrowed. My unpaid Principal could exceed that Maximum Limit due to Minimum Payments and interest rate increases. In that event, on the date that my paying my Minimum Payment would cause me to exceed that limit, I will instead pay a new Minimum Payment. This means that my monthly payment may change more frequently than annually and such payment changes will not be limited by the Payment Cap. The new Minimum Payment will be in an amount that would be sufficient to repay my then unpaid Principal in full on the Maturity Date in substantially equal payments at the current interest rate.

**(G) Required Full Payment**

On the tenth        Payment Change Date and on each succeeding fifth Payment Change Date thereafter, I will begin paying the Full Payment as my Minimum Payment until my monthly payment changes again. I also will begin paying the Full Payment as my Minimum Payment on the final Payment Change Date.

**(H) Payment Options**

After the first Interest Rate Change Date, the Note Holder may provide me with up to three (3) additional payment options that are greater than the Minimum Payment, which are called "Payment Options." The Payment Options are calculated using the new interest rate in accordance with Section 2(D). I may be given the following Payment Options:

(i) **Interest Only Payment:** the amount that would pay the interest portion of the monthly payment. The Principal balance will not be decreased by this Payment Option and it is only available if the interest portion exceeds the Minimum Payment.

(ii) **Amortized Payment:** the amount necessary to pay the loan off (Principal and interest) at the Maturity Date in substantially equal payments. This monthly payment amount is calculated on the assumption that the current rate will remain in effect for the remaining term.

* PayOption MTA ARM Rider
1E310-XX (09/05)                    Page 4 of 6

**EXHIBIT 13, PAGE 119**

DOC ID #: 00012501532101006

(iii) **15 Year Amortized Payment:** the amount necessary to pay the loan off (Principal and Interest) within a fifteen (15) year term from the first payment due date in substantially equal payments. This monthly payment amount is calculated on the assumption that the current rate will remain in effect for the remaining term.

These Payment Options are only applicable if they are greater than the Minimum Payment.

## B. TRANSFER OF THE PROPERTY OR A BENEFICIAL INTEREST IN BORROWER

Section 18 of the Security Instrument entitled "Transfer of the Property or a Beneficial Interest in Borrower" is amended to read as follows:

**Transfer of the Property or a Beneficial Interest in Borrower.** As used in this Section 18, "Interest in the Property" means any legal or beneficial interest in the Property, including, but not limited to, those beneficial interests transferred in a bond for deed, contract for deed, installment sales contract or escrow agreement, the intent of which is the transfer of title by Borrower at a future date to a purchaser.

If all or any part of the Property or any Interest in the Property is sold or transferred (or if Borrower is not a natural person and a beneficial interest in Borrower is sold or transferred) without Lender's prior written consent, Lender may require immediate payment in full of all sums secured by this Security Instrument. However, this option shall not be exercised by Lender if such exercise is prohibited by Applicable Law. Lender also shall not exercise this option if: (a) Borrower causes to be submitted to Lender information required by Lender to evaluate the intended transferee as if a new loan were being made to the transferee; and (b) Lender reasonably determines that Lender's security will not be impaired by the loan assumption and that the risk of a breach of any covenant or agreement in this Security Instrument is acceptable to Lender.

To the extent permitted by Applicable Law, Lender may charge a reasonable fee as a condition to Lender's consent to the loan assumption. Lender may also require the transferee to sign an assumption agreement that is acceptable to Lender and that obligates the transferee to keep all the promises and agreements made in the Note and in this Security Instrument. Borrower will continue to be obligated under the Note and this Security Instrument unless Lender releases Borrower in writing.

If Lender exercises the option to require immediate payment in full, Lender shall give Borrower notice of acceleration. The notice shall provide a period of not less than 30 days from the date the notice is given in accordance with Section 15 within which Borrower must pay all sums secured by

* PayOption MTA ARM Rider
1E310-XX (09/05)                    Page 5 of 6

**EXHIBIT 13, PAGE 120**

this Security Instrument. If Borrower fails to pay these sums prior to the expiration of this period, Lender may invoke any remedies permitted by this Security Instrument without further notice or demand on Borrower.

