# EXHIBIT  16

Recorded in Official Records, Orange County
Tom Daly, Clerk-Recorder

‖‖‖‖‖‖‖‖‖‖‖‖‖‖‖‖‖   **12.00**

**2012000002551 08:00am 01/04/12**
93 401 A32 2

0.00 0.00 0.00 0.00 3.00 0.00 0.00 0.00

RECORDING REQUESTED BY

Americas Wholesale Lender, Inc.

AND WHEN RECORDED MAIL TO
Wendmere Funding, LLC
c/o Berman & Associates
8144 Kokoma Dr.  Suite 101
Las Vegas, NV 89128

---

## ASSIGNMENT OF DEED OF TRUST

FOR VALUE RECEIVED, the undersigned hereby grants, assigns and transfers to:
WENDMERE FUNDING, LLC, a Kentucky Limited Liability Company, AS LENDER AND SOLE
BENEFICIARY, all beneficial interest under that certain Deed of Trust dated November 9, 2011, executed by
MARY B. WELLS, AN UNMARRIED WOMAN AS HER SOLE AND SEPARATE PROPERTY

Trustor, to

Trustee,    North American Title Company, A California Corporation

and recorded as Instrument No 2011000580146 on November 15, 2011

of Official Records in the County Recorder's office of Orange County, California, describing land therein as:

SEE LEGAL DESCRIPTION ATTACHED HERETO AND MADE A PART HEREOF BY THIS
REFERENCE THERETO.

ALSO KNOWN AS: 5369 Grandview Avenue, Yorba Linda, CA. 92886

TOGETHER with the note therein described or referred to, the money due and to become due thereon with interest,
and all rights accrued or to accrue under said Deed of Trust, along with assignment of rights in and to that certain
ALTA Lender's Policy, Extended-1, bearing policy no. 92002-11-112238-01 issued by North American Title
Insurance Company.

Dated: December 12, 2011

_(signature)_ , presider

Americas Wholesale Lender, Inc. By Dennis Bell, president

State of Kentucky At Large

ON December 12, 2011, before me, Brittany Nichols, a Notary Public, personally appeared Dennis Bell who proved
to me on the basis of satisfactory evidence to be the person whose name is subscribed to the within instrument and
acknowledged to me that he executed the same in his authorized capacity, and that his signature on the instrument the
person or entity upon behalf of which the person acted, executed the instrument.
I certify under the Penalty of Perjury that the foregoing paragraph is true and correct.

WITNESS my hand and official seal.

Signature _(signature)_

> **Brittany Nichols**
> Notary Public ID No. 424999
> State at Large, Kentucky
> My Commission Expires on July 30, 2014

---

**EXHIBIT 16, PAGE 129**

## LEGAL DESCRIPTION

Real property in the City of Yorba Linda, County of Orange, State of California, described as follows:

Those portions of Lot 6, Block 23 of the Yorba Linda Tract, as per map recorded in Book 5, Pages 17 and 18 of Miscellaneous Maps, in the office of the County Recorder of said County, described as follows:

Parcel 1:

The Northwesterly 260.49 feet on the Easterly 420.29 feet of said Lot 6 said Southeasterly 420.49 feet being Measured to the Center Line of the Street 50.00 feet in Width adjoining said Lot on the Southeast;

Except therefrom the Northwesterly 130.49 feet

Also except therefrom the Northeasterly 180.00 feet thereof

Also except therefrom the Southeasterly 162.97 feet thereof

Parcel 2:

A Non-Exclusive Easement for Road and public utility purposes over that Portion of said Lot 6 described as follows:

Beginning at a point in the Northwesterly line of the Street 50.00 feet in width now known as Grandview Avenue adjoining said Lot on the Southeast distant thereon South 28° 09' 25" West 137.02 feet from its intersection with the Northeasterly line of said Lot said point of beginning being the beginning of a tangent curve concave Northerly having a Radius of 18.00 feet; thence Westerly along said curve through a central angle of 89° 56' 40" an arc distance of 28.26 feet to a line tangent; thence North 61° 47' 15" West along said tangent line 161.81 feet to the beginning of a tangent curve concave Northeasterly having a radius of 35.00 feet; thence Northwesterly along said curve through a central angle of 45° 05' 57" an arc distance of 27.55 feet to the beginning of a Reverse curve concave Southeasterly having a radius of 50.00 feet; thence Northwesterly along said curve through a central angle of 270° 011' 54" an arc distance of 235.79 feet to the beginning of a Reverse curve concave Southerly having a radius of 35.00 feet; thence feet; thence Southeasterly along said curve through a central of 45° 05' 57" an arc distance of 27.55 feet to a line tangent; thence South 61° 47' 15" East along said tangent line 161.81 feet to the beginning of a tangent curve concave Southwesterly having a radius of 18.00 feet; thence Southerly along said curve through a central angle of 90° 03' 20" an arc distance of 26.29 feet to the Northwesterly line of said Grand View Avenue; thence North 28° 09' 25" East along said Northwesterly line 86.00 feet to the point of beginning.

Except therefrom that Portion included within Parcel 1 herein above described

Note: Said Land is shown on a Map of Survey Recorded in Book 32, Page 22 Record of Surveys in the Office of the County Recorder of said Orange County.

APN: 348-141-05

Page 3

Order No.:  **92002-1112238-11**

**EXHIBIT 16, PAGE 130**

# EXHIBIT  17

1

**GLOBAL CAPITAL LAW**
Gary Harre, Esq.  CBN# 86938
2   Diane Beall, Esq. CBN# 86877
8700 Warner Ave, Ste 200
3   Fountain Valley, CA 92708
Telephone: (714) 907-4182
4   Facsimile: (714) 907-4175
Email: ghcmecf@gmail.com

5

6   ATTORNEYS FOR PLAINTIFF, TAN NGUYEN

**FILED**
SUPERIOR COURT OF CALIFORNIA
COUNTY OF ORANGE
CENTRAL JUSTICE CENTER

MAR 25 2011

ALAN CARLSON, Clerk of the Court
BY J. TRAN

7

8   **SUPERIOR COURT OF THE STATE OF CALIFORNIA**
**COUNTY OF ORANGE**
9   **CENTRAL JUSTICE CENTER**

10

11   TAN NGUYEN, an Individual.

12                                   Plaintiff,

13                 vs.

14   AMERICAS WHOLESALE LENDER,
INC., a New York Corporation;
15   MORTGAGE ELECTRONIC
REGISTRATION SYSTEMS, INC., a
16   Delaware Corporation; and DOES 1
through 100, inclusive.
17

18                                   Defendants.

19

**30-2011**

Case No. **00461444**

**COMPLAINT TO QUIET TITLE AND
FOR DAMAGES AND PENALTY;
WRONGFUL FORECLOSURE.**

**JUDGE DAVID R. CHAFFEE**

20        COMES NOW, Plaintiff TAN NGUYEN, by and through his counsels,

21   alleges:

22        1.    Plaintiff TAN NGUYEN (hereinafter "NGUYEN") is, and at all times

23   mentioned is an individual and owner of real properties described herein under.

24        2.    Defendant AMERICAS WHOLESALE LENDER, INC. (hereinafter

25   "AWL"), is, and at all times mentioned is a New York Corporation conducting

26   business in Orange County, California.

27

28

COMPLAINT TO QUIET TITLE AND FOR DAMAGES AND PENALTY; WRONGFUL FORECLOSURE.

3.       Defendant MORTGAGE ELETRONIC REGISTRATION SYSTEMS, INC. (hereinafter "MERS"), is, and at all times mentioned is a Delaware corporation conducting <u>unauthorized</u> business in California.

4.       Defendants DOES 1 through 100, inclusive, has, or claims to have, an interest in the property, the exact nature of which is unknown to plaintiff. Plaintiff is ignorant of the true names, interests, rights, and capacities of defendants sued as DOES 1 through 100, inclusive, and therefore sue these defendants by those fictitious names. Plaintiff will amend this complaint to allege their true names, rights, interests, and capacities when they are ascertained.

5.       On May 16, 2000, plaintiff, for a valuable consideration, received Grant Deed, which was recorded with the Orange County recorder, California as instrument number 20000258446.

6.       Such Grant Deed covers the following described real property situated in the City of Midway ("the property") and is described as follows:

> PARCEL:
> LOT 39, OF TRACT NO, 2298, IN THE CITY OF MIDWAY, COUNTY OF ORANGE, STATE OF CALIFORNIA, AS PER MAP FILED IN BOOK 82, OF MAPS, AT PAGES 41 THROUGH 45, INCLUSIVE, IN THE OFFICE OF THE COUNTY RECORDER OF ORANGE COUNTY.
> APN: 097-464-04. AKA 14791 Riata Street, Midway City, California 92655.

7.       On or about October 18, 2004, plaintiff entered into a written contract, by the terms of which, plaintiff executed a promissory note (hereinafter "NOTE") in favor of Americas Wholesale Lender, a corporation organized and existing under the laws of New York.

8.       Such promissory note is secured by a Deed of Trust (hereinafter "DOT") recorded with the Orange County Recorder as instrument number 2004000938222.

- 1 -

COMPLAINT TO QUIET TITLE AND FOR DAMAGES AND PENALTY; WRONGFUL FORECLOSURE.

EXHIBIT 17, PAGE 132

9.     The DOT purportedly named MERS as nominee for AWL and its successors and assigns.  MERS is further designated as beneficiary under the DOT even though it has no pecuniary interest in the NOTE.

10.    Plaintiff, upon information and belief, therefore alleges that Defendants purposely ignored standards of appraisals, underwritings, including the fabrication of documents to refinance Plaintiff's property for the express purpose of enriching themselves.

11.    AWL caused MERS to go on title as the "Nominee Beneficiary," of "Securitized Instruments" in order to hide the true identity of the "Successor Assignees" of the "Notes".

12.    The "Securitization System" was designed to minimize the risks of "Predatory Lending", "Defaulting Loans", and other risks by "Insuring and Cross-Collateralizing" thousands of loans in a loan pool.  If a loan defaulted and resulted in a foreclosure, and foreclosure was pursued, the loan would be "paid-off in full" by insurance proceeds.

## FIRST CAUSE OF ACTION
## FRAUD AND INTENTIONAL DECEIT
### [AGAINST ALL DEFENDANTS]

13.    Plaintiff re-alleges and incorporates the allegations contained in the preceding paragraphs as though set forth at length herein.

14.    Nathan Nguyen (hereinafter, "Nathan") at all material times was the agent (loan advisor) and/or employee of defendant AWL, acting on behalf of and under the direction of ("AWL") and as such Nathan, held himself as an expert of home loan procurement and reposes his faith trust and confidence in "AWL".

15.    The acts and practices of Nguyen and AWL as respect to the re-financing of home of Plaintiff herein are the acts and practices so commingled considered being in severable.

– 2 –

**EXHIBIT 17, PAGE 133**

16.     Days prior to October 4, 2004, Nathan as employee of Defendant "AWL" made the following representations to plaintiff:

    a. That Plaintiff was receiving a 30 year fixed interest rate loan from ("AWL").

    b. That Nathan had proper documentation to support 100% financing of the proposed home price purchase.

    c. That the loan information in which Plaintiff conveyed via a telephone interview would be accurately transcribed into accurate loan documents.

    d. That Plaintiff divorce was not a problem in getting him a loan.

    e. That Plaintiff having other loans with the Plaintiff spouse was not an impediment to the proposed transaction.

    f. That Nathan had exceptional skill obtaining proposed loans for others.

    g. That the market value of the house would continually rise and would be and would remain an appropriate investment for Plaintiff and his family.

    h. That Plaintiff could refinance in a few years with no difficulties.

17.     The representations made by Nathan on the behalf of AWL were untruthful.  The actual facts were:

    a. Plaintiff's loan was not a 30 years fixed interest rate loan.  It was an adjustable rate negative amortization balloon payment loan.  With a "high risk" and "high interest".

    b. There was not adequate documentation to support such a loan.

    c. That the loan application was manufactured by Nathan with misleading inputs for approvals.

    d. That other loans were an impediment to Plaintiff receiving the most favorable terms to any offered.

COMPLAINT TO QUIET TITLE AND FOR DAMAGES AND PENALTY; WRONGFUL FORECLOSURE.

**EXHIBIT 17, PAGE 134**

e. That loan information was misleadingly documented, defaced, and proffered.

f. That there was no refinancing available in two years.

18.    Defendants, through its "Loan Advisor" Nathan, had a "duty and obligation" to be truthful and failed in these duties and obligations.

19.    Defendants knew that plaintiff was unaware of, and could not have reasonably discovered, material information about the loan transaction diligence needs including the multiple inputs of fabricated income levels until that was an approval at and acceptable debt to income ratio.  Defendant knew this was untrue.

20.    Defendants and "Loan Advisor" Nathan willfully and knowingly set forth a misleading scenario as to the foundations of the loan transaction they proposed to Plaintiff, to the harm and detriment of Plaintiff.

21.    When Nathan, the "Loan Advisor", made these representations, Defendants and their "Alter Egos", along with the immediate supervisors of Nathan, knew and should have known that these representations were untruthful and misleading.

22.    These representations were made with the intention to deceive Plaintiff and to induce Plaintiff to act in reliance on these representations to his detriment, whereby the fruits of these inducements would inure to the enrichment and benefits of the defendant herein alleged.

23.    Plaintiff was duped and subjected to onerous foreclosure proceeding, drained of personal savings, and has been damaged in the sum well over $100,000 plus additional loss of personal money, and emotional distress.

24.    The conduct of these defendants was an intentional misrepresentation, deceit, or concealment of material facts, and constituted despicable conduct that subjected plaintiff to a cruel and unjust hardship.

COMPLAINT TO QUIET TITLE AND FOR DAMAGES AND PENALTY; WRONGFUL FORECLOSURE.

**EXHIBIT 17, PAGE 135**

25.    Plaintiff's audit indicates that "AWL" and its agents collected over $24,000.00 for extending it services, and $5,600 undisclosed "Yield Spread Premiums".

26.    These despicable acts justify an award of compensatory, consequential, emotional distress, and punitive damages as well as injunctive relief pursuant to California CC § 1709, CC § 3294(a)(b)(3), CC § 3343.

**SECOND CAUSE OF ACTION**
**SLANDER OF TITLE**
(AGAINST ALL DEFENDANTS)

27.    Plaintiff re-alleges and incorporates the allegations contained in the preceding paragraphs as though set forth at length herein.

28.    "MERS", while seeking to act as and to represent itself as the agent of the "AWL" nominee beneficiary of the "Deed of Trust", and without a grant of privilege, color of right, caused a "Notice of Default" to be recorded against Plaintiff Property.

29.    None of the Defendants, whether jointly or severally, were a recorded beneficiary or assignee of any beneficiary of any "Deed of Trust" recorded against the property.

30.    AWL'S possible colorable claim is by contract; but was not an endorsed assignee of the note. The only recorded beneficiary known eligible to act by contract did not hold the note.  An endorsed in blank copy of such note did not even exists.

31.    The overall validity of the foreclosure proceeding is disputed on the ground that "Defendants", each of them had no legal authority to conduct such a proceeding in as much as they breached Section of the California Code and these Defendants have no legal standing or pivity of contract.

- 5 -

**EXHIBIT 17, PAGE 136**

32.   These Defendants acted with oppression, and when requested to correct such errors, they failed, refused and neglected to take such action.  Such failures to act caused serious damages to which Plaintiff seeks to recover.

**THIRD CAUSE OF ACTION**
**(VIOLATION OF BUSINESS & PROFESSIONAL CODE § 17200 et. seq.)**
(AGAINST ALL DEFENDANTS)

33.   Plaintiff re-alleges and incorporates the allegations contained in the preceding paragraphs as though set forth at length herein.

34.   The Defendants' Business Practices involves "Deceptive Lending".

35.   Section §17200 is designed to protect "Consumers".  The "Defendants" foreclosure conduct and unresponsive practices were clearly and substantially unfair and deceptive.

36.   "AWL" violations of Financial Code § 50505, demonstrates unfair business practices.   These practices are designed with the culpable state of mind and with the intent to "perpetrate falsities" upon unsophisticated consumers by "steering" and fully controlling the "Loan Process" to enhance profits at the expense, loss and injuries to Plaintiff.

37.   Defendant "AWL" misrepresented to Plaintiff that the original terms of the loans, the nature, and details of the transactions entered.  These included the "true costs of the loan", the "distribution of the loan proceeds", and if the loan was pre sold into a securitization trust, and if there were "undisclosed fees".

38.   "AWL" unfairly induced Plaintiff to enter into a mortgage loan transactions that it and others knew that Plaintiff was not able to pay.

39.   "AWL" misrepresented to Plaintiff that the "points and fees" payable from the proceeds of the mortgage were "bona fide" and "reasonably and necessary" for the extension of credit, when in fact they were not.

40.   "AWL" unfairly induced Plaintiff to execute and/or executing on behalf of "Plaintiff" inaccurate documents in order to close loans.

- 6 –

**EXHIBIT 17, PAGE 137**

41.   "AWL" extended credit to Plaintiff on the basis of the "Value of the
Premises", rather than on the basis of his documented or situational ability to
pay, and in "violation of law".

42.   Payment of brokerage fees that were in no way reasonably related to
"brokerage services actually rendered".   These rather constituted "kickbacks" for
the referral of deliberately deceptive induced loans.

43.   Through its agent, "AWL" engaged in high pressure sales tactics to induce
Plaintiff to enter into deceptive, unfair and unconscionable transactions that
were steered without a referee of integrity.

