98.   In the January 30, 2007 earnings conference call, Mozilo attempted to distinguish Countrywide from other lenders by stating "we backed away from the subprime area because of our concern over credit quality." On March 13, 2007, in an interview with Maria Bartiromo on CNBC, Mozilo said that it would be a "mistake" to compare monoline subprime lenders to Countrywide. He then went on to state that the subprime market disruption in the first quarter of 2007 would "be great for Countrywide at the end of the day because all of the irrational competitors will be gone."

99.   Sambol also made misleading statements that were designed to reassure investors. For example, at a May 24, 2005 investor day presentation, Sambol reassured analysts that Countrywide addressed the higher credit risk associated with adjustable rate mortgage programs by requiring different underwriting criteria such as "higher credit scores or lower loan to value ratios." At the September 13, 2006 Fixed Income Investor Forum, Sambol downplayed Countrywide's participation in originating subprime loans by falsely stating that Countrywide had been "on the sidelines" of the risky subprime market.

100.   The statements in Countrywide's periodic filings and statements by its chief executives were materially false when made, because Mozilo and Sambol were well aware that Countrywide had increasingly widened its underwriting guidelines year over year from 2004 through 2006, and Countrywide's loan quality had deteriorated as a result.

**J.     Countrywide's Collapse**

101.   In the first quarter of 2007, subprime 80/20s experienced high levels of defaults and delinquencies, which caused severe disruptions in the secondary market for subprime loans. On January 31, 2007, two members of Countrywide's Risk Management participated in the annual meeting of the American Securitization Forum ("ASF"), which was attended by sophisticated investors who purchased mortgage backed securities in the secondary market. They reported

1   back in a February 2, 2007 email, which was forwarded to Sambol, and noted that,
2   "[t]he obvious big topic of concern was 2006 vintage performance, both prime and
3   nonprime. **All recognize that 80/20's (and the layered risk on top of them) are**
4   **definitely the main culprit** and are concerned that the rating agencies sized it
5   wrong. All want to know when we are pulling back guidelines...and why we
6   haven't already." (emphasis added.) They went on to note that, **"[i]nvestors**
7   **believed that 100% financing and layered risk is the driver."** (emphasis
8   added.)

9        102.   One of the Countrywide employees attending the conference observed
10  that higher than expected losses on 80/20 loans caused investors to fear
11  increasingly high losses and the possibility that their investments, which, in many
12  cases, had received AAA ratings, would be downgraded.  The secondary market
13  for 80/20 loans essentially evaporated after the conference.  In 2007, as a result of
14  the increasingly risky loans that it had been underwriting, Countrywide began to
15  report extensive credit problems.  In May 2007, Countrywide disclosed in its Form
16  10-Q for the first quarter of 2007 that its consolidated net earnings for the quarter
17  were $434 million, a 37% **decrease** from net earnings in the first quarter of 2006.
18  Countrywide indicated that its first quarter results had been negatively impacted by
19  higher delinquencies related to its subprime lending, which had caused the company
20  to (1) take a write down of $217.8 million due to its inability to sell certain of its
21  subprime loans into the secondary market; (2) reduce the estimated value of its
22  retained servicing rights by $429.6 million; and (3) increase its allowance for loan
23  losses on loans held for investment by $95.9 million.

24       103.   Then, on August 9, 2007, Countrywide disclosed in its Form 10-Q for
25  the second quarter of 2007 that its consolidated net earnings for the quarter were
26  $485 million, a 33% net decrease from the second quarter of 2006.  Countrywide
27  attributed the decline to credit-related costs, specifically, a $417.2 million
28  impairment loss on its retained interests, including $388.1 million related to home

1  equity loans, and a $231 million increase in its allowance for loan losses.  On July

2  24, 2007, in the earnings release teleconference, Countrywide disclosed for the first

3  time that its definition of "prime" loans included loans made to borrowers with

4  FICO scores as low as 500, and that 80% of its portfolio of Pay-Option loans held

5  for investment were underwritten based upon reduced documentation.  After the

6  disclosures regarding its credit risk on July 24, 2007, Countrywide's share price

7  dropped from the previous day's close of $34.06 to $30.50 on July 24, an 11%

8  decline.

9       104.   Concurrent with its rising credit losses, Countrywide experienced a

10  liquidity crisis in August 2007.  Revenues from Countrywide's capital markets

11  loan sales and securitizations had dropped from $553.5 million in pre-tax earnings

12  in 2006 to $14.9 million in 2007, and Countrywide found itself unable to access

13  the short term credit markets by issuing commercial paper.  As a result, on August

14  16, 2007, Countrywide announced that it had drawn down its entire $11.5 billion

15  credit facility to supplement its cash position.  Following that announcement, the

16  ratings agencies downgraded Countrywide's securities, and Countrywide's stock

17  declined from $21.29 per share to $18.95, another approximately 11% decline.

18       105.   On August 23, 2007, Countrywide announced that Bank of America

19  had invested $2 billion in Countrywide in exchange for non-voting preferred

20  securities.

21       106.   On October 26, 2007, Countrywide reported a quarterly loss of $1.2

22  billion. The company's Form 10-Q, filed on November 9, 2007, disclosed that

23  Countrywide had taken a $1 billion impairment loss on its loans held for sale and

24  mortgage backed securities, and had taken $1.9 billion in credit charges related to its

25  allowance for loan losses and its provision for representations and warranties on

26  loans it had securitized and sold.  In the October earnings call, Mozilo nevertheless

27  assured investors that the company would return to profitability in the fourth quarter

28  of 2007 - a representation that caused Countrywide's share price to rise from its

1 previous day's close of $13.07 to $17.30 after the call, despite its poor performance
2 in that quarter.

3     107. Thereafter, Countrywide's share price continued to trend downward,
4 driven in part by bankruptcy rumors, until it closed at $8.94 on December 31, 2007.
5 Then, on January 8, 2008, Countrywide's shares dropped 28%, from $7.64 to $5.47,
6 again on rumors that the company intended to file for bankruptcy. On January 11,
7 2008, prior to reporting its year-end 2007 results, Countrywide announced that it
8 was being acquired by Bank of America in an all stock transaction estimated to
9 have an approximate value of $4 billion.

10     108. On March 29, 2008, in its Form 10-K for the year ended December 31,
11 2007, Countrywide disclosed that the contraction of the secondary market for its
12 loans had increased its financing needs because it was required to hold loans for
13 longer periods pending sale and certain loans had become unmarketable and had to
14 be held for investment. In response to these funding needs, Countrywide disclosed
15 that it had: (1) speeded integration of mortgage banking activities into
16 Countrywide Bank to reduce its dependency on the secondary markets; (2) taken a
17 $2 billion infusion from Bank of America in exchange for shares of preferred
18 stock; (3) drawn down an $11.5 billion credit line to maintain liquidity; and (4)
19 revised its product offerings and underwriting guidelines, such that the majority of
20 its loan production was again eligible for sale to the government sponsored entities.

21     **K.**   **Stock Sales of Mozilo and Sambol**

22     109. Both Mozilo and Sambol realized profits on sales of Countrywide
23 stock in 2005, 2006, and 2007, through stock sales pursuant to various 10b5-1
24 plans. From May 9, 2005, when the Form 10-Q for the first quarter of 2005 was
25 filed, through the end of 2007, Mozilo exercised stock options and sold the
26 underlying shares for total proceeds of at least $260 million, and Sambol exercised
27 stock options and sold the underlying shares for total proceeds of at least $40
28 million.

1      **L.   Mozilo, Sambol, and Sieracki Participated in Several Offerings of**
2            **Countrywide Securities While the Misleading Periodic Reports**
3            **Were Outstanding**

4      110.   On February 9, 2006, Countrywide filed a registration statement on
5      Form S-3ASR that registered a then indeterminate amount of common stock,
6      preferred stock, stock purchase contracts, stock purchase units, and debt securities
7      of Countrywide.  Thereafter, Countrywide filed 180 prospectus supplements
8      identifying the securities it was offering for sale, including a Post-Effective
9      Amendment to that Form S-3ASR dated October 30, 2006.  On November 16,
10     2007, Countrywide filed a registration statement on Form S-3ASR that registered
11     $2 billion worth of Series A Floating Rate Convertible Senior Debentures and $2
12     billion worth of Series B Floating Rate Convertible Senior Debentures.  Sieracki,
13     Sambol and Mozilo signed all of these offerings, each of which incorporated one
14     of the false Form 10-Ks by reference.

