1    8.2    *Other Loan Modifications.* With the same frequency as specified in Section

2  8.1, CFC will provide to the Office of the Attorney General a report detailing the numbers and

3  types of modifications concluded on first-lien residential mortgage loans secured by Borrower-

4  occupied property in the State of Nevada, (other than Qualifying Mortgages), and the total

5  unpaid principal balance of such modified loans.

6    8.3    **Best Servicing Practices for Modifying First Lien Qualifying Mortgages on**

7  **Residential Property Subject to Second Lien Mortgages.** CFC will periodically report to

8  the Office of the Attorney General on its progress in developing best servicing practices as

9  described in Section 3.1(h).

10    8.4    **Compliance Monitor.** CFC will appoint an employee as the Compliance

11  Monitor for this Judgment. The Compliance Monitor will be responsible for (a) making reports

12  to the Office of the Attorney General under this Judgment and (b) receiving and responding to

13  complaints from the Office of the Attorney General or from individual borrowers concerning the

14  operation of the loan modification program.

15    **9.    RELEASES: MORE FAVORABLE SETTLEMENTS**

16    9.1    **Releases from Borrowers.** Borrowers to whom payments under the

17  Foreclosure Relief Program are offered shall, as a condition of receiving such payments, be

18  required to execute and return to CFC a release of claims that includes the following

19  language:

20    In consideration for the payment we are to receive under the Foreclosure Relief

21  Program, we release Countrywide Financial Corporation and its affiliates and their respective

22  directors, officers, employees and agents (except brokers) from all civil claims, causes of

23  action, any other right to obtain any type of monetary damages (including punitive damages),

24  expenses, attorneys' and other fees, rescission, restitution or any other remedies of whatever

25  kind at law or in equity, in contract, in tort (including, but not limited to, personal injury and

26  emotional distress), arising under any source whatsoever, including any statute, regulation,

27  rule, or common law, whether in a civil, administrative, arbitral or other judicial or non-judicial

28  proceeding, whether known or unknown, whether or not alleged, threatened or asserted by us

1   or by any other person or entity on our behalf, including any currently pending or future

2   purported or certified class action in which we are now or may hereafter become a class

3   member, that arise from or are in any way related to CFC Loan No. [_____] and any loans

4   originated directly or indirectly by Countrywide Financial Corporation or its affiliates in

5   connection therewith that are secured by a second mortgage, including, without limitation, the

6   origination of any such loan (and any representations or omissions made during that

7   origination process), the terms and conditions of any such loan, and the servicing or

8   administration of any such loan after its origination; provided, however, that nothing herein

9   shall bar the assertion of any released claim solely as an affirmative defense to any claim

10  against us for a deficiency in respect of any such loan, but in no event shall we be permitted to

11  obtain an affirmative recovery in any such deficiency action.

12      9.2   **Release.** As to CFC and its Affiliates, this Judgment effects a full resolution,

13  complete settlement, and release by the Office of the Attorney General of the State of Nevada

14  of all claims arising out of the residential mortgage origination or servicing activities of CFC

15  and its subsidiaries occurring before entry of this Judgment that are within the authority of the

16  Office of the Attorney General to release, except for (i) any claims that the State of Nevada

17  might have as an investor in CFC securities; (ii) any regulatory or enforcement proceedings by

18  or on behalf of another State of Nevada officer or agency; (iii) any claims or investigations

19  identified to CFC by the Office of the Attorney General of the State of Nevada; and (iv) any

20  criminal investigations or proceedings. This Judgment does not resolve or release, but

21  instead specifically preserves, any claims the State of Nevada may have against Angelo

22  Mozilo or David Sambol.

23      9.3   **More Favorable Terms.** The parties agree that should CFC resolve allegations

24  concerning the conduct covered by this Judgment which occurred before the date of this

25  Judgment in actions brought by Attorneys General of other states on terms that are different

26  than those contained in this Judgment (other than terms offered by CFC but not accepted by

27  the Office of the Attorney General), then CFC will provide a copy of those terms to the Office

28  of the Attorney General for review. If, after review, the Office of the Attorney General

1 determines the terms of such resolutions are, taken as a whole, more favorable than those
2 contained in this Judgment, then CFC shall stipulate that this Judgment shall be amended to
3 reflect all of such terms in place of the terms hereof.

## 10. OTHER TERMS AND CONDITIONS

5       10.1   **No Admission.** The Judgment shall not constitute an admission of wrongdoing
6 by BAC or CFC, nor shall it be cited as such by the Office of the Attorney General of the State
7 of Nevada. The Agreement shall not be admissible in any other proceeding as evidence of
8 wrongdoing or a concession of responsibility.

9       10.2   **Confidentiality.** The Office of the Attorney General agrees that all confidential
10 information disclosed to it by BAC or CFC or any of their Affiliates, including but not limited to
11 the periodic reports that will be provided pursuant to Section 8, shall be kept confidential;
12 provided, however, that the following information reported to the Office of the Attorney
13 General on a periodic basis shall not be deemed confidential to the extent aggregated for
14 Borrowers in the State of Nevada for a full reporting period: (a) the total number of loans
15 modified, (b) the total number of loans modified, by type of loan, (c) the total dollar amount of
16 interest and principal expected to be saved by Borrowers as a result of such modifications
17 over the life of the loans, and (d) the total dollar amount of payments under Sections 5 and 6
18 of this Judgment to Borrowers. The Office of the Attorney General shall not disclose or use
19 any confidential information without the prior written consent of the disclosing party, except to
20 the extent required by law, regulation, or court order (and in such case, only upon prior written
21 notice to the disclosing party).

22       10.3   **Submission to Jurisdiction for Limited Purpose.** CFC submits to the
23 jurisdiction of the court in the State of Nevada for the limited purpose of entering into and
24 enforcing this Judgment only. Any acts, conduct, or appearance by CFC does not constitute
25 and shall not be construed as a submission to the general jurisdiction of any court in the State
26 of Nevada for any purpose whatsoever.

27       10.4   **Enforcement.** This Court shall retain jurisdiction over this matter for the
28 purposes of (a) enabling the Office of the Attorney General of the State of Nevada to apply, at

.24

1  any time, for enforcement of any provision of this Judgment and for sanctions or other

2  remedies for any violation of this Judgment; and (b) enabling any party to this Judgment to

3  apply, upon giving 45 days written notice to all other parties, for such further orders and

4  directions as might be necessary or appropriate either for the construction or carrying out of

5  this Judgment or for the modification or termination of one or more injunctive provisions of this

6  Judgment.

7      10.5   *Conflict with Subsequent Law.*  In the event that any applicable law conflicts

8  with any provision hereof, making it impossible for CFC to comply both with the law and with

9  the provisions of this Judgment, the provisions of the law shall govern.

10     10.6   *No Third Party Beneficiaries Intended.*  This Judgment is not intended to

11  confer upon any person any rights or remedies, including rights as a third party beneficiary.

12  This Judgment is not intended to create a private right of action on the part of any person or

13  entity other than the parties hereto.

14     10.7   *Service of Notices and Process.*  Service of notices and process required or

15  permitted by this Judgment or its enforcement shall be in writing and delivered or served (as

16  appropriate) on the following persons, or any person subsequently designated by the parties:

17      **For BAC and CFC:**
         John Beisner
18       Brian Boyle
         O'MELVENY & MYERS LLP
19       1625 Eye Street, N.W.
         Washington, D.C. 20006
20

21      **For the Office of the Attorney General:**
         CATHERINE CORTEZ MASTO
22       Attorney General
         ERNEST D. FIGUEROA
23       Chief Deputy Attorney General
         Nevada Bar No. 006295
24       100 North Carson Street
         Carson City, Nevada 89701
25       Attorneys for the State of Nevada

26      Any party may change the designated persons and address for delivery with respect to

27  itself by giving notice to the other parties as specified herein.

28

1    10.8 *Waiver.* The failure of any party to exercise any rights under this Judgment
2 shall not be deemed a waiver of any right or any future rights.

3    10.9 *Severability.* If any part hereof shall for any reason be found or held invalid or
4 unenforceable by any court of competent jurisdiction, such invalidity or unenforceability shall
5 not affect the remainder hereof, which shall survive and be construed as if such invalid or
6 unenforceable part had not been contained herein.

7    10.10 *Counterparts.* This Judgment may be signed in one or more counterparts,
8 each of which shall be deemed an original. Facsimile copies of this Judgment and the
9 signatures hereto may be used with the same force and effect as an original.

10    10.11 *Inurement.* This Judgment is binding and inures to the benefit of the parties
11 hereto and their respective successors and assigns.

12    10.12 *Integration.* This Judgment constitutes the entire agreement of the parties with
13 respect to the subject matter hereof and supersedes all prior agreements and understandings
14 relating to the subject matter hereof.

15    10.13 *Amendment.* This Judgment may be amended solely by written agreement
16 signed by the Office of the Attorney General and CFC.

17    10.14 *Termination.* Except to the extent an early date is specified or the provisions of
18 this Judgment are earlier terminated according to the terms hereof, the obligations of CFC
19 under this Judgment shall terminate on the Termination Date. Provided, however, that no
20 termination of the obligations under this Judgment shall change or terminate the terms of any
21 loan modification entered into pursuant to Section 4 of this Judgment.

22 ///
23 ///
24 ///
25 ///
26 ///
27 ///
28 ///

1    **SIGNATURES:**

2    FOR COUNTRYWIDE FINANCIAL CORPORATION

3

4    By:

5    JAMES CICCONE
     Title:  Executive Vice President, Deputy General Counsel

6    DATED:   1/26/09

7

8    **APPROVED AS TO FORM:**

9

10   By:

11   ARIEL E. STERN
     Nevada Bar No. 008276

12   BALLARD SPAHR ANDREWS & INGERSOLL, LLP
     100 City Parkway, Suite 1750

13   Las Vegas, Nevada 89106
     (702) 387-3085

14   Attorney for Countrywide Financial Corporation

15   DATED:  2/2/09

16

17   **FOR THE STATE OF NEVADA:**

18   CATHERINE CORTEZ MASTO
     Attorney General

19

20

21   By:

22   ERNEST D. FIGUEROA
     Chief Deputy Attorney General

23   Nevada Bar No. 006295
     100 North Carson Street

24   Carson City, Nevada 89701
     775-684-1197

25   Attorneys for Plaintiffs, State Of Nevada

26   DATED:  1/29/09

27

28

                        27

1

## AFFIRMATION

2
**Pursuant to NRS 239B.030**

3
The undersigned does hereby affirm that the preceding **CONSENT JUDGMENT** filed in

4
District Court does not contain the social security number of any person.

5
DATED this _____ day of _____, 2009.

6
SUBMITTED BY:

7
CATHERINE CORTEZ MASTO

8
Attorney General

9   By:

10
ERNEST D. FIGUEROA
Chief Deputy Attorney General

11
Nevada Bar No. 006295
100 North Carson Street

12
Carson City, Nevada  89701
775-684-1197

13
Attorneys for Plaintiffs, State of Nevada

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

28

Exhibit "4"