DOC ID #: 00012501532101006

BY SIGNING BELOW, Borrower accepts and agrees to the terms and covenants contained in this Adjustable Rate Rider.

WITNESS THE HAND(S) AND SEAL(S) OF THE UNDERSIGNED.

_____
MERRY B. WELLS                                    -Borrower

_____
-Borrower

_____
-Borrower

_____
-Borrower

• PayOption MTA ARM Rider
1E310-XX (09/05)                    Page 6 of 6

**EXHIBIT 13, PAGE 121**

# EXHIBIT #3

**EXHIBIT 13, PAGE 122**

## EXHIBIT 3

Those portions of Lot 6, Block 23 of the Yorba Linda Tract, in the City of Yorba Linda, County of Orange, State of California, as per map recorded in Book 5, Pages 17 and 18 of Miscellaneous Maps, in the office of the County Recorder of said County, described as follows:

Parcel 1:

The Northwesterly 260.49 feet on the Easterly 420.29 feet of said Lot 6 said Southeasterly 420.49 feet being measured to the center line of the street 50.00 feet in width adjoining said lot on the Southeast:

Except therefrom the Northwesterly 130.49 feet

Also except therefrom the Northeasterly 180.00 feet thereof

Also except therefrom the Southeasterly 162.97 feet thereof

Parcel 2:

A non-exclusive easement for road and public utility purposes over that portion of said Lot 6 described as follows:

Beginning at a point in the Northwesterly line of the street 50.00 feet in width now known as Grandview Avenue adjoining said lot on the Southeast distant thereon South 28° 09' 25" West 137.02 feet from its intersection with the Northeasterly line of said lot said point of beginning being the beginning of a tangent curve concave Northerly having a radius of 18.00 feet; thence Westerly along said curve through a central angle of 89° 56' 40" an arc distance of 28.26 feet to a line tangent; thence North 61° 47' 15" West along said tangent line 161.81 feet to the beginning of a tangent curve concave Northeasterly having a radius of 35.00 feet; thence Northwesterly along said curve through a central angle of 45° 05' 57" an arc distance of 27.55 feet to the beginning of a reverse curve concave Southeasterly having a radius of 50.00 feet; thence Northwesterly along said curve through a central angle of 270° 011' 54" an arc distance of 235.79 feet to the beginning of a reverse curve concave Southerly having a radius of 35.00 feet; thence feet; thence Southeasterly along said curve through a central of 45° 05' 57" an arc distance of 27.55 feet to a line tangent; thence South 61° 47' 15" East along said tangent line 161.81 feet to the beginning of a tangent curve concave Southwesterly having a radius of 18.00 feet; thence Southerly along said curve through a central angle of 90° 03' 20" an arc distance of 26.29 feet to the Northwesterly line of said Grand View Avenue; thence North 28° 09' 25" East along said Northwesterly line 86.00 feet to the point of beginning.

Except therefrom that portion included within Parcel 1 herein above described

Note:   Said land is shown on a map of Survey recorded in Book 32, Page 22 Record of Surveys in the office of the County Recorder of said Orange County

Assessor's Parcel No: 348-141-05

**EXHIBIT 13, PAGE 123**

# EXHIBIT  14

**JUD-100**

ELECTRONICALLY RECEIVED
Superior Court of California,
County of Orange

08/10/2011 at 12:15:50 PM
Clerk of the Superior Court
By Sonya Herrera Wilson, Deputy Clerk

| ATTORNEY OR PARTY WITHOUT ATTORNEY *(Name, state bar n...)* | FOR COURT USE ONLY |
|---|---|
| Advocates Law and Real Estate<br>Diane Beall, (#86877)<br>243 S. Escondido Ave, Suite #125 Escondido, CA 92025<br>TELEPHONE NO: 760-807-5417   FAX NO. *(Optional):*<br>E-MAIL ADDRESS *(Optional):* attorneydianebeall@gmail.com<br>ATTORNEY FOR *(Name):* Merry B. Wells | **FILED**<br>SUPERIOR COURT OF CALIFORNIA<br>COUNTY OF ORANGE<br>CENTRAL JUSTICE CENTER<br><br>AUG 26 2011<br><br>ALAN CARLSON, Clerk of the Court<br>*Palacios*<br>BY  K PALACIOS |