44.   Plaintiff reasonably relied on above-identified "Deceptive Lender Acts and
Practices", and entered into "mortgage loan" transactions that he would not
otherwise have entered into, but for those "Deceptive Acts and Practices".

45.   Plaintiff is entitled to the equitable and monetary relief set by state
statutes, and an order enjoining ("AWL") and its agents from continuing to
engage in the unfair and deceptive lending practices described herein.

**FOURTH CAUSE OF ACTION**
WRONGFUL FORECLOSURE
[AGAINST ALL DEFENDANTS]

46.   Plaintiff re-alleges and incorporates the allegations contained in the
preceding paragraphs as though set forth at length herein.

47.   Defendant MERS has no beneficial interest in the obligation discussed
herein.

48.   MERS, through its agent as a purported Trustee, has no basis upon which
to foreclose since they have no beneficial interest in the Note or underlying
obligation under the assignment of the deed of trust.

49.   It is axiomatic that the alleged breach is based on an obligation not
assigned in the deed of trust upon which MERS seek to foreclose.

-7-

COMPLAINT TO QUIET TITLE AND FOR DAMAGES AND PENALTY; WRONGFUL FORECLOSURE.

**EXHIBIT 17, PAGE 138**

50.    Defendant MERS has full knowledge that it had no interest in the underlying obligation and is holding an invalid lien. Its continuing action in foreclosing Plaintiff's properties is reckless and willful to justify exemplary damages.

WHEREFORE, Plaintiff prays judgment as follows:

1.    For judgment quieting Plaintiff's title to the property against all defendants;

2.    For damages in the sum of $1,000,000.00;

3.    For a statutory penalty;

4.    For exemplary damages;

5.    For costs of suit and attorney fees herein incurred; and

6.    For such other and further relief as the court may deem proper.

DATED: 03/25/2011                                  Global Capital Law, P.C.

                                                   By Gary Harre, Esq.
                                                   Attorneys for TAN NGUYEN

- 8 -

**EXHIBIT 17, PAGE 139**

DECLARATION OF TAN NGUYEN

I, Tan Nguyen, am the Plaintiff in the above entitled action.  I declare, under penalty of perjury and under the laws of the State of California, the contents therein to be true to the best of my knowledge and belief.  If called upon to testify as to these matters, I could and would competently do so.

Executed, this 25th day of March, 2011 at Fountain Valley, County of Orange, California.

_____

Tan Nguyen

- 9 -

COMPLAINT TO QUIET TITLE AND FOR DAMAGES AND PENALTY; WRONGFUL FORECLOSURE.

**EXHIBIT 17, PAGE 140**

# EXHIBIT  18



**GLOBAL CAPITAL LAW**
8700 Warner Ave, Ste 200
Fountain Valley, CA 92708
Telephone: (714) 907-4182
Facsimile: (714) 907-4175
Email: ghcmecf@gmail.com



ATTORNEYS FOR PLAINTIFF, TAN NGUYEN

## SUPERIOR COURT OF THE STATE OF CALIFORNIA
## COUNTY OF ORANGE
## CENTRAL JUSTICE CENTER

|  |  |
|---|---|
| TAN NGUYEN, an Individual. | Case No.  30-2011-00461444 |
| Plaintiff, |  |
| vs. |  |
| AMERICAS WHOLESALE LENDER, INC., a New York Corporation; MORTGAGE ELECTRONIC REGISTRATION SYSTEMS, INC., a Delaware Corporation; and DOES 1 through 100, inclusive. | **SETTLEMENT AGREEMENT, STIPULATION FOR ENTRY OF JUDGEMENT AND JUDGMENT.**<br><br>Hon. David R. Chaffee |
| Defendants. |  |

This Stipulation for Entry of Judgment and Judgment ("Final Judgment") is entered into by Plaintiff, TAN NGUYEN ("NGUYEN") and Defendant AMERICAS WHOLESALE LENDER, INC., New York Corporation ("AWL").  For purposes of this Final Judgment, NGUYEN and AWL shall be referred to collectively as "Parties" and individually as "Party".  The Parties have stipulated and consented to the entry of this Final Judgment prior to the taking of any proof, and without trial or adjudication of any fact or law herein.  The Parties also have waived their right to appeal and have agreed to settle the above-captioned matter without further litigation, as set forth below.

**EXHIBIT 18, PAGE 141**

## INTRODUCTION

This matter arises from the dispute of a promissory note executed in favor of AWL and secured by a Deed of Trust recorded with the Orange County Recorder as instrument number 2004000938222.  Said Deed of Trust purportedly encumbered Plaintiff's real property known as 14791 Riata Street, Westminster, CA 92655.

On or about March 25, 2011, Plaintiff filed a Complaint against the Defendants in the Orange County Superior Court alleging fraud, slander of title, unfair business practice, wrongful foreclosure and quiet title.  Plaintiff sought to recover monetary damages, injunctive relief and quiet title as the result of alleged injuries caused by Defendants and its agents, employees or affiliates.

The Parties engaged in settlement negotiations prior to the filing of this Final Judgment.  In those settlement negotiations, Parties are represented by counsels.  The Parties have agreed to settle this matter without litigation pursuant to the terms of this Final Judgment.

## SETTLEMENT AGREEMENT AND JUDGMENT
## PURSUANT TO STIPULATED FINDING OF FACT

The Parties, after opportunity for review by their respective counsel, hereby stipulate and consent to the entry of this Final Judgment based on the following finding of facts as set forth below.

**1.   JURISDICTION**

1.1.   The Parties stipulate and agree that the Superior Court of California, County of Orange, has subject matter jurisdiction over the matters alleged in this action and personal jurisdiction over the Parties to this Final Judgment.

**2.   STIPULATED AND FINDING OF FACTS**

2.1.   Plaintiff is the Borrower of the promissory note in favor of America's Wholesale Lender made on October 4, 2004, covering the property described as

– 1 –

**EXHIBIT 18, PAGE 142**

14791 Riata Street, Westminster, CA 92655.  A true and correct copy of promissory note is attached herein as Exhibit 1.

    2.2.   Defendant AMERICAS WHOLESALE LENDER, INC., New York Corporation, is the Lender of the promissory note.

    2.3.   Defendant AMERICAS WHOLESALE LENDER, INC., New York Corporation, is the beneficiary of the Deed of Trust dated October 4, 2004 and recorded with the Orange County Recorder as instrument number 200400093822.  A true and correct copy of the Deed of Trust is attached herein as Exhibit 2.

    2.4.   Defendant Mortgage Electronic Registration Systems, Inc. ("MERS") is a separate corporation that is acting solely as nominee for AWL, holding no interest in the subject promissory note as attached herein as Exhibit 1 or Deed of Trust as attached herein as Exhibit 2.

    2.5.   Defendant AMERICAS WHOLESALE LENDER, INC., New York Corporation is the holder of the promissory note and deed of trust identified herein and is currently in possession of the promissory note.

    2.6.   Defendant AMERICAS WHOLESALE LENDER, INC., New York Corporation, as the holder of the promissory note, has not made any endorsement.

    2.7.   Defendant AMERICAS WHOLESALE LENDER, INC., New York Corporation, as beneficiary of the Deed of Trust, has not assigned nor authorized any assignment of the Deed of Trust identified herein.

    2.8.   No person, party or entity, including trustee or nominee purporting to act on the behalf of AWL, is authorized to collect payment as identified in the promissory note, to initiate foreclosure or substitution of trustee as identified in the Plaintiff's complaint.

- 2 -

**EXHIBIT 18, PAGE 143**

2.9.   Any substitution of trustee, assignment of Deed of Trust, or demand for payment that was not executed by Defendant AWL was not authorized by AWL and is hereby VOID.

**3.    SETTLEMENT AGREEMENT**

3.1.   Pursuant to the Federal Mortgage Relief Act and other applicable reliefs, Parties agree to enter loan modification covering the following real property with physical address of 14791 Riata St, Midway City, CA 92655:

**LOT 39 OF TRACT NO. 2298 AS MAP RECORDED IN BOOK 82 PAGE 41-45 OF MISCELANEOUS MAPS, IN THE OFICE OF THE COUNTY RECORDER OF ORANGE.  A.P.N.: 097-464-04.**

3.2.   Parties agree to loan modification as follows:

3.2.1. AWL shall prepare and Plaintiff will execute a new promissory note secured by a first Deed of Trust in the amount of $225,000.00.  Said note shall provide for simple interest per annum at the rate of 5.00% and amortized over a period of 30 years.

3.2.2. Plaintiff may make a discounted lump sum payment in the amount of $75,000.00 within 60 days as full and satisfaction of this new promissory note without pre-payment penalty.

3.2.3. Upon execution of said note and Deed of Trust by Plaintiff and recordation thereof with the County Recorder of Orange, all sums due or past due on the promissory note identified and attached herein Exhibit 1 is hereby satisfied.

3.2.4. Concurrently herewith, AWL shall prepare and record a full reconveyance of the Deed of Trust recorded with the Orange County Recorder as instrument number 200400093822.  Said Deed of Trust is attached herein as Exhibit 2.

3.3.    Parties agree to pay their own costs in this action.

- 3 -

**EXHIBIT 18, PAGE 144**

3.4.     This settlement agreement is a compromise of this disputed claim and the loan modification agreements in 3.2 shall not be construed as an admission of liability by AWL.

3.5.     All parties shall cooperate in preparation and execution of all necessary documents and to take all action which may be necessary to give full force and effect to the term and intent of this agreement.

3.6.     AWL agrees to dismiss or not to file any related cross-complaint in this action.

3.7.     To the extent that any agent, employee or affiliate of AWL has violated California laws in connection with the loan that is the subject of this Complaint, these person and entity are not party to this agreement and is not released from civil or criminal liability.

**4.     ENFORCEMENT OF FINAL JUDGMENT AND PENALTIES.**

4.1.     In the event that any person or entity, whether purportedly acting on the behalf of AWL or another entity initiate foreclosure, collection, recordation of document claiming any right or interest in, and to, the subject Deed of Trust as identified in Exhibit 2, AWL shall cause such action to be terminated by enforcement of this agreement and/or recording appropriate document as required to negate such action or enforcement at its own expense.

4.2.     Except as provided in this agreement, nothing in this Final Judgment shall limit any rights of Plaintiff to seek any other relief or criminal or civil remedies provided by law against other parties related to the subject loan identified herein.

**5.     MATTERS COVERED BY THIS SETTLEMENT AGREEMENT, FINDING OF FACT AND JUDGMENT.**

5.1.     The Court finds that on stipulation between Parties, all matters are factually accurate as supported by evidence attached herein and conclusively

- 4 -

**EXHIBIT 18, PAGE 145**

determined that AMERICAS WHOLESALE LENDER, INC., New York Corporation, is the Lender and beneficial owner of the subject loan and no other party holds any interest in the subject property as described herein.

5.2.    This settlement agreement and Final Judgment is a final and binding resolution and settlement of all "Covered Matters." As used in this Final Judgment, Cover Matters means all claims that have been alleged, or claims that could have been asserted within the scope of the allegations set forth, in the Complaint in this matter, stipulation and finding of facts as established by evidence attached herein.

5.3.    Any claims, violations or causes of action against AWL or its officers that are not alleged in the Complaint, including, but not limited to, any violations of laws are hereby forever waived.

**6.    NOTICE.**

All submissions and notices required by this agreement shall be sent to:

For Plaintiff:

> TAN NGUYEN
> 14791 Riata St.
> Midway City, CA 92655

With Copies to

> Global Capital Law, P.C.
> 8700 Warner Ave., Ste 200
> Fountain Valley, CA 92708

For Americas Wholesale Lender, Inc.:

> 875 Avenue of the Americas, Ste 501
> New York, NY 10001.

Any Party may change its notice name and address by informing the other party in writing, but no change is effective until it is received. All notices and other communications required or permitted under this agreement that are properly addressed as provided in this paragraph are effective upon delivery if

SETTLEMENT AGREEMENT, STIPULATION FOR ENTRY OF JUDGEMENT AND JUDGMENT.

**EXHIBIT 18, PAGE 146**

delivered personally or by overnight mail, or are effective five (5) days following deposit in the United States mail, postage prepaid, if delivered by mail.

**7.     APPLICATION OF AGREEMENT AND FINAL JUDGMENT.**

This agreement and Final Judgment shall apply to and be binding upon the Plaintiff and upon Americas Wholesale Lender, Inc., a New York Corporation and its successors and assigns.

**8.     AUTHORITY TO ENTER AGREEMENT AND FINAL JUDGMENT.**

Each signatory to this Agreement and Final Judgment certifies that he or she is fully authorized by the party he or she represents to enter into this Agreement and Final Judgment, to execute it on behalf of the party represented and legally to bind that party.

**9.     INTERPRETATION.**

This Agreement and Final Judgment was drafted equally by all Parties. The Parties agree that the rule of construction holding that ambiguity is construed against the drafting party shall not apply to the interpretation of this Agreement and Final Judgment.

**10.   COUNTERPART SIGNATURES.**

This Agreement and Final Judgment may be executed by the Parties in counterpart.

**11. INTEGRATION.**

This Agreement and Final Judgment constitutes the entire agreement between the Parties and may not be amended or supplemented except as provided for in this agreement.  No oral representations have been made or relied upon other than as expressly set forth herein.

/./././

/././

/././

**EXHIBIT 18, PAGE 147**

**12. MOFIDICATION.**

This Agreement and Final Judgment may be modified only on noticed motion by a Party with approval of the Court, or upon written consent of the Parties and the approval of the Court.

**13. INCORPORATION OF EXHIBITS.**

Each of the Exhibits is incorporated herein by reference.

**IT IS SO STIPULATED.**

For the Plaintiff, TAN NGUYEN:

DATED: _3/4/11_                                    _____
                                                          TAN NGUYEN


For the Defendant, AMERICAS WHOLESALE LENDER, INC.:

DATED: _____                                _____
                                                          Maurits Van Eck
                                                          Sr. Vice President

**EXHIBIT 18, PAGE 148**

**12. MOFIDICATION.**

This Agreement and Final Judgment may be modified only on noticed motion by a Party with approval of the Court, or upon written consent of the Parties and the approval of the Court.

**13. INCORPORATION OF EXHIBITS.**

Each of the Exhibits is incorporated herein by reference.

**IT IS SO STIPULATED.**

For the Plaintiff, TAN NGUYEN:

DATED: _____     _____
                            TAN NGUYEN

For the Defendant, AMERICAS WHOLESALE LENDER, INC.:

DATED: 3/30/2011            _____
                            Maurits Van Eck
                            Sr. Vice President

Corporate America's Wholesale Lender Inc. Seal

- 7 -

**EXHIBIT 18, PAGE 149**

# EXHIBIT 1

EXHIBIT 18, PAGE 150

Prepared by: NATHAN NGUYEN

LOAN #: 802685

# ADJUSTABLE RATE NOTE

(LIBOR One-Month Index - Payment Caps)

**THIS NOTE CONTAINS PROVISIONS THAT WILL CHANGE THE INTEREST RATE AND THE MONTHLY PAYMENT. THERE MAY BE A LIMIT ON THE AMOUNT THAT THE MONTHLY PAYMENT CAN INCREASE OR DECREASE. THE PRINCIPAL AMOUNT TO REPAY COULD BE GREATER THAN THE AMOUNT ORIGINALLY BORROWED, BUT NOT MORE THAN THE LIMIT STATED IN THIS NOTE.**

OCTOBER 04, 2004             SAN JOSE                    CALIFORNIA
      [Date]                    [City]                      [State]

14791 RIATA STREET, WESTMINSTER, CA 92655
[Property Address]

### 1. BORROWER'S PROMISE TO PAY

In return for a loan that I have received, I promise to pay U.S. $ 390,000.00      (this amount is called "Principal"), plus interest, to the order of Lender. Lender is
AMERICA'S WHOLESALE LENDER
I will make all payments under this Note in the form of cash, check or money order.

I understand that Lender may transfer this Note. Lender or anyone who takes this Note by transfer and who is entitled to receive payments under this Note is called the "Note Holder."

### 2. INTEREST

**(A) Interest Rate**

Interest will be charged on unpaid principal until the full amount of Principal has been paid. I will pay interest at a yearly rate of   1.000  %. The interest rate I will pay may change.

The interest rate required by this Section 2 is the rate I will pay both before and after any default described in Section 7(B) of this Note.

**(B) Interest Rate Change Dates**

The interest rate I will pay may change on the first          day of DECEMBER, 2004   , and on that day every month thereafter. Each date on which my interest rate could change is called an "Interest Rate Change Date." The new rate of interest will become effective on each Interest Rate Change Date.

**(C) Index**

Beginning with the first Change Date, my adjustable interest rate will be based on an Index. The "Index" is the average of interbank offered rates for one month U.S. dollar-denominated deposits in the London market ("LIBOR"), as published in The Wall Street Journal. The most recent Index figure available as of the date 15 days before each Change Date is called the "Current Index".

If the Index is no longer available, the Note Holder will choose a new index that is based upon comparable information. The Note Holder will give me notice of this choice.

**(D) Calculation of Interest Rate Changes**

Before each Interest Rate Change Date, the Note Holder will calculate my new interest rate by adding TWO & 60/100                        percentage point(s) (   2.600 %) to the Current Index. The Note Holder will then round the result of this addition to the nearest one-eighth of one percentage point (0.125%). This rounded amount will be my new interest rate until the next Interest Rate Change Date. My interest rate will never be greater than   9.950 %.

CONV
● ARM PayOption Note with Prepayment Penalty Option
2D726-XX (12/03)(d)

Page 1 of 4

Initials: 

```
* 2 3 8 9 1 *
```

```
* 0 0 0 8 0 2 6 6 5 0 0 0 0 0 2 D 7 2 6 *
```

**EXHIBIT 18, PAGE 151**

LOAN #: 802685

**3. PAYMENTS**

**(A) Time and Place of Payments**

I will pay principal and interest by making a payment every month.