15     **M.   Insider Trading By Mozilo**

16     111.   Mozilo also engaged in insider trading in Countrywide securities.
17     Mozilo established four sales plans pursuant to Rule 10b5-1 of the Exchange Act
18     in October, November, and December 2006 while in possession of material, non-
19     public information concerning the operations and financial condition of
20     Countrywide.

21            **C.      Countrywide's Insider Trading Policy**

22     112.   During the relevant period, Countrywide had an insider trading policy
23     in effect, dated as of June 24, 2005, which prohibited trading in Countrywide
24     securities on the basis of material non-public information.  The policy included a
25     section entitled "Material Information" that stated:

26            3.2   Material Information

27            U.S. federal securities laws prohibit
               transactions while aware of material
28            nonpublic information.  "Material"
               information means information relating to the

- 43 -

company with publicly traded securities, which, if publicly disseminated, would likely affect the market price of any of its securities, or which would likely be considered important by a reasonable investor in determining whether to buy, sell, or hold such securities.

In addition, the policy included a section regarding 10b5-1 sales plans that stated:

4.3   10b5-1 Trading Arrangements

A.   Section 10b5-1 of the Exchange Act creates an exception to the prohibition against trading while in the possession of material nonpublic information. In order to take advantage of the exception set forth in Section 10b5-1 of the Exchange Act, Directors and Executives Officers must enter into a 10b5-1 Trading Plan; provided that such Trading Plan:

i.   specifies the amount of shares to be purchased or sold and the price at which and the date on which the shares are to be purchased or sold; or

ii.   includes a written formula or algorithm, or computer program, for determining the amount of shares to be purchased or sold and the price at which and the date on which the shares are to be purchased or sold; or

iii.   does not permit the individual to exercise any subsequent influence over how, when or whether to effect purchases or sales; provided, in addition, that any other person who, pursuant to the contract, instruction, or plan, did exercise such influence must not be aware of the material nonpublic information when doing so; and

iv.   was acknowledged by Countrywide in writing and pre-cleared by the Office of the Chief Legal Officer.

113.   Mozilo knew about and understood the Countrywide insider trading policy. In addition, prior to the execution of each 10b5-1 sales plan, Countrywide's legal department was required to review and approve the sales plan

1    and Mozilo was required to orally represent to Countrywide's general counsel that

2    he was not in possession of material non-public information.

    2.    **Mozilo Established His 2006 10b5-1 Sales Plans While**

         **In Possession of Material, Nonpublic Information**

5         114.  As set forth in section E. above, in 2006, Mozilo possessed material

6    non-public information regarding the characteristics and performance of Pay-

7    Option ARM loans as well as increasing credit risks associated with this product.

8    None of this information was disclosed to the public prior to the establishment of

9    Mozilo's sales plans in October, November, and December 2006.

10        115.  As set forth in section F. above, in 2006, Mozilo learned of red flags

11   concerning Countrywide's expanded underwriting guidelines and concluded that

12   certain of Countrywide's mortgage loans would have a future detrimental financial

13   impact on the company.  In response to this information, beginning in early 2006,

14   Mozilo raised his concerns with other members of senior management and

15   instructed them to take action to mitigate risks associated with lower quality loans.

16        116.  While in possession of this material, non-public information, Mozilo

17   established four different Rule 10b5-1 plans.

18        117.  On October 27, 2006, Mozilo established a sales plan that directed his

19   broker to exercise 3,989,588 stock options and sell the underlying shares on

20   specific days set forth in the plan beginning on November 1, 2006 and ending no

21   later than October 5, 2007 (the "October 2006 Plan").

22        118.  Mozilo gave final approval to create the October 2006 Plan during a

23   meeting with his financial advisor on September 25, 2006, one day before sending

24   an e-mail to Sambol and Sieracki, as described in paragraphs 68 and 69 above, that

25   stated among other things, that "**we are flying blind on how these loans will**

26   **perform in a stressed environment of higher unemployment, reduced values**

27   **and slowing home sales.**" (emphasis added).

28

119.   Also on October 27, 2006, Mozilo established a sales plan in the name of the Mozilo Family Foundation, a charitable organization that he chaired, that directed the broker to sell 91,999 shares of Countrywide stock held by the Foundation: 23,000 shares to be sold on November 1, 6, and 16, 2006 and 22,999 shares to be sold on November 21, 2006 (the "Foundation Plan").

120.   On November 13, 2006, Mozilo established a sales plan for the Mozilo Living Trust, a revocable trust created for the benefit of his family, that directed the broker to sell 100,000 shares of Countrywide stock in lots of 25,000 shares on November 16, 21, 29, and December 4, 2006 (the "Trust Plan").

121.   On December 12, 2006, Mozilo established a sales plan that directed his broker to exercise 1,389,580 stock options and sell the underlying shares on specific days set forth in the plan beginning on January 5, 2007 and ending no later than December 14, 2007 (the "December 2006 Plan").

122.   Mozilo executed the December 2006 Sales Plan five days after he circulated a memorandum, described in paragraph 52 above, to all managing directors and the board of directors that analyzed subprime mortgages.

123.   On February 2, 2007, Mozilo amended the December 2006 Plan ("February Amendment") by directing the exercise of an additional 2,467,777 stock options and selling the underlying shares on the schedule already set forth in the December 2006 Plan.

124.   From November 2006 through October 2007, Mozilo exercised over five million stock options and sold the underlying shares pursuant to the four sales plans, realizing gains of over $139 million.

///
///
///
///
///

# FIRST CLAIM FOR RELIEF

## FRAUD IN THE OFFER OR SALE OF SECURITIES

### Violations of Section 17(a) of the Securities Act

### (Against All Defendants)

125. The Commission realleges and incorporates by reference ¶¶ 1 through 124 above.

126. Defendants, and each of them, by engaging in the conduct described above, directly or indirectly, in the offer or sale of securities by the use of means or instruments of transportation or communication in interstate commerce or by the use of the mails:

    a.    with scienter, employed devices, schemes, or artifices to defraud;

    b.    obtained money or property by means of untrue statements of a material fact or by omitting to state a material fact necessary in order to make the statements made, in light of the circumstances under which they were made, not misleading; or

    c.    engaged in transactions, practices, or courses of business which operated or would operate as a fraud or deceit upon the purchaser.

127. By engaging in the conduct described above, Defendants violated, and unless restrained and enjoined will continue to violate, Section 17(a) of the Securities Act, 15 U.S.C. § 77q(a).

///
///
///
///
///
///

## SECOND CLAIM FOR RELIEF

### FRAUD IN CONNECTION WITH THE PURCHASE

### OR SALE OF SECURITIES

**Violations and Aiding and Abetting Violations of Section 10(b) of the**

**Exchange Act and Rule 10b-5 thereunder**

**(Against All Defendants)**

128.  The Commission realleges and incorporates by reference ¶¶ 1 through 124 above.

129.  Defendants, and each of them, by engaging in the conduct described above, directly or indirectly, in connection with the purchase or sale of a security, by the use of means or instrumentalities of interstate commerce, of the mails, or of the facilities of a national securities exchange, with scienter:

    a.    employed devices, schemes, or artifices to defraud;

    b.    made untrue statements of a material fact or omitted to state a material fact necessary in order to make the statements made, in the light of the circumstances under which they were made, not misleading; or

    c.    engaged in acts, practices, or courses of business which operated or would operate as a fraud or deceit upon other persons.

130.  By engaging in the conduct described above, Defendants violated, and unless restrained and enjoined will continue to violate, Section 10(b) of the Exchange Act, 15 U.S.C. § 78j(b), and Rule 10b-5 thereunder, 17 C.F.R. § 240.10b-5.