1 WILLARD K. TOM
  General Counsel
2
  LUCY E. MORRIS
3 HEATHER ALLEN
  LYNETTE HOTCHKISS
4 lmorris@ftc.gov; hallen@ftc.gov;
  lhotchkiss@ftc.gov
5 Federal Trade Commission
  600 Pennsylvania Avenue, N.W.
6 Washington, D.C. 20580
  Tel: (202) 326-3224
7 Fax: (202) 326-3768

8 JOHN D. JACOBS (Local Counsel)
  jjacobs@ftc.gov
9 California Bar No. 134154
  Federal Trade Commission
10 10877 Wilshire Blvd., Ste. 700
  Los Angeles, CA 90024
11 Tel: (310) 824-4343
  Fax: (310) 824-4380

12

13
  Attorneys for the Plaintiff
14 Federal Trade Commission

15                    UNITED STATES DISTRICT COURT

16                 CENTRAL DISTRICT OF CALIFORNIA

17

18

19
  FEDERAL TRADE COMMISSION,    )    CV10  4193  RSWL  SSx
20                             )
        Plaintiff,             )
21                             )
           v.                  )
22                             )    COMPLAINT FOR PERMANENT
  COUNTRYWIDE HOME LOANS, INC.,)    INJUNCTION AND OTHER EQUITABLE
23 a corporation, and          )    RELIEF
                               )
24 BAC HOME LOANS SERVICING, LP,)
  a limited partnership,       )
25                             )
        Defendants.            )
26                             )

27

28

BY

CLERK U.S. DISTRICT COURT
CENTRAL DIST. OF CALIF.
LOS ANGELES

2010 JUN -7  AM 10: 23

FILED

1      Plaintiff, the Federal Trade Commission ("FTC"), for its
2  Complaint alleges:

3     1.    The FTC brings this action under Section 13(b) of the
4  Federal Trade Commission Act ("FTC Act"), 15 U.S.C. § 53(b), to
5  obtain permanent injunctive relief, rescission or reformation of
6  contracts, restitution, the refund of monies paid, disgorgement of
7  ill-gotten monies, and other equitable relief for Defendants' acts
8  or practices in violation of Section 5(a) of the FTC Act, 15 U.S.C.
9  § 45(a).

10                **JURISDICTION AND VENUE**

11     2.    This Court has subject matter jurisdiction pursuant to 28
12  U.S.C. §§ 1331, 1337(a), and 1345, and 15 U.S.C. §§ 45(a) and
13  53(b).

14     3.    Venue is proper in this district under 28 U.S.C. §§
15  1391(b) and (c), and 15 U.S.C. § 53(b).

16                    **PLAINTIFF**

17     4.    The FTC is an independent agency of the United States
18  Government created by statute. 15 U.S.C. §§ 41-58. The FTC
19  enforces Section 5(a) of the FTC Act, 15 U.S.C. § 45(a), which
20  prohibits unfair or deceptive acts or practices in or affecting
21  commerce.

22     5.    The FTC is authorized to initiate federal district court
23  proceedings, by its own attorneys, to enjoin violations of the FTC
24  Act and to secure such equitable relief as may be appropriate in
25  each case, including rescission or reformation of contracts,
26  restitution, the refund of monies paid, and the disgorgement of
27  ill-gotten monies. 15 U.S.C. §§ 53(b) and 56(a)(2)(A).

28

1

**DEFENDANTS**

2    6.    Defendant Countrywide Home Loans, Inc. ("CHL") is a New
3 York corporation with its principal place of business in Calabasas,
4 CA.    CHL transacts or has transacted business in this district.

5    7.    Defendant BAC Home Loans Servicing, LP ("BAC Servicing"),
6 formerly doing business as Countrywide Home Loans Servicing, LP, is
7 a Texas limited partnership with its principal place of business in
8 Calabasas, CA.    BAC Servicing transacts or has transacted business
9 in this district.

10    8.    Defendants operate a mortgage servicing business that
11 services millions of home loans annually.    Defendants have operated
12 as a common enterprise while engaging in the unlawful acts and
13 practices alleged below.    Because Defendants have operated as a
14 common enterprise, each of them is jointly and severally liable for
15 the acts and practices alleged below.

16

**COMMERCE**

17    9.    At all times material to this Complaint, Defendants have
18 maintained a substantial course of trade in or affecting commerce,
19 as "commerce" is defined in Section 4 of the FTC Act, 15 U.S.C. §
20 44.

21

**NATURE OF ENFORCEMENT ACTION**

22    10.    This enforcement action is brought to remedy unlawful
23 acts and practices by Defendants in servicing mortgage loans for a
24 particularly vulnerable class of consumers:    borrowers in financial
25 distress who are struggling to keep their homes.    Many of the loans
26 serviced by Defendants are risky, high-cost loans that had been
27 originated or funded by Defendants' parent company, Countrywide

28

3

1 Financial Corporation ("CFC"), and its subsidiaries (collectively,
2 "Countrywide"). When borrowers fall behind on their payments,
3 Defendants obtain a number of default-related services (such as
4 property inspections and foreclosure trustee services) by funneling
5 the work through a panoply of Countrywide subsidiaries. As a
6 matter of practice, Defendants and the subsidiaries add a
7 substantial mark-up to their actual costs for the services and then
8 charge the borrower the marked-up fees. Defendants' marked-up fees
9 violate the mortgage contract because they exceed the actual cost
10 of the services and are not reasonable and appropriate to protect
11 the note holder's interest in the property and rights under the
12 security instrument. Borrowers do not have any choice in who
13 performs default-related services or the cost of those services,
14 and they do not have the option to shop for those services.

15    11. In addition, this action is brought to remedy unlawful
16 acts and practices by Defendants in servicing loans for borrowers
17 who are seeking to save their homes through a Chapter 13
18 bankruptcy. In connection with these bankruptcy cases, Defendants
19 have made various representations to borrowers about their mortgage
20 loans that are false or lack a reasonable basis. Defendants also
21 have failed to disclose to borrowers during their bankruptcy case
22 when fees and escrow shortages and deficiencies have accrued on
23 their loan. After the bankruptcy cases have closed and borrowers
24 no longer have the protection of the bankruptcy court, Defendants
25 unfairly seek to collect those amounts, including through
26 foreclosure actions.

27

28

4

1

## DEFENDANTS' BUSINESS PRACTICES

2      12.   Prior to July 1, 2008, when Countrywide was acquired by
3  Bank of America Corporation, Countrywide produced hundreds of
4  billions of dollars in mortgage loans each year.  Defendants, as
5  Countrywide subsidiaries, have been the mortgage servicer for many
6  of these loans.  In many instances, Countrywide packaged its loans
7  into mortgage-backed securities and sold them to investors on the
8  secondary market.  Countrywide often retained the right to service
9  loans it securitized, and Defendants have serviced these loans
10 pursuant to servicing agreements with the investors.  After July 1,
11 2008, Defendants have continued to service millions of mortgage
12 loans, including tens of thousands of loans involving borrowers in
13 bankruptcy and foreclosure.  Defendants now do business under the
14 brand name of "Bank of America Home Loans."

15     13.  Many of the loans serviced by Defendants are subprime or
16 "nontraditional" mortgages such as pay option adjustable rate
17 mortgages ("ARMs"), interest-only mortgages, and loans made with
18 little or no income or asset documentation.  In recent years,
19 Countrywide produced an increasing number of such loans, and
20 Defendants' loan servicing portfolio grew significantly.  In March
21 2008, prior to being acquired by Bank of America Corporation,
22 Countrywide was ranked as the top mortgage servicer in the United
23 States and had a servicing portfolio with a balance of over $1.4
24 trillion.  In September 2009, after its acquisition of Countrywide,
25 Bank of America was ranked as the nation's top mortgage servicer
26 with a servicing portfolio of over $2.1 trillion.

27

28

1    14.   When a borrower becomes delinquent on a mortgage loan,
2   mortgage servicers order various default-related services that are
3   intended to protect the lender's interest in the property.  For
4   example, a mortgage servicer may order a property inspection for
5   the purpose of verifying the occupancy status of the home.  In its
6   mortgage servicing operation, Countrywide follows a so-called
7   "vertical integration strategy" to generate default-related fee
8   income.  Rather than obtain default-related services directly from
9   third-party vendors and charge borrowers for the actual cost of
10  these services, Countrywide formed subsidiaries to act as middle-
11  men in the default services process ("default subsidiaries").  The
12  default subsidiaries exist solely to generate revenues for
13  Countrywide and do not operate at arms length with Defendants.

14    15.   The scheme works as follows.  Defendants order default-
15  related services from the default subsidiaries, which in turn
16  obtain the services from third-party vendors.  The default
17  subsidiaries then charge Defendants a fee significantly marked up
18  from the third-party vendors' fee for the service, and the
19  Defendants, in turn, assess and collect these marked-up fees from
20  borrowers.  As a result, even as the mortgage market collapsed, and
21  more borrowers fell into delinquency in recent years, Countrywide
22  earned substantial profits by funneling default-related services
23  through its default subsidiaries.  As stated by Countrywide in an
24  October 2007 Earnings Call, the company's strategy was to profit
25  from default-related services in down times such as the current
26  mortgage crisis:

27

28

1            Now, we are frequently asked what the impact of

2            our servicing costs and earnings will be from

3            increased delinquencies and [loss] mitigation

4            efforts, and what happens to costs.  And what

5            we point out is, as I will now, is that

6            increased operating expenses in times like this

7            tend to be fully offset by increases in

8            ancillary income in our servicing operation,

9            greater fee income from items like late

10           charges, and importantly from in-sourced vendor

11           functions that represent part of our

12           diversification strategy, a counter-cyclical

13           diversification strategy such as our businesses

14           involved in foreclosure trustee and default

15           title services and property inspection

16           services.

17 (*See* Statement of David Sambol, President, Chief Operating Officer,

18 and Director of Countrywide Financial Corporation.)

19    16.  The mortgage contract between a lender and borrower

20 typically consists of two documents: the promissory note ("Note"),

21 and the mortgage or deed of trust ("Security Instrument").  The

22 mortgage contracts serviced by Defendants are substantially similar

23 to the standard Fannie Mae/Freddie Mac form contracts and contain

24 form language regarding what occurs if a borrower defaults on his

25 or her loan.  The Security Instrument authorizes the servicer, in

26 cases of default, to:

27

28

1              pay for whatever is reasonable or appropriate
2              to protect the note holder's interest in the
3              property and rights under the security
4              instrument, including protecting and/or
5              assessing the value of the property, and
6              securing and/or repairing the property.

7  The Security Instrument further provides that any such amounts
8  "disbursed by" the servicer shall become additional debt of the
9  borrower secured by the Security Instrument and shall bear interest
10 at the Note rate "from the date of disbursement." Regarding the
11 payment of foreclosure fees in the event of default, the Note
12 provides that the note holder:

13             will have the right to be paid back by me for
14             all of its costs and expenses in enforcing this
15             Note to the extent not prohibited by applicable
16             law. Those expenses include, for example,
17             reasonable attorneys' fees.

18 Thus, the mortgage contract allows the servicer to pay for default-
19 related services when necessary or appropriate, and to be
20 reimbursed by the borrower, but it does not authorize the servicer
21 to mark up the actual cost of those services to make a profit.