SUPERIOR COURT OF CALIFORNIA, COUNTY OF   Orange
STREET ADDRESS: 700 Civic Center Drive, West
MAILING ADDRESS:
CITY AND ZIP CODE: Santa Ana, CA 92701
BRANCH NAME: Central Justice Center

PLAINTIFF: Merry B. Wells

DEFENDANT: America's Wholesale Lender, Inc. et. al.

| JUDGMENT | | CASE NUMBER: |
|---|---|---|
| ☐ By Clerk   ☐ By Default   ☐ After Court Trial | | 30-2011-00485562 |
| ☐ By Court   ☑ On Stipulation   ☐ Defendant Did Not Appear at Trial | | Judge Rodriguez - C6 |

### JUDGMENT

1. ☐ **BY DEFAULT**
   a. Defendant was properly served with a copy of the summons and complaint.
   b. Defendant failed to answer the complaint or appear and defend the action within the time allowed by law.
   c. Defendant's default was entered by the clerk upon plaintiff's application.
   d. ☐ **Clerk's Judgment** (Code Civ. Proc., § 585(a)). Defendant was sued only on a contract or judgment of a court of this state for the recovery of money.
   e. ☐ **Court Judgment** (Code Civ. Proc., § 585(b)). The court considered
      (1) ☐ plaintiff's testimony and other evidence.
      (2) ☐ plaintiff's written declaration (Code Civ. Proc., § 585(d)).

2. ☑ **ON STIPULATION**
   a. Plaintiff and defendant agreed (stipulated) that a judgment be entered in this case. The court approved the stipulated judgment and
   b. ☑ the signed written stipulation was filed in the case.
   c. ☐ the stipulation was stated in open court   ☐ the stipulation was stated on the record.

3. ☐ **AFTER COURT TRIAL.** The jury was waived. The court considered the evidence.
   a. The case was tried on *(date and time):*
      before *(name of judicial officer):*
   b. Appearances by:
      ☐ Plaintiff *(name each):*                          ☐ Plaintiff's attorney *(name each):*
         (1)                                                    (1)
         (2)                                                    (2)
      ☐ Continued on Attachment 3b.
      ☐ Defendant *(name each):*                          ☐ Defendant's attorney *(name each):*
         (1)                                                    (1)
         (2)                                                    (2)
      ☐ Continued on Attachment 3b.
   c. ☐ Defendant did not appear at trial. Defendant was properly served with notice of trial.
   d. ☐ A statement of decision (Code Civ. Proc., § 632) ☐ was not ☐ was requested.

Page 1 of 2

Form Approved for Optional Use
Judicial Council of California
JUD-100 [New January 1, 2002]

**JUDGMENT**

Code of Civil Procedure, §§ 585, 664.6

**EXHIBIT 14, PAGE 124**

| PLAINTIFF: Merry B. Wells | CASE NUMBER: |
|---|---|
| DEFENDANT: America's Wholesale Lender, Inc. et. al. | 30-2011-00485562 |

**JUDGMENT IS ENTERED AS FOLLOWS BY:** ☐ THE COURT   ☐ THE CLERK

4. ☑ **Stipulated Judgment.** Judgment is entered according to the stipulation of the parties.

5. **Parties.** Judgment is

  a. ☐ for plaintiff (name each):

      and against defendant (names):

      ☐ Continued on Attachment 5a.

  b. ☑ for defendant (name each):
      America's Wholesale Lender, Inc., a New York Corporation

  c. ☐ for cross-complainant (name each):

      and against cross-defendant (name each):

      ☐ Continued on Attachment 5c.

  d. ☐ for cross-defendant (name each):