I will make my monthly payments on the first day of each month beginning on DECEMBER 01, 2004 . I will make these payments every month until I have paid all the principal and interest and any other charges described below that I may owe under this Note. Each monthly payment will be applied as of its scheduled due date and will be applied to interest before Principal. If, on NOVEMBER 01, 2034 , I still owe amounts under this Note, I will pay those amounts in full on that date, which is called the "Maturity Date."

I will make my monthly payments at
P.O. Box 10219, Van Nuys, CA 91410-0219
or at a different place if required by the Note Holder.

**(B) Amount of My Initial Monthly Payments**

Each of my initial monthly payments will be in the amount of U.S. $ 1,254.39 . This amount may change.

**(C) Payment Change Dates**

My monthly payment may change as required by Section 3(D) below beginning on the first day of DECEMBER, 2005 , and on that day every 12th month thereafter. Each of these dates is called a "Payment Change Date." My monthly payment also will change at any time Section 3(F) or 3(G) below requires me to pay a different monthly payment.

I will pay the amount of my new monthly payment each month beginning on each Payment Change Date or as provided in Section 3(F) or 3(G) below.

**(D) Calculation of Monthly Payment Changes**

At least 30 days before each Payment Change Date, the Note Holder will calculate the amount of the monthly payment that would be sufficient to repay the unpaid principal that I am expected to owe at the Payment Change Date in full on the maturity date in substantially equal installments at the interest rate effective during the month preceding the Payment Change Date. The result of this calculation is called the "Full Payment." The Note Holder will then calculate the amount of my monthly payment due the month preceding the Payment Change Date multiplied by the number 1.075. The result of this calculation is called the "Limited Payment." Unless Section 3(F) or 3(G) below requires me to pay a different amount, my new required monthly payment will be the lesser of the Limited Payment and the Full Payment. I also have the option each month to pay more than the Limited Payment up to and including the Full Payment for my monthly payment.

**(E) Additions to My Unpaid Principal**

My monthly payment could be less than the amount of the interest portion of the monthly payment that would be sufficient to repay the unpaid principal I owe at the monthly payment date in full on the Maturity Date in substantially equal payments. If so, each month that my monthly payment is less than the interest portion, the Note Holder will subtract the amount of my monthly payment from the amount of the interest portion and will add the difference to my unpaid principal. The Note Holder also will add interest on the amount of this difference to my unpaid principal each month. The interest rate on the interest added to Principal will be the rate required by Section 2 above.

**(F) Limit on My Unpaid Principal; Increased Monthly Payment**

My unpaid principal can never exceed a maximum amount equal to ONE HUNDRED FIFTEEN percent ( 115 %) of the Principal amount I originally borrowed. My unpaid principal could exceed that maximum amount due to the Limited Payments and interest rate increases. In that event, on the date that my paying my monthly payment would cause me to exceed that limit, I will instead pay a new monthly payment. The new monthly payment will be in an amount that would be sufficient to repay my then unpaid principal in full on the Maturity Date in substantially equal installments at the current interest rate.

**(G) Required Full Payment**

On the fifth Payment Change Date and on each succeeding fifth Payment Change Date thereafter, I will begin paying the Full Payment as my monthly payment until my monthly payment changes again. I also will begin paying the Full Payment as my monthly payment on the final Payment Change Date.

**4. NOTICE OF CHANGES**

The Note Holder will deliver or mail to me a notice of any changes in the amount of my monthly payment before the effective date of any change. The notice will include information required by law to be given to me and also the title and telephone number of a person who will answer any question I may have regarding the notice.

**EXHIBIT 18, PAGE 152**

LOAN #: 802685

**5.  BORROWER'S RIGHT TO PREPAY**

I have the right to make payments of Principal at any time before they are due. A payment of Principal only is known as a "Prepayment." When I make a Prepayment, I will tell the Note Holder in writing that I am doing so.

Subject to the Prepayment penalty specified below, I may make a full Prepayment or partial Prepayments of my obligation. The Note Holder will use all of my Prepayments to reduce the amount of Principal that I owe under this Note. If I make a partial Prepayment, there will be no changes in the due date or in the amount of my monthly payment unless the Note Holder agrees in writing to those changes.

If within the first THIRTY SIX        months after the execution of the Note, I make any Prepayment(s) within any 12-month period, the total of which exceeds twenty (20) percent of the original Principal amount of this loan, I will pay a Prepayment penalty in an amount equal to the payment of six (6) months' advance interest on the amount by which the total of my Prepayment(s) within that 12-month period exceeds twenty (20) percent of the original Principal amount of the loan. The Note Holder will waive this penalty if I furnish the Note Holder with documentation, in the manner and at a time reasonably specified by the Note Holder, identifying the Prepayment as being in connection with the sale of the Property to an unrelated Third Party.

**6.  LOAN CHARGES**

If a law, which applies to this loan and which sets maximum loan charges, is finally interpreted so that the interest or other loan charges collected or to be collected in connection with this loan exceed the permitted limits, then: (a) any such loan charge shall be reduced by the amount necessary to reduce the charge to the permitted limit; and (b) any sums already collected from me that exceeded permitted limits will be refunded to me. The Note Holder may choose to make this refund by reducing the Principal I owe under this Note or by making a direct payment to me. If a refund reduces Principal, the reduction will be treated as a partial Prepayment.

**7.  BORROWER'S FAILURE TO PAY AS REQUIRED**

**(A) Late Charges for Overdue Payments**

If the Note Holder has not received the full amount of any monthly payment by the end of   FIFTEEN        calendar days after the date it is due, I will pay a late charge to the Note Holder. The amount of the charge will be    5.000  % of my overdue payment of principal and interest. I will pay this late charge promptly but only once on each late payment.

**(B) Default**

If I do not pay the full amount of each monthly payment on the date it is due, I will be in default.

**(C) Notice of Default**

If I am in default, the Note Holder may send me a written notice telling me that if I do not pay the overdue amount by a certain date, the Note Holder may require me to pay immediately the full amount of Principal that has not been paid and all the interest that I owe on that amount. That date must be at least 30 days after the date on which the notice is mailed to me or delivered by other means.

**(D) No Waiver By Note Holder**

Even if, at a time when I am in default, the Note Holder does not require me to pay immediately in full as described above, the Note Holder will still have the right to do so if I am in default at a later time.

**(E) Payment of Note Holder's Costs and Expenses**

If the Note Holder has required me to pay immediately in full as described above, the Note Holder will have the right to be paid back by me for all of its costs and expenses in enforcing this Note to the extent not prohibited by applicable law. These expenses include, for example, reasonable attorneys' fees.

**8.  GIVING OF NOTICES**

Unless applicable law requires a different method, any notice that must be given to me under this Note will be given by delivering it or by mailing it by first class mail to me at the Property Address above or at a different address if I give the Note Holder a notice of my different address.

Unless the Note Holder requires a different method, any notice that must be given to the Note Holder under this Note will be given by delivering it or by mailing it by first class mail to the Note Holder at the address stated in Section 3(A) above or at a different address if I am given a notice of that different address.

**9.  OBLIGATIONS OF PERSONS UNDER THIS NOTE**

If more than one person signs this Note, each person is fully and personally obligated to keep all the promises made in this Note, including the promise to pay the full amount owed. Any person who is a guarantor, surety or endorser of this Note is also obligated to do these things. Any person who takes over these obligations, including the obligations of a guarantor, surety or endorser of this Note, is also obligated to keep all the promises made in this Note. The Note Holder may enforce its rights under this Note against each person individually or against all of us together. This means that any one of us may be required to pay all the amounts owed under this Note.

**10.  WAIVERS**

I and any other person who has obligations under this Note waive the rights of Presentment and Notice of Dishonor. "Presentment" means the right to require the Note Holder to demand payment of amounts due. "Notice of Dishonor" means the right to require the Note Holder to give notice to other persons that amounts due have not been paid.

**EXHIBIT 18, PAGE 153**

LOAN #: 802685

**11. UNIFORM SECURED NOTE**

This Note is a uniform instrument with limited variations in some jurisdictions. In addition to the protections given to the Note Holder under this Note, a Mortgage, Deed of Trust, or Security Deed (the "Security Instrument"), dated the same date as this Note, protects the Note Holder from possible losses that might result if I do not keep the promises that I make in this Note. That Security Instrument describes how and under what conditions I may be required to make immediate payment in full of all amounts I owe under this Note. Some of these conditions are described as follows:

Transfer of the Property or a Beneficial Interest in Borrower. As used in this Section 18, "Interest in the Property" means any legal or beneficial interest in the Property, including, but not limited to, those beneficial interests transferred in a bond for deed, contract for deed, installment sales contract or escrow agreement, the intent of which is the transfer of title by Borrower at a future date to a purchaser.

If all or any part of the Property or any Interest in the Property is sold or transferred (or if Borrower is not a natural person and a beneficial interest in Borrower is sold or transferred) without Lender's prior written consent, Lender may require immediate payment in full of all sums secured by this Security Instrument. However, this option shall not be exercised by Lender if such exercise is prohibited by Applicable Law. Lender also shall not exercise this option if: (a) Borrower causes to be submitted to Lender information required by Lender to evaluate the intended transferee as if a new loan were being made to the transferee; and (b) Lender reasonably determines that Lender's security will not be impaired by the loan assumption and that the risk of a breach of any covenant or agreement in this Security Instrument is acceptable to Lender.

To the extent permitted by Applicable Law, Lender may charge a reasonable fee as a condition to Lender's consent to the loan assumption. Lender may also require the transferee to sign an assumption agreement that is acceptable to Lender and that obligates the transferee to keep all the promises and agreements made in the Note and in this Security Instrument. Borrower will continue to be obligated under the Note and this Security Instrument unless Lender releases Borrower in writing.

If Lender exercises the option to require immediate payment in full, Lender shall give Borrower notice of acceleration. The notice shall provide a period of not less than 30 days from the date the notice is given in accordance with Section 15 within which Borrower must pay all sums secured by this Security Instrument. If Borrower fails to pay these sums prior to the expiration of this period, Lender may invoke any remedies permitted by this Security Instrument without further notice or demand on Borrower.

WITNESS THE HAND(S) AND SEAL(S) OF THE UNDERSIGNED.

_____ (Seal)
TAN KHANH NGUYEN                                                    -Borrower

_____ (Seal)
                                                                              -Borrower

_____ (Seal)
                                                                              -Borrower

_____ (Seal)
                                                                              -Borrower

[Sign Original Only]

CONV
● ARM PayOption Note with Prepayment Penalty Option
2D728-XX (12/03)                              Page 4 of 4

**EXHIBIT 18, PAGE 154**

# EXHIBIT 2

RECORDING REQUESTED BY:
Stewart Title

WHEN RECORDED MAIL TO:

Countrywide Home Loans, Inc.
MS SV-79 Document Processing
P.O. Box 10423
Van Nuys, CA 91410-0423

**RECORDING REQUESTED
BY STEWART TITLE
IRVINE** 40205968

Recorded in Official Records, Orange County
Tom Daly, Clerk-Recorder

‖‖‖‖‖‖‖‖‖‖‖‖‖‖‖‖‖‖‖‖‖  **84.00**

**2004000938222 12:47pm 10/18/04**
203 59 D11 27

0.00 0.00 0.00 0.00 78.00 0.00 0.00 0.00

## DEED OF TRUST
DOCUMENT TITLE

SEPARATE PAGE PURSUANT TO GOVERNMENT CODE 27361.6

**EXHIBIT 18, PAGE 156**

RECORDING REQUESTED
BY STEWART TITLE
IRVINE

Recording Requested By:
W. WISMAR

After Recording Return To:
COUNTRYWIDE HOME LOANS, INC.

MS SV-79 DOCUMENT PROCESSING
P.O.Box 10423
Van Nuys, CA 91410-0423

Prepared By:
NATHAN NGUYEN

40205968

_____ [Space Above This Line For Recording Data] _____

E29392883                                           00080268510004
[Escrow/Closing #]                                  [Doc ID #]

# DEED OF TRUST

MIN 1000157-0004229160-5

## DEFINITIONS

Words used in multiple sections of this document are defined below and other words are defined in Sections 3, 11, 13, 18, 20 and 21. Certain rules regarding the usage of words used in this document are also provided in Section 16.

(A) "Security Instrument" means this document, which is dated OCTOBER 04, 2004    , together with all Riders to this document.

(B) "Borrower" is

TAN KHANH NGUYEN, AN UNMARRIED MAN

CALIFORNIA-Single Family-Fannie Mae/Freddie Mac UNIFORM INSTRUMENT WITH MERS

Page 1 of 16                                                    Initials: _____

-6A(CA) (0207)    CHL (09/02)(d)    VMP MORTGAGE FORMS - (800)521-7291         Form 3005  1/01
CONV/VA

*23991*

*0008026850000001006A*

DOC ID #: 00080268510004

Borrower's address is
14791 RIATA STREET, WESTMINSTER, CA 92655
Borrower is the trustor under this Security Instrument.
(C) "Lender" is
AMERICA'S WHOLESALE LENDER
Lender is a CORPORATION
organized and existing under the laws of NEW YORK
Lender's address is
P.O. Box 10219, Van Nuys, CA 91410-0219
(D) "Trustee" is
CTC FORECLOSURE SERVICES CORPORATION
155 N. LAKE AVENUE, PASADENA, CA 91109-7137 ,
(E) "MERS" is Mortgage Electronic Registration Systems, Inc. MERS is a separate corporation that is acting solely as a nominee for Lender and Lender's successors and assigns. **MERS is the beneficiary under this Security Instrument.** MERS is organized and existing under the laws of Delaware, and has an address and telephone number of P.O. Box 2026, Flint, MI 48501-2026, tel. (888) 679-MERS.
(F) "Note" means the promissory note signed by Borrower and dated OCTOBER 04, 2004      . The Note states that Borrower owes Lender
THREE HUNDRED NINETY THOUSAND and 00/100

Dollars (U.S. $ 390,000.00      ) plus interest. Borrower has promised to pay this debt in regular Periodic Payments and to pay the debt in full not later than NOVEMBER 01, 2034      .
(G) "Property" means the property that is described below under the heading "Transfer of Rights in the Property."
(H) "Loan" means the debt evidenced by the Note, plus interest, any prepayment charges and late charges due under the Note, and all sums due under this Security Instrument, plus interest.
(I) "Riders" means all Riders to this Security Instrument that are executed by Borrower. The following Riders are to be executed by Borrower [check box as applicable]:

| [X] Adjustable Rate Rider | [ ] Condominium Rider | [ ] Second Home Rider |
| [ ] Balloon Rider | [ ] Planned Unit Development Rider | [ ] 1-4 Family Rider |
| [ ] VA Rider | [ ] Biweekly Payment Rider | [ ] Other(s) [specify] |

(J) "Applicable Law" means all controlling applicable federal, state and local statutes, regulations, ordinances and administrative rules and orders (that have the effect of law) as well as all applicable final, non-appealable judicial opinions.
(K) "Community Association Dues, Fees, and Assessments" means all dues, fees, assessments and other charges that are imposed on Borrower or the Property by a condominium association, homeowners association or similar organization.
(L) "Electronic Funds Transfer" means any transfer of funds, other than a transaction originated by check, draft, or similar paper instrument, which is initiated through an electronic terminal, telephonic instrument, computer, or magnetic tape so as to order, instruct, or authorize a financial institution to debit or credit an account. Such term includes, but is not limited to, point-of-sale transfers, automated teller machine transactions, transfers initiated by telephone, wire transfers, and automated clearinghouse transfers.
(M) "Escrow Items" means those items that are described in Section 3.
(N) "Miscellaneous Proceeds" means any compensation, settlement, award of damages, or proceeds paid by any third party (other than insurance proceeds paid under the coverages described in Section 5) for: (i) damage to, or destruction of, the Property; (ii) condemnation or other taking of all or any part of the Property; (iii)

Initials: _LT_

-6A(CA) (0207)          CHL (09/02)          Page 2 of 16          Form 3005 1/01

DOC ID #: 00080268510004

conveyance in lieu of condemnation; or (iv) misrepresentations of, or omissions as to, the value and/or condition of the Property.

**(O) "Mortgage Insurance"** means insurance protecting Lender against the nonpayment of, or default on, the Loan.

**(P) "Periodic Payment"** means the regularly scheduled amount due for (i) principal and interest under the Note, plus (ii) any amounts under Section 3 of this Security Instrument.

**(Q) "RESPA"** means the Real Estate Settlement Procedures Act (12 U.S.C. Section 2601 et seq.) and its implementing regulation, Regulation X (24 C.F.R. Part 3500), as they might be amended from time to time, or any additional or successor legislation or regulation that governs the same subject matter. As used in this Security Instrument, "RESPA" refers to all requirements and restrictions that are imposed in regard to a "federally related mortgage loan" even if the Loan does not qualify as a "federally related mortgage loan" under RESPA.

**(R) "Successor in Interest of Borrower"** means any party that has taken title to the Property, whether or not that party has assumed Borrower's obligations under the Note and/or this Security Instrument.

**TRANSFER OF RIGHTS IN THE PROPERTY**
The beneficiary of this Security Instrument is MERS (solely as nominee for Lender and Lender's successors and assigns) and the successors and assigns of MERS. This Security Instrument secures to Lender: (i) the repayment of the Loan, and all renewals, extensions and modifications of the Note; and (ii) the performance of Borrower's covenants and agreements under this Security Instrument and the Note. For this purpose, Borrower irrevocably grants and conveys to Trustee, in trust, with power of sale, the following described property located in the COUNTY of ORANGE :

| [Type of Recording Jurisdiction] | [Name of Recording Jurisdiction] |

SEE EXHIBIT "A" ATTACHED HERETO AND MADE A PART HEREOF.