///

///

///

///

## THIRD CLAIM FOR RELIEF

### VIOLATIONS OF COMMISSION PERIODIC REPORTING

### REQUIREMENTS

**Aiding and Abetting Violations of Section 13(a) of the Exchange Act, and**

**Rules 12b-20, 13a-1, and 13a-13 thereunder**

**(Against All Defendants)**

131. The Commission realleges and incorporates by reference ¶¶ 1 through 124 above.

132. Countrywide violated Section 13(a) of the Exchange Act and Rules 12b-20, 13a-1, and 13a-13 thereunder, by filing with the Commission annual reports on Form 10-K for fiscal years 2005, 2006, and 2007 and quarterly reports on Form 10-Q for each quarter in 2005, 2006, and 2007 that were materially false and failed to include material information necessary to make the required statements, in light of the circumstances under which they were made, not misleading.

133. Mozilo, Sambol, and Sieracki knowingly provided substantial assistance to Countrywide in its violation of Section 13(a) of the Exchange Act and Rules 12b-20, 13a-1, and 13a-13 thereunder in connection with Countrywide's annual reports for fiscal years 2005, 2006, and 2007 and its quarterly reports for each quarter in 2005, 2006, and 2007.

134. By engaging in the conduct described above and pursuant to Section 20(e) of the Exchange Act, 15 U.S.C. § 78t(e), Mozilo, Sambol, and Sieracki aided and abetted Countrywide's violations, and unless restrained and enjoined will continue to aid and abet violations, of Section 13(a) of the Exchange Act, and Rules 12b-20, 13a-1, and 13a-13 thereunder.

///

///

///

## FOURTH CLAIM FOR RELIEF

## CERTIFICATION VIOLATIONS

### Violations of Rule 13a-14 of the Exchange Act

### (Against Defendants Mozilo and Sieracki)

135. The Commission realleges and incorporates by reference ¶¶ 1 through 124 above.

136. Mozilo and Sieracki violated Rule 13a-14 by signing the certifications included with Countrywide fiscal year 2005, 2006, and 2007 Forms 10-K, certifying, among other things, that the forms fully complied with the requirements of the Exchange Act and fairly presented, in all material respects, the financial condition and results of operations of the company, when, in fact, the reports contained untrue statements of material fact and omitted material information necessary to make the reports not misleading.

137. By engaging in the conduct described above, defendants Mozilo and Sieracki violated Exchange Act Rule 13a-14, 17 C.F.R. § 240.13a-14. Unless restrained and enjoined, defendants Mozilo and Sieracki will continue to violate Rule 13a-14, 17 C.F.R. § 240.13a-14.

## PRAYER FOR RELIEF

WHEREFORE, the Commission respectfully requests that the Court:

### I.

Issue findings of fact and conclusions of law that the defendants committed the alleged violations.

### II.

Issue judgments, in a form consistent with Fed. R. Civ. P. 65(d), permanently enjoining Defendant Mozilo and his agents, servants, employees, attorneys, and those persons in active concert or participation with any of them, who receive actual notice of the order by personal service or otherwise, from violating Section 17(a) of the Securities Act, Section 10(b) of the Exchange Act,

1 and Rules 10b-5 and 13a-14 thereunder, and from aiding and abetting violations of

2 Section 13(a) of the Exchange Act, and Rules 12b-20, 13a-1, and 13a-13

3 thereunder.

### III.

5     Issue judgments, in a form consistent with Fed. R. Civ. P. 65(d),

6 permanently enjoining Defendant Sambol and his agents, servants, employees,

7 attorneys, and those persons in active concert or participation with any of them,

8 who receive actual notice of the order by personal service or otherwise, from

9 violating Section 17(a) of the Securities Act, and Section 10(b) of the Exchange

10 Act, and Rule 10b-5 thereunder, and from aiding and abetting violations of Section

11 13(a) of the Exchange Act, and Rules 12b-20, 13a-1, and 13a-13 thereunder.

### IV.

13     Issue judgments, in a form consistent with Fed. R. Civ. P. 65(d),

14 permanently enjoining Defendant Sieracki and his agents, servants, employees,

15 attorneys, and those persons in active concert or participation with any of them,

16 who receive actual notice of the order by personal service or otherwise, from

17 violating Section 17(a) of the Securities Act, Section 10(b) of the Exchange Act,

18 and Rules 10b-5 and 13a-14 thereunder, and from aiding and abetting violations of

19 Section 13(a) of the Exchange Act, and Rules 12b-20, 13a-1, and 13a-13

20 thereunder.

### V.

22     Enter an order, pursuant to Section 21(d)(2) of the Exchange Act, 15 U.S.C.

23 § 78u(d)(2), prohibiting defendants Mozilo, Sambol, and Sieracki from acting as

24 officers or directors of any issuer that has a class of securities registered pursuant

25 to Section 12 of the Exchange Act, 15 U.S.C. § 78l, or that is required to file

26 reports pursuant to Section 15(d) of the Exchange Act, 15 U.S.C. § 78o(d).

27 ///

28 ///

## VI.

Order defendants Mozilo and Sambol to disgorge all ill-gotten gains from their illegal conduct, together with prejudgment interest thereon.

## VII.

Order defendants Mozilo, Sambol, and Sieracki to pay civil penalties under Section 21(d)(3) of the Exchange Act, 15 U.S.C. § 78u(d)(3).

## VIII.

Order defendant Mozilo to pay a civil penalty under Section 21A(a) of the Exchange Act, 15 U.S.C. § 78u-1(a).

## IX.

Retain jurisdiction of this action in accordance with the principles of equity and the Federal Rules of Civil Procedure in order to implement and carry out the terms of all orders and decrees that may be entered, or to entertain any suitable application or motion for additional relief within the jurisdiction of this Court.

## X.

Grant such other and further relief as this Court may determine to be just and necessary.

DATED:  June 4, 2009

*Lynn  M.  Dean*
JOHN M. McCOY, III
SPENCER E. BENDELL
LYNN M. DEAN
SAM PUATHASNANON
PARIS WYNN
Attorneys for Plaintiff
Securities and Exchange Commission

1  **DEMAND FOR JURY TRIAL**

2      Plaintiff hereby demands trial by jury.

3

4  DATED:  June 4, 2009

5                                          JOHN M. McCOY, III
                                           SPENCER E. BENDELL
6                                          LYNN M. DEAN
                                           SAM PUATHASNANON
7                                          PARIS WYNN
                                           Attorneys for Plaintiff
8                                          Securities and Exchange Commission

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28



Home | Previous Page

U.S. Securities and Exchange Commission

**U.S. Securities and Exchange Commission**

**Litigation Release No. 21068A / June 4, 2009**

**Accounting and Auditing Enforcement Release No. 3023 / June 4, 2009**

***Securities and Exchange Commission v. Angelo Mozilo, David Sambol, and Eric Sieracki, (C.D. Cal.), Civil Action No. CV 09-03994 (VBF)***

**SEC Files Securities Fraud Charges Against Former Countrywide Executives**

On June 4, 2009, the Securities and Exchange Commission announced the filing of securities fraud charges against former Countrywide Financial CEO Angelo Mozilo, former chief operating officer and president David Sambol, and former chief financial officer Eric Sieracki. They are charged with deliberately misleading investors about the significant credit risks being taken in efforts to build and maintain the company's market share.

The Commission has additionally charged Mozilo with insider trading for selling his Countrywide stock based on non-public information for nearly $140 million in profits.

In its complaint filed in federal district court in Los Angeles, the SEC alleges that Mozilo, Sambol, and Sieracki misled the market by falsely assuring investors that Countrywide was primarily a prime quality mortgage lender that had avoided the excesses of its competitors.

According to the SEC's complaint, Countrywide's credit risks were so alarming that Mozilo internally issued a series of increasingly dire assessments of various Countrywide loan products and the resulting risks to the company. In one internal e-mail, Mozilo referred to a profitable subprime product as "toxic." In another internal e-mail regarding the performance of its heralded Pay-Option ARM loan, he acknowledged that the company was "flying blind."