22     17. In charging marked-up fees for default services,
23 Defendants have violated the mortgage contract by charging
24 borrowers for default services that exceed the actual cost of the
25 services and that are not reasonable and appropriate to protect the
26 note holder's interest in the property and rights under the
27 security instrument. In addition, Defendants have charged

28

8

1 borrowers for the performance of default services, such as property
2 inspections and title reports, that in some instances were not
3 reasonable and appropriate to protect the note holder's interest in
4 the property and rights under the security instrument.

5     18. Countrywide Field Services Corporation ("CFSC"), now
6 doing business as BAC Field Services Corporation, is one of the
7 default subsidiaries used by Defendants in servicing borrowers'
8 mortgage loans. Until at least July 1, 2008, CFSC was a subsidiary
9 of Defendant CHL. Defendants order property inspections and
10 property preservation services, such as lawn cuts, from CFSC, which
11 in turn orders the services from third-party vendors. The vendors
12 charge CFSC prices for the performance of these services, which
13 prices CFSC then marks up in numerous instances by 100% or more
14 before "charging" them to Defendants. Defendants then charge the
15 marked-up fees to the borrower. Defendants collect these marked-up
16 fees from borrowers through various means, including in connection
17 with repayment plans, reinstatements, payoffs, bankruptcy plans,
18 and foreclosures.

19     19. Defendants obtain services through other default
20 subsidiaries in similar fashion and then charge borrowers fees for
21 default services that are substantially marked up from the actual
22 cost of the services. These other default subsidiaries are
23 LandSafe Default, Inc., also known as LandSafe National Default,
24 ("LandSafe") and ReconTrust Company, N.A. ("ReconTrust").
25 Defendants order pre-foreclosure title reports from LandSafe at the
26 very beginning of a foreclosure referral. As soon as the report is
27 completed, the borrower is billed for it, and Defendants send the

28

1  report with the foreclosure referral to a foreclosure attorney or
2  trustee.  In many instances, Defendants send foreclosure referrals
3  to ReconTrust.  ReconTrust acts as the Defendants' foreclosure
4  trustee in non-judicial foreclosure states, such as California.
5  LandSafe hires vendors to perform pre-foreclosure title services
6  and then "charges" fees to Defendants for those services that are
7  substantially marked up from the vendors' prices.  Likewise,
8  ReconTrust provides foreclosure trustee services that have been
9  substantially marked up from the actual cost of the services.
10 Defendants then pass on these marked-up fees to borrowers.

11      20.  Defendants service tens of thousands of mortgage loans
12 for borrowers who are in Chapter 13 bankruptcy, the purpose of
13 which is to allow consumers to keep their homes and emerge from
14 bankruptcy with a "fresh start."  In connection with these
15 bankruptcy cases and in numerous instances, including in bankruptcy
16 filings such as proofs of claim and motions for relief from stay,
17 Defendants have made representations to borrowers about their
18 mortgage loans that are false or lack a reasonable basis.
19 Defendants failed to adopt adequate policies and procedures to
20 ensure the accuracy of their representations, and they used
21 antiquated technology that led to numerous inaccuracies in
22 servicing loans in bankruptcy, including payment posting errors and
23 the assessment of unauthorized fees.  Defendants also have failed
24 to disclose to borrowers during their bankruptcy case when fees and
25 escrow deficiencies and shortages have accrued on their loan.
26 After the bankruptcy case has closed and borrowers no longer have

27

28

10

1 the protection of the bankruptcy court, Defendants seek to collect
2 those amounts, including in some cases through foreclosure actions.

3 **VIOLATIONS OF THE FTC ACT**

4   21.  Section 5(a) of the FTC Act, 15 U.S.C. § 45(a), prohibits
5 "unfair or deceptive acts or practices in or affecting commerce."

6   22.  Misrepresentations or deceptive omissions of material
7 fact constitute deceptive acts or practices prohibited by Section
8 5(a) of the FTC Act.  Acts or practices are unfair under Section 5
9 of the FTC Act if they cause or are likely to cause substantial
10 injury to consumers that consumers cannot reasonably avoid
11 themselves and that is not outweighed by countervailing benefits to
12 consumers or competition.  15 U.S.C. § 45(n).

13   **Count I: Misrepresentation of Amounts Owed**

14   23.  In the course and conduct of their loan servicing and
15 collection, Defendants in numerous instances have represented,
16 directly or indirectly, expressly or by implication, that consumers
17 are obligated to pay the amounts specified in Defendants'
18 communications for default-related services such as property
19 inspections, title reports, and foreclosure trustee services.

20   24.  In truth and in fact, in numerous instances, consumers
21 are not obligated to pay the amounts that have been specified in
22 Defendants' communications for default-related services such as
23 property inspections, title reports, and foreclosure trustee
24 services.  Defendants include in the amounts they represent as owed
25 fees that have been marked up beyond the actual cost of the
26 services and/or fees that are for the performance of unnecessary or
27 unreasonable services, in violation of the mortgage contract.

28

11

1    25.   Therefore, Defendants' representations as set forth in
2  Paragraph 23 of this Complaint are false or misleading and
3  constitute deceptive acts or practices in violation of Section 5(a)
4  of the FTC Act, 15 U.S.C. § 45(a).

5              **Count II: Unfair Assessment and Collection of Fees**

6    26.   In the course and conduct of their loan servicing and
7  collection, Defendants in numerous instances have assessed and
8  collected default-related fees that they were not legally
9  authorized to assess and collect pursuant to the mortgage contract.

10   27.   Defendants' actions cause or are likely to cause
11  substantial injury to consumers that consumers cannot reasonably
12  avoid themselves and that is not outweighed by countervailing
13  benefits to consumers or competition.

14   28.   Therefore, Defendants' practices as described in
15  Paragraph 26 above constitute unfair acts or practices in violation
16  of Section 5 of the FTC Act, 15 U.S.C. § 45(a) and 45(n).

17            **Count III: Deceptive Claims in Bankruptcy Servicing**

18   29.   In the course and conduct of servicing loans in
19  bankruptcy, Defendants in numerous instances have made
20  representations about different aspects of consumers' loans,
21  including amounts owed for pre-petition arrearage and the amount
22  and delinquency status of post-petition payments.

23   30.   In truth and in fact, in numerous instances, the
24  representations set forth in Paragraph 29 are false or misleading
25  or Defendants did not have a reasonable basis for the
26  representations at the time the representations were made.

27

28

                                12

1    31.   Therefore, the making of the representations as set forth
2 in Paragraph 29 of this Complaint constitutes a deceptive act or
3 practice in or affecting commerce in violation of Section 5(a) of
4 the FTC Act, 15 U.S.C. § 45(a).

5            **Count IV: Unfair Collection of Hidden Bankruptcy Fees**

6    32.   In numerous instances, Defendants have failed to disclose
7 adequately to borrowers during their bankruptcy case when fees and
8 escrow deficiencies and shortages have accrued on their loan.
9 After the bankruptcy case has closed and borrowers no longer have
10 the protection of the bankruptcy court, Defendants seek to collect
11 those amounts, including through foreclosure actions.

12    33.   Defendants' actions cause or are likely to cause
13 substantial injury to consumers that consumers cannot reasonably
14 avoid themselves and that is not outweighed by countervailing
15 benefits to consumers or competition.

16    34.   Therefore, Defendants' practices as described in
17 Paragraph 32 above constitute unfair acts or practices in violation
18 of Section 5 of the FTC Act, 15 U.S.C. §§ 45(a) and 45(n).

19                              **CONSUMER INJURY**

20    35.   Consumers have suffered and will continue to suffer
21 substantial injury as a result of Defendants' violations of the FTC
22 Act.   In addition, Defendants have been unjustly enriched as a
23 result of their unlawful acts or practices.   Absent injunctive
24 relief by this Court, Defendants are likely to continue to injure
25 consumers, reap unjust enrichment, and harm the public interest.

26

27

28

                                13

1

**THIS COURT'S POWER TO GRANT RELIEF**

2      36.   Section 13(b) of the FTC Act, 15 U.S.C. § 53(b), empowers
3 this Court to grant injunctive and such other relief as the Court
4 may deem appropriate to halt and redress violations of any
5 provision of law enforced by the FTC.  The Court, in the exercise
6 of its equitable jurisdiction, may award ancillary relief,
7 including rescission or reformation of contracts, restitution, the
8 refund of monies paid, and the disgorgement of ill-gotten monies,
9 to prevent and remedy any violation of any provision of law
10 enforced by the FTC.

11

**PRAYER FOR RELIEF**

12      Wherefore, Plaintiff FTC, pursuant to Section 13(b) of the FTC
13 Act, 15 U.S.C. § 53(b), and the Court's own equitable powers,
14 requests that the Court:

15      A.   Enter a permanent injunction to prevent future violations
16 of the FTC Act;

17      B.   Award such relief as the Court finds necessary to redress
18 injury to consumers resulting from Defendants' violations of the
19 FTC Act, including but not limited to, rescission or reformation of
20 contracts, restitution, the refund of monies paid, and the
21 disgorgement of ill-gotten monies; and

22      C.   Award Plaintiff the costs of bringing this action, as
23 well as such other and additional relief as the Court may determine
24 to be just and proper.

25

26

27

28

14

1  Dated: June 7, 2010          Respectfully submitted,

2                               WILLARD K. TOM
                                General Counsel
3

4                               Lucy E. Morris
5                               Heather Allen
                                Lynette Hotchkiss
6                               lmorris@ftc.gov; hallen@ftc.gov;
                                lhotchkiss@ftc.gov
7                               Federal Trade Commission
                                600 Pennsylvania Avenue, N.W.
8                               Washington, D.C.  20580
                                Tel: (202) 326-3224
9                               Fax: (202) 326-3768

10

11                              John D. Jacobs (Local Counsel)
12                              jjacobs@ftc.gov
                                California Bar No. 134154
13                              Federal Trade Commission
                                10877 Wilshire Blvd., Ste. 700
14                              Los Angeles, CA 90024
                                Tel: (310) 824-4343
15                              Fax: (310) 824-4380

16                              Attorneys for Plaintiff
                                Federal Trade Commission
17

18

19

20

21

22

23

24

25

26

27

28

15

Exhibit "5"



**Federal Trade Commission**
**Protecting America's Consumers**

For Release: 07/20/2011

# FTC Returns Nearly $108 Million to 450,000 Homeowners Overcharged by Countrywide for Loan Servicing Fees

The Federal Trade Commission is mailing 450,177 refund checks worth almost $108 million to homeowners who were allegedly overcharged by Countrywide Home Loans, Inc. As part of the FTC's efforts to protect financially distressed homeowners, the FTC reached a settlement with Countrywide last year over allegations that the company collected excessive fees from borrowers who were struggling to keep their homes.

"It's astonishing that a single company could be responsible for overcharging more than 450,000 homeowners," FTC Chairman Jon Leibowitz said. "Countrywide's unconscionable behavior harmed American consumers on a massive scale and we are proud to be getting every single dollar back to hundreds of thousands of struggling consumers who can least afford to lose the money."

The FTC's June 2010 settlement order required Countrywide, which is now owned by Bank of America, to pay $108 million to be used for refunds and barred the company from taking advantage of borrowers who have fallen behind on their payments. The refunds are being distributed to consumers whose loans were serviced by Countrywide between January 1, 2005, and July 1, 2008, and who were subject to the company's allegedly unlawful practices.