6. **Amount.**

  a. ☐ Defendant named in item 5a above must pay plaintiff on the complaint:

| (1) ☐ | Damages | $ |
|---|---|---|
| (2) ☐ | Prejudgment interest at the annual rate of   % | $ |
| (3) ☐ | Attorney fees | $ |
| (4) ☐ | Costs | $ |
| (5) ☐ | Other (specify): | $ |
| (6) | **TOTAL** | $ |

  c. ☐ Cross-defendant named in item 5c above must pay cross-complainant on the cross-complaint:

| (1) ☐ | Damages | $ |
|---|---|---|
| (2) ☐ | Prejudgment interest at the annual rate of   % | $ |
| (3) ☐ | Attorney fees | $ |
| (4) ☐ | Costs | $ |
| (5) ☐ | Other (specify): | $ |
| (6) | **TOTAL** | $ |

  b. ☑ Plaintiff to receive nothing from defendant named in item 5b.
      ☐ Defendant named in item 5b to recover costs $
      ☐ and attorney fees $

  d. ☐ Cross-complainant to receive nothing from cross-defendant named in item 5d.
      ☐ Cross-defendant named in item 5d to recover costs $
      ☐ and attorney fees $

7. ☑ Other (specify):
The signed Stipulated Agreement referenced above in #2b., which includes the Stipulated Findings of Facts (Sections 2.0-2.8) and the Settlement Agreement (Sections 3.0-3.7) is filed with this Court.

Date: 9/26/11      ☐ _____
                        JUDICIAL OFFICER

Date:      ☐ Clerk, by _____, Deputy

| (SEAL) | **CLERK'S CERTIFICATE** (Optional) |
|---|---|
| | I certify that this is a true copy of the original judgment on file in the court. |
| | Date: |
| | Clerk, by _____, Deputy |

                                                    Page 2 of 2

JUD-100 [New January 1, 2002]        **JUDGMENT**

**EXHIBIT 14, PAGE 125**

# EXHIBIT  15

RECORDING REQUESTED BY:
NORTH AMERICAN TITLE COMPANY

AND WHEN RECORDED MAIL TO:
AMERICA'S WHOLESALE LENDER, INC.
C/O BERMAN AND ASSOCIATES, LLC
8144 KOKOMA DRIVE, STE. 101
LAS VEGAS, NV 89128

3/3-5

| | |
|---|---|
| Recorded in Official Records, Orange County | |
| Tom Daly, Clerk-Recorder | |
| ‖‖‖‖‖‖‖‖‖‖‖‖‖‖‖‖‖‖‖  **21.00** | |
| **2011000580146** 02:49pm 11/15/11 | |
| 68 422 D11 A36 3 | |
| 0.00 0.00 0.00 0.00 6.00 0.00 0.00 0.00 | |

A.P.N.: 348-141-05          Order No.: 1112238          Space Above This Line for Recorder's Use Only          Escrow No.: 37290RS

## SHORT FORM DEED OF TRUST AND ASSIGNMENT OF RENTS

**THIS DEED OF TRUST,** made this **Ninth day of November, 2011,** between

**TRUSTOR:** Merry B. Wells, an Unmarried Woman

whose address is 5369 Grandview Avenue, Yorba Linda, CA 92886, and

**TRUSTEE: NORTH AMERICAN TITLE COMPANY, A CALIFORNIA CORPORATION,** and

**BENEFICIARY: AMERICA'S WHOLESALE LENDER, INC.**

**Witnesseth:** That Trustor IRREVOCABLY GRANTS, TRANSFERS AND ASSIGNS to TRUSTEE IN TRUST, WITH POWER OF SALE, that property in the City of **Yorba Linda, Orange** County, State of California, described as:

**SEE LEGAL DESCRIPTION ATTACHED HERETO AND MADE A PART HEREOF BY THIS REFERENCE THERETO.**

"If the Trustor shall sell, convey or alienate said property, or any part thereof, or any interest therein, or shall be divested of his title or any interest therein in any manner or way, whether voluntarily or involuntarily, without the written consent of the beneficiary being first had and obtained, beneficiary shall have the right, at its option, except as prohibited by law, to declare any indebtedness or obligations secured hereby, irrespective of the maturity date specified in any Note evidencing the same, immediately due and payable."

TOGETHER WITH the rents, issues, and profits thereof, SUBJECT, HOWEVER, to the right, power and authority given to and conferred upon Beneficiary by paragraph 10 of the provisions incorporated by reference to collect and apply such rents, issues and profits.