Parcel ID Number: 09746404          which currently has the address of
14791 RIATA STREET, WESTMINSTER ,
[Street/City]

California    92655    ("Property Address"):
[Zip Code]

TOGETHER WITH all the improvements now or hereafter erected on the property, and all easements, appurtenances, and fixtures now or hereafter a part of the property. All replacements and additions shall also be covered by this Security Instrument. All of the foregoing is referred to in this Security Instrument as the "Property." Borrower understands and agrees that MERS holds only legal title to the interests granted by Borrower in this Security Instrument, but, if necessary to comply with law or custom, MERS (as nominee for Lender and Lender's successors and assigns) has the right: to exercise any or all of those interests, including,

Initials: *N. T*

-6A(CA) (0207)    CHL (09/02)    Page 3 of 16    Form 3005 1/01

**EXHIBIT 18, PAGE 159**

DOC ID #: 00080268510004

but not limited to, the right to foreclose and sell the Property; and to take any action required of Lender including, but not limited to, releasing and canceling this Security Instrument.

BORROWER COVENANTS that Borrower is lawfully seised of the estate hereby conveyed and has the right to grant and convey the Property and that the Property is unencumbered, except for encumbrances of record. Borrower warrants and will defend generally the title to the Property against all claims and demands, subject to any encumbrances of record.

THIS SECURITY INSTRUMENT combines uniform covenants for national use and non-uniform covenants with limited variations by jurisdiction to constitute a uniform security instrument covering real property.

UNIFORM COVENANTS. Borrower and Lender covenant and agree as follows:

**1. Payment of Principal, Interest, Escrow Items, Prepayment Charges, and Late Charges.** Borrower shall pay when due the principal of, and interest on, the debt evidenced by the Note and any prepayment charges and late charges due under the Note. Borrower shall also pay funds for Escrow Items pursuant to Section 3. Payments due under the Note and this Security Instrument shall be made in U.S. currency. However, if any check or other instrument received by Lender as payment under the Note or this Security Instrument is returned to Lender unpaid, Lender may require that any or all subsequent payments due under the Note and this Security Instrument be made in one or more of the following forms, as selected by Lender: (a) cash; (b) money order; (c) certified check, bank check, treasurer's check or cashier's check, provided any such check is drawn upon an institution whose deposits are insured by a federal agency, instrumentality, or entity; or (d) Electronic Funds Transfer.

Payments are deemed received by Lender when received at the location designated in the Note or at such other location as may be designated by Lender in accordance with the notice provisions in Section 15. Lender may return any payment or partial payment if the payment or partial payments are insufficient to bring the Loan current. Lender may accept any payment or partial payment insufficient to bring the Loan current, without waiver of any rights hereunder or prejudice to its rights to refuse such payment or partial payments in the future, but Lender is not obligated to apply such payments at the time such payments are accepted. If each Periodic Payment is applied as of its scheduled due date, then Lender need not pay interest on unapplied funds. Lender may hold such unapplied funds until Borrower makes payment to bring the Loan current. If Borrower does not do so within a reasonable period of time, Lender shall either apply such funds or return them to Borrower. If not applied earlier, such funds will be applied to the outstanding principal balance under the Note immediately prior to foreclosure. No offset or claim which Borrower might have now or in the future against Lender shall relieve Borrower from making payments due under the Note and this Security Instrument or performing the covenants and agreements secured by this Security Instrument.

**2. Application of Payments or Proceeds.** Except as otherwise described in this Section 2, all payments accepted and applied by Lender shall be applied in the following order of priority: (a) interest due under the Note; (b) principal due under the Note; (c) amounts due under Section 3. Such payments shall be applied to each Periodic Payment in the order in which it became due. Any remaining amounts shall be applied first to late charges, second to any other amounts due under this Security Instrument, and then to reduce the principal balance of the Note.

If Lender receives a payment from Borrower for a delinquent Periodic Payment which includes a sufficient amount to pay any late charge due, the payment may be applied to the delinquent payment and the late charge. If more than one Periodic Payment is outstanding, Lender may apply any payment received from Borrower to the repayment of the Periodic Payments if, and to the extent that, each payment can be paid in full. To the extent that any excess exists after the payment is applied to the full payment of one or more Periodic Payments, such excess may be applied to any late charges due. Voluntary prepayments shall be applied first to any prepayment charges and then as described in the Note.

Any application of payments, insurance proceeds, or Miscellaneous Proceeds to principal due under the Note shall not extend or postpone the due date, or change the amount, of the Periodic Payments.

**EXHIBIT 18, PAGE 160**

DOC ID #: 0008026851004

**3. Funds for Escrow Items.** Borrower shall pay to Lender on the day Periodic Payments are due under the Note, until the Note is paid in full, a sum (the "Funds") to provide for payment of amounts due for: (a) taxes and assessments and other items which can attain priority over this Security Instrument as a lien or encumbrance on the Property; (b) leasehold payments or ground rents on the Property, if any; (c) premiums for any and all insurance required by Lender under Section 5; and (d) Mortgage Insurance premiums, if any, or any sums payable by Borrower to Lender in lieu of the payment of Mortgage Insurance premiums in accordance with the provisions of Section 10. These items are called "Escrow Items." At origination or at any time during the term of the Loan, Lender may require that Community Association Dues, Fees, and Assessments, if any, be escrowed by Borrower, and such dues, fees and assessments shall be an Escrow Item. Borrower shall promptly furnish to Lender all notices of amounts to be paid under this Section. Borrower shall pay Lender the Funds for Escrow Items unless Lender waives Borrower's obligation to pay the Funds for any or all Escrow Items. Lender may waive Borrower's obligation to pay to Lender Funds for any or all Escrow Items at any time. Any such waiver may only be in writing. In the event of such waiver, Borrower shall pay directly, when and where payable, the amounts due for any Escrow Items for which payment of Funds has been waived by Lender and, if Lender requires, shall furnish to Lender receipts evidencing such payment within such time period as Lender may require. Borrower's obligation to make such payments and to provide receipts shall for all purposes be deemed to be a covenant and agreement contained in this Security Instrument, as the phrase "covenant and agreement" is used in Section 9. If Borrower is obligated to pay Escrow Items directly, pursuant to a waiver, and Borrower fails to pay the amount due for an Escrow Item, Lender may exercise its rights under Section 9 and pay such amount and Borrower shall then be obligated under Section 9 to repay to Lender any such amount. Lender may revoke the waiver as to any or all Escrow Items at any time by a notice given in accordance with Section 15 and, upon such revocation, Borrower shall pay to Lender all Funds, and in such amounts, that are then required under this Section 3.

Lender may, at any time, collect and hold Funds in an amount (a) sufficient to permit Lender to apply the Funds at the time specified under RESPA, and (b) not to exceed the maximum amount a lender can require under RESPA. Lender shall estimate the amount of Funds due on the basis of current data and reasonable estimates of expenditures of future Escrow Items or otherwise in accordance with Applicable Law.

The Funds shall be held in an institution whose deposits are insured by a federal agency, instrumentality, or entity (including Lender, if Lender is an institution whose deposits are so insured) or in any Federal Home Loan Bank. Lender shall apply the Funds to pay the Escrow Items no later than the time specified under RESPA. Lender shall not charge Borrower for holding and applying the Funds, annually analyzing the escrow account, or verifying the Escrow Items, unless Lender pays Borrower interest on the Funds and Applicable Law permits Lender to make such a charge. Unless an agreement is made in writing or Applicable Law requires interest to be paid on the Funds, Lender shall not be required to pay Borrower any interest or earnings on the Funds. Borrower and Lender can agree in writing, however, that interest shall be paid on the Funds. Lender shall give to Borrower, without charge, an annual accounting of the Funds as required by RESPA.

If there is a surplus of Funds held in escrow, as defined under RESPA, Lender shall account to Borrower for the excess funds in accordance with RESPA. If there is a shortage of Funds held in escrow, as defined under RESPA, Lender shall notify Borrower as required by RESPA, and Borrower shall pay to Lender the amount necessary to make up the shortage in accordance with RESPA, but in no more than 12 monthly payments. If there is a deficiency of Funds held in escrow, as defined under RESPA, Lender shall notify Borrower as required by RESPA, and Borrower shall pay to Lender the amount necessary to make up the deficiency in accordance with RESPA, but in no more than 12 monthly payments.

Upon payment in full of all sums secured by this Security Instrument, Lender shall promptly refund to Borrower any Funds held by Lender.

-6A(CA) (0207)    CHL (09/02)    Page 5 of 16    Initials: _N.T_    Form 3005 1/01

EXHIBIT 18, PAGE 161

DOC ID #: 00080268510004

**4. Charges; Liens.** Borrower shall pay all taxes, assessments, charges, fines, and impositions attributable to the Property which can attain priority over this Security Instrument, leasehold payments or ground rents on the Property, if any, and Community Association Dues, Fees, and Assessments, if any. To the extent that these items are Escrow Items, Borrower shall pay them in the manner provided in Section 3.

Borrower shall promptly discharge any lien which has priority over this Security Instrument unless Borrower: (a) agrees in writing to the payment of the obligation secured by the lien in a manner acceptable to Lender, but only so long as Borrower is performing such agreement; (b) contests the lien in good faith by, or defends against enforcement of the lien in, legal proceedings which in Lender's opinion operate to prevent the enforcement of the lien while those proceedings are pending, but only until such proceedings are concluded; or (c) secures from the holder of the lien an agreement satisfactory to Lender subordinating the lien to this Security Instrument. If Lender determines that any part of the Property is subject to a lien which can attain priority over this Security Instrument, Lender may give Borrower a notice identifying the lien. Within 10 days of the date on which that notice is given, Borrower shall satisfy the lien or take one or more of the actions set forth above in this Section 4.

Lender may require Borrower to pay a one-time charge for a real estate tax verification and/or reporting service used by Lender in connection with this Loan.

**5. Property Insurance.** Borrower shall keep the improvements now existing or hereafter erected on the Property insured against loss by fire, hazards included within the term "extended coverage," and any other hazards including, but not limited to, earthquakes and floods, for which Lender requires insurance. This insurance shall be maintained in the amounts (including deductible levels) and for the periods that Lender requires. What Lender requires pursuant to the preceding sentences can change during the term of the Loan. The insurance carrier providing the insurance shall be chosen by Borrower subject to Lender's right to disapprove Borrower's choice, which right shall not be exercised unreasonably. Lender may require Borrower to pay, in connection with this Loan, either: (a) a one-time charge for flood zone determination, certification and tracking services; or (b) a one-time charge for flood zone determination and certification services and subsequent charges each time remappings or similar changes occur which reasonably might affect such determination or certification. Borrower shall also be responsible for the payment of any fees imposed by the Federal Emergency Management Agency in connection with the review of any flood zone determination resulting from an objection by Borrower.

If Borrower fails to maintain any of the coverages described above, Lender may obtain insurance coverage, at Lender's option and Borrower's expense. Lender is under no obligation to purchase any particular type or amount of coverage. Therefore, such coverage shall cover Lender, but might or might not protect Borrower, Borrower's equity in the Property, or the contents of the Property, against any risk, hazard or liability and might provide greater or lesser coverage than was previously in effect. Borrower acknowledges that the cost of the insurance coverage so obtained might significantly exceed the cost of insurance that Borrower could have obtained. Any amounts disbursed by Lender under this Section 5 shall become additional debt of Borrower secured by this Security Instrument. These amounts shall bear interest at the Note rate from the date of disbursement and shall be payable, with such interest, upon notice from Lender to Borrower requesting payment.

All insurance policies required by Lender and renewals of such policies shall be subject to Lender's right to disapprove such policies, shall include a standard mortgage clause, and shall name Lender as mortgagee and/or as an additional loss payee and Borrower further agrees to generally assign rights to insurance proceeds to the holder of the Note up to the amount of the outstanding loan balance. Lender shall have the right to hold the policies and renewal certificates. If Lender requires, Borrower shall promptly give to Lender all receipts of

**EXHIBIT 18, PAGE 162**

DOC ID #: 00080268510004

paid premiums and renewal notices. If Borrower obtains any form of insurance coverage, not otherwise
required by Lender, for damage to, or destruction of, the Property, such policy shall include a standard
mortgage clause and shall name Lender as mortgagee and/or as an additional loss payee and Borrower further
agrees to generally assign rights to insurance proceeds to the holder of the Note up to the amount of the
outstanding loan balance.

In the event of loss, Borrower shall give prompt notice to the insurance carrier and Lender. Lender may
make proof of loss if not made promptly by Borrower. Unless Lender and Borrower otherwise agree in
writing, any insurance proceeds, whether or not the underlying insurance was required by Lender, shall be
applied to restoration or repair of the Property, if the restoration or repair is economically feasible and
Lender's security is not lessened. During such repair and restoration period, Lender shall have the right to hold
such insurance proceeds until Lender has had an opportunity to inspect such Property to ensure the work has
been completed to Lender's satisfaction, provided that such inspection shall be undertaken promptly. Lender
may disburse proceeds for the repairs and restoration in a single payment or in a series of progress payments
as the work is completed. Unless an agreement is made in writing or Applicable Law requires interest to be
paid on such insurance proceeds, Lender shall not be required to pay Borrower any interest or earnings on
such proceeds. Fees for public adjusters, or other third parties, retained by Borrower shall not be paid out of
the insurance proceeds and shall be the sole obligation of Borrower. If the restoration or repair is not
economically feasible or Lender's security would be lessened, the insurance proceeds shall be applied to the
sums secured by this Security Instrument, whether or not then due, with the excess, if any, paid to Borrower.
Such insurance proceeds shall be applied in the order provided for in Section 2.

If Borrower abandons the Property, Lender may file, negotiate and settle any available insurance claim
and related matters. If Borrower does not respond within 30 days to a notice from Lender that the insurance
carrier has offered to settle a claim, then Lender may negotiate and settle the claim. The 30-day period will
begin when the notice is given. In either event, or if Lender acquires the Property under Section 22 or
otherwise, Borrower hereby assigns to Lender (a) Borrower's rights to any insurance proceeds in an amount
not to exceed the amounts unpaid under the Note or this Security Instrument, and (b) any other of Borrower's
rights (other than the right to any refund of unearned premiums paid by Borrower) under all insurance policies
covering the Property, insofar as such rights are applicable to the coverage of the Property. Lender may use
the insurance proceeds either to repair or restore the Property or to pay amounts unpaid under the Note or this
Security Instrument, whether or not then due.

6. **Occupancy.** Borrower shall occupy, establish, and use the Property as Borrower's principal residence
within 60 days after the execution of this Security Instrument and shall continue to occupy the Property as
Borrower's principal residence for at least one year after the date of occupancy, unless Lender otherwise
agrees in writing, which consent shall not be unreasonably withheld, or unless extenuating circumstances exist
which are beyond Borrower's control.

7. **Preservation, Maintenance and Protection of the Property; Inspections.** Borrower shall not
destroy, damage or impair the Property, allow the Property to deteriorate or commit waste on the Property.
Whether or not Borrower is residing in the Property, Borrower shall maintain the Property in order to prevent
the Property from deteriorating or decreasing in value due to its condition. Unless it is determined pursuant to
Section 5 that repair or restoration is not economically feasible, Borrower shall promptly repair the Property if
damaged to avoid further deterioration or damage. If insurance or condemnation proceeds are paid in
connection with damage to, or the taking of, the Property, Borrower shall be responsible for repairing or
restoring the Property only if Lender has released proceeds for such purposes. Lender may disburse proceeds
for the repairs and restoration in a single payment or in a series of progress payments as the work is
completed. If the insurance or condemnation proceeds are not sufficient to repair or restore the Property,
Borrower is not relieved of Borrower's obligation for the completion of such repair or restoration.

EXHIBIT 18, PAGE 163

DOC ID #: 0008026851004

Lender or its agent may make reasonable entries upon and inspections of the Property. If it has reasonable cause, Lender may inspect the interior of the improvements on the Property. Lender shall give Borrower notice at the time of or prior to such an interior inspection specifying such reasonable cause.

**8. Borrower's Loan Application.** Borrower shall be in default if, during the Loan application process, Borrower or any persons or entities acting at the direction of Borrower or with Borrower's knowledge or consent gave materially false, misleading, or inaccurate information or statements to Lender (or failed to provide Lender with material information) in connection with the Loan. Material representations include, but are not limited to, representations concerning Borrower's occupancy of the Property as Borrower's principal residence.

**9. Protection of Lender's Interest in the Property and Rights Under this Security Instrument.** If (a) Borrower fails to perform the covenants and agreements contained in this Security Instrument, (b) there is a legal proceeding that might significantly affect Lender's interest in the Property and/or rights under this Security Instrument (such as a proceeding in bankruptcy, probate, for condemnation or forfeiture, for enforcement of a lien which may attain priority over this Security Instrument or to enforce laws or regulations), or (c) Borrower has abandoned the Property, then Lender may do and pay for whatever is reasonable or appropriate to protect Lender's interest in the Property and rights under this Security Instrument, including protecting and/or assessing the value of the Property, and securing and/or repairing the Property. Lender's actions can include, but are not limited to: (a) paying any sums secured by a lien which has priority over this Security Instrument; (b) appearing in court; and (c) paying reasonable attorneys' fees to protect its interest in the Property and/or rights under this Security Instrument, including its secured position in a bankruptcy proceeding. Securing the Property includes, but is not limited to, entering the Property to make repairs, change locks, replace or board up doors and windows, drain water from pipes, eliminate building or other code violations or dangerous conditions, and have utilities turned on or off. Although Lender may take action under this Section 9, Lender does not have to do so and is not under any duty or obligation to do so. It is agreed that Lender incurs no liability for not taking any or all actions authorized under this Section 9.