The SEC's complaint alleges that Countrywide's annual reports for 2005, 2006, and 2007 misled investors in claiming that Countrywide "manage[d] credit risk through credit policy, underwriting, quality control and surveillance activities." Its annual reports for 2005 and 2006 falsely stated that the company ensured its "access to the secondary mortgage market by consistently producing quality mortgages." The annual report for 2006 also falsely claimed that Countrywide had "prudently underwritten" its Pay-Option ARM loans.

The SEC alleges that Mozilo, Sambol, and Sieracki actually knew, and

acknowledged internally, that Countrywide was writing increasingly risky loans and that defaults and delinquencies would rise as a result, both in loans that Countrywide serviced and loans that the company packaged and sold as mortgage-backed securities.

According to the SEC's complaint, Countrywide developed what was internally referred to as a "supermarket" strategy that widened underwriting guidelines to match any product offered by its competitors. By the end of 2006, Countrywide's underwriting guidelines were as wide as they had ever been, and Countrywide made an increasing number of loans based on exceptions to those already wide guidelines, even though exception loans had a higher rate of default.

The SEC's complaint alleges that Mozilo believed that the risk was so high that he repeatedly urged that Countrywide sell its entire portfolio of Pay-Option loans. Despite these severe concerns about the increasing risks that Countrywide was undertaking, Mozilo, Sambol, and Sieracki hid these risks from the investing public.

The SEC further alleges that Mozilo engaged in insider trading of Countrywide stock that he owned. Mozilo established four executive stock sale plans for himself in October, November, and December 2006 while he was aware of material, non-public information concerning Countrywide's increasing credit risk and the expected poor performance of Countrywide-originated loans. From November 2006 through August 2007, Mozilo exercised more than 5.1 million stock options and sold the underlying shares for total proceeds of nearly $140 million, pursuant to written trading plans adopted in late 2006 and early 2007.

The SEC's complaint alleges that each of the defendants violated Section 17(a) of the Securities Act of 1933, Section 10(b) of the Securities Exchange Act of 1934 and Rule 10b-5 thereunder, and aided and abetted violations of Sections 13(a) of the Exchange Act and Rules 12b-20, 13a-1, and 13a-13 thereunder. The complaint further alleges that Mozilo and Sieracki violated Rule 13a-14 under the Exchange Act. The SEC's complaint seeks permanent injunctive relief, officer and director bars, and financial penalties against all of the defendants and the disgorgement of ill-gotten gains with prejudgment interest against Mozilo and Sambol.

➤ SEC Complaint in this matter

*http://www.sec.gov/litigation/litreleases/2009/lr21068a.htm*

Home | Previous Page                             Modified: 07/30/2009

Exhibit "17"

Former Countrywide CEO Angelo Mozilo to Pay SEC's Largest–Ever Fina...nst a Public Company's Senior Executive; 2010–197; October 15, 2010          3/11/12 12:23 AM

Case 8:12-cv-00242-CJC-AN   Document 22   Filed 03/12/12   Page 19 of 48   Page ID #:884



Home | Previous Page

**U.S. Securities and Exchange Commission**

## Former Countrywide CEO Angelo Mozilo to Pay SEC's Largest-Ever Financial Penalty Against a Public Company's Senior Executive

**Settlement Permanently Bars Mozilo from Future Officer or Director Service**

### FOR IMMEDIATE RELEASE
### 2010-197

*Washington, D.C., Oct. 15, 2010* — The Securities and Exchange Commission today announced that former Countrywide Financial CEO Angelo Mozilo will pay a record $22.5 million penalty to settle SEC charges that he and two other former Countrywide executives misled investors as the subprime mortgage crisis emerged. The settlement also permanently bars Mozilo from ever again serving as an officer or director of a publicly traded company.

Mozilo's financial penalty is the largest ever paid by a public company's senior executive in an SEC settlement. Mozilo also agreed to $45 million in disgorgement of ill-gotten gains to settle the SEC's disclosure violation and insider trading charges against him, for a total financial settlement of $67.5 million that will be returned to harmed investors.

Former Countrywide chief operating officer David Sambol agreed to a settlement in which he is liable for $5 million in disgorgement and a $520,000 penalty, and a three-year officer and director bar. Former chief financial officer Eric Sieracki agreed to pay a $130,000 penalty and a one-year bar from practicing before the Commission. In settling the SEC's charges, the former executives neither admit nor deny the allegations against them.

The penalties and disgorgement paid by Sambol and Sieracki will also be returned to harmed investors.

"Mozilo's record penalty is the fitting outcome

High-Res Photo



"Mozilo's record penalty is the fitting outcome for a corporate executive who deliberately disregarded his duties to investors by concealing what he saw from inside the executive suite — a looming disaster in which Countrywide was buckling under the weight of increasing risky mortgage underwriting, mounting defaults and delinquencies, and a deteriorating business model."

**Robert Khuzami
Director
SEC Enforcement
Division**

Former Countrywide CEO Angelo Mozilo to Pay SEC's Largest-Ever Fina...nst a Public Company's Senior Executive; 2010-197; October 15, 2010    3/11/12 12:23 AM

Case 8:12-cv-00242-CJC-AN    Document 22    Filed 03/12/12    Page 20 of 48    Page ID #:885

for a corporate executive who deliberately disregarded his duties to investors by concealing what he saw from inside the executive suite — a looming disaster in which Countrywide was buckling under the weight of increasing risky mortgage underwriting, mounting defaults and delinquencies, and a deteriorating business model," said Robert Khuzami, Director of the SEC's Division of Enforcement.

John McCoy, Associate Regional Director of the SEC's Division of Enforcement, added, "This settlement will provide affected shareholders significant financial relief, and reinforces the message that corporate officers have a personal responsibility to provide investors with an accurate and complete picture of known risks and uncertainties facing a company."

The settlement was approved by the Honorable John F. Walter, United States District Judge for the Central District of California in a court hearing held today.

The SEC filed charges against Mozilo, Sambol, and Sieracki on June 4, 2009, alleging that they failed to disclose to investors the significant credit risk that Countrywide was taking on as a result of its efforts to build and maintain market share. Investors were misled by representations assuring them that Countrywide was primarily a prime quality mortgage lender that had avoided the excesses of its competitors. In reality, Countrywide was writing increasingly risky loans and its senior executives knew that defaults and delinquencies in its servicing portfolio as well as the loans it packaged and sold as mortgage-backed securities would rise as a result.

The SEC's complaint further alleged that Mozilo engaged in insider trading in the securities of Countrywide by establishing four 10b5-1 sales plans in October, November, and December 2006 while he was aware of material, non-public information concerning Countrywide's increasing credit risk and the risk regarding the poor expected performance of Countrywide-originated loans.

In addition to the financial penalties, Mozilo and Sambol consented to the entry of a final judgment that provides for a permanent injunction against violations of the antifraud provisions of the Securities Act of 1933 and the Securities Exchange Act of 1934. Mozilo also consented to the entry of a permanent officer and director bar, and Sambol consented to the entry of a three-year bar.

Sieracki agreed to a permanent injunction from further violations of Sections 17(a)(2) and 17(a)(3) of the Securities Act, and consented to a one-year bar under the Commission's Rule of Practice 102(e)(3).

The SEC investigation that led to the filing and settlement of this enforcement action was conducted by Michele Wein Layne, Spencer E. Bendell, Lynn M. Dean, Paris Wynn, and Sam Puathasnanon. Together with Associate Regional Director John M. McCoy, that same team has been handling the SEC's litigation.