According to the FTC, homeowners who were in default on their loans were charged excessive fees for services such as property inspections, lawn mowing, and other services meant to protect the lender's interest in the property. Rather than simply hire third-party vendors to perform the services, Countrywide used subsidiaries to hire the vendors. The subsidiaries allegedly marked up the price of the services charged by the vendors – often by 100 percent or more – and Countrywide then charged the homeowners the marked-up fees. The FTC complaint alleges that the company's strategy was to increase profits from default-related service fees in bad economic times.

Also, in servicing loans for borrowers trying to save their homes in Chapter 13 bankruptcy proceedings, the FTC alleged that Countrywide made false or unsupported claims to borrowers about amounts owed or the status of their loans, and added fees and escrow charges to their mortgage accounts without notice.

An administrator working for the FTC will send out refunds to consumers who were overcharged for property inspections, maintenance services, title searches, and foreclosure trustee services, and to those who were in Chapter 13 bankruptcy, and were charged fees or escrow charges without being notified.

Consumers who receive the checks should cash them by September 19, 2011. The amount of each check will vary from less than $500 to as much as several thousand dollars. The FTC never requires consumers to pay money or provide information before redress checks can be cashed. Former Countrywide customers with questions should call the redress administrator, Gilardi & Co., LLC at 1-888-230-3196 or visit the FTC's Countrywide settlement webpage.

The Federal Trade Commission works for consumers to prevent fraudulent, deceptive, and unfair business practices and to provide information to help spot, stop, and avoid them. To file a complaint in English or Spanish, visit the FTC's online Complaint Assistant or call 1-877-FTC-HELP (1-877-382-4357). The FTC enters complaints into Consumer Sentinel, a secure, online database available to more than 2,000 civil and criminal law enforcement agencies in the U.S. and abroad. The FTC's website provides free information on a variety of consumer topics. Like the FTC on Facebook and follow us on Twitter.

**MEDIA CONTACT:**

*Office of Public Affairs*
202-326-2180

(Countrywide redress)

**E-mail this News Release**
If you send this link to someone else, the FTC will not collect any personal information about you or the recipient.

**Vea este comunicado de prensa en español.**

| Related Items: |
| --- |



### Cases: FTC v. Countrywide

**View larger, download, or embed video**

**Federal Trade Commission, Plaintiff, v. Countrywide Home Loans, Inc. and BAC Home Loans Servicing, LP, Defendants.**
(United States District Court for the Central District of California)
Case No. CV-10-4193
FTC File No. 082 3205

**Consumer Information:**

- FTC Settlement with Countrywide
- Mortgage Servicing: Making Sure Your Payments Count
- Defaulting on Your Mortgage Has Costly Consequences

Last Modified: Wednesday, July 20, 2011

Exhibit "6"

 *FEDERAL BUREAU OF INVESTIGATION* 

## Los Angeles Division

Home • Los Angeles • Press Releases • 2011 • Former Employee of Countrywide Home Loans Ordered to Pay $1.2 Million in Restitution for Data Breach Involving...

### Former Employee of Countrywide Home Loans Ordered to Pay $1.2 Million in Restitution for Data Breach Involving Information for Millions of Individuals

*Defendant Also Sentenced to Eight Months in Federal Prison Followed by 10 Months in a Community Correctional Facility*

**FBI Los Angeles**
September 28, 2011

**Public Affairs Specialist Laura Eimiller**
(310) 996-3343

A former employee of Countrywide Home Loan was sentenced to prison and ordered to pay restitution Wednesday in connection with a large-scale data breach, announced André Birotte Jr., the United States Attorney for the Central District of California, and Steven Martinez, the Assistant Director in Charge of the FBI's Los Angeles Field Office.

Rene Rebollo, 39, of Pasadena, was sentenced by U.S. District Judge Christina A. Snyder to eight months in prison, followed by 10 months in a community correctional facility. Judge Snyder also ordered Rebollo to pay $1.2 million in restitution to Countrywide, now Bank of America, and imposed restrictions with regard to Rebollo's future access to consumer information.

Rebollo was arrested in 2008 after an investigation revealed that he had downloaded, possessed, and sold consumer information contained in Countrywide databases. Rebollo pled guilty to violating 42 U.S. Code 408 (a)(8), unlawfully disclosing social security numbers.

Rebollo was employed as a senior financial analyst for Countrywide's subprime mortgage division in Pasadena where he had access to computer databases, many of which contained sensitive consumer information maintained in private Countrywide databases. Rebollo admitted that he saved the reports to personally owned flash drives and distributed financial information and contact information pertaining to approximately 2.5 million individuals. Rebollo further admitted that, in at least 50,000 instances, the individuals' Social Security numbers were disclosed.

Rebollo opened a personal bank account specifically for the purpose of depositing and holding the illegal proceeds of the Countrywide data sales.

A second man charged in a related case, Wahid Siddiqi, 28, formerly of Thousand Oaks, was previously sentenced to 36 months in prison after he pleaded guilty to fraud and related criminal activity involving access devices.

As a result of the data breach, Countrywide underwent considerable expenses, including notification of individuals whose information was improperly disclosed, at a cost of approximately $1.2 million, and providing free credit monitoring for those individuals at a cost of approximately $15.75 million. Countrywide has also estimated that it has expended approximately $13.4 million in civil litigation, including several class action lawsuits, arising from the data breach.

This case is a result of an investigation by the FBI's Los Angeles Field Office, and was prosecuted by the United States Attorney's Office in Los Angeles.

**MEDIA CONTACT:**

Assistant U.S. Attorney: Angela Davis: 213 894-3456 or 213 393-5601 (cell)

---

**Los Angeles Division Links**

**Los Angeles Home**

**Contact Us**
- Overview
- Territory/Jurisdiction

**News and Outreach**
- Press Room | Stories
- In Your Community

**About Us**
- Our People & Capabilities
- What We Investigate
- Our Partnerships
- Los Angeles History

**Wanted by the FBI - Los Angeles**

**FBI Jobs**

U.S. Attorney's Office Spokesman: Thom Mrozek: 213 894-6947

FBI Media Relations: 310 996-3343

Accessibility | eRulemaking | Freedom of Information Act | Legal Notices | Legal Policies and Disclaimers | Links | Privacy Policy | USA.gov | White House
FBI.gov is an official site of the U.S. Federal Government, U.S. Department of Justice

Close

Exhibit "7"

### Office of Attorney General Terry Goddard



### Terry Goddard Charges Bank of America with Mortgage Fraud

(Phoenix, Ariz - Dec. 17, 2010) Attorney General Terry Goddard announced that his Office today filed a lawsuit against Bank of America Corporation and its affiliated companies ("Bank of America") alleging violations of the Arizona Consumer Fraud Act and violations of the consent judgment entered in March 2009 between Arizona and the Countrywide companies owned by Bank of America.

The lawsuit, filed in Maricopa County Superior Court, was triggered by hundreds of consumer complaints and follows a year-long investigation into Bank of America's residential mortgage servicing practices, particularly its loan modification and foreclosure practices.

Goddard stated that Bank of America, the nation's largest residential mortgage loan servicer, should be leading the way out of the country's foreclosure crisis. Instead, he said, "Bank of America has been the slowest of all the servicers to ramp up loss mitigation efforts in response to the housing crisis. It has shown callous disregard for the devastating effects its servicing practices have had on individual borrowers and on the economy as a whole."

The complaint asks the court to hold the defendants in contempt for violating the consent judgment and to order them to pay restitution to eligible consumers and civil penalties, attorneys' fees, and costs of investigation to the State. It further asks the court to order the defendants to pay up to $25,000 for each violation of the consent judgment and up to $10,000 for each violation of the Arizona Consumer Fraud Act.

Goddard noted that Arizona has been particularly hard hit by the foreclosure crisis, as evidenced by recent reports ranking the state second behind Nevada in foreclosures. Nevada plans to file a similar lawsuit against Bank of America today.

The consent judgment was entered into on March 13, 2009 to resolve the Attorney General's allegations that Countrywide had engaged in widespread consumer fraud in originating and marketing mortgage loans. In the judgment, Countrywide agreed to develop and implement a loan modification program for certain former Countrywide borrowers in Arizona. Bank of America acquired Countrywide on July 1, 2008 and has assumed responsibility for Countrywide's compliance with the consent judgment.

The complaint filed today alleges that, since the consent judgment was entered, Bank of America has repeatedly violated the judgment's provisions related to loan modifications. Instead of providing the relief to which eligible homeowners were entitled, Bank of America has failed to make timely decisions on modification requests and proceeded with foreclosures while modification requests were pending in violation of the agreement.

The complaint also alleges that Bank of America has violated the Consumer Fraud Act by misleading Arizona consumers about its loss mitigation process and programs, including matters such as:
• Whether homeowners must be delinquent on their mortgage payments to be considered for a loan modification.
• How much time it would take to receive a decision from Bank of America on a modification request or a short sale request.
• Whether foreclosure would proceed while a modification or short sale request was pending, or while a homeowner was making trial payments.
• Whether the homeowner had been approved for a loan modification.
• Failure to provide valid reasons why the homeowner was declined for a modification.
• Whether the homeowner would be approved for a permanent modification if the consumer successfully made all trial modification payments.

As a result of Bank of America's deceptive practices, many homeowners who were already contending with other financial hardships have been led to unnecessarily deplete their dwindling savings in futile attempts to obtain the promised relief and save their homes. Many homeowners who tried to obtain a modification from Bank of America ended up owing more principal on their loans or having less equity (becoming more "underwater") in

their homes. Others gave up their chances to pursue other financial options, such as short sales, while trying to modify their loans with Bank of America. These consumers endured months of frustrating delays, not knowing whether or when they would lose their homes. They called Bank of America and resubmitted their paperwork over and over again in futile efforts to get the help they were promised.

"I am filing this lawsuit today because, after years of delay and broken promises, Arizonans should not have to wait any longer to seek redress," Goddard stated. "Our homeowners and communities need and deserve relief. Bank of America must be held accountable for its deceptive conduct and failed commitments."

This case is being handled by Consumer Advocacy Division Chief Susan P. Segal and Assistant Attorney General Carolyn R. Matthews.

Goddard urged all homeowners who are in or are facing foreclosure to seek assistance as soon as possible. Homeowners can speak with a HUD-approved housing counselor by calling the Arizona Foreclosure Prevention Helpline toll-free at 1-877-448-1211. Borrowers who believe they have been the victim of mortgage fraud or other scams should contact the Attorney General's Office at (602) 542-5763 or by filing a complaint on the Attorney General's website, at www.azag.gov. Additional foreclosure prevention resources are also available on the Attorney General's website.

Copies of the 2009 consent judgment and today's complaint are attached. For additional information, contact Janey Pearl at (602) 542-8019.