FOR THE PURPOSE OF SECURING: 1.Performance of each agreement of Trustor incorporated by reference or contained herein.  2.Payment of the indebtedness evidenced by one promissory note of even date herewith, and any extension or renewal thereof, in the principal sum of **$385,000.00** executed by Trustor in favor of Beneficiary or order.  3.Payment of such further sums as the then record owner of said property hereafter may borrow from Beneficiary, when evidenced by another note (or notes) reciting it is so secured.

TO PROTECT THE SECURITY OF THIS DEED OF TRUST, TRUSTOR AGREES: By the execution and delivery of this Deed of Trust and the note secured hereby, that provisions (1) to (14), inclusive, of the fictitious deed of trust recorded in Santa Barbara County and Sonoma County on October 18, 1961, and in all other counties on October 23, 1961, in the book and at the page of Official Records in the office of the county recorder of the county where said property is located, noted below and opposite the name of such county, viz:

PAGE 1 OF 4

**EXHIBIT 15, PAGE 126**

A.P.N.: **348-141-05**

| County | Book | Page | County | Book | Page | County | Book | Page | County | Book | Page | County | Book | Page |
|--------|------|------|--------|------|------|--------|------|------|--------|------|------|--------|------|------|
| Alameda | 435 | 684 | Imperial | 1091 | 501 | Merced | 1547 | 538 | San Benito | 271 | 383 | Siskiyou | 468 | 181 |
| Alpine | 1 | 250 | Inyo | 147 | 598 | Modoc | 184 | 851 | San Bernardino | 5567 | 61 | Solano | 1105 | 182 |
| Amador | 104 | 348 | Kern | 3427 | 60 | Mono | 52 | 429 | San Francisco | A332 | 905 | Sonoma | 1851 | 689 |
| Butte | 1145 | 1 | Kings | 792 | 833 | Monterey | 2194 | 538 | San Joaquin | 2470 | 311 | Stanislaus | 1715 | 456 |
| Calaveras | 145 | 152 | Lake | 362 | 39 | Napa | 639 | 86 | San Luis Obispo | 1151 | 12 | Sutter | 572 | 297 |
| Colusa | 296 | 617 | Lassen | 171 | 471 | Nevada | 305 | 320 | San Mateo | 4078 | 420 | Tehama | 401 | 289 |
| Contra Costa | 3978 | 47 | Los Angeles | T2055 | 899 | Orange | 5889 | 611 | Santa Barbara | 1878 | 860 | Trinity | 93 | 366 |
| Del Norte | 78 | 414 | Madera | 810 | 170 | Placer | 895 | 301 | Santa Clara | 5336 | 01 | Tulare | 2294 | 275 |
| El Dorado | 568 | 456 | Marin | 1508 | 339 | Plumas | 151 | 5 | Santa Cruz | 1431 | 494 | Tuolumne | 135 | 47 |
| Fresno | 4626572 | | Mariposa | 77 | 292 | Riverside | 3005 | 523 | Shasta | 684 | 528 | Ventura | 2062 | 386 |
| Glenn | 422 | 184 | Mendocino | 579 | 530 | Sacramento | 4331 | 62 | Sierra | 29 | 335 | Yolo | 653 | 245 |
| Humboldt | 657 | 527 | | | | San Diego | Series 2 Book 1961, Page 183887 | | | | | | Yuba | 334 | 486 |

(which provisions, identical in all counties, are printed on page 3 of this document) hereby are adopted and incorporated herein and made a part hereof as fully as though set forth herein at length; that he will observe and perform said provisions; and that the references to property, obligations, and parties in said provisions shall be construed to refer to the property, obligations, and parties set forth in this Deed of Trust.

In accordance with Section 2924b, Civil Code, request is hereby made that a copy of any Notice of Default and a copy of any Notice of Sale be mailed to Trustor at Trustor's address hereinbefore set forth, or if none shown, to Trustor at the property address.