Any amounts disbursed by Lender under this Section 9 shall become additional debt of Borrower secured by this Security Instrument. These amounts shall bear interest at the Note rate from the date of disbursement and shall be payable, with such interest, upon notice from Lender to Borrower requesting payment.

If this Security Instrument is on a leasehold, Borrower shall comply with all the provisions of the lease. If Borrower acquires fee title to the Property, the leasehold and the fee title shall not merge unless Lender agrees to the merger in writing.

**10. Mortgage Insurance.** If Lender required Mortgage Insurance as a condition of making the Loan, Borrower shall pay the premiums required to maintain the Mortgage Insurance in effect. If, for any reason, the Mortgage Insurance coverage required by Lender ceases to be available from the mortgage insurer that previously provided such insurance and Borrower was required to make separately designated payments toward the premiums for Mortgage Insurance, Borrower shall pay the premiums required to obtain coverage substantially equivalent to the Mortgage Insurance previously in effect, at a cost substantially equivalent to the cost to Borrower of the Mortgage Insurance previously in effect, from an alternate mortgage insurer selected by Lender. If substantially equivalent Mortgage Insurance coverage is not available, Borrower shall continue to pay to Lender the amount of the separately designated payments that were due when the insurance coverage ceased to be in effect. Lender will accept, use and retain these payments as a non-refundable loss reserve in lieu of Mortgage Insurance. Such loss reserve shall be non-refundable, notwithstanding the fact that the Loan is ultimately paid in full, and Lender shall not be required to pay Borrower any interest or earnings on such loss reserve. Lender can no longer require loss reserve payments if Mortgage Insurance coverage (in the amount and for the period that Lender requires) provided by an insurer selected by Lender again becomes available, is obtained, and Lender requires separately designated payments toward the premiums for Mortgage Insurance. If Lender required Mortgage Insurance as a condition of making the Loan and Borrower was required to make separately designated payments toward the premiums for Mortgage Insurance, Borrower

-6A(CA) (0207)    CHL (09/02)    Page 8 of 16    Initials: _____    Form 3005 1/01

**EXHIBIT 18, PAGE 164**

DOC ID #: 00080268510004

shall pay the premiums required to maintain Mortgage Insurance in effect, or to provide a non-refundable loss reserve, until Lender's requirement for Mortgage Insurance ends in accordance with any written agreement between Borrower and Lender providing for such termination or until termination is required by Applicable Law. Nothing in this Section 10 affects Borrower's obligation to pay interest at the rate provided in the Note.

Mortgage Insurance reimburses Lender (or any entity that purchases the Note) for certain losses it may incur if Borrower does not repay the Loan as agreed. Borrower is not a party to the Mortgage Insurance.

Mortgage insurers evaluate their total risk on all such insurance in force from time to time, and may enter into agreements with other parties that share or modify their risk, or reduce losses. These agreements are on terms and conditions that are satisfactory to the mortgage insurer and the other party (or parties) to these agreements. These agreements may require the mortgage insurer to make payments using any source of funds that the mortgage insurer may have available (which may include funds obtained from Mortgage Insurance premiums).

As a result of these agreements, Lender, any purchaser of the Note, another insurer, any reinsurer, any other entity, or any affiliate of any of the foregoing, may receive (directly or indirectly) amounts that derive from (or might be characterized as) a portion of Borrower's payments for Mortgage Insurance, in exchange for sharing or modifying the mortgage insurer's risk, or reducing losses. If such agreement provides that an affiliate of Lender takes a share of the insurer's risk in exchange for a share of the premiums paid to the insurer, the arrangement is often termed "captive reinsurance." Further:

(a) Any such agreements will not affect the amounts that Borrower has agreed to pay for Mortgage Insurance, or any other terms of the Loan. Such agreements will not increase the amount Borrower will owe for Mortgage Insurance, and they will not entitle Borrower to any refund.

(b) Any such agreements will not affect the rights Borrower has - if any - with respect to the Mortgage Insurance under the Homeowners Protection Act of 1998 or any other law. These rights may include the right to receive certain disclosures, to request and obtain cancellation of the Mortgage Insurance, to have the Mortgage Insurance terminated automatically, and/or to receive a refund of any Mortgage Insurance premiums that were unearned at the time of such cancellation or termination.

11. **Assignment of Miscellaneous Proceeds; Forfeiture.** All Miscellaneous Proceeds are hereby assigned to and shall be paid to Lender.

If the Property is damaged, such Miscellaneous Proceeds shall be applied to restoration or repair of the Property, if the restoration or repair is economically feasible and Lender's security is not lessened. During such repair and restoration period, Lender shall have the right to hold such Miscellaneous Proceeds until Lender has had an opportunity to inspect such Property to ensure the work has been completed to Lender's satisfaction, provided that such inspection shall be undertaken promptly. Lender may pay for the repairs and restoration in a single disbursement or in a series of progress payments as the work is completed. Unless an agreement is made in writing or Applicable Law requires interest to be paid on such Miscellaneous Proceeds, Lender shall not be required to pay Borrower any interest or earnings on such Miscellaneous Proceeds. If the restoration or repair is not economically feasible or Lender's security would be lessened, the Miscellaneous Proceeds shall be applied to the sums secured by this Security Instrument, whether or not then due, with the excess, if any, paid to Borrower. Such Miscellaneous Proceeds shall be applied in the order provided for in Section 2.

In the event of a total taking, destruction, or loss in value of the Property, the Miscellaneous Proceeds shall be applied to the sums secured by this Security Instrument, whether or not then due, with the excess, if any, paid to Borrower.

In the event of a partial taking, destruction, or loss in value of the Property in which the fair market value of the Property immediately before the partial taking, destruction, or loss in value is equal to or greater than the amount of the sums secured by this Security Instrument immediately before the partial taking, destruction, or loss in value, unless Borrower and Lender otherwise agree in writing, the sums secured by this Security

**EXHIBIT 18, PAGE 165**

DOC ID #: 00080268510004

Instrument shall be reduced by the amount of the Miscellaneous Proceeds multiplied by the following fraction:
(a) the total amount of the sums secured immediately before the partial taking, destruction, or loss in value
divided by (b) the fair market value of the Property immediately before the partial taking, destruction, or loss
in value. Any balance shall be paid to Borrower.

In the event of a partial taking, destruction, or loss in value of the Property in which the fair market value
of the Property immediately before the partial taking, destruction, or loss in value is less than the amount of
the sums secured immediately before the partial taking, destruction, or loss in value, unless Borrower and
Lender otherwise agree in writing, the Miscellaneous Proceeds shall be applied to the sums secured by this
Security Instrument whether or not the sums are then due.

If the Property is abandoned by Borrower, or if, after notice by Lender to Borrower that the Opposing
Party (as defined in the next sentence) offers to make an award to settle a claim for damages, Borrower fails to
respond to Lender within 30 days after the date the notice is given, Lender is authorized to collect and apply
the Miscellaneous Proceeds either to restoration or repair of the Property or to the sums secured by this
Security Instrument, whether or not then due. "Opposing Party" means the third party that owes Borrower
Miscellaneous Proceeds or the party against whom Borrower has a right of action in regard to Miscellaneous
Proceeds.

Borrower shall be in default if any action or proceeding, whether civil or criminal, is begun that, in
Lender's judgment, could result in forfeiture of the Property or other material impairment of Lender's interest
in the Property or rights under this Security Instrument. Borrower can cure such a default and, if acceleration
has occurred, reinstate as provided in Section 19, by causing the action or proceeding to be dismissed with a
ruling that, in Lender's judgment, precludes forfeiture of the Property or other material impairment of Lender's
interest in the Property or rights under this Security Instrument. The proceeds of any award or claim for
damages that are attributable to the impairment of Lender's interest in the Property are hereby assigned and
shall be paid to Lender.

All Miscellaneous Proceeds that are not applied to restoration or repair of the Property shall be applied in
the order provided for in Section 2.

12. Borrower Not Released; Forbearance By Lender Not a Waiver. Extension of the time for
payment or modification of amortization of the sums secured by this Security Instrument granted by Lender to
Borrower or any Successor in Interest of Borrower shall not operate to release the liability of Borrower or any
Successors in Interest of Borrower. Lender shall not be required to commence proceedings against any
Successor in Interest of Borrower or to refuse to extend time for payment or otherwise modify amortization of
the sums secured by this Security Instrument by reason of any demand made by the original Borrower or any
Successors in Interest of Borrower. Any forbearance by Lender in exercising any right or remedy including,
without limitation, Lender's acceptance of payments from third persons, entities or Successors in Interest of
Borrower or in amounts less than the amount then due, shall not be a waiver of or preclude the exercise of any
right or remedy.

13. Joint and Several Liability; Co-signers; Successors and Assigns Bound. Borrower covenants and
agrees that Borrower's obligations and liability shall be joint and several. However, any Borrower who
co-signs this Security Instrument but does not execute the Note (a "co-signer"): (a) is co-signing this Security
Instrument only to mortgage, grant and convey the co-signer's interest in the Property under the terms of this
Security Instrument; (b) is not personally obligated to pay the sums secured by this Security Instrument; and
(c) agrees that Lender and any other Borrower can agree to extend, modify, forbear or make any
accommodations with regard to the terms of this Security Instrument or the Note without the co-signer's
consent.

-6A(CA) (0207)      CHL (09/02)      Page 10 of 16      Initials: _____   Form 3005 1/01

**EXHIBIT 18, PAGE 166**

DOC ID #: 0008026851004

Subject to the provisions of Section 18, any Successor in Interest of Borrower who assumes Borrower's obligations under this Security Instrument in writing, and is approved by Lender, shall obtain all of Borrower's rights and benefits under this Security Instrument. Borrower shall not be released from Borrower's obligations and liability under this Security Instrument unless Lender agrees to such release in writing. The covenants and agreements of this Security Instrument shall bind (except as provided in Section 20) and benefit the successors and assigns of Lender.

**14. Loan Charges.** Lender may charge Borrower fees for services performed in connection with Borrower's default, for the purpose of protecting Lender's interest in the Property and rights under this Security Instrument, including, but not limited to, attorneys' fees, property inspection and valuation fees. In regard to any other fees, the absence of express authority in this Security Instrument to charge a specific fee to Borrower shall not be construed as a prohibition on the charging of such fee. Lender may not charge fees that are expressly prohibited by this Security Instrument or by Applicable Law.

If the Loan is subject to a law which sets maximum loan charges, and that law is finally interpreted so that the interest or other loan charges collected or to be collected in connection with the Loan exceed the permitted limits, then: (a) any such loan charge shall be reduced by the amount necessary to reduce the charge to the permitted limit; and (b) any sums already collected from Borrower which exceeded permitted limits will be refunded to Borrower. Lender may choose to make this refund by reducing the principal owed under the Note or by making a direct payment to Borrower. If a refund reduces principal, the reduction will be treated as a partial prepayment without any prepayment charge (whether or not a prepayment charge is provided for under the Note). Borrower's acceptance of any such refund made by direct payment to Borrower will constitute a waiver of any right of action Borrower might have arising out of such overcharge.

**15. Notices.** All notices given by Borrower or Lender in connection with this Security Instrument must be in writing. Any notice to Borrower in connection with this Security Instrument shall be deemed to have been given to Borrower when mailed by first class mail or when actually delivered to Borrower's notice address if sent by other means. Notice to any one Borrower shall constitute notice to all Borrowers unless Applicable Law expressly requires otherwise. The notice address shall be the Property Address unless Borrower has designated a substitute notice address by notice to Lender. Borrower shall promptly notify Lender of Borrower's change of address. If Lender specifies a procedure for reporting Borrower's change of address, then Borrower shall only report a change of address through that specified procedure. There may be only one designated notice address under this Security Instrument at any one time. Any notice to Lender shall be given by delivering it or by mailing it by first class mail to Lender's address stated herein unless Lender has designated another address by notice to Borrower. Any notice in connection with this Security Instrument shall not be deemed to have been given to Lender until actually received by Lender. If any notice required by this Security Instrument is also required under Applicable Law, the Applicable Law requirement will satisfy the corresponding requirement under this Security Instrument.

**16. Governing Law; Severability; Rules of Construction.** This Security Instrument shall be governed by federal law and the law of the jurisdiction in which the Property is located. All rights and obligations contained in this Security Instrument are subject to any requirements and limitations of Applicable Law. Applicable Law might explicitly or implicitly allow the parties to agree by contract or it might be silent, but such silence shall not be construed as a prohibition against agreement by contract. In the event that any provision or clause of this Security Instrument or the Note conflicts with Applicable Law, such conflict shall not affect other provisions of this Security Instrument or the Note which can be given effect without the conflicting provision.

As used in this Security Instrument: (a) words of the masculine gender shall mean and include corresponding neuter words or words of the feminine gender; (b) words in the singular shall mean and include the plural and vice versa; and (c) the word "may" gives sole discretion without any obligation to take any action.

**17. Borrower's Copy.** Borrower shall be given one copy of the Note and of this Security Instrument.

Initials: _N.T_

6A(CA) (0207)   CHL (09/02)   Page 11 of 16   Form 3005 1/01

**EXHIBIT 18, PAGE 167**

DOC ID #: 00080268510004

**18. Transfer of the Property or a Beneficial Interest in Borrower.** As used in this Section 18, "Interest in the Property" means any legal or beneficial interest in the Property, including, but not limited to, those beneficial interests transferred in a bond for deed, contract for deed, installment sales contract or escrow agreement, the intent of which is the transfer of title by Borrower at a future date to a purchaser.

If all or any part of the Property or any Interest in the Property is sold or transferred (or if Borrower is not a natural person and a beneficial interest in Borrower is sold or transferred) without Lender's prior written consent, Lender may require immediate payment in full of all sums secured by this Security Instrument. However, this option shall not be exercised by Lender if such exercise is prohibited by Applicable Law.

If Lender exercises this option, Lender shall give Borrower notice of acceleration. The notice shall provide a period of not less than 30 days from the date the notice is given in accordance with Section 15 within which Borrower must pay all sums secured by this Security Instrument. If Borrower fails to pay these sums prior to the expiration of this period, Lender may invoke any remedies permitted by this Security Instrument without further notice or demand on Borrower.

**19. Borrower's Right to Reinstate After Acceleration.** If Borrower meets certain conditions, Borrower shall have the right to have enforcement of this Security Instrument discontinued at any time prior to the earliest of: (a) five days before sale of the Property pursuant to any power of sale contained in this Security Instrument; (b) such other period as Applicable Law might specify for the termination of Borrower's right to reinstate; or (c) entry of a judgment enforcing this Security Instrument. Those conditions are that Borrower: (a) pays Lender all sums which then would be due under this Security Instrument and the Note as if no acceleration had occurred; (b) cures any default of any other covenants or agreements; (c) pays all expenses incurred in enforcing this Security Instrument, including, but not limited to, reasonable attorneys' fees, property inspection and valuation fees, and other fees incurred for the purpose of protecting Lender's interest in the Property and rights under this Security Instrument; and (d) takes such action as Lender may reasonably require to assure that Lender's interest in the Property and rights under this Security Instrument, and Borrower's obligation to pay the sums secured by this Security Instrument, shall continue unchanged. Lender may require that Borrower pay such reinstatement sums and expenses in one or more of the following forms, as selected by Lender: (a) cash; (b) money order; (c) certified check, bank check, treasurer's check or cashier's check, provided any such check is drawn upon an institution whose deposits are insured by a federal agency, instrumentality or entity; or (d) Electronic Funds Transfer. Upon reinstatement by Borrower, this Security Instrument and obligations secured hereby shall remain fully effective as if no acceleration had occurred. However, this right to reinstate shall not apply in the case of acceleration under Section 18.

**20. Sale of Note; Change of Loan Servicer; Notice of Grievance.** The Note or a partial interest in the Note (together with this Security Instrument) can be sold one or more times without prior notice to Borrower. A sale might result in a change in the entity (known as the "Loan Servicer") that collects Periodic Payments due under the Note and this Security Instrument and performs other mortgage loan servicing obligations under the Note, this Security Instrument, and Applicable Law. There also might be one or more changes of the Loan Servicer unrelated to a sale of the Note. If there is a change of the Loan Servicer, Borrower will be given written notice of the change which will state the name and address of the new Loan Servicer, the address to which payments should be made and any other information RESPA requires in connection with a notice of transfer of servicing. If the Note is sold and thereafter the Loan is serviced by a Loan Servicer other than the purchaser of the Note, the mortgage loan servicing obligations to Borrower will remain with the Loan Servicer or be transferred to a successor Loan Servicer and are not assumed by the Note purchaser unless otherwise provided by the Note purchaser.

Neither Borrower nor Lender may commence, join, or be joined to any judicial action (as either an individual litigant or the member of a class) that arises from the other party's actions pursuant to this Security Instrument or that alleges that the other party has breached any provision of, or any duty owed by reason of, this Security Instrument, until such Borrower or Lender has notified the other party (with such notice given in

**EXHIBIT 18, PAGE 168**

DOC ID #: 00080268510004

compliance with the requirements of Section 15) of such alleged breach and afforded the other party hereto a reasonable period after the giving of such notice to take corrective action. If Applicable Law provides a time period which must elapse before certain action can be taken, that time period will be deemed to be reasonable for purposes of this paragraph. The notice of acceleration and opportunity to cure given to Borrower pursuant to Section 22 and the notice of acceleration given to Borrower pursuant to Section 18 shall be deemed to satisfy the notice and opportunity to take corrective action provisions of this Section 20.