The SEC has filed many other enforcement actions involving mortgage-related securities and mortgage-related products linked to the financial crisis, including:

Former Countrywide CEO Angelo Mozilo to Pay SEC's Largest–Ever Fina...nst a Public Company's Senior Executive; 2010–197; October 15, 2010          3/11/12 12:23 AM

Case 8:12-cv-00242-CJC-AN    Document 22    Filed 03/12/12    Page 21 of 48    Page ID #:886

- American Home Mortgage (4/28/2009)
- Reserve Fund (5/05/2009)
- Evergreen (6/08/2009)
- New Century (12/07/2009)
- Brookstreet (12/08/2009)
- State Street (2/04/2010)
- Morgan Keegan (4/07/2010)
- Goldman Sachs (4/16/2010)
- Farkas/Taylor, Bean & Whitaker (6/16/2010)
- ICP (6/21/2010)
- Citigroup (7/29/2010)

# # #

For more information about this enforcement action, contact:

Robert S. Khuzami
Director, SEC Enforcement Division
(202) 551-4500

Lorin L. Reisner
Deputy Director, SEC Enforcement Division
(202) 551-4787

Rosalind Tyson
Regional Director, SEC Los Angeles Regional Office
(323) 965-3893

John M. McCoy III
Associate Regional Director, SEC Los Angeles Regional Office
(323) 965-4561

*http://www.sec.gov/news/press/2010/2010-197.htm*

Home | Previous Page                                    Modified: 10/15/2010

Exhibit "18"

FOR PUBLICATION

## UNITED STATES BANKRUPTCY COURT
## DISTRICT OF NEW JERSEY

| | | |
|---|---|---|
| In the Matter of | : | Case No. 08-18700-JHW |
| John T. Kemp | : | |
| Debtor | : | |
| John T. Kemp | : | Adversary No. 08-2448 |
| Plaintiff | : | |
| v. | : | |
| Countrywide Home Loans, Inc. | : | **OPINION** |
| Defendant | : | |

APPEARANCES:   Bruce H. Levitt, Esq.
Levitt & Slafkes, PC
76 South Orange Avenue, Suite 305
South Orange, New Jersey   07079
Counsel for the Debtor

Harold Kaplan, Esq.
Dori L. Scovish, Esq.
Frenkel, Lambert, Weiss, Weisman & Gordon, LLP
80 Main Street, Suite 460
West Orange, New Jersey   07052
Counsel for the Defendant

**FILED**

JAMES J. WALDRON, CLERK

November 16, 2010

U.S. BANKRUPTCY COURT
CAMDEN, N.J.
BY: Theresa O'Brien, Judicial
Assistant to Chief Judge Wizmur

Before the court for resolution is the debtor's adversary complaint

seeking to expunge the proof of claim filed on behalf of the Bank of New York

by Countrywide Home Loans, Inc. as servicer.  The debtor challenges the

creditor's opportunity to enforce the obligation alleged to be due, based

primarily on the fact that the underlying note executed by the debtor was not properly indorsed to the transferee, and was never placed in the transferee's possession. Under the New Jersey Uniform Commercial Code, the note, as a negotiable instrument, is not enforceable by the Bank of New York under these circumstances. The plaintiff/debtor's challenge to the proof of claim is sustained on this record.

## PROCEDURAL HISTORY

On May 9, 2008, the debtor, John T. Kemp, filed a voluntary petition for relief under Chapter 13 of the Bankruptcy Code. The debtor scheduled an ownership interest in several properties, including one located at 1316 Kings Highway, Haddon Heights, New Jersey, the property at issue in this proceeding. Schedule D of the debtor's petition, listing creditors holding secured claims, listed Countrywide Home Loans as both the first and second mortgagee, with claims of $167,000 and $42,000, respectively, against the 1316 Kings Highway property. The debtor's Chapter 13 plan proposed to make payments over 60 months to satisfy priority claims and to cure arrearages on three separate mortgages, including the two Countrywide mortgages.[1]

---

[1]     The debtor filed an amended plan on October 3, 2008 which was confirmed on December 11, 2008 at $2,081 for 54 months. The modified plan increased the arrearage to be paid to Countrywide from $18,000 to $34,000,

On June 11, 2008, the defendant herein, Countrywide Home Loans, Inc. (hereinafter "Countrywide"), identifying itself as the servicer for the Bank of New York, filed a secured proof of claim in the amount of $211,202.41, including $40,569.69 in arrears, noting the property at 1316 Kings Highway as the collateral for the claim.[2]  The debtor filed this adversary complaint on October 16, 2008 against Countrywide, seeking to expunge its proof of claim.[3] The debtor asserts that the Bank of New York cannot enforce the underlying obligation.

---

and maintained the second Countrywide mortgage arrears at $6,000.  A second modified plan was filed on April 15, 2010 and is currently scheduled for confirmation on December 8, 2010.  The latest modified plan does not list Countrywide as a creditor to be treated under the plan.

[2]      Although the debtor listed two mortgages held by Countrywide against 1316 Kings Highway in his schedules, Countrywide only filed one proof of claim regarding one mortgage and note.

[3]      In 2008, Countrywide Financial Corporation, the umbrella organization for Countrywide Home Loans, Inc., was purchased by the Bank of America Corporation.  Effective April 27, 2009, Countrywide Home Loans, Inc. changed its name to BAC Home Loan Servicing, L.P. ("BAC Servicing").  Motion to Dismiss, Van Beveren Certif. at 1.  On July 1, 2010, a "Transfer of Claim for Security" was filed on the debtor's claim register, transferring the claim from "Countrywide Home Loans, Inc., servicer for Bank of New York" to "BAC Home Loan Servicing, LP".  In this opinion, I will continue to refer to the defendant as Countrywide.

-3-

## FACTS

In his complaint, the debtor does not dispute that he signed the original mortgage documents in question. The note and mortgage were executed by the debtor on May 31, 2006. The note, designated as an "Interest Only Adjustable Rate Note", listed the lender as "Countrywide Home Loans, Inc." No indorsement appeared on the note. Accompanying the note was an unsigned "Allonge to Note" dated the same day, May 31, 2006, in favor of "America's Wholesale Lender", directing that the debtor "Pay to the Order of Countrywide Home Loans, Inc., d/b/a America's Wholesale Lender."[4]

The mortgage, in the amount of $167,000, listed the lender as "America's Wholesale Lender". Mortgage Electronic Registration Systems, Inc., or "MERS", is named as "the mortgagee", and is authorized to act "solely as the nominee" for the lender and the lender's successors and assigns. The mortgage references the promissory note signed by the borrower on the same date. The mortgage was recorded in the Camden County Clerk's Office on July 13, 2006.

Shortly after the execution by the debtor of the note and mortgage, the

---

[4]    The record does not reflect whether the unsigned allonge was physically affixed to the note.

instruments executed by the debtor were apparently pooled with other similar instruments and sold as a package to the Bank of New York as Trustee. On June 28, 2006, a Pooling and Servicing Agreement ("PSA" or "the Agreement") was executed by CWABS, Inc. as the depositor, with Countrywide Home Loans, Inc., Park Monaco, Inc. and Park Sienna, LLC as the sellers, Countrywide Home Loans Servicing LP ("Countrywide Servicing") as the master servicer, and the Bank of New York as the Trustee. Pursuant to the Agreement, the depositor was directed to transfer the Trust Fund, consisting of specified mortgage loans and their proceeds, including the debtor's loan, to the Bank of New York as Trustee, in return for certificates referred to as Asset-backed Certificates, Series 2006-8. The sellers sold, transferred or assigned to the depositor "all the right, title and interest of such Seller in and to the applicable Initial Mortgage Loans, including all interest and principal received and receivable by such Seller." PSA § 2.01(a) at 52. In turn, the depositor immediately transferred "all right title and interest in the Initial Mortgage Loans," including the debtor's loan, to the Trustee, for the benefit of the certificate holders. Id.

The Agreement expressly provided that in connection with the transfer of each loan, the depositor was to deliver "the original Mortgage Note, endorsed by manual or facsimile signature in blank in the following form: 'Pay to the order

-5-

of _____ without recourse', with all intervening endorsements that show

a complete chain of endorsement from the originator to the Person endorsing

the Mortgage Note." PSA § 2.01(g)(i) at 56.  Most significantly for purposes of

this discussion, the note in question was never indorsed in blank or delivered

to the Bank of New York, as required by the Pooling and Servicing Agreement.


On March 14, 2007, MERS, as the nominee for America's Wholesale

Lender, assigned the debtor's mortgage to the Bank of New York as Trustee for

the Certificateholders CWABs, Inc. Asset-backed Certificates, Series 2006-8.