Terry Goddard on Bank of America Mortgage Fraud.mp3

BofAComplaint.pdf

FAQ's regarding the State's Lawsuit against Bank of America

Arizona Borrower's Bill of Rights

Foreclosure Resource Center

\#\#\#

Exhibit "8"

COPY

DEC 17 2010


MICHAEL K. JEANES, CLERK
S. HACK
DEPUTY CLERK

1  Terry Goddard
   Attorney General
2  (Firm State Bar No. 14000)
   Susan P. Segal
3  Assistant Attorney General
   State Bar No. 006098
4  Carolyn R. Matthews
   Assistant Attorney General
5  State Bar No. 013953
   Office of the Attorney General
6  1275 West Washington Street
   Phoenix, AZ 85007-2926
7  consumer@azag.gov

8  Attorneys for Plaintiff

9

10              IN THE SUPERIOR COURT OF THE STATE OF ARIZONA

11                 IN AND FOR THE COUNTY OF MARICOPA

12  STATE OF ARIZONA, *ex rel.* TERRY          CV 2010-033580
    GODDARD, Attorney General,            Case No.:
13
                   Plaintiff,             **COMPLAINT**
14
15        vs.                             **(VIOLATIONS OF CONSENT
                                          JUDGMENT AND VIOLATIONS
16  COUNTRYWIDE FINANCIAL CORPORATION,    OF ARIZONA CONSUMER
    a Delaware corporation; COUNTRYWIDE HOME   FRAUD ACT)**
17  LOANS, INC., a New York corporation; FULL
    SPECTRUM LENDING, INC., a California
18  corporation; BANK OF AMERICA
    CORPORATION, a Delaware corporation; BANK
19  OF AMERICA, NATIONAL ASSOCIATION, a
    national bank; BAC HOME LOANS SERVICING,
20  LP, a foreign limited partnership; RECONTRUST
    COMPANY, N.A., a wholly-owned subsidiary of
21  Bank of America, N.A.; and BLACK
    CORPORATIONS 1-10,
22
                   Defendants.
23

24
        Plaintiff, the State of Arizona by its Attorney General Terry Goddard ("State" or
25
    "Attorney General"), for its complaint, hereby alleges as follows in support of its claims that
26

1  the Defendants have violated Arizona law in their servicing of residential home mortgage loans.

2  First, Defendants have failed to honor the commitments made in the Consent Judgment

3  ("Consent Judgment") entered on March 13, 2009, which resolved allegations that Countrywide

4  engaged in consumer fraud in its mortgage lending practices. *State of Arizona v. Countrywide*

5  *Financial Corporation, Countrywide Home Loans, Inc., and Full Spectrum Lending, Inc.*

6  (Maricopa County Superior Court, Cause No. CV2009-006468).   *See* Consent Judgment,

7  **Exhibit "A."**   More broadly, Defendants have continued to engage in widespread consumer

8  fraud by misrepresenting to Arizona consumers whether they were eligible for modifications of

9  their mortgage loans, when Bank of America would make a decision on their modification

10  requests, whether Bank of America had approved their modification requests, why Bank of

11  America declined their modification requests, and whether and when Bank of America would

12  foreclose upon their homes.  Bank of America's failure to offer loan modifications in the time

13  and manner promised and its deception of consumers about the status, timing, impact, and

14  outcome of their loan modification requests violate the Arizona Consumer Fraud Act, A.R.S.

15  §§ 44-1521, et seq. ("Consumer Fraud Act").

16  **JURISDICTION AND VENUE**

17      1.      This Court has jurisdiction to consider this Complaint pursuant to the Consent

18  Judgment ¶¶ III.2.3, III.8.4, III.10.3, III.10.4, and the Consumer Fraud Act, including A.R.S.

19  §§ 44-1521 and -1532, and to order injunctive relief, restitution, civil penalties, costs of

20  investigation, and attorney's fees to prevent the practices alleged in this Complaint and to

21  remedy the consequences of those practices.

22      2.      Venue is appropriate in Maricopa County pursuant to A.R.S. § 12-401.

23  **PARTIES**

24      3.      Plaintiff is the State of Arizona, *ex rel.* Terry Goddard, the Attorney General of

25  Arizona, who is authorized to bring this action under the Consent Judgment and the Consumer

26  Fraud Act, including A.R.S. §§ 44-1521 and -1532.

-2-

4.     Defendant Countrywide Financial Corporation ("CFC") is a Delaware corporation and a thrift holding company doing business in Arizona.

5.     Defendant Countrywide Home Loans, Inc. is a New York corporation licensed to do business in Arizona, is a wholly owned subsidiary of CFC, and is or was a licensed mortgage banking organization.

6.     Defendant Full Spectrum Lending, Inc. is or was a California corporation, is or was a wholly-owned subsidiary of CFC, and is or was a licensed mortgage banking organization.

7.     Defendant Bank of America, National Association ("N.A.") is a national banking association with its principal place of business located in Charlotte, North Carolina. At all times material hereto, Bank of America, N.A. was a corporation registered to do and doing business in the State of Arizona.

8.     Defendant Bank of America Corporation is a Delaware corporation with its principal place of business located in Charlotte, North Carolina. Bank of America Corporation is a holding company and the parent company for Defendants CFC and Bank of America, N.A.

9.     On July 1, 2008, Defendant Bank of America Corporation announced that it had completed its purchase of CFC, including Countrywide Home Loans, Inc., Full Spectrum Lending, Inc., and Countrywide Home Loans Servicing, LP.

10.     Defendant BAC Home Loans Servicing, LP ("BAC") is a limited partnership with its principal place of business located in Austin, Texas and is authorized to do business in Arizona. BAC is a subsidiary of Bank of America, N.A.

11.     Defendant ReconTrust Company, N.A. ("ReconTrust") is a non-deposit trust company and a wholly-owned subsidiary of Bank of America, N.A. that services defaulted mortgages in a number of states, including Arizona. At all times material hereto, ReconTrust's principal place of business was located in Thousand Oaks, California.

12.     Upon its acquisition of CFC, Bank of America, N.A. through BAC assumed the

-3-

1   responsibility for servicing the CFC loans covered by the Consent Judgment and the
2   responsibility for compliance therewith.

3       13.   Bank of America, N.A., through BAC, also services loans originated by Bank of
4   America, N.A., or its affiliates or subsidiaries, as well as loans serviced under contract for other
5   institutions.

6       14.   Defendants Black Corporations 1 through 10 are fictitious names for affiliates or
7   subsidiaries of one or more of the other named Defendants, whose names are unknown to the
8   State at this time, and who may have liability for some or all of the conduct alleged herein.
9   Defendants Black Corporations 1 through 10 may be corporations, partnerships, limited
10  partnerships, or any other form of legal entity.  (Defendants Bank of America Corporation,
11  Bank of America, N.A., BAC, ReconTrust, and Black Corporations 1 through 10 are referred to
12  collectively hereinafter as "Bank of America" or "the Bank.")

13                                **BACKGROUND**

14      15.   On March 13, 2009, the State filed the Consent Judgment in the Consent
15  Judgment proceeding with CFC, Countrywide Home Loans, Inc., and Full Spectrum Lending,
16  Inc. (collectively, "Countrywide").  The Consent Judgment resolved the State's allegations
17  under the Arizona Consumer Fraud Act that Countrywide had engaged in widespread consumer
18  fraud in the origination, marketing, and servicing of mortgage loans in Arizona.

19      16.   The Consent Judgment provided for payments to (a) Arizona Countrywide
20  borrowers who were subject to foreclosure but agreed to voluntarily surrender their homes
21  before foreclosure (referred to as the relocation assistance program), and (b) a $2,049,149 fund,
22  which, pursuant to the Consent Judgment, the Attorney General has been using to fund housing
23  counselors and other foreclosure prevention efforts (referred to as the foreclosure relief
24  program).

25      17.   The Consent Judgment also included a commitment, separately valued by Bank
26

                                      -4-

1   of America at roughly $8.4 billion nationally, [1] to provide loan modifications in a program that

2   Bank of America subsequently named the "National Homeownership Retention Program"

3   ("NHRP"). Bank of America estimated that NHRP would reach approximately 13,000 eligible

4   borrowers in Arizona.

5       18.    Loan modifications, by which mortgage servicers[2] change the terms of borrowers'

6   mortgage terms, have been a cornerstone of public and private efforts to preserve home

7   ownership in the recent financial crisis. Through the modification process, servicers, like Bank

8   of America, reduce borrowers' interest rates, extend their loan terms, and/or forgive or forbear

9   principal in order to reach a monthly mortgage payment that borrowers can afford.

10      19.    Although the mortgage notes' owners (or investors) do not receive the payment

11  stream promised in the original loan documents, loan modifications can prevent a greater loss

12  by preserving some level of payments from the borrowers and avoiding foreclosures.

13      20.    Over the twenty-one months since the Consent Judgment was entered and the

14  more than two years since Bank of America took over servicing the Countrywide loans, Bank

15  of America has repeatedly violated the provisions of the Consent Judgment related to loan

16  modifications.  Instead of providing the relief to which struggling borrowers are entitled—

17  timely consideration for loan modifications that would make their mortgages affordable and a

18  stop on foreclosure proceedings while they apply for and are evaluated for assistance—Bank of

19  America has subjected Arizona consumers to the following conduct:

20          a.  Initiated foreclosure proceedings or moved eligible borrowers toward

21              foreclosure while their requests for loan modifications are pending, despite the

22              Bank's commitment to halt foreclosures during that time;

23

24  [1]     The Consent Judgment was the result of a multistate investigation. Similar consent
    judgments were entered in other states at about the same time.
25  [2]     Mortgage servicers are the entities to whom homeowners make their mortgage payments.
    They collect payments from homeowners, forward payments to mortgage owners, and perform
26  related services pursuant to agreements between mortgage owner and servicer.

b. On information and belief, failed to make decisions on modifications, on average, within 60 days, leaving eligible borrowers in limbo for months or even more than a year;

c. Failed to use its best efforts to secure investor approval of potential modifications; and

d. Failed to timely and sufficiently respond to complaints regarding its performance under the Consent Judgment.

Together and separately, these failures constitute material breaches of the Consent Judgment.

21.   For these reasons, on April 9, 2010, the Attorney General's Office notified Bank of America that it considered the Bank to be in breach of the Consent Judgment. Bank of America denied any violations of the Consent Judgment and has not informed the Attorney General's Office of any change in its practices as a result of the Attorney General's notification of breach.

22.   In addition, Bank of America has misled, and continues to mislead, Arizona consumers—both those within and outside the reach of the Consent Judgment—about its loss mitigation[3] efforts.

23.   According to hundreds of complaints filed with and investigated by the Attorney General's Office, Bank of America repeatedly has deceived homeowners about the loan modification process. Bank of America's deceptions include, but are not limited to, the following:

a. Consumers must be delinquent on their mortgage payments in order to be considered for loan modifications, even though delinquency is not a condition

---

[3]   "Loss mitigation" includes all alternatives to foreclosure, including loan modifications, forbearance of payments, deeds in lieu of foreclosure (by which a borrower surrenders ownership of the property without a foreclosure action), and short sales (in which the servicer and investor typically agree to accept a sale that does not cover the entire principal balance owed as satisfaction of the borrower's obligation).

of federal programs or Bank of America's own loan modification programs;

    b.  Bank of America would make decisions on modifications within a specified time frame, although the Bank kept many consumers waiting months longer than promised;

    c.  Bank of America would not foreclose upon consumers' homes while modification requests were pending or while homeowners were making trial modification payments;

    d.  Bank of America had approved a loan modification, when it had not;

    e.  Bank of America would convert consumers to permanent modifications if and when they made the payments required by trial modification agreements, although many consumers who successfully completed their trial periods have not received permanent modifications; and

    f.  Bank of America would make decisions on short sales[4] within a specified period of time, although Bank of America repeatedly kept consumers waiting well beyond the promised time.