**NOTICE:  A COPY OF ANY NOTICE OF DEFAULT AND OF ANY NOTICE OF SALE WILL BE SENT ONLY TO THE ADDRESS CONTAINED IN THIS RECORDED REQUEST.  IF YOUR ADDRESS CHANGES, A NEW REQUEST MUST BE RECORDED.**

Signature of Trustor(s)

_[signature]_

Merry B. Wells

Document Date:  __November 9, 2011__

STATE OF CALIFORNIA          )SS
COUNTY OF _Los Angeles_      )

On _November 9, 2011_ _____ before me, _____, a notary public in and for said state, personally appeared _Sandra L. West   Merry B. Wells_ who proved to me on the basis of satisfactory evidence to be the person(s) whose name(s) is/are subscribed to the within instrument and acknowledged to me that he/she/they executed the same in his/her/their authorized capacity(ies), and that by his/her/their signature(s) on the instrument the person(s), or the entity upon behalf of which the person(s) acted, executed the instrument.

I certify under PENALTY OF PERJURY under the laws of the State of California that the  foregoing paragraph is true and correct.

WITNESS my hand and official seal.

Signature _Sandra L. West_

(Seal)

SANDRA L. WEST
Commission # 1859165
Notary Public - California
Orange County
My Comm. Expires Aug 4, 2013

PAGE 2 OF 4

**EXHIBIT 15, PAGE 127**

**LEGAL DESCRIPTION**

Real property in the City of Yorba Linda, County of Orange, State of California, described as follows:

Those portions of Lot 6, Block 23 of the Yorba Linda Tract, as per map recorded in Book 5, Pages 17 and 18 of Miscellaneous Maps, in the office of the County Recorder of said County, described as follows:

Parcel 1:

The Northwesterly 260.49 feet on the Easterly 420.29 feet of said Lot 6 said Southeasterly 420.49 feet being Measured to the Center Line of the Street 50.00 feet in Width adjoining said Lot on the Southeast;

Except therefrom the Northwesterly 130.49 feet

Also except therefrom the Northeasterly 180.00 feet thereof

Also except therefrom the Southeasterly 162.97 feet thereof

Parcel 2:

A Non-Exclusive Easement for Road and public utility purposes over that Portion of said Lot 6 described as follows:

Beginning at a point in the Northwesterly line of the Street 50.00 feet in width now known as Grandview Avenue adjoining said Lot on the Southeast distant thereon South 28° 09' 25" West 137.02 feet from its intersection with the Northeasterly line of said Lot said point of beginning being the beginning of a tangent curve concave Northerly having a Radius of 18.00 feet; thence Westerly along said curve through a central angle of 89° 56' 40" an arc distance of 28.26 feet to a line tangent; thence North 61° 47' 15" West along said tangent line 161.81 feet to the beginning of a tangent curve concave Northeasterly having a radius of 35.00 feet; thence Northwesterly along said curve through a central angle of 45° 05' 57" an arc distance of 27.55 feet to the beginning of a Reverse curve concave Southeasterly having a radius of 50.00 feet; thence Northwesterly along said curve through a central angle of 270° 011' 54" an arc distance of 235.79 feet to the beginning of a Reverse curve concave Southerly having a radius of 35.00 feet; thence feet; thence Southeasterly along said curve through a central of 45° 05' 57" an arc distance of 27.55 feet to a line tangent; thence South 61° 47' 15" East along said tangent line 161.81 feet to the beginning of a tangent curve concave Southwesterly having a radius of 18.00 feet; thence Southerly along said curve through a central angle of 90° 03' 20" an arc distance of 26.29 feet to the Northwesterly line of said Grand View Avenue; thence North 28° 09' 25" East along said Northwesterly line 86.00 feet to the point of beginning.

Except therefrom that Portion included within Parcel 1 herein above described

Note: Said Land is shown on a Map of Survey Recorded in Book 32, Page 22 Record of Surveys in the Office of the County Recorder of said Orange County.

APN: 348-141-05

Order No.:  **92002-1112238-11**

ORANGE,CA      DOCUMENT: TD 2011.580146                                        Page 3 of 3

Printed on 2/8/2012 4:53:00 PM          Provided by DataTrace System

**EXHIBIT 15, PAGE 128**