**21. Hazardous Substances.** As used in this Section 21: (a) "Hazardous Substances" are those substances defined as toxic or hazardous substances, pollutants, or wastes by Environmental Law and the following substances: gasoline, kerosene, other flammable or toxic petroleum products, toxic pesticides and herbicides, volatile solvents, materials containing asbestos or formaldehyde, and radioactive materials; (b) "Environmental Law" means federal laws and laws of the jurisdiction where the Property is located that relate to health, safety or environmental protection; (c) "Environmental Cleanup" includes any response action, remedial action, or removal action, as defined in Environmental Law; and (d) an "Environmental Condition" means a condition that can cause, contribute to, or otherwise trigger an Environmental Cleanup.

Borrower shall not cause or permit the presence, use, disposal, storage, or release of any Hazardous Substances, or threaten to release any Hazardous Substances, on or in the Property. Borrower shall not do, nor allow anyone else to do, anything affecting the Property (a) that is in violation of any Environmental Law, (b) which creates an Environmental Condition, or (c) which, due to the presence, use, or release of a Hazardous Substance, creates a condition that adversely affects the value of the Property. The preceding two sentences shall not apply to the presence, use, or storage on the Property of small quantities of Hazardous Substances that are generally recognized to be appropriate to normal residential uses and to maintenance of the Property (including, but not limited to, hazardous substances in consumer products).

Borrower shall promptly give Lender written notice of (a) any investigation, claim, demand, lawsuit or other action by any governmental or regulatory agency or private party involving the Property and any Hazardous Substance or Environmental Law of which Borrower has actual knowledge, (b) any Environmental Condition, including but not limited to, any spilling, leaking, discharge, release or threat of release of any Hazardous Substance, and (c) any condition caused by the presence, use or release of a Hazardous Substance which adversely affects the value of the Property. If Borrower learns, or is notified by any governmental or regulatory authority, or any private party, that any removal or other remediation of any Hazardous Substance affecting the Property is necessary, Borrower shall promptly take all necessary remedial actions in accordance with Environmental Law. Nothing herein shall create any obligation on Lender for an Environmental Cleanup.

NON-UNIFORM COVENANTS. Borrower and Lender further covenant and agree as follows:

**22. Acceleration; Remedies.** Lender shall give notice to Borrower prior to acceleration following Borrower's breach of any covenant or agreement in this Security Instrument (but not prior to acceleration under Section 18 unless Applicable Law provides otherwise). The notice shall specify: (a) the default; (b) the action required to cure the default; (c) a date, not less than 30 days from the date the notice is given to Borrower, by which the default must be cured; and (d) that failure to cure the default on or before the date specified in the notice may result in acceleration of the sums secured by this Security Instrument and sale of the Property. The notice shall further inform Borrower of the right to reinstate after acceleration and the right to bring a court action to assert the non-existence of a default or any other defense of Borrower to acceleration and sale. If the default is not cured on or before the date specified in the notice, Lender at its option may require immediate payment in full of all sums secured by this Security Instrument without further demand and may invoke the power of sale and any other remedies permitted by Applicable Law. Lender shall be entitled to collect all expenses incurred in pursuing the remedies provided in this Section 22, including, but not limited to, reasonable attorneys' fees and costs of title evidence.

DOC ID #: 00080268510004

If Lender invokes the power of sale, Lender shall execute or cause Trustee to execute a written
notice of the occurrence of an event of default and of Lender's election to cause the Property to be sold.
Trustee shall cause this notice to be recorded in each county in which any part of the Property is
located. Lender or Trustee shall mail copies of the notice as prescribed by Applicable Law to Borrower
and to the other persons prescribed by Applicable Law. Trustee shall give public notice of sale to the
persons and in the manner prescribed by Applicable Law. After the time required by Applicable Law,
Trustee, without demand on Borrower, shall sell the Property at public auction to the highest bidder at
the time and place and under the terms designated in the notice of sale in one or more parcels and in
any order Trustee determines. Trustee may postpone sale of all or any parcel of the Property by public
announcement at the time and place of any previously scheduled sale. Lender or its designee may
purchase the Property at any sale.

Trustee shall deliver to the purchaser Trustee's deed conveying the Property without any covenant
or warranty, expressed or implied. The recitals in the Trustee's deed shall be prima facie evidence of the
truth of the statements made therein. Trustee shall apply the proceeds of the sale in the following order:
(a) to all expenses of the sale, including, but not limited to, reasonable Trustee's and attorneys' fees; (b)
to all sums secured by this Security Instrument; and (c) any excess to the person or persons legally
entitled to it.

**23. Reconveyance.** Upon payment of all sums secured by this Security Instrument, Lender shall request
Trustee to reconvey the Property and shall surrender this Security Instrument and all notes evidencing debt
secured by this Security Instrument to Trustee. Trustee shall reconvey the Property without warranty to the
person or persons legally entitled to it. Lender may charge such person or persons a reasonable fee for
reconveying the Property, but only if the fee is paid to a third party (such as the Trustee) for services rendered
and the charging of the fee is permitted under Applicable Law. If the fee charged does not exceed the fee set
by Applicable Law, the fee is conclusively presumed to be reasonable.

**24. Substitute Trustee.** Lender, at its option, may from time to time appoint a successor trustee to any
Trustee appointed hereunder by an instrument executed and acknowledged by Lender and recorded in the
office of the Recorder of the county in which the Property is located. The instrument shall contain the name of
the original Lender, Trustee and Borrower, the book and page where this Security Instrument is recorded and
the name and address of the successor trustee. Without conveyance of the Property, the successor trustee shall
succeed to all the title, powers and duties conferred upon the Trustee herein and by Applicable Law. This
procedure for substitution of trustee shall govern to the exclusion of all other provisions for substitution.

**25. Statement of Obligation Fee.** Lender may collect a fee not to exceed the maximum amount
permitted by Applicable Law for furnishing the statement of obligation as provided by Section 2943 of the
Civil Code of California.

**EXHIBIT 18, PAGE 170**

DOC ID #: 00080268510004

**BY SIGNING BELOW,** Borrower accepts and agrees to the terms and covenants contained in this Security Instrument and in any Rider executed by Borrower and recorded with it.

Witnesses:

_____          _____(Seal)
                                                                                        TAN KHANH NGUYEN                              -Borrower

_____          _____(Seal)
                                                                                                                                                      -Borrower

_____(Seal)
                                                                                                                                                      -Borrower

_____(Seal)
                                                                                                                                                      -Borrower

-6A(CA) (0207)          CHL (09/02)                    Page 15 of 16                    Form 3005  1/01

**EXHIBIT 18, PAGE 171**

DOC ID #: 00080268510004

State of California
County of *Orange*                                                    } ss.

On *October 7, 2004* before me, *A. G. JACOBS* personally appeared

*TAN KHANH NGUYEN*

~~personally known to me~~

(or proved to me on the basis of satisfactory evidence) to be the person(s) whose name(s) is/are subscribed to the within instrument and acknowledged to me that he/she/they executed the same in his/her/their authorized capacity(ies), and that by his/her/their signature(s) on the instrument the person(s) or the entity upon behalf of which the person(s) acted, executed the instrument.

WITNESS my hand and official seal.

A. G. JACOBS
Commission # 1347480
Notary Public — California
Orange County
My Comm. Expires Apr 5, 2006

_____ (Seal)

-5A(CA) (0207)          CHL (09/02)          Page 16 of 16          Initials: _____          Form 3005  1/01

**EXHIBIT 18, PAGE 172**

Government Code Section 27361.7

I certify under penalty of perjury that the notary seal on the document to which this statement is attached reads as follows:

Name of Notary:                          A.G. Jacobs

Date commission expires:                 April 5, 2006

Commission No.:                          1347480

Vendor No.:                              NNA1

Place of execution:                      Orange County

Date:                                    October 18, 2004

Stewart Title of California
By:    ARASH SAREMI

**EXHIBIT 18, PAGE 173**

Prepared by: NATHAN NGUYEN

**AMERICA'S WHOLESALE LENDER**

Branch #: 0000927
910 E. HAMILTON AVENUE #110
CAMPBELL, CA 95008
Phone: (408)558-7700
Br Fax No.: (408)369-8271

DATE:           10/04/2004
CASE #:
DOC ID #:       00080268510004
BORROWER: TAN KHANH NGUYEN
PROPERTY ADDRESS: 14791 RIATA STREET
                  WESTMINSTER, CA 92655

## LEGAL DESCRIPTION EXHIBIT A

FHA/VA/CONV
● Legal Description Exhibit A
1C404-XX (04/03)(d)



`* 2 3 9 9 1 *`          `* 0 0 0 8 0 2 6 8 5 0 0 0 0 0 1 0 0 6 A *`

**EXHIBIT 18, PAGE 174**

**EXHIBIT "A"**

40205968

## LEGAL DESCRIPTION

The land referred to herein is situated in the State of California, County of ORANGE, described as follows:

LOT 39 OF TRACT NO. 2298, IN THE CITY OF WESTMINSTER, COUNTY OF ORANGE, STATE OF CALIFORNIA, AS PER MAP RECORDED IN BOOK 82, PAGES 41 THROUGH 45 INCLUSIVE OF MISCELLANEOUS MAPS, IN THE OFFICE OF THE COUNTY RECORDER OF SAID COUNTY.

EXCEPTING THEREFROM; ALL OIL, OIL RIGHTS, NATURAL GAS RIGHTS, MINERAL RIGHTS, AND OTHER HYDROCARBON SUBSTANCES BY WHATEVER NAME KNOWN, TOGETHER WITH APPURTENANT RIGHTS THERETO, WITHOUT, HOWEVER, ANY RIGHT TO ENTER UPON THE SURFACE OF SAID LAND NOR ANY PORTION OF THE SUBSURFACE LYING ABOVE A DEPTH OF 500 FEET, AS EXCEPTED OR RESERVED IN INSTRUMENTS OF RECORD.

End of Legal Description

Continued on next page

-2-

**EXHIBIT 18, PAGE 175**

## ADJUSTABLE RATE RIDER
(LIBOR One-Month Index - Payment Caps)

After Recording Return To:
COUNTRYWIDE HOME LOANS, INC.
MS SV-79 DOCUMENT PROCESSING
P.O.Box 10423
Van Nuys, CA 91410-0423

Prepared By:
NATHAN NGUYEN

E29392883
[Escrow/Closing #]

00080268510004
[Doc ID #]

CONV
● ARM PayOption Rider
1D729-US (07/02).01(d)

Page 1 of 7

Initials: 

EXHIBIT 18, PAGE 176

DOC ID #: 00080268510004

THIS ADJUSTABLE RATE RIDER is made this FOURTH           day of
OCTOBER, 2004      , and is incorporated into and shall be deemed to amend and supplement the
Mortgage, Deed of Trust, or Security Deed (the "Security Instrument") of the same date given by the
undersigned ("Borrower") to secure Borrower's Adjustable Rate Note (the "Note") to
AMERICA'S WHOLESALE LENDER

("Lender") of the same date and covering the property described in the Security Instrument and located at:
14791 RIATA STREET
WESTMINSTER, CA 92655
[Property Address]

**THE NOTE CONTAINS PROVISIONS THAT WILL CHANGE THE INTEREST RATE
AND THE MONTHLY PAYMENT. THERE MAY BE A LIMIT ON THE AMOUNT THAT
THE MONTHLY PAYMENT CAN INCREASE OR DECREASE. THE PRINCIPAL
AMOUNT TO REPAY COULD BE GREATER THAN THE AMOUNT ORIGINALLY
BORROWED, BUT NOT MORE THAN THE LIMIT STATED IN THE NOTE.**

ADDITIONAL COVENANTS. In addition to the covenants and agreements made in the Security
Instrument, Borrower and Lender further covenant and agree as follows:

**A. INTEREST RATE AND MONTHLY PAYMENT CHANGES**
The Note provides for changes in the interest rate and the monthly payments, as follows:

**2. INTEREST**
(A) Interest Rate
Interest will be charged on unpaid principal until the full amount of Principal has been paid. I will pay
interest at a yearly rate of       1.000  %. The interest rate I will pay may change.
The interest rate required by this Section 2 is the rate I will pay both before and after any default
described in Section 7(B) of the Note.

CONV
● ARM PayOption Rider
1D729-US (07/02).01                          Page 2 of 7              Initials: NT.

**EXHIBIT 18, PAGE 177**

DOC ID #: 00080268510004

**(B) Interest Rate Change Dates**

The interest rate I will pay may change on the first                    day of
DECEMBER, 2004     , and on that day every month thereafter. Each date on which my interest
rate could change is called an "Interest Rate Change Date." The new rate of interest will become effective on
each Interest Rate Change Date.

**(C) Index**

Beginning with the first Change Date, my adjustable
interest rate will be based on an Index. The "Index" is the
average of interbank offered rates for one month U.S.
dollar-denominated deposits in the London market ("LIBOR"), as
published in The Wall Street Journal. The most recent Index
figure available as of the date 15 days before each Change
Date is called the "Current Index".

If the Index is no longer available, the Note Holder will choose a new index that is based upon
comparable information. The Note Holder will give me notice of this choice.

**(D) Calculation of Interest Rate Changes**

Before each Interest Rate Change Date, the Note Holder will calculate my new interest rate by adding
TWO & 60/100                                              percentage point(s)
(    2.600  %) to the Current Index. The Note Holder will then round the result of this addition to the
nearest one-eighth of one percentage point (0.125%). This rounded amount will be my new interest rate until
the next Interest Rate Change Date. My interest rate will never be greater than      9.950  %.

CONV
● ARM PayOption Rider
1D729-US (07/02).01                    Page 3 of 7                    Initials: *N,T*

**EXHIBIT 18, PAGE 178**

DOC ID #: 00080268510004

**3. PAYMENTS**

**(A) Time and Place of Payments**

I will pay principal and interest by making a payment every month.

I will make my monthly payments on the FIRST day of each month beginning on December, 2004 . I will make these payments every month until I have paid all the principal and interest and any other charges described below that I may owe under this Note. Each monthly payment will be applied to interest before Principal. If, on NOVEMBER 01, 2034 , I still owe amounts under the Note, I will pay those amounts in full on that date, which is called the "Maturity Date."

I will make my monthly payments at
P.O. Box 10219, Van Nuys, CA 91410-0219

or at a different place if required by the Note Holder.

**(B) Amount of My Initial Monthly Payments**

Each of my initial monthly payments will be in the amount of U.S. $ 1,254.39 . This amount may change.

**(C) Payment Change Dates**

My monthly payment may change as required by Section 3(D) below beginning on the first day of DECEMBER, 2005 , and on that day every 12th month thereafter. Each of these dates is called a "Payment Change Date." My monthly payment also will change at any time Section 3(F) or 3(G) below requires me to pay a different monthly payment.

I will pay the amount of my new monthly payment each month beginning on each Payment Change Date or as provided in Section 3(F) or 3(G) below.

**(D) Calculation of Monthly Payment Changes**

At least 30 days before each Payment Change Date, the Note Holder will calculate the amount of the monthly payment that would be sufficient to repay the unpaid principal that I am expected to owe at the Payment Change Date in full on the maturity date in substantially equal installments at the interest rate effective during the month preceding the Payment Change Date. The result of this calculation is called the "Full Payment". The Note Holder will then calculate the amount of my monthly payment due the month preceding the Payment Change Date multiplied by the number 1,075. The result of this calculation is called the "Limited Payment." Unless Section 3(F) or 3(G) below requires me to pay a different amount, my new

CONV
● ARM PayOption Rider
1D729-US (07/02).01

Page 4 of 7

Initials: _NcT_

**EXHIBIT 18, PAGE 179**

DOC ID #: 00080268510004

required monthly payment will be lesser of the Limited Payment and the Full Payment. I also have the option each month to pay more than the Limited Payment up to and including the Full Payment for my monthly payment.

**(E) Additions to My Unpaid Principal**

My monthly payment could be less than the amount of the interest portion of the monthly payment that would be sufficient to repay the unpaid principal I owe at the monthly payment date in full on the Maturity Date in substantially equal payments. If so, each month that my monthly payment is less than the interest portion, the Note Holder will subtract the amount of my monthly payment from the amount of the interest portion and will add the difference to my unpaid principal. The Note Holder also will add interest on the amount of this difference to my unpaid principal each month. The interest rate on the interest added to Principal will be the rate required by Section 2 above.

**(F) Limit on My Unpaid Principal; Increased Monthly Payment**

My unpaid principal can never exceed a maximum amount equal to

ONE HUNDRED FIFTEEN            percent (      115 %) of the Principal amount I originally borrowed. My unpaid principal could exceed that maximum amount due to the Limited Payments and interest rate increases. In that event, on the date that my paying my monthly payment would cause me to exceed that limit, I will instead pay a new monthly payment. The new monthly payment will be in an amount that would be sufficient to repay my then unpaid principal in full on the Maturity Date in substantially equal installments at the current interest rate.

**(G) Required Full Payment**

On the fifth Payment Change Date and on each succeeding fifth Payment Change Date thereafter, I will begin paying the Full Payment as my monthly payment until my monthly payment changes again. I also will begin paying the Full Payment as my monthly payment on the final Payment Change Date.

**4. NOTICE OF CHANGES**

The Note Holder will deliver or mail to me a notice of any changes in the amount of my monthly payment before the effective date of any change. The notice will include information required by law to be given me and also the title and telephone number of a person who will answer any question I may have regarding the notice.