The assignment purported to assign "a certain mortgage dated May 31, 2006 . .

. [t]ogether with the Bond, Note or other obligation described in the Mortgage,

and the money due and to become due thereon, with the interest." The

assignment provided further that the "Assignor covenants that there is now

due and owing upon the Mortgage and the Bond, Note or other obligation

secured thereby, the sum of $167,199.92 Dollars principal with interest

thereon to be computed at the rate of 9.530 percent per year." The assignment

was recorded with the County Clerk on March 24, 2008.


At the trial of this matter, Countrywide produced a new undated "Allonge

to Promissory Note", which directed the debtor to "Pay to the Order of Bank of

New York, as Trustee for the Certificateholders CWABS, Inc., Asset-backed

Certificates, Series 6006-8."[5]  The new allonge was signed by Sharon Mason,

Vice President of Countrywide Home Loans, Inc., in the Bankruptcy Risk

Litigation Management Department.  Linda DeMartini, a supervisor and

operational team leader for the Litigation Management Department for BAC

Home Loans Servicing L.P. ("BAC Servicing"),[6] testified that the new allonge

was prepared in anticipation of this litigation, and that it was signed several

weeks before the trial by Sharon Mason.


As to the location of the note, Ms. DeMartini testified that to her

knowledge, the original note never left the possession of Countrywide, and that

the original note appears to have been transferred to Countrywide's foreclosure

unit, as evidenced by internal FedEx tracking numbers.  She also confirmed

that the new allonge had not been attached or otherwise affixed to the note.

She testified further that it was customary for Countrywide to maintain

_____

[5]      The allonge misidentifies the Asset-backed Certificates as "Series
6006-8" rather than "Series 2006-8."

[6]      Ms. DeMartini testified that Countrywide Home Loans, Inc., the
originator of the note and mortgage at issue here, and Countrywide Home
Loans Servicing LP, the servicer of the loan both before and after the sale of the
loan, were and are two different legal entities under one corporate umbrella.
Her understanding that the entity known as Countrywide Home Loans
Servicing LP became BAP Home Loans Servicing LP when Bank of America took
over the Countrywide entities differs from the representation made in papers
submitted by the defendant herein that the entity known as Countrywide Home
Loans, Inc. became BAP Home Loan Servicing LP.  See n. 3.

possession of the original note and related loan documents.

In a supplemental submission dated September 9, 2009, the defendant asserted that "the Defendant/Secured Creditor located the original Note. The original Note with allonge and Pooling and Servicing Agreement are available for inspection."[7] When the matter returned to the court on September 24, 2009, counsel for the defendant represented to the court that he had the original note, with the new allonge now attached, in his possession. No additional information was presented regarding the chain of possession of the note from its origination until counsel acquired possession.

In sum, we have established on this record that at the time of the filing of the proof of claim, the debtor's mortgage had been assigned to the Bank of New

---

[7]     In a bizarre twist, in the same September 9, 2009 submission, Countrywide produced a copy of a "Lost Note Certification," dated February 1, 2007, which indicated that the original note had been delivered to the lender on the origination date and thereafter "misplaced, lost or destroyed, and after a thorough and diligent search, no one has been able to locate the original Note." The defendant asserted for the first time that the "whereabouts of the Note could not be determined" at the time that the proof of claim was filed. Def. Suppl. Subm. at 6. As a result, Countrywide claimed that it was unable to affix the allonge to the note until after the original note had been rediscovered. At the next hearing on September 24, 2009, counsel was not able to explain the inconsistencies between the lost note certification, Ms. DeMartini's testimony, and the "rediscovery" of the note, and asked that the lost note certification be disregarded. T13-15 to 16 (9/24/2009).

York, but that Countrywide did not transfer possession of the associated note

to the Bank.  Shortly before trial in this matter, the defendant executed an

allonge to transfer the note to the Bank of New York; however, the allonge was

not initially affixed to the original note, and possession of the note never

actually changed.  The Pooling and Servicing Agreement required an

indorsement and transfer of the note to the Trustee, but this was not

accomplished prior to the filing of the proof of claim.  The defendant has now

produced the original note and has apparently affixed the new allonge to it, but

the original note and allonge still have not been transferred to the possession of

the Bank of New York.  Countrywide, the originator of the loan, filed the proof

of claim on behalf of the Bank of New York as Trustee, claiming that it was the

servicer for the loan.  Pursuant to the PSA, Countrywide Servicing, and not

Countrywide, Inc., was the master servicer for the transferred loans.[8]  At all

relevant times, the original note appears to have been either in the possession

---

[8]     According to a Prospectus Supplement dated June 30, 2006, filed
by Countrywide, Inc. with the Securities and Exchange Commission, see
www.sec.gov, Countrywide Servicing was created to service the loans originated
by Countrywide, Inc.  The Prospectus notes that "Countrywide Home Loans
expects to continue to directly service a portion of its loan portfolio," while
transferring new mortgage loans to Countrywide Servicing.  Prospectus
Supplement at 40.  In addition, because "certain employees of Countrywide
Home Loans became employees of Countrywide Servicing, Countrywide
Servicing has engaged Countrywide Home Loans as a subservicer to perform
certain loan servicing activities on its behalf."  Id.  Because Countrywide Home
Loans, Inc. designated itself as the servicer for the Bank of New York on the
proof of claim at issue here, I assume for these purposes that it is acting in
that capacity on this loan.

of Countrywide or Countrywide Servicing.[9]

## DISCUSSION

With this factual backdrop, we turn to the issue of whether the challenge
to the proof of claim filed on behalf of the Bank of New York, by its servicer
Countrywide, can be sustained. Under the Bankruptcy Code, a claim is
deemed allowed unless a party in interest objects. 11 U.S.C. § 502(a). If an
objection to a claim is made, the claim is disallowed "to the extent that . . .
such claim is unenforceable against the debtor and property of the debtor,
under any agreement or applicable law for a reason other than because such
claim is contingent or unmatured." 11 U.S.C. § 502(b)(1).

Countrywide's claim here must be disallowed, because it is
unenforceable under New Jersey law on two grounds. First, under New
Jersey's Uniform Commercial Code ("UCC") provisions, the fact that the owner

---

[9]   The record is unclear about whether the original note has been in
the possession of Countrywide Home Loans, Inc. or Countrywide Home Loans
Servicing LP. Ms. DeMartini testified both that the original note was always
located in the Countrywide origination file (presumably at Countrywide Home
Loans, Inc.) and that the servicer actually retained possession of the original
note (presumably Countrywide Home Loans Servicing LP). She also testified
that the "Documents Department" was charged with imaging and storing the
original documents, but the record is not clear about which of the two entities
housed the Documents Department.

of the note, the Bank of New York, never had possession of the note, is fatal to its enforcement. Second, upon the sale of the note and mortgage to the Bank of New York, the fact that the note was not properly indorsed to the new owner also defeats the enforceability of the note.

Under New Jersey law, the enforcement of a promissory note that is secured by a mortgage is governed by the UCC. The note, at issue here, made payable to Countrywide, providing for interest and an unconditional promise to pay the lender, is a "negotiable instrument" under the New Jersey UCC, which defines a negotiable instrument as "an unconditional promise or order to pay a fixed amount of money, with or without interest or other charges described in the promise or order, if it: (1) is payable to bearer or to order at the time it is issued or first comes into possession of a holder; (2) is payable on demand or at a definite time." N.J.S.A. 12A:3-104. A party is entitled to enforce a negotiable instrument if it is "the holder of the instrument, a nonholder in possession of the instrument who has the rights of a holder, or a person not in possession of the instrument who is entitled to enforce the instrument pursuant to 12A:3-309 or subsection d. of 12A:3-418." N.J.S.A. 12A:3-301. In this case, the creditor may not enforce the instrument under any of the three statutory qualifiers.