    24.  As a result of Bank of America's misrepresentations, many Arizona consumers stopped making mortgage payments in a perilous attempt to qualify for help. Others waited for months for—or never received—answers on their modification requests, all the while fearing that they would lose their homes; many actually lost their homes. Some consumers were misled to continue making payments in the belief that they would be able to obtain

---

[4]    As noted in the previous footnote, a short sale is a sale of real property in which the sales price is insufficient to pay the loan encumbering the property and the seller is unable to pay the difference. *See* A.R.S. § 32-2130 (eff. 1/1/11). Under the federal Home Affordable Foreclosure Alternatives ("HAFA") short sale program (a MHA Program), for example, Bank of America agrees under certain circumstances that the borrower may list and sell the property with the understanding that the Bank will accept less than the amount due on the mortgage and will release the borrower from any further responsibility for the outstanding debt. *See* http://homeloanhelp.bankofamerica.com/en/home-affordable-foreclosure.html (last visited Nov. 8, 2010).

1  modifications and keep their homes.  Had they known they would lose their homes despite
2  making payments, some consumers might have sought short sales or other foreclosure
3  alternatives or simply allowed their homes to be foreclosed, saving the money from the
4  additional payments for other necessary expenses.  Other consumers lost willing buyers who
5  could have mitigated their own (and Bank of America's) financial losses by stepping in to
6  purchase their homes.

7      25.    Bank of America's conduct is not limited to a few consumers.  Assessments
8  conducted by the federal government demonstrate that Arizona consumers' experiences reflect
9  a pervasive, nationwide pattern and practice of conduct:

10          a.  Bank of America ranks last in virtually every homeowner experience metric
11              monitored by the Department of Treasury in its monthly Servicer Performance
12              Report issued under the federal Making Home Affordable ("MHA") Program,[5]
13              which is available at:
14              http://www.financialstability.gov/docs/Sept%20MHA%20Public%202010.pdf.
15              According to the October 2010 report, which reflects data through September
16              2010, Bank of America has the worst speed to answer homeowner calls and the
17              worst call abandon rate, indicating that call centers are unable to handle the
18              volume of consumer calls.  In addition, Bank of America has a higher than
19              average complaint rate to a federal hotline and the worst time for resolving third-
20              party complaints (e.g., from housing counselors) to the federal government. *Id.*
21          b.  The Treasury Department recently cited Bank of America for failing to comply
22
23

24  [5]    The MHA Program was introduced in February 2009 as part of the federal Financial
25  Stability Plan.  Its goal is to stabilize the housing market and help struggling homeowners avoid
    foreclosure.  The MHA program encompasses several different programs through which
26  participating servicers agree to offer eligible homeowners various loss mitigation alternatives.
    Bank of America is a participating servicer in the MHA program.

1   with requirements of the HAMP program[6] and directed the Bank to make certain

2   undisclosed changes in its procedures. *See*

3   http://www.nationalmortgagenews.com/nmn_features/boa-jpm-wells-told-

4   comply-1021591-1.html (Oct. 8, 2010).

## VIOLATIONS OF THE CONSENT JUDGMENT

**Bank of America Has Violated the Consent Judgment by Proceeding with Foreclosures While Modification Requests Are Pending.**

8       26.    The Consent Judgment entered into between Countrywide and the State requires Bank of America to offer loan modifications to "Eligible Borrowers" in "Qualifying Mortgages." An Eligible Borrower is a borrower with a first mortgage payment due on or before December 31, 2007, secured by an owner-occupied 1-to-4-unit residential property, and serviced by a Countrywide servicer or its affiliate. Consent Judgment ¶ III.4.1, attached as Exhibit "A."

14      27.    A Qualifying Mortgage is defined in the Consent Judgment as a Subprime Mortgage or Pay Option Adjustable Rate Mortgage ("ARM") where the Eligible Borrower is either "Delinquent" or "Seriously Delinquent"[7] and the ratio between the value of the mortgage and the value of the home ("LTV") is 75% or more. Consent Judgment ¶ III.4.2.

18      28.    The Consent Judgment prohibits Bank of America from initiating or advancing a foreclosure while an Eligible Borrower is being evaluated for a loan modification. Consent Judgment ¶ III.4.6(a).

---

[6]  "HAMP" is an acronym for Home Affordable Modification Program, one of the federal programs under the MHA Program. HAMP provides eligible homeowners the opportunity to modify the terms of their mortgages so that they may become and remain current on their mortgage payments.

[7]  A Seriously Delinquent Borrower is defined in the Consent Judgment as one who is 60 days or more behind on his or her payments. A Delinquent Borrower is one who is Seriously Delinquent or subject to an imminent reset or recast and, as a result, likely to become Seriously Delinquent on or before June 30, 2012. Consent Judgment ¶ III.1.2.

1    29.    Bank of America has initiated or advanced foreclosures of Eligible Borrowers

2  while their modification requests are pending.

3  **Bank of America Has Violated the Consent Judgment by Making Homeowners Wait for**

4  **Six Months or More than a Year for Decisions on their Modification Requests.**

5    30.    The Consent Judgment requires Bank of America to make decisions on

6  modification requests within 60 days, on average, after Eligible Borrowers provide complete

7  applications to Bank of America. Consent Judgment ¶ III.4.9.

8    31.    In the cases described below, and in many other cases reviewed by the Attorney

9  General's Office, Eligible Borrowers waited for more than 60 days for decisions on their loan

10  modification requests.

11    32.    These repeated, long delays are inconsistent with Bank of America's obligation to

12  make timely decisions on modification requests.

13    33.    On information and belief, including the number of complaints the State has

14  received of delay of considerably more than 60 days, the State alleges that Bank of America has

15  violated this provision of the Consent Judgment.

16  **Bank of America Has Failed to Timely and Sufficiently Respond to the Attorney**

17  **General's Complaints as Required by the Consent Judgment.**

18    34.    The Consent Judgment requires Bank of America to appoint a compliance

19  monitor to review and respond to complaints from the Attorney General, as well as from

20  individual borrowers. Consent Judgment ¶ 8.4.

21    35.    In an effort to resolve potential performance issues and secure relief for Arizona

22  consumers, the Attorney General's Office routinely escalates consumer complaints to Bank of

23  America's appointed compliance monitor for review and response.

24    36.    The Attorney General's Office has had to repeat its requests for responses to

25  consumer complaints numerous times.  For example, on August 25, 2009, the Attorney

26  General's Office requested for a second time that Bank of America respond to 10 consumer

1   complaints, including two that were two months past an extension to reply requested by Bank
2   of America.  Several of the complaints had been submitted to Bank of America more than three
3   months before.  Other letters noting the Bank's failure to respond to multiple complaints were
4   sent on October 9, 2009; March 24, 2010; July 12, 2010; September 16, 2010; September 24,
5   2010; and October 27, 2010.  On March 24, 2010, the Office sent the Bank a list of 46
6   consumer complaints for which it was awaiting a response, including several for which the
7   Office was asking for a third, fourth or fifth time.  *See* Attorney General letters, **Exhibit "B"**
8   (customer names redacted).

9        37.   In addition, some of the Bank's responses have been patently insufficient, as they
10  either fail to answer the allegations of the complaint, provide only partial information or
11  response, or provide nothing more than a form letter unrelated to the issues alleged.  *See* Bank
12  of America sample responses, **Exhibit "C"** (customer names redacted).

13       38.   Bank of America's delayed and insufficient responses, as described herein, do not
14  satisfy Bank of America's obligation under the Consent Judgment to respond to consumer
15  complaints.

16  **Bank of America has Failed to Make Best Efforts to Secure Investor Approval for**
17  **Modifications, as Required by the Consent Judgment.**

18       39.   In the Consent Judgment, Bank of America represented that it had, or reasonably
19  expected to obtain, authority to offer NHRP modifications for "a substantial majority" of
20  Qualifying Mortgages.  Consent Judgment ¶ III.4.7(e).  In those instances where Bank of
21  America did not have the necessary authority, it committed to use its "best efforts" to obtain
22  investor authorization. *Id.*

23       40.   Bank of America has informed some Eligible Borrowers that they were denied
24  modifications because the investor would not consent to the changed terms.

25       41.   On information and belief, Bank of America has not made its best efforts to
26  secure investor approval in such cases.

-11-

1   modified payment, the second modified payment was rejected because the loan was in

2   foreclosure.

3      53.    In April 2009, at Bank of America's request, the family again faxed all of their

4   financial information—twice. When they spoke to a Bank representative, they were again

5   promised that they had been approved for a modification.

6      54.    Two weeks later, Bank of America called the homeowners asking what they

7   wanted to do about their home. The homeowners explained to the Bank representative that they

8   were in a modification, and the representative told them their modification had been denied two

9   weeks earlier and a sale date was set for June 30.

10      55.    The Bank representative told the homeowners to fax in their information again,

11   which they did.

12      56.    In June, Bank of America's automated response system indicated, when the

13   homeowners called, that collection activity had been suspended and their loan had been

14   forwarded to a negotiator; the system advised them not to contact the negotiator as it might

15   delay the process.

16      57.    Then in July, the Bank sent the homeowners a letter that discussed assistance for

17   tenants in foreclosed properties. When they called Bank of America about it, the Bank

18   representative told them that their home had been sold on June 30. When they asked about the

19   modification, the representative said it was still in review.

20      58.    On August 4, five (5) days before the homeowners' deadline to vacate their home

21   and after they had signed a rental contract on a new residence, Bank of America contacted the

22   homeowners to discuss their loan modification request. On August 5, Bank of America sent the

23   homeowners a letter denying their workout request.

24   **M.D. (CIC # 09-26422)**

25      59.    In or about September 2008, Bank of America sent this Eligible Borrower in

26   Glendale solicitations indicating that she might be eligible for a loan modification through the

1  was denied due to lack of documentation, even though they had submitted all required
2  documents.

3    70.    Bank representatives told them that the multiple offers had created confusion and
4  assured them that the records would be fixed and their modification approved within 30 to 90
5  days.

6    71.    The homeowners called and received verification from Bank representatives that
7  all of their documents were received and appropriately logged. They made their three trial
8  modification payments from May through July 2009.

9    72.    After the third payment, they called to check their status. A Bank representative
10  advised them that their request had been denied and their file closed. The Bank offered
11  different reasons for the denial on different calls: their documents were missing, their
12  documents did not reach the right department, and they did not qualify for a modification.

13    73.    A few weeks after the denial, the homeowners re-applied for a modification. A
14  Bank representative told them that their loan modification review would not resume until after
15  February 2010 because the investor, Bank of New York, did not want to give them a loan
16  modification until they showed that they could make forbearance payments for six months.

17    74.    On information and belief, Bank of New York was the trustee for the investor and
18  had no authority to deny the modification. Bank of America had fully delegated authority to
19  decide whether and on what terms to offer a loan modification or forbearance.

20    75.    On March 26, 2010, Bank of America asked the homeowners to provide financial
21  information within one week.

22    76.    The homeowners were unable to get the requested documents from their
23  accountant on such a short turn-around time, and, as a consequence, Bank of America cancelled
24  their modification.

25    77.    The homeowners reapplied for a modification in April 2010. Since then, Bank of
26  America has asked them to re-send their information at least five more times.