CONV
● ARM PayOption Rider
1D729-US (07/02).01                           Page 5 of 7                          Initials: *N/T*

**EXHIBIT 18, PAGE 180**

DOC ID #: 00080268510004

**B. TRANSFER OF THE PROPERTY OR A BENEFICIAL INTEREST IN BORROWER**

Uniform Covenant 18 of the Security Instrument is amended to read as follows:

**Transfer of the Property or a Beneficial Interest in Borrower.** As used in this Section 18, "Interest in the Property" means any legal or beneficial interest in the Property, including, but not limited to, those beneficial interests transferred in a bond for deed, contract for deed, installment sales contract or escrow agreement, the intent of which is the transfer of title by Borrower at a future date to a purchaser.

If all or any part of the Property or any Interest in the Property is sold or transferred (or if Borrower is not a natural person and a beneficial interest in Borrower is sold or transferred) without Lender's prior written consent, Lender may require immediate payment in full of all sums secured by this Security Instrument. However, this option shall not be exercised by Lender if such exercise is prohibited by Applicable Law. Lender also shall not exercise this option if: (a) Borrower causes to be submitted to Lender information required by Lender to evaluate the intended transferee as if a new loan were being made to the transferee; and (b) Lender reasonably determines that Lender's security will not be impaired by the loan assumption and that the risk of a breach of any covenant or agreement in this Security Instrument is acceptable to Lender.

To the extent permitted by Applicable Law, Lender may charge a reasonable fee as a condition to Lender's consent to the loan assumption. Lender also may require the transferee to sign an assumption agreement that is acceptable to Lender and that obligates the transferee to keep all the promises and agreements made in the Note and in this Security Instrument. Borrower will continue to be obligated under the Note and this Security Instrument unless Lender releases Borrower in writing.

If Lender exercises the option to require immediate payment in full, Lender shall give Borrower notice of acceleration. The notice shall provide a period of not less than 30 days from the date the notice is given in accordance with Section 15 within which Borrower must pay all sums secured by this Security Instrument. If Borrower fails to pay these sums prior to the expiration of this period, Lender may invoke any remedies permitted by this Security Instrument without further notice or demand on Borrower.

CONV
● ARM PayOption Rider
1D729-US (07/02).01

Page 6 of 7

Initials: _N.T_

DOC ID #: 00080268510004

BY SIGNING BELOW, Borrower accepts and agrees to the terms and covenants contained in this Adjustable Rate Rider.

_____ (Seal)
TAN KHANH NGUYEN                                    -Borrower

_____ (Seal)
                                                    -Borrower

_____ (Seal)
                                                    -Borrower

_____ (Seal)
                                                    -Borrower

CONV
● ARM PayOption Rider
1D729-US (07/02).01                    Page 7 of 7

**EXHIBIT 18, PAGE 182**

# EXHIBIT 19

JUD-100

| ATTORNEY OR PARTY WITHOUT ATTORNEY *(Name, state bar number, and address):* | FOR COURT USE ONLY |
|---|---|
| Global Capital Law, P.C.<br>8700 Warner Ave., Ste 200<br>Fountain Valley, CA 92708<br>TELEPHONE NO.: (714) 907-4182   FAX NO. *(Optional):* (714) 907-4115<br><br>E-MAIL ADDRESS *(Optional):*<br>ATTORNEY FOR *(Name):* Plaintiff, TAN NGUYEN | RECEIVED<br>SUPERIOR COURT OF CALIFORNIA<br>CENTRAL JUSTICE CENTER<br>APR XX 2011<br>BY: R. LUCEY<br><br>RECEIVED<br>SUPERIOR COURT OF CALIFORNIA<br>COUNTY OF ORANGE<br>CENTRAL JUSTICE CENTER<br>APR 05 2011 |

**SUPERIOR COURT OF CALIFORNIA, COUNTY OF** Orange
STREET ADDRESS: 700 Civic Center Drive West
MAILING ADDRESS:
CITY AND ZIP CODE: Santa Ana, CA 92701
BRANCH NAME: Central Justice Center

FILED
SUPERIOR COURT OF CALIFORNIA
COUNTY OF ORANGE
CENTRAL JUSTICE CENTER
APR 07 2011
ALAN CARLSON, Clerk of the Court
BY: C BOLSKY

PLAINTIFF: Tan Nguyen

DEFENDANT: Americas Wholesale Lender, Inc.

| JUDGMENT | | CASE NUMBER: |
|---|---|---|
| ☐ By Clerk   ☐ By Default   ☐ After Court Trial<br>☑ By Court   ☑ On Stipulation   ☐ Defendant Did Not<br>                                           Appear at Trial | | 30-2011-00461444 |

**JUDGMENT**

1. ☐ **BY DEFAULT**
   a. Defendant was properly served with a copy of the summons and complaint.
   b. Defendant failed to answer the complaint or appear and defend the action within the time allowed by law.
   c. Defendant's default was entered by the clerk upon plaintiff's application.
   d. ☐ **Clerk's Judgment** (Code Civ. Proc., § 585(a)). Defendant was sued only on a contract or judgment of a court of this state for the recovery of money.
   e. ☐ **Court Judgment** (Code Civ. Proc., § 585(b)). The court considered
      (1) ☐ plaintiff's testimony and other evidence.
      (2) ☐ plaintiff's written declaration (Code Civ. Proc., § 585(d)).

2. ☑ **ON STIPULATION**
   a. Plaintiff and defendant agreed (stipulated) that a judgment be entered in this case. The court approved the stipulated judgment and
   b. ☑ the signed written stipulation was filed in the case.
   c. ☐ the stipulation was stated in open court   ☐ the stipulation was stated on the record.

3. ☐ **AFTER COURT TRIAL.** The jury was waived. The court considered the evidence.
   a. The case was tried on *(date and time):*
      before *(name of judicial officer):*
   b. Appearances by:
      ☐ Plaintiff *(name each):*                    ☐ Plaintiff's attorney *(name each):*
         (1)                                            (1)
         (2)                                            (2)
      ☐ Continued on Attachment 3b.

      ☐ Defendant *(name each):*                    ☐ Defendant's attorney *(name each):*
         (1)                                            (1)
         (2)                                            (2)
      ☐ Continued on Attachment 3b.

   c. ☐ Defendant did not appear at trial. Defendant was properly served with notice of trial.
   d. ☐ A statement of decision (Code Civ. Proc., § 632)   ☐ was not   ☐ was   requested.

Page 1 of 2

Form Approved for Optional Use
Judicial Council of California
JUD-100 [New January 1, 2002]

**JUDGMENT**

Code of Civil Procedure, §§ 585, 664.6

**EXHIBIT 19, PAGE 183**

| PLAINTIFF: Tan Nguyen | CASE NUMBER: |
|---|---|
| DEFENDANT: Americas Wholesale Lender, Inc. | 30-2011-00461444 |

**JUDGMENT IS ENTERED AS FOLLOWS BY:**  ☑ THE COURT   ☐ THE CLERK

4. ☑ **Stipulated Judgment.** Judgment is entered according to the stipulation of the parties.

5. **Parties.** Judgment is

a. ☐ for plaintiff *(name each)*:                           c. ☐ for cross-complainant *(name each)*:

    and against defendant *(names)*:                        and against cross-defendant *(name each)*:

    ☐ Continued on Attachment 5a.                          ☐ Continued on Attachment 5c.

b. ☑ for defendant *(name each)*:                          d. ☐ for cross-defendant *(name each)*:
    Americas Wholesale Lender, Inc., a New York
    Corporation.

6. **Amount.**

a. ☐ Defendant named in item 5a above must              c. ☐ Cross-defendant named in item 5c above must pay
       pay plaintiff on the complaint:                          cross-complainant on the cross-complaint:

| (1) | ☐ | Damages | $ | | (1) | ☐ | Damages | $ |
|---|---|---|---|---|---|---|---|---|
| (2) | ☐ | Prejudgment interest at the annual rate of    % | $ | | (2) | ☐ | Prejudgment interest at the annual rate of    % | $ |
| (3) | ☐ | Attorney fees | $ | | (3) | ☐ | Attorney fees | $ |
| (4) | ☐ | Costs | $ | | (4) | ☐ | Costs | $ |
| (5) | ☐ | Other *(specify)*: | $ | | (5) | ☐ | Other *(specify)*: | $ |
| (6) | | **TOTAL** | $ | | (6) | | **TOTAL** | $ |

b. ☑ Plaintiff to receive nothing from defendant         d. ☐ Cross-complainant to receive nothing from
       named in item 5b.                                        cross-defendant named in item 5d.
       ☐ Defendant named in item 5b to recover                 ☐ Cross-defendant named in item 5d to recover
          costs $                                                 costs $
          ☐ and attorney fees $                                  ☐ and attorney fees $

7. ☑ Other *(specify)*:
    Judicial finding of fact in support of stipulated judgment as described in the signed stipulation filed
    herein.

Date:   APR 0 7 2011

                                                          JUDICIAL OFFICER
                                                          DAVID R. CHAFFEE

Date: _____   ☐ Clerk, by _____ , Deputy

**CLERK'S CERTIFICATE** *(Optional)*

(SEAL)

I certify that this is a true copy of the original judgment on file in the court.

Date:

Clerk, by _____ , Deputy

Page 2 of 2

**EXHIBIT 19, PAGE 184**

# EXHIBIT  20

Recording Requested By:
Global Capital Law, PC
When recorded mail document to:
NAME  Global Capital Law, PC
ADDRESS  8700 Warner Ave, Ste 200
CITY
STATE & ZIP  Fountain Valley, CA 92708
APN NO. 097-464-04

Recorded in Official Records, Orange County
Tom Daly, Clerk-Recorder
|||||||||||||||||||||||||||||||||| 21.00
2011000197448 3:22 pm 04/18/11
62 417 S15 R01   2
0.00 0.00 0.00 0.00 3.00 0.00 0.00 0.00

Above Space for Recorder's Use Only

# SUBSTITUTION OF TRUSTEE AND FULL RECONVEYANCE

Whereas, Tan Khanh Nguyen _____ was the Original

Trustor, CTC Foreclosure Services Corporation _____, the original

Trustee, and America's Wholesale Lender _____

Original beneficiary, under that certain Deed of Trust dated ____ October 4, 2004

and recorded _____ as Instrument No. ____ 200400938222

Book ____ 82 _____ Page ___ 41 - 45 _____, Official Records of the County of ORANGE

_____ State of California and

WHEREAS, the undersigned present beneficiary desires to substitute a new Trustee under said Deed of Trust in place and instead of
CTC Foreclosure Services Corporation

Now therefore, the undersigned hereby substitutes himself/herself/themselves as Trustee under said Deed of Trust and does hereby reconvey, without warranty, to the person or persons legally entitled hereto, the Estate now held by him thereunder. Whenever the context hereof so requires, the masculine gender includes the feminine and/or neuter, and the singular numbers includes the plural.

The undersigned hereby accepts said appointment as trustee under the above deed of trust, and as successor trustee, and pursuant to the request of said owner and holder and in accordance with the provisions of said deed of trust, does hereby RECONVEY WITHOUT WARRANTY, TO THE PERSONS LEGALLY ENTITLED THERETO, all the estate now held by it under said deed of trust.

BENEFICIARY / NEW TRUSTEE
America's Wholesale Lender, Inc.
By: _____
VICE PRESIDENT

Dated: 4/09/2011

STATE OF
COUNTY OF  McCraden

ON  4/9/2011 _____ before me, Debra Shatnantis _____ a Notary Public,
personally appeared  Dennis L. Bell _____ who proved to me on the basis of satisfactory evidence to be the person(s) whose name(s) is/are subscribed to the within instrument and acknowledged to me that he/she/they executed the same in his/her/their authorized capacity(ies), and that by his/her/their signature(s) on the instrument the person(s), or the entity upon behalf of which the person(s) acted, executed the instrument.

I certify under PENALTY OF PERJURY under the laws of the State of _____ that the foregoing paragraph is true and correct.

WITNESS my hand and official seal.

Signature _____ (seal)
4/14/2014 (exp.)

**EXHIBIT 20, PAGE 185**

**ACKNOWLEDGMENT**

State of California

County of _____

On _____ before me, _____

personally appeared _____
                                                    (insert name and title of the officer)

who proved to me on the basis of satisfactory evidence to be the person(s) whose name(s) is/are
subscribed to the within instrument and acknowledged to me that he/she/they executed the same
in his/her/their authorized capacity(ies), and that by his/her/their signature(s) on the instrument
the person(s), or the entity upon behalf of which the person(s) acted, executed the instrument.

I certify under PENALTY OF PERJURY under the laws of the State of California that the
foregoing paragraph is true and correct.

WITNESS my hand and official seal.

Signature _____  **(Seal)**

_____
                                                    (this area for official notarial seal)
**Government Code 27361.7**

I certify under penalty of perjury that the Notary Seal on the document to which this statement is
attached reads as follows:

Name of the Notary: _____

Date Commission Expires: _____

County Where Bond is Filed: _____

Commission Number: _____

Manufacturer/Vendor Number: _____

Place of Execution: _____ Date: _____

Signature: _____

_____

I certify under penalty of perjury and the laws of the State of California that the illegible portion
of this document to which this statement is attached reads as follows:

KENTUCKY & DEBRA SHAKNAITIS

Place Execution: _SANTA ANA_____ Date: _04/18/11_____

Signature: _____

**EXHIBIT 20, PAGE 186**

# EXHIBIT 21

Global Capital Law, PC
Gary Harre, ESQ. (Bar No. 86938)
8700 Warner Avenue, Suite 200
Fountain Valley, CA 92708
Phone: (714) 907-4182
Fax: (714) 907-4175
Email: ghcmecf@gmail.com
Attorneys for CELIA CALCO-CRAWFORD

**FILED**
SUPERIOR COURT OF CALIFORNIA
COUNTY OF ORANGE
CENTRAL JUSTICE CENTER

JUN 14 2011

ALAN CARLSON, Clerk of the Court
_Heather M Mitchell_
BY  H. MITCHELL

# SUPERIOR COURT OF THE STATE OF CALIFORNIA
## COUNTY OF ORANGE
## CENTRAL JUSTICE CENTER
## UNLIMITED JURISDICTION

30-2011

CELIA CALCO-CRAWFORD,
Plaintiff,

vs.

AMERICA'S WHOLESALE LENDER,
MORTGAGE ELECTRONIC
REGISTRATON SYSTEMS, INC.; All
Persons Unknown Claiming Any Legal
or Equitable Right, Title, Estate, Lien,
or Interest in the Property Described in
the Complaint Adverse to Plaintiff's
Title, or Any Cloud on Plaintiff's Title
DOES 1 TO 99,
Defendants

CASE NO.:  0 0 4 8 3 5 5 7

COMPLAINT JUDGE KAZUHARU MAKINO

1. **VIOLATION OF RESPA**
2. **VIOLATION OF TRUTH-IN-
   LENDING ACT ("TILA")**
3. **FRAUDULENT CONCEALMENT**
4. **DECLARATORY RELIEF ON
   MERS LEGAL STATUS**
5. **QUIET TITLE**

COMES NOW PLAINTIFF CELIA CALCO-CRAWFORD, an individual, and hereby

complains and alleges against the Defendants as follows:

## JURISDICTION AND VENUE

1.  Pursuant to Article VI, § 10, of the California Constitution and California *Code of*

*Civil Procedure* § 410.10, jurisdiction is proper in the Orange Superior Court of the State of

Page 1

*Complaint Celia Calco-Crawford v. America's Wholesale Lender et al.*

**EXHIBIT 21, PAGE 187**

California because the events and transactions which form the basis of this Complaint occurred in the County of Orange, State of California, and within this judicial district.

2.    The real property which gives rises to the causes of action alleged herein is located at 23244 Coso , City of Mission Viejo, County of Orange, California 92692, APN: 937-85-055 (the "Property").

## THE PARTIES

3.    Plaintiff CELIA CALCO-CRAWFORD, an individual ("Plaintiff",) is, and at all relevant times was, an individual, and resident of the County of Orange, State of California. In this action, Plaintiff is the homeowner who became a victim in the hands of the defendants.

4.    Plaintiff is informed and believes and thereon alleges that Defendant AMERICA'S WHOLESALE LENDER, a New York corporation ("AWL"), is, and at all relevant times was transacting business in the County of Orange, State of California.  However, AWL is not shown on the on-line record of California Secretary of State Office,

5.    Plaintiff is informed and believes and thereon alleges that Defendant MORTGAGE ELECTRONIC REGISTRATON SYSTEMS, INC., (hereinafter "MERS") was transacting business in the County of Orange, State of California.  In this action, MERS was named as *"nominee for lender"*, AWL, a brand-new concept in real property law that Plaintiff will elaborate elsewhere in this complaint.

6.    Plaintiff does not know the names or true capacities of Defendants identified as All Persons Unknown Claiming Any Legal or Equitable Right, Title, Estate, Lien, or Interest in the Property Described in the Complaint Adverse to Plaintiff's Title, or Any Cloud on Plaintiff's Title and Does 1 through 99, inclusive, herein, and therefore sues these Defendants by fictitious name (the "Fictitious Defendants").  The Fictitious Defendants are in some manner liable to Plaintiff, or claim some right, title, or interest in the property herein described that is subsequent to and subject to the interest of Plaintiff, or both.  Plaintiff will amend this complaint to allege the true names, interests, rights, and capacities of the Fictitious Defendants when ascertained.