-11-

1.   Holder.

A "holder" is defined as "the person in possession if the instrument is payable to bearer or, in the case of an instrument payable to an identified person, if the identified person is in possession." N.J.S.A. 12A:1-201(20). "Mere ownership or possession of a note is insufficient to qualify an individual as a 'holder'." Adams v. Madison Realty & Dev. Inc., 853 F.2d 163, 166 (3d Cir. 1988). Where, as here, the ownership of an instrument is transferred, the transferee's attainment of the status of "holder" depends on the negotiation of the instrument to the transferee. N.J.S.A. 12A:3-201(a). The two elements required for negotiation, both of which are missing here, are the transfer of possession of the instrument to the transferee, and its indorsement by the holder. N.J.S.A. 12A:3-201(b).

As to the issue of possession, we are not certain on this record whether the party in possession of the note is Countrywide or Countrywide Servicing.[10] What we do know is that the note was purchased by the Bank of New York as Trustee, but never came into the physical possession of the Bank. Because the Bank of New York never had possession of the note, it can not qualify as a "holder" under the New Jersey UCC. See Dolin v. Darnall, 115 N.J.L. 508, 181

---

[10]   See n. 9.

A. 201 (E&A 1935) ("Since the plaintiff was not 'in possession of' the notes in question, he was neither the 'holder' nor the 'bearer' thereof.").[11]

The second element required to negotiate an instrument to the transferee, i.e., indorsement of the instrument by the holder, is also missing here. An indorsement means "a signature, other than that of a signer as maker, drawer, or acceptor, that alone or accompanied by other words is made on an instrument for the purpose of negotiating the instrument, restricting payment of the instrument, or incurring indorser's liability on the instrument." N.J.S.A. 12A:3-204. The indorsement may be on the instrument itself, or it may be on "a paper affixed to the instrument." Id. Such a paper is called an "allonge", defined as "[a] slip of paper sometimes attached to a negotiable instrument for the purpose of receiving further indorsements when the original paper is filled with indorsements." See Black's Law Dictionary at 88 (9th Ed. 2009).

The significance of indorsement and affixation requirements to achieve

---

[11]     If Countrywide was in possession of the note, then it would have had "holder" status as of the date of the petition filing date, because the note was payable to Countrywide, no indorsement or allonge had been executed, and Countrywide was in possession of the original note. However, Countrywide did not file the claim on its own behalf. Rather, it filed the claim as "servicer for Bank of New York." The qualification of the Bank of New York, rather than Countrywide, to enforce the note is at issue.

holder status, and thereby qualify to enforce a note against the maker, was

explained by the Third Circuit in Adams v. Madison Realty & Dev. Inc., supra.

The court explained that the maker of the note must have certainty regarding

the party who is entitled to enforce the note.

> From the maker's standpoint, therefore, it becomes essential to
> establish that the person who demands payment of a negotiable
> note, or to whom payment is made, is the duly qualified holder.
> Otherwise, the obligor is exposed to the risk of double payment, or
> at least to the expense of litigation incurred to prevent duplicative
> satisfaction of the instrument.  These risks provide makers with a
> recognizable interest in demanding proof of the chain of title.
> Consequently, plaintiffs here, as makers of the notes, may properly
> press defendant to establish its holder status.

853 F.2d at 168.


At the time of the Adams' decision, the New Jersey UCC provided in

relevant part that "[a]n indorsement must be written by or on behalf of the

holder and on the instrument or on a paper so firmly affixed thereto as to

become a part thereof." N.J.S.A. 12A:3-202(2) (1961).[12] The UCC Commentary

explained that this language was in conformance with those

> decisions holding that a purported indorsement on a mortgage or
> other separate paper pinned or clipped to an instrument is not

-------------------------------------------

[12]    The New Jersey Study Comment noted that the "wording in
reference to indorsements [was] changed from 'or upon a paper attached
thereto', to 'so firmly affixed thereto as to become a part thereof'.  This change
merely implement[ed] the ancient doctrine of allonge."

-14-

sufficient for negotiation. The indorsement must on the
instrument itself or on a paper intended for the purpose is so
firmly affixed to the instrument as to become an extension or part
of it. Such a paper is called an allonge.

In 1995, Chapter 3 of Title 12A was amended and subsection 2 of 12A:3-202

was revised, renumbered, and included as the last sentence in N.J.S.A. 12A:3-

204(a). As revised, the provision now states that "[f]or the purpose of

determining whether a signature is made on an instrument, a paper affixed to

the instrument is a part of the instrument." N.J.S.A. 12A:3-204(a).


In this case, we had neither a proper indorsement on the note itself, nor

an allonge that was executed at the time the proof of claim was filed. An

allonge purporting to negotiate the note to the Bank of New York was not

executed until shortly before the original trial date, and was not affixed to the

original note until the second trial date. Even if the newly executed allonge is

recognized as a valid indorsement of the note, under these circumstances, the

Bank of New York does not qualify as a holder, because it never came into

possession of the note.[13]

---

[13]     As an additional argument in support of the proposition that the
Bank of New York qualifies as a holder who may enforce the note, the claimant
cites to Mulert v. National Bank of Tarentum, 210 F. 857, 860 (3d Cir. 1913)
for the proposition that it had constructive possession of the note because
Countrywide intended to transfer possession, and that constructive possession
is sufficient to permit the transferee to enforce the note. This proposition is not
sustainable in light of the actual possession required under the New Jersey

2.    <u>Nonholder in Possession.</u>

Nor does the claimant qualify as a non-holder in possession who has the rights of a holder. "A person may be a person entitled to enforce the instrument even though the person is not the owner of the instrument or is in wrongful possession of the instrument." N.J.S.A. 12A:3-301. The Official Comment to section 3-301 adds that this definition:

> includes a person in possession of an instrument who is not a holder. A nonholder in possession of an instrument includes a person that acquired rights of a holder by subrogation or under Section 3-203(a). It also includes both a remitter that has received an instrument from the issuer but has not yet transferred or negotiated the instrument to another person and also any other person who under applicable law is a successor to the holder or otherwise acquires the holder's rights.

<u>Id.</u> at UCC Comment to § 3-301. Countrywide, the originator of the loan and the original "holder" of the note, sold the note to the Bank of New York as Trustee. In this way, the Bank of New York is a successor to the holder. As a successor to the holder of the note, the Bank of New York would qualify as a non-holder in possession who could enforce the note by its servicer if it had possession of the note. Because the Bank of New York does not have possession of the note, and never did, it may not enforce the note as a

---

UCC. <u>See</u> N.J.S.A. 12A:1-201(20).

nonholder in possession.

3.   <u>Non-holder Not in Possession.</u>

The third category that would enable a claimant to enforce the note

would be a person not in possession of the note who is entitled to enforce the

note pursuant to N.J.S.A. 12A:3-309 or subsection d. of N.J.S.A. 12A:3-418.

Section 12A:3-309 concerns the enforcement of lost, destroyed or stolen

instruments.[14]  The defendant presented a lost note certification to this court,

_____

[14]    N.J.S.A. 12A:3-309 provides:

a. A person not in possession of an instrument is entitled to
enforce the instrument if the person was in possession of the
instrument and entitled to enforce it when loss of possession
occurred, the loss of possession was not the result of a transfer by
the person or a lawful seizure, and the person cannot reasonably
obtain possession of the instrument because the instrument was
destroyed, its whereabouts cannot be determined, or it is in the
wrongful possession of an unknown person or a person that
cannot be found or is not amenable to service of process.

b. A person seeking enforcement of an instrument under
subsection a. of this section must prove the terms of the
instrument and the person's right to enforce the instrument. If that
proof is made, 12A:3-308 applies to the case as if the person
seeking enforcement had produced the instrument. The court may
not enter judgment in favor of the person seeking enforcement
unless it finds that the person required to pay the instrument is
adequately protected against loss that might occur by reason of a
claim by another person to enforce the instrument. Adequate
protection may be provided by any reasonable means.

-17-

but the factual predicate of the certificate conflicted with other facts presented on this record, and we have determined to disregard the certificate.[15]  Section 12A:3-418, concerning payment or acceptance by mistake, does not apply here.