-16-

78. It has been over 20 months since the homeowners accepted the Bank's modification offer, and they are still waiting for a permanent modification. In a letter dated November 9, 2010, Bank of America confirmed that the homeowners are <u>still</u> under review for a modification, and once again asked them to provide their updated financial information.

## VIOLATIONS OF THE ARIZONA CONSUMER FRAUD ACT

### Bank of America's Loss Mitigation Practices Also Violate the Arizona Consumer Fraud Act.

79. Bank of America has engaged, and continues to engage, in a pattern and practice of misleading consumers about the potential or process for securing modifications of their mortgages and other loss mitigation options and about the potential for being foreclosed upon while they are in loss mitigation or once they have obtained modifications.

80. Bank of America has made representations regarding the time frame within which it will make decisions on modifications and about the impact of the modification process on foreclosure proceedings. The Bank has made these representations both orally to individual consumers and in its public statements and materials:

    a. Bank of America's website indicates that it will "typically" take 30 to 45 calendar days from the receipt of a consumer's documents to make a decision on a loan modification request. *See* http://homeloanhelp.bankofamerica.com/en/fha-home-affordable-modification.html (Next Step: Documents) (visited May 27, 2010; last visited Oct. 28, 2010), attached as **Exhibit "E."** Although Bank of America does not guarantee that every consumer will receive an answer within that time frame, Bank of America's statements, especially when considered with its other representations, create the impression that modification decisions will not drag on for six months or longer.

    b. Bank of America also promises on its website that: "You can expect to hear

-17-

back from us within 10 business days from when we receive all your required documents. The purpose of contacting you is to confirm receipt of your information, let you know how the evaluation process works and how long it takes. . . ." http://homeloanhelp.bankofamerica.com/en/fha-home-affordable-modification.html (Next Step: Documents) (visited May 27, 2010; last visited Oct. 28, 2010), **Exhibit "E."**

    c.  Bank of America representatives have told consumers by telephone over and over again that their modification reviews would be complete within a particular period of time, typically 30, 60, or 90 days.

81.    Bank of America has imposed delay on many consumers far in excess of the times it promised it would take to make a decision on their loan modification requests.

82.    Bank of America blames most of the delays in processing loan modification requests on customer failure to provide the required documentation.

83.    Yet Bank of America rarely sends consumers written notification that documents are missing.

84.    Bank of America frequently even fails to notify consumers orally that documents are missing.

85.    Bank of America also represents publicly, and federal rules require, that consumers need not be delinquent to be eligible for a modification.

    a.  Bank of America's website notes: "If you've suffered a hardship that is affecting your ability to make your mortgage payments or have already missed a payment, you may be able to receive a more affordable mortgage payment under the Home Affordable Modification Program." http://homeloanhelp.bankofamerica.com/en/home-affordable-modification.html (visited May 27, 2010; last visited October 28, 2010), **Exhibit "F."** *See also* Treasury Department's MHA Handbook, which can

1    be found at:

2    https://www.hmpadmin.com/portal/programs/docs/hamp_servicer/mhahandbo

3    ok_20.pdf, at 19 (Sept. 22, 2010) ("A loan is eligible for HAMP if the servicer

4    verifies that all of the following criteria are met: . . . The mortgage loan is

5    delinquent or default is reasonably foreseeable."), **Exhibit "G."**

6    86.    Yet Bank of America representatives have told consumers that they must miss

7    payments in order to be considered for loan modifications.

8    87.    In addition, on its website, among other places, and orally, Bank of America

9    assures consumers that it will not foreclose while they are participating in a modification plan

10   or awaiting a decision on a loan modification request.

11   88.    On Bank of America's website, for example, consumers are taken through

12   "Frequently Asked Questions," which assure them that their homes will not be sold while they

13   are awaiting a decision on their modification request or on a modification plan:

14   I want to try to get a home loan modification under the Making

15   Home Affordable program, but I'm afraid that my lender will go

16   ahead with the foreclosure while I'm trying to make it happen. Can

17   I get more time to explore this option?

18   Yes. While we review your eligibility for the program, your loan

19   will not go to foreclosure sale. When you enter a trial plan under the

20   program, your loan will not be referred to foreclosure, and any

21   pending foreclosure proceeding will not go to sale.

22   *See* http://homeloanhelp.bankofamerica.com/en/frequently-asked-

23   questions.html?documentstate =Foreclosure (visited May 27, 2010); **Exhibit "H";**

24   http://homeloanhelp.bankofamerica.com/en/foreclosure.html (last visited Oct. 28, 2010),

25   **Exhibit "I";** Help for America's Homeowners, *Supplemental Directive 10-02, Home*

26   *Affordable Modification Program – Borrower Outreach and Communication* at 3, 5-7 (Mar. 24,

1    2010), available at:

2    https://www.hmpadmin.com/portal/programs/docs/hamp_servicer/sd1002.pdf, **Exhibit "J."**

3        89.    Despite such assurances, Bank of America has advanced or completed

4    foreclosures while homeowners are participating in modification plans or awaiting decision on

5    loan modification requests.

6        90.    Bank of America has told consumers who call after receiving a foreclosure–

7    related communication that they should ignore the notice; their homes will not be sold.

8        91.    In several cases, despite these representations and the fact that the consumer was

9    either awaiting a decision or on a modification plan, Bank of America sold the consumer's

10   home anyway.

11       92.    In other cases, Bank of America assessed foreclosure fees, even though the

12   foreclosure process should have never started or proceeded.

13       93.    In other cases, Bank of America represented to consumers that if they were

14   approved for trial modifications, made each of their trial payments on time, and submitted

15   required paperwork, they would receive permanent modifications.

16       94.    Yet after numerous consumers paid the required three—or often more—trial

17   payments, Bank of America did not place them in permanent modifications.  At least one

18   consumer remained in a trial modification for a year.

19       95.    Other consumers received foreclosure notices or were foreclosed upon while

20   paying on trial plans or were denied permanent modifications for reasons that, on information

21   and belief, were unjustified.

22       96.    Finally, some consumers made monthly payments on trial plans that Bank of

23   America subsequently denied had received trial plans.

24       97.    Also according to the Department of Treasury, Bank of America, at 27%, has the

25   second lowest rate of converting borrowers from temporary trial modifications to permanent

26   modifications (PNC Mortgage, at 24%, has the lowest rate).  It also has, by far, the highest

-20-

1   number of "aged trials," or trial modifications that have been pending for more than six months.
2   (Bank of America's roughly 32,000 aged trials are more than four times that of its nearest
3   single competitor, JP Morgan Chase, at fewer than 8,000 aged trials.)

4       98.    Bank of America has assured some consumers that their loan modifications have
5   been approved, but then failed to provide the paperwork to conclude the modifications.

6       99.    In other cases, Bank of America promised the homeowner that a modification
7   was approved and then later denied the modification.

8       100.   In addition, Bank of America fails to timely, or reasonably, respond to short sale
9   offers.

10      101.   On its website, Bank of America represents that once a short sale offer is
11  received, "[Bank of America will] get back to you with a decision on the offer within 10
12  business days."   http://homeloanhelp.bankofamerica.com/en/home-affordable-foreclosure.html
13  (Is it Right for Me, Step 4) (visited May 27, 2010; last visited Oct. 28, 2010), **Exhibit "K."**

14      102.   Bank of America represents that it will accept short sale offers consistent with the
15  fair market value of the home.   *See, e.g.,* http://homeloanhelp.bankofamerica.com/en/short-
16  sale.html (Program at a Glance, Step 4) (visited May 27, 2010; last visited November 11, 2010)
17  ("We will determine the fair market value of your home by ordering a valuation and reviewing
18  the prices of recently sold homes comparable to yours in your local market.   Based on our
19  findings, we may present you with a counter offer if the original offer is not in alignment with
20  the fair market value of your home."), **Exhibit "L."**

21      103.   Yet Bank of America did not respond to many short sale offers for months.   This
22  has caused consumers (and Bank of America) to lose potential buyers, who could not brook the
23  long delay or uncertainty.

24      104.   In addition, Bank of America did not accept reasonable short sale offers that met
25  or exceeded the asking price and fair market or appraised value.

26

**Bank of America Misled Consumers by Telling Them That Their Modifications Were Declined or Delayed Due to Investor Actions (or Inaction) When No Investor Approval Was Needed.**

105.    Bank of America services securitized mortgages[9] according to the terms of a pooling and servicing agreement ("PSA") between the Bank as servicer, the mortgage owner, and the trustee appointed to act on behalf of the investors by the PSA.  Many PSAs include provisions on when and how Bank of America may modify borrowers' mortgages.

106.    Under some agreements, Bank of America is delegated authority to modify mortgages without any approval from the trustee or investor(s).  This authority may be limited to certain types of modifications (e.g., modifications that do not decrease the interest rate or principal) or borrowers (e.g., borrowers who have missed a certain number of payments).

107.    In other instances, Bank of America is required to submit each proposed modification to the trustee or investor(s) for approval.

108.    Finally, some PSAs do not permit any modifications or prohibit certain types of modifications.

109.    Bank of America has informed a number of Arizona consumers that their loan modifications were declined, or that a decision on their modifications had been delayed, because the investors had not approved their modifications.

110.    However, the Attorney General has reviewed documents from the trustee for at least one of these PSAs that indicate that:  (a) the PSA had delegated authority to Bank of America to offer mortgage modifications without the approval; and (b) the trustee frequently advised Bank of America, in response to inquiries from consumers, that Bank of America did not need its approval to enter into modifications and noted that Bank of America's

---

[9]    Securitized mortgages are mortgages that have been bundled with other mortgages and transferred into a trust for the purpose of selling interests therein as securities.  Persons or entities who purchase those interests are referred to as investors.

-22-

1  representations to the contrary were "misinforming" borrowers.

2  **Sample Consumer Complaints:  Consumer Fraud Act.**

3      111.  The misrepresentations described above were made in connection with the

4  promotion and operation of Bank of America's loss mitigation program.  The experiences of

5  just a handful of consumers, which demonstrate Bank of America's typical conduct, are

6  described below.

7      **C.C. (CIC # 10-6406)**

8      112.  Bank of America repeatedly advised an Apache Junction couple that it would not

9  foreclose on their home loan while their request for a loan modification was pending.

10      113.  The homeowners first applied for a modification in May 2009 because repeated

11  hospitalizations and missed work had caused them to fall behind on their mortgage payments.

12  They engaged a third party firm to assist with the modification.

13      114.  In September 2009, the Bank (or its agent or subsidiary) recorded a Notice of

14  Trustee's Sale.

15      115.  Through March 2010, the third party firm spoke weekly or daily with Bank of

16  America attempting to expedite a modification.  The firm repeatedly re-sent its authorization

17  form and the homeowners' supporting documents and was repeatedly assured that the

18  modification was under review.  Sale dates were set and postponed throughout this period.

19      116.  On March 17, the day before a scheduled sale date, Bank of America, for the first

20  time, told the third party firm that it had extended a modification offer in November but the

21  homeowners had not returned the agreement and, as a result, the modification review had been

22  cancelled.

23      117.  On information and belief, the November modification offer was never received

24  by either the third party firm or the homeowners.