7.    Plaintiff is informed and believes and thereon alleges that, at all times herein, each of the named defendants, including the Doe defendants, were the principals, agents, servants, partners, joint venturers, shareholders, investors, employees, independent contractors, designated representatives, *alter egos*, and/ or other authorized persons or entities of each of the other

**EXHIBIT 21, PAGE 188**

remaining defendants, and were negligent in the selection, hiring and supervision of the other defendants, and in doing the things herein alleged, was acting within the course and scope of such agency, agreement, or employment in furtherance of such agency and/or employment and with the full knowledge, approval, agreement, permission, consent, ratification, either express or implied, of each of the remaining Defendants, and are, therefore, responsible and liable, carelessly, negligently, strictly, vicariously and/ or otherwise, jointly and severally, for the damages and injury that they caused Plaintiff.

## ALLEGATIONS FOR ALL CAUSES OF ACTION

8.      Plaintiff is the owner of the Property, which is her residential home by Grant Deed On or about October 14, 2005 and recorded as Orange County Instrument No. 2005000829244.

9.      On or about October 1, 2005, Plaintiff applied to defendant AWL a mortgage loan in the amount of $396,000 (the "Loan".)

10.      Upon information and belief and that at the time of application, AWL did not provide to Plaintiff a Good Faith Estimate ("GFE"). Later during this investigations, Plaintiff obtained a GFE which shows a signature which was purported to be her signature but in fact was not signed by her.  Such deficiency would fall under the Real Estate Settlement Procedures Act (hereinafter " RESPA").

11.      It is alleged and belief that at the time of application, AWL did not provide to Plaintiff a Truth-in-Lending Disclosure (hereinafter "TILA Disclosure").  Later during this investigation, Plaintiff obtained a TILA Disclosure which shows a signature which was purported to be her signature but in fact was not signed by her.

12.      At close of escrow, Plaintiff signed a Fixed Rate Note (the "Note"), and on AWL's record, this loan has the Loan No. 115513767.  Plaintiff also executed a Deed of Trust (hereinafter "DOT") recorded  as Orange County Instrument No. 2005000829245.

13.      Upon information and belief since the close of the loan transaction, and unknown to Plaintiff until recently,  the Loan was placed into a pool which was then securitized, then held by a trust, then the securities issued from it was then sold to investors.

14.      Plaintiff is informed and believes, and thereon alleges that at the present time, whereas defendant AWL is still collecting monthly payments through certain loan servicer, it is no longer holder in due course of the Loan.

Page 3

*Complaint Celia Calco-Crawford v. America's Wholesale Lender et al.*

**EXHIBIT 21, PAGE 189**

15.     Currently, there is no Notice of Default issued regarding monthly payments.

**FIRST CAUSE OF ACTION**
**VIOLATION OF R.E.S.P.A**
**AGAINST ALL DEFENDANTS**

Plaintiff realleges and incorporates by reference as though fully set forth herein all paragraphs above this paragraph.

16.     Upon information and belief the Loan is a "federally related mortgage loan" subject to the provisions of RESPA, 12 *U.S.C.* § 2601 *et seq.*

17.     It is alleged and believed that Defendants AWL violated RESPA by failing to provide Plaintiff with a Good Faith Estimate. The GFE currently found in AWL's records is a forged document.

18.     Upon information and belief the failure to provide a Good Faith Estimate to Plaintiff is a basis for the statute of limitations to be tolled until such disclosure has been made. To date, Plaintiff has not received a Good Faith Estimate from AWL, nor any assignee of the beneficial interest of the Deed of Trust and the Note of the Loan executed by Plaintiff with AWL.

19.     Upon information and belief and as a further direct and substantial result of the violations of RESPA by Defendant AWL Plaintiff is entitled to statutory damages of $1,000.00, pursuant to RESPA, 12 *U.S.C.* § 2605.

20.     It is alleged and believed that as a further direct and substantial result of the violations of RESPA by Defendant AWL Plaintiff is entitled to rescind the Loan, including its accompanying Deed of Trust, as to all the Defendants identified in this cause of action.

21.     It is alleged and believed that as a further direct and substantial result of the violations of RESPA by Defendant AWL, Plaintiff is entitled to reasonable attorney's fees and costs, pursuant to RESPA, 12 *U.S.C.* § 2605.

22.     Any and all statutes of limitations under RESPA are tolled as a result of the failure by Defendants AWL to comply with the requirements of RESPA.

**SECOND CAUSE OF ACTION**
**VIOLATION OF TRUTH-IN-LENDING ACT**
**AGAINST ALL DEFENDANTS**

23.     Plaintiff realleges and incorporates by reference as though fully set forth herein all paragraphs above this paragraph.

Page 4

*Complaint Celia Calco-Crawford v. America's Wholesale Lender et al.*

**EXHIBIT 21, PAGE 190**

24.     The Loan is a "federally related mortgage loan" subject to the provisions
of Truth in Lending Act.

25.     Defendant AWL violated TILA in that it failed to provide Plaintiff
With a Truth in Lending Disclosure.

26.     It is alleged that the failure to provide a Truth in Lending Disclosure to Plaintiff
is a basis for the statute of limitations to be tolled until such disclosure has been made. To date,
Plaintiff has not received a Truth in Lending Disclosure from AWL, nor any assignee of the
beneficial interest of the Deed of Trust and the Note of the Loan. As said stated above, the TIL
Disclosure found in AWL's records is a apparent forged document.

27.     It is alleged and believed that as a direct and substantial result of the violations
of TILA by Defendant AWL, Plaintiff has incurred general damages in a sum according to proof
at trial, together with interest thereon from and after the loan date, in the maximum amount
allowed by law.

28.     As a further direct and substantial result of the violations of TILA by Defendant
AWL, Plaintiff is entitled to rescind the Loan, including its accompanying Deed of Trust, as to
all the Defendants identified in this cause of action.

29.     Upon information and belief all statutes of limitations under TILA are equitably
tolled as a result of the failure by Defendants AWL, and Does 1 through 99, inclusive, and each
of them, to comply with the requirements of RESPA.

30.     Other defendants are jointly liable as a consequence of the conspiracy.

### THIRD CAUSE OF ACTION
### FRAUDULENT CONCEALMENT
### AGAINST ALL DEFENDANTS

31.     Plaintiff realleges and incorporates by reference as though fully
set forth herein all paragraphs above this paragraph.

32.     It is alleged and believed that at all times herein mentioned, Defendants and their
alter egos owed a fiduciary duty to disclose to Plaintiff all material facts relating to the Loan.

33.     It is alleged and believed that in promoting the Loan, and throughout the  loan
process, and thereafter, Defendants knowingly and willfully suppressed and concealed from
Plaintiff material facts known to them but not to Plaintiff, including, but not limited to, as alleged
herein, the true identity of the lender who in fact financed the Loan; that the Loan would be

Page 5

*Complaint Celia Calco-Crawford v. America's Wholesale Lender et al.*

assigned, sold, or transferred to one or more MBS Trusts; that the Loan would not be retained in Defendant's loan portfolio but would be pre-sold into the secondary mortgage market; that the Loan was not the only loan product available to Plaintiff and for which she qualified, etc.

34.     Defendants intentionally suppressed and concealed the foregoing material facts from Plaintiff with the intent to deceive and to defraud Plaintiff and to induce or to execute the Note and the Deed of Trust.

35.     At the time of the concealment of the material facts alleged herein, Plaintiff was unaware of the true facts.  As a result of the fraudulent concealment of Defendants, Plaintiff entered into the Loan, executed the Note and Deed of Trust, and forestalled taking any action to protect her interests.  Plaintiff would not have executed the Note and the Deed of Trust if all of the material terms of the Note had been disclosed to her before close of escrow.

36.     As a direct and substantial result of the fraudulent concealment of Defendants, Plaintiff has incurred general damages in a sum according to proof at trial, together with interest thereon from and after The Closing Date, in the maximum amount allowed by law.

37.     As a further direct and substantial result of the fraudulent concealment of Defendants, Plaintiff has incurred damage to her credit rating, in a sum according to proof at trial.

38.     The conduct of Defendants constitutes a series of intentional acts committed by such Defendants with the intention of depriving Plaintiff of property or legal rights or otherwise causing Plaintiff injury.  Such conduct was despicable and has subjected Plaintiff to unjust hardship in conscious disregard of his rights, so as to justify an award of exemplary and punitive damages against such Defendants, in a sum according to proof at trial.

39.     The Note and the Deed of Trust provide that in the event of Plaintiff's default resulting in foreclosure procedures, Defendants shall be entitled to reasonable attorney's fees.  By virtue of California *Civil Code* § 1717, the right to attorney's fees is reciprocal, entitling Plaintiff to recover attorney's fees if she prevails in this action.

40.     Other defendants are jointly liable as a consequence of the conspiracy.

## FOURTH CAUSE OF ACTION
## DECLARATORY RELIEF ON MERS LEGAL STATUS
## AGAINST MERS

41.     Plaintiff realleges and incorporates by reference as though fully set forth

**EXHIBIT 21, PAGE 192**

herein all paragraphs above this paragraph.

42.    Mortgage Electronic Registration Systems, Inc. (hereinafter "MERS") was created about a decade ago. It is owned by several of the largest mortgage companies in America, including Fannie Mae, Freddie Mac, Wells Fargo, Citimortgage, Chase, HSBC and AWL, etc.

43.    Upon information and belief the mortgage industry created MERS with the intent, as it is claimed, "to streamline the mortgage process, by acting as the mortgagee of record for the holders and servicers of mortgages." In other words, MERS made it cheaper and faster for these mortgage companies to buy and sell loans without all the extra paperwork and fees they would have incurred had they done it the old fashioned way. The idea was that while a mortgage was being chopped up, sold and resold, the ownership interests would supposedly be electronically tracked by MERS, hopefully avoiding those pesky recording fees in the county records.

44.    Upon information and belief once the loan is assigned to MERS, all subsequent assignments were not recorded in public records as required by laws.

45.    It is alleged and believed that MERS has no beneficial interest in the NOTE in its role as nominee for the holder and does not become the holder of the promissory note that the Deed of Trust as the security instrument.

46.    It is alleged and believed that MERS' assertion as beneficiary in the Deed of Trust and acted on its own in assignment its beneficial interest is a nullity.

47.    Upon information and belief around late 2009, starting with the collapse of the banking system in the United States, problem with MERS status as a legal entity and a bone fide assignee holding mortgage became an issue. Several courts, federal as wells as states across the country, have not recognized MERS's standing as legitimate assignee on promissory notes as well as on deed of trusts.

48.    It is alleged and believed that as a result, MERS has no standing to foreclose or assign its nominal interest.

49.    Plaintiff is entitled to declaratory relief from the court declaring that MERS has no legal standing in any role in the Property.

//
//
//

Page 7

*Complaint Celia Calco-Crawford v. America's Wholesale Lender et al.*

**EXHIBIT 21, PAGE 193**

**FIFTH CAUSE OF ACTION**
**QUIET TITLE**
**AGAINST ALL DEFENDANTS**

50.      Plaintiff repeats and realleges herein all paragraphs above this paragraph, as though fully set forth at length herein.

51.      Plaintiff is and at all times herein mentioned has been, the owner in fee simple and in possession and control of the Property.

52.      On information and belief, the Loan was sold by AWL into the secondary mortgage market, primarily in the form of securities known as Mortgage Backed Securities ("MBS")[1].

53.      Plaintiff is informed and believes and thereon alleges that Loan was acquired and transferred to one or more MBS Trusts, without written notice to Plaintiff as required by RESPA and California *Civil Code* § 2937.

54.      Plaintiff is informed and believes and thereon alleges that at or about the time the MBS Trust in which the Loan belongs, issues securities to an investor, AWL lender may have transferred, conveyed, and assigned to the MBS Trust all of its right, title, and interest in the underlying loan. The assignment included the transfer to the MBS Trust of all principal and interest due by Plaintiff with respect to the loan. The MBS trustee has then, with such

---

[1] Footnote 1.

The process for creating an MBS begins when the originating lender sells, or pre-sells even before a loan is consummated, a borrower's note and the security for the note (a mortgage or deed of trust) to a third-party arranger, generally an investment bank or other financial institution, who packages mortgage loans – generally thousands of separate loans – into a pool and then transfers the mortgage loans to a trust (the "MBS Trust") that issues securities to investors typically large institutional investors such as pension plans, insurance companies, or hedge funds, collateralized by the pool of loans. The MBS Trust finances the purchase of the loan pool through the issuance of MBS's to investors. Borrowers' monthly payments, now funneled into the loan pool, are used to make monthly interest and principal payments to the investors in the MBS Trust. In order to qualify as an MBS under federal securities law (15 U.S.C. § 78(c)(a)(41)), an MBS must be rated in one of the two highest rating categories by at least one nationally recognized statistical rating organization, such as Standard & Poors, Moody's, or Fitch. The accuracy of such organizations' credit ratings of MBS' generally, as well as the integrity of the ratings process as a whole, has been seriously questioned by the SEC. *Summary Report of issues Identified in the...Examinations of Select Credit Rating Issues,* July, 2008.

Upon the sale of a loan, the originating lender is paid the full principal amount of the loan, plus an additional fee based on a percentage of the loan amount. The originating lender either transfers the responsibility to collect borrowers' monthly payments on a loan to a loan servicing company, or retains such loan servicing (collection) functions for an additional fee. The loan servicer remits borrowers' monthly loan payments to the MBS Trust. An MBS Trust typically issues different classes of MBS's known as "tranches," which offer a sliding scale of coupon rates based on the level of credit protection afforded to the security. Credit protection is designed to shield the tranche securities from the loss of interest and principal due to defaults of the loans in the pool. The degree of credit protection afforded a tranche security is known as its "credit enhancement" and is provided through several means.

Page 8

*Complaint Celia Calco-Crawford v. America's Wholesale Lender et al.*

**EXHIBIT 21, PAGE 194**

assignment in hand, executed and delivered the MBS to investors.  As part of the assignment,
AWL has delivered to the MBS trustee the Note, negotiated without recourse to the order
of the MBS trustee by endorsement on the note or by a separate "allonge," or deliver in blank,
without endorsement or allonge, the Note and the Deed of Trust.  Upon information and belief
the MBS trustee is now would be holding such documents in trust for the benefit of the investors
in the MBS Trust. Afterwards, in lieu of actual delivery of a borrower's note, mortgage, deed of
trust, or similar security instrument, and an assignment of such instrument to the MBS trustee,
AWL will cause the MBS trustee to be recorded as the beneficial owner of loans pursuant to
MERS' rules for electronically tracking changes in ownership rights.

55.     Plaintiff is informed and believes and thereon alleges that all right, title, and
interest in the loan she obtained from AWL was transferred, conveyed, and assigned to one or
more MBS Trusts.  Plaintiff is further informed and believes and thereon alleges that the actual
Note and the Deed of Trust she executed when she obtained her loan from Defendants were
delivered to one or more MBS Trusts, with or without a written assignment or, in the case of the
note, with or without written endorsement or allonge, or, in lieu of actual delivery to an MBS
Trust, Plaintiff's loan, and the transfer, conveyance, and assignment thereof, was registered in
the MERS system pursuant to the rules for electronically tracking changes in ownership rights,
with an MBS trustee recorded in the MERS system as the beneficial owner of Plaintiff's loan.

56.     As stated above, at the Closing Date, the lender of the Loan and the holder of the
Deed of Trust was AWL.  After the Loan was closed and until now, Plaintiff made payments to
defendant AWL, which is simply a servicer, and does not own the Loan, or the Note.  At this
point in time, Plaintiff alleges that no entity is qualified to be "holder in due course" of the Note
and the Deed of Trust any more.

57.     Plaintiff is informed and believes that the mortgage of record is MERS but
(a) MERS is simply a holder-of-record for the mortgagee but not the mortgagee itself, and (b)
Being a suspended corporation, MERS has no standing to take any legal action.

58.     In summary, the claims from any and all defendants on the Property are without
any right whatsoever and those defendants have no right, title, estate, lien, or interest whatsoever
in the Property or any part of the Property, such that any attempted non-judicial foreclosure on
the Property is illegal and unlawful.

59.     Plaintiff seeks determination that she holds fee simple title to the Property free of

Page 9

*Complaint Celia Calco-Crawford v. America's Wholesale Lender et al.*

**EXHIBIT 21, PAGE 195**

any purported adverse claims of Defendants and a determination be made as of June 10, 2011.

## PRAYER

WHEREFORE, Plaintiff CELIA CALCO-CRAWFORD, an individual, prays for judgment

against Defendants AWL, MERS,  All Persons Unknown Claiming Any Legal or Equitable Right, Title, Estate, Lien, or Interest in the Property Described in the Complaint Adverse to Plaintiff's Title, or Any Cloud on Plaintiff's Title; and DOES 1 through 99, inclusive, as follows:

a.  For a declaration from the court that the America's Wholesale Lender 'interest on the Property, whether secured or unsecured, is invalid and void.

b.  For a declaration from the court that the MERS's interest on the Property whether secured or unsecured, is invalid and void.

c.  For an order of court quieting title to the Property to Plaintiff free of any purported adverse claims of Defendants;

d.  For costs of suit incurred herein;

e.  For attorney fees incurred in prosecution herein; and

f.  For such other and further relief as the Court deems just and proper.

g.  For an Order Quieting title to Plaintiff as of June 10, 2011.

DATED: June 10, 2011

GLOBAL CAPITAL LAW, P. C.
A PROFESSIONAL CORPORATION

GARY HARRE, ESQ, ATTORNEY FOR PLAINTIFF

Page 10

*Complaint Celia Calco-Crawford v. America's Wholesale Lender et al.*

**EXHIBIT 21, PAGE 196**