In a recent District Court decision from the District of Massachusetts, the court rejected the enforcement of a note where the assignee of the note and accompanying mortgage did not have possession of the note.  Marks v. Braunstein, No. 09-11402-NMG, 2010 WL 3622111 (D.Mass. Sept. 14, 2010).  In Marks, the assignee of the note and mortgage purchased the collateral for the note, a commercial building, from the Chapter 7 trustee, filed a secured proof of claim, and sought to enforce the note and mortgage against the proceeds from the sale.  When the matter first came on to be heard, the claimant confirmed that he was not in possession of the note and was unaware of who was in possession of it.[16]  Because the claimant acknowledged that he was never in possession of the note, he was precluded from reliance on Section 3-309A of the Massachusetts UCC, which permits enforcement of a lost, destroyed or stolen instrument, but requires possession of the instrument at

---

[15]   See n. 7.

[16]   Following the disallowance of the proof of claim by the court, the claimant discovered the location of the note.  However, the bankruptcy court denied his motion for reconsideration of the disallowance.  The denial was affirmed by the District Court.  Marks v. Braunstein, 2010 WL 3622111 at *5.

some point.  Citing to Premier Capital, LLC v. Gavin, 319 B.R. 27, 33 (1st Cir.

BAP 2004), the Marks court reflected that "[t]he purpose of the possession

requirement in Article 3 is to protect the Debtor from multiple enforcement

claims to the same note." Id. at *3.  Acknowledging that conflicting

enforcement claims were not a concern in the case before it, the court

nevertheless applied the statutory requirements to hold that the note could not

be enforced by the claimant to collect proceeds otherwise due to the claimant

from the sale of the collateral on account of his secured claim.

Similarly, in this case, the purchaser of the note and mortgage, the Bank

of New York, never had possession of the note.  Therefore, under the Uniform

Commercial Code as adopted in New Jersey, the Bank of New York as Trustee

may not enforce the instrument.

On behalf of the Bank of New York, Countrywide contends that the

written mortgage assignment in this case, which purports to assign both the

note and mortgage in this case, and which was properly executed and recorded

with the appropriate county clerk's office, serves to properly transfer the note

to the new owner, enabling the new owner to enforce both the note and the

mortgage.  The recorded assignment of mortgage does include provision for the

assignment of the note as well.  However, the recorded assignment of the

-19-

mortgage does not establish the enforceability of the note. As discussed above, the UCC governs the transfer of a promissory note. See 29 Myron C. Weinstin, New Jersey Practice, Law of Mortgages, § 11.2 at 749. The attempted assignment of the note in the assignment of mortgage document, together with the terms of the Pooling and Servicing Agreement, created an ownership issue, but did not transfer the right to enforce the note.

> The right to enforce an instrument and ownership of the instrument are two different concepts. . . . Moreover, a person who has an ownership right in an instrument might not be a person entitled to enforce the instrument. For example, suppose X is the owner and holder of an instrument payable to X. X sells the instrument to Y but is unable to deliver immediate possession to Y. Instead, X signs a document conveying all of X's right, title, and interest in the instrument to Y. Although the document may be effective to give Y a claim to ownership of the instrument, Y is not a person entitled to enforce the instrument until Y obtains possession of the instrument. No transfer of the instrument occurs under Section 3-203(a) until it is delivered to Y.

N.J.S.A. 12A:3-203 (UCC Cmt. 1). Accordingly, the Bank of New York has a valid claim of ownership, but may not enforce the note on the basis of the reference to the note in the recorded assignment of the mortgage.

The fact that the proof of claim in question was filed by "Countrywide Home Loans, Inc., as servicer for Bank of New York, Trustee" does not alter the enforceability of the note. Bankruptcy Rule 3001(b) provides that a proof of claim may be filed by either the creditor "or the creditor's agent."

FED.R.BANKR.P. 3001(b). Here, Countrywide, Inc. was the originator of the note and mortgage, but sold both the note and mortgage to the Bank of New York as Trustee, and filed the proof of claim as the "servicer" for the Bank of New York. A servicer has standing to file a proof of claim on behalf of a creditor. See, e.g., Greer v. O'Dell, 305 F.3d 1297, 1302 (11th Cir. 2002) ("A servicer is a party in interest in proceedings involving loans which it services."); In re Viencek, 273 B.R. 354, 358 (N.D.N.Y. 2002); In re Gulley, No. 07-33271-SGJ-13, 2010 WL 3342193, *9 (Bankr. N.D.Tex. Aug. 23, 2010) ("many courts have held that a mortgage servicer has standing to participate in a debtor's bankruptcy case by virtue of its pecuniary interest in collecting payments under the terms of a note"); In re Minbatiwalla, 424 B.R. 104, 109 (Bankr. S.D.N.Y. 2010); In re Conde- Dedonato, 391 B.R. 247, 250 (Bankr. E.D.N.Y. 2008) ("A servicer of a mortgage is clearly a creditor and has standing to file a proof of claim against a debtor pursuant to its duties as a servicer."). But Countrywide, as the servicer, acts only as the agent of the owner of the instrument, and has no greater right to enforce the instrument than its principal. See, e.g., Greer v. O'Dell, 305 F.3d at 1303. Because the Bank of New York has no right to enforce the note, Countrywide as its agent and servicer cannot enforce the note.[17]

---

[17]    As noted, Countrywide Home Loans, Inc. is listed as the servicer on the debtor's loan. However, there is serious question raised about the authority of that entity to file a proof of claim on behalf of the Bank of New

## CONCLUSION

Because the claim filed by "Countrywide Home Loans, Inc., servicer for Bank of New York" cannot be enforced under applicable state law, the claim must be disallowed under 11 U.S.C. § 502(b)(1).


Dated:   November 16, 2010

JUDITH H. WIZMUR
CHIEF JUDGE
U.S. BANKRUPTCY COURT

---

York.  A Power of Attorney dated November 15, 2005 was submitted, affording Countrywide Home Loans Servicing LP, not Countrywide Home Loans, Inc., the limited opportunity to perform all necessary acts to foreclose mortgage loans, dispose of properties and modify or release mortgages, presumably including the authority to file a proof of claim in a bankruptcy case.

# Exhibit "19"



# Countrywide®

## AMERICA'S WHOLESALE LENDER®

Exhibit "20"

Bank Of America Faces New Probe; New York Attorney General Launches Investigation Into Mortgage Securitization | Foreclosure Fraud - Fighting Foreclosure Fraud by Sharing the Knowledge

# 4closureFraud

### Fighting Foreclosure Fraud
### by Sharing the Knowledge

Who would you be, what would you do,
how would you live, if you were immortal...
4closureFraud · 2010

HOME   ABOUT   CONTACT   DEPOSITIONS   JUDICIAL FORECLOSURE   MESSAGE BOARD   RADIO SHOW   RESOURCES   SECURITIZATION   VIDEOS

## BANK OF AMERICA FACES NEW PROBE; NEW YORK ATTORNEY GENERAL LAUNCHES INVESTIGATION INTO MORTGAGE SECURITIZATION

Posted by *4closureFraud* on June 13, 2011 · 18 Comments



## BANK OF AMERICA FACES NEW PROBE; NEW YORK ATTORNEY GENERAL LAUNCHES INVESTIGATION INTO MORTGAGE SECURITIZATION

New York Attorney General Eric Schneiderman has targeted Bank of America, the biggest U.S. bank by assets, in a new probe that questions the validity of potentially thousands of mortgage securities and their associated foreclosures, two people familiar with the matter said.

The investigation, which began quietly in recent weeks, is part of a larger inquiry that is scrutinizing whether mortgage companies and Wall Street firms took the necessary steps under New York state law when creating mortgage-based securities, these people said, who requested anonymity because they weren't authorized to speak publicly about the probe.



CIVIL JUSTICE Advocates

**Florida Foreclosure Defense**
# 954.677.8888

Auto Title Loans
Save 50%
Member BBB - In Bus. Since 1987
No Extra Fees - Professional Svc

Learn More

SUBSCRIBE TO 4CLOSUREFRAUD.ORG VIA EMAIL

Enter your email address to subscribe to this blog and receive notifications of new posts by email.

Email Address

Subscribe

**Subscription Options**

Good Friends $10.00USD - monthly

Subscribe