25      118.  In addition, during their many conversations with Bank of America before and

26  after the modification offer allegedly was sent, Bank of America repeatedly told the

1   homeowners and their representative only that a review was pending; no Bank of America
2   representative ever mentioned that a modification offer had been extended and not returned.

3        119.    Informed of the scheduled sale, the wife went later that day to a local Bank of
4   America branch and was told to return with her documents.

5        120.    When she returned the next day, the branch representative made a telephone call
6   and told her "not to worry"; there was a stop on the foreclosure and a loan modification
7   package would arrive the following day.

8        121.    The next day, the homeowner learned that her home had been sold the day before.

9        122.    Several days later, the Bank sent the homeowners a modification agreement.

10        123.    The homeowners accepted the modification agreement, returned it to the Bank,
11   and began paying the modified amount.

12        124.    Subsequently, the homeowner repeatedly called Bank of America to check on the
13   status of both the home sale and the modification.  For months Bank representatives gave her
14   different information as to whether her home was sold and whether she was in a modification.

15        125.    In June, the Bank told her that her house was in foreclosure.

16        126.    After the homeowner complained to the Attorney General's Office, the Bank told
17   her in July that it had rescinded the foreclosure and her modification was approved.  However,
18   she received no written approval of the loan modification agreement but only modified
19   payment coupons.

20        127.    On approximately April 7, 2010, a Cancellation of Notice of Sale was recorded
21   with the Maricopa County Recorder's Office.  However, the Bank did not tell the homeowner
22   the sale had been rescinded until July.

23        **S.M.N. (CIC # 09-11304)**

24        128.    In September 2008, six months after applying for a modification, a husband and
25   wife in Tucson entered into an agreement with Countrywide to modify their mortgage.

26        129.    Although the modification was to be effective October 1, 2008, it still has not

1  gone into effect more than two years later.

2      130.   When the couple called Bank of America—repeatedly—to confirm that the

3  modification had been applied to their mortgage, the Bank repeatedly assured them that they

4  had the modification, told them it would take 30 to 90 days for their account to be updated to

5  reflect the modification, and instructed them to continue to make the modified payment.

6      131.   In June 2009, Bank of America also wrote to the Attorney General's Office,

7  which had forwarded the couple's complaint, that the account was being updated to reflect the

8  modification and to remove the foreclosure status.

9      132.   During the same period of time, Bank of America reported the consumers as

10  delinquent to the credit bureaus and began the foreclosure process, setting a sale date for their

11  home of August 10, 2009.

12      133.   Finally, on August 31, 2009, the homeowners received a new modification, but

13  the terms were incorrect and foreclosure and other inappropriate fees had been included.  Bank

14  of America told them to ignore the paperwork and promised they would receive a corrected

15  agreement.

16      134.   In October 2009, the Bank began returning the consumers' modified payments

17  because they did not represent the total amount due.  Apparently, the Bank still had not

18  recognized the agreed-to modification.

19      135.   After the Attorney General's Office forwarded this information to Bank of

20  America, the homeowners received a new letter stating that Bank of America was "pleased to

21  inform" them that their account was being reviewed and they would be considered for a loan

22  modification.

23      136.   When, by March 10, 2010, the Bank still had not agreed to honor the original

24  modification, which the consumers continued to honor, the consumers filed suit in Pima County

25  Superior Court for breach of contract, among other claims.

26      137.   After the lawsuit was filed, Bank of America finally offered the homeowners the

1  modification they had agreed to two and a half years earlier and removed the negative reporting
2  to the credit bureaus.

3     **D.F. (CIC # 09-28680)**

4     138.    When her income dropped, a Phoenix homeowner began contacting Bank of
5  America in February 2009 to request a loan modification.

6     139.    Each time she called, she was told that she would not be considered for a
7  modification while she was current on her mortgage.

8     140.    In July 2009, when the homeowner was no longer able to make her full mortgage
9  payments, she submitted the documents to start the application process.

10    141.    When the homeowner had not heard from Bank of America by August, she
11 attended a fair sponsored by the federal Department of Housing and Urban Development,
12 where she met with a Bank of America representative.  She completed another application at
13 the fair because the representative told her it would accelerate the process.

14    142.    The homeowner called Bank of America in September 2009 and a Bank
15 representative told her that her request was being reviewed and she would be contacted when
16 the review was complete.  When she called again in October, she was told that the review
17 would be finished by October 30, 2009.

18    143.    On October 20, a new Bank of America negotiator contacted her and told her she
19 did not qualify for a modification, though she gave no reason.  The negotiator told the
20 homeowner she would be eligible only for a forbearance of her mortgage payments.  The
21 homeowner asked for time to consider the alternatives and called the negotiator a week later.

22    144.    When the homeowner called back, the negotiator told her that, according to the
23 negotiator's manager, the homeowner was "pre-qualified" for a HAMP modification and
24 quoted her a new payment amount.  The negotiator explained the program and promised the
25 homeowner she would receive paperwork in the next two weeks and her first payment would be
26 due December 1.

145.    When the paperwork did not arrive in two weeks, the homeowner twice called the Bank and Bank representatives assured her she had been approved and the documents were on the way, but were merely slowed by a backlog and the holidays.

146.    The homeowner then received a letter from ReconTrust dated November 13, 2009 informing her that her account had been referred to its office to begin the foreclosure process.

147.    She immediately called Bank of America and was told that she had received the notice because of "coding" in the system and that the Bank would not foreclose on her home.

148.    Four days later, she received a Notice of Trustee's Sale, which set an auction date of February 15, 2010.

149.    Bank of America sent the homeowner a notice dated November 23, 2009 stating that it did "not have a modification program available which [she] could qualify for, because; [sic] [her] loan being current."

150.    The homeowner continued to call Bank of America and was told the modification documents would come soon and, at Bank of America's suggestion, she made her first trial payment.

151.    In mid-December, the Bank told the homeowner that her request was now being reviewed again, and it could take another 30 to 90 days to get a decision.  The Bank representative could not explain why her request was being reviewed again.

152.    On January 26, 2010, three months after she was told the paperwork was en route, the homeowner received her loan modification agreement, which she signed and returned, along with the requested documents.

153.    When she called Bank of America to confirm receipt of her documents, a Bank representative told her that her foreclosure sale date had been postponed to April 15, 2010.  She continued to make her trial payments and to check in regularly with Bank of America.

154.    The homeowner's description of what followed echoes the stories told by numerous Bank of America consumers:

On April 12, 2010, I was contacted by [named Bank of America representative] who told me that he was reviewing my MHA [modification] documents and he needed additional paperwork. Once again, I faxed this additional paperwork to him again on April 16, and then called him to let him know I had faxed the paperwork. I asked for a return call to verify he received the paperwork. He did not return my call. On April 20, [name] called me to ask if I faxed over the paperwork and I confirmed I did. He said he did not receive it and requested that I re-send the paperwork again to another fax number. Frustrated, I did this again and told him to call me as soon as he received it. [Name] called me back as I was re-faxing the paperwork and then told me that he cannot help me and that I was sent to the wrong department . . . and that I should call the MHA dept directly at [number]. I called the MHA Dept and they did not have my account # on file and said they did not have my paperwork, this started a series transferring me around to different departments. I was finally transferred to [name] at the Office of the president [sic] and she said my account was assigned to [another name]. She would not transfer me to [name] and she sent her an e-mail to have [name] call me back to discuss the status of the MHA and that I would receive a call within 24-48 hours. I asked for [name's] direct phone number but [name] would not give it to me and said if [name] did not call me within 24-48 hours that I should call the Office of the president back and request the phone number. I never received a phone call from [name.]

155.   In correspondence dated April 30, 2010, after the Attorney General's Office forwarded the homeowner's complaint, Bank of America confirmed that the homeowner had completed her trial modification and had been approved for a permanent modification on April 14. The letter promised that the paperwork would be sent in 30 to 60 days.

156.   The homeowner then checked the ReconTrust website and found that her home was scheduled for a trustee's sale on May 13, 2010.

157.   When she called about this, a Bank of America representative told her that it takes time to get homes removed from the list.

158.   In July, Bank of America's Regulatory Relationship Team wrote her noting that the foreclosure had been suspended and her loan was in review for a permanent modification.

159.   In August 2010, Bank of America sent the homeowner another letter stating,

"Bank of America regrets that you were informed that your loan was approved for a modification. The April 20, 2010 letter you received was most likely referring to our underwriter's approval which precedes the approval by the investor." The letter went on to say that the modification review was "pending approval from the loan's investor." The letter also stated that no sale date would be scheduled while the modification was in review.

160. On information and belief, the homeowner's loan was owned by Fannie Mae. Bank of America had authority to evaluate and modify the mortgage under HAMP (for which the consumer's loan apparently was being considered) without Fannie Mae's approval.

161. In September 2010, the homeowner received a Notice of Intent to Accelerate.

162. In October, she received a letter from the Comptroller of the Currency in response to a complaint she had filed in December 2009. The letter indicated that Bank of America was unable to qualify her for a modification due to her income; however, she had never received a denial from Bank of America.

163. On information and belief, to date, Bank of America has never notified the homeowner that her application for a HAMP modification was denied.

164. Bank of America sent the homeowner a Notice dated October 6, 2010, which stated that she had completed her commitment under the six-month Special Forbearance Agreement and was "now up to date and current on [her] home loan payments."

165. The homeowner was never in a Special Forbearance Plan, however; she was in a three-month HAMP trial plan offered January 20, 2010, which she had accepted and on which she had been paying faithfully for nine months.

166. Subsequently, the Bank began refusing to accept the homeowner's modified payments. The Bank told her that she could re-apply for a modification if she resumed making her full mortgage payments.

167. Because Bank of America would not accept the modified payments, because the homeowner still could not afford the full mortgage payments, and because she could not face

1   the stress of going through another modification review after waiting for a decision for over a
2   year, the homeowner stopped making her mortgage payments on October 1, 2010 and did not
3   re-apply for a modification.

4       168.   Her home was scheduled for trustee's sale on December 14, 2010.

5       169.   On November 6, 2010, Bank of America finally offered the homeowner a
6   permanent modification.

7   **F.W. (CIC # 10-1656)**

8       170.   An elderly homeowner in Mesa applied for a modification with Countrywide in
9   or about April 2009. When the Bank indicated it had not received the application, she faxed it
10  again in mid-June and again in mid-July.

11      171.   In August 2009, a Bank representative told the homeowner her modification
12  request was in review and it could take up to 90 to 120 days for a decision. In September, the
13  Bank asked for updated information, which she submitted.

14      172.   Then Bank of America sent her a Notice of Trustee's Sale setting a sale date of
15  December 15, 2009.

16      173.   On October 12, 2009, a Bank representative informed the homeowner that a trial
17  modification had been approved effective November 1, 2009.

18      174.   The homeowner made her first trial payment. On October 21, the homeowner's
19  representative contacted the Bank and the Bank representative told her that the modification
20  documents could take up to 60 to 90 days to arrive and advised her to check back every couple
21  of weeks.

22      175.   During one of the status calls in early November, Bank of America reported that
23  the homeowner's "file was cancelled" on September 1 because of missing documents, despite
24  the Bank's previous representation that a modification had been approved.

25      176.   The homeowner's representative submitted her documents to the Bank, again.

26      177.   In mid-November and early December, the Bank promised that the modification

-30-