1  request was again in review and confirmed that it had the homeowner's trial payment and her

2  documents.  Bank of America advised the homeowner to make another trial payment to

3  postpone the December foreclosure, which she did.

4       178.    On December 8, Bank of America decided not to postpone the foreclosure,

5  although it did not notify the homeowner.  Her home was sold on December 14, 2009.

6       179.    Two days after the sale, Bank of America sent the homeowner a letter approving

7  a trial modification, but the homeowner had already left her home.  In February 2010, a

8  judgment was entered against the homeowner ordering her to deliver possession of the

9  property, which she already had done.

10      180.    In or about October 2010, a Bank of America representative called the

11 homeowner to ask why she was not making her mortgage payments and threatened that the

12 Bank would foreclose if she did not pay.

13 **S. and P. A. (CIC #10-11578)**

14      181.    Faced with a reduction in income and increased medical expenses, these

15 homeowners applied for a loan modification from Countrywide in or about February 2009.

16      182.    In June 2009 Bank of America offered them a trial modification plan reducing

17 their payments to $1,910.51.  Since this amount was greater than 31% of their income, the

18 ceiling for a HAMP modification, they did not accept the offer.

19      183.    On July 3, 2009, Bank of America sent the homeowners a second trial

20 modification plan, reducing their monthly payments to $1,782.50, 31% of their income.  The

21 homeowners called Bank of America and a representative advised them to ignore the first offer

22 and to sign and submit the second agreement.  They followed these instructions and began

23 paying the trial payment amount of $1,782.50 per month.

24      184.    In January 2010, after the homeowners had made five timely trial payments, Bank

25 of America sent them a letter notifying them that they had not been making the payments of

26 $1,910.51 and were therefore at risk of losing their eligibility for a permanent modification.

1    185.   The homeowners explained via certified letter that they had paid, as instructed,
2  pursuant to the second trial plan.

3    186.   Bank of America did not respond to the homeowners' letter.  Despite multiple
4  calls to Bank of America and through the federal HOPE hotline, the homeowners were never
5  able to reach anyone who could help.

6    187.   In May, Bank of America sent the homeowners a letter denying their request for
7  modification for the same reason given in the January letter.

8    188.   The homeowners called their assigned point of contact at the Bank throughout
9  June and July.  On June 18, that contact told them their permanent modification had been
10  approved and they should receive the final paperwork in 30 days.

11    189.   On July 7, 2010, Bank of America explained in a letter to the homeowners that
12  the earlier denials had been sent in error, confirmed that the trial payments had been received
13  every month, and reassured them that the loan was "under review for a permanent loan
14  modification . . . [and] has been escalated for expedited processing."

15    190.   On July 22, a new point of contact from the Bank called them and said the
16  permanent modification paperwork should arrive in 45 to 60 days.

17    191.   In a July 27, 2010 letter, however, the Bank told the homeowners that their
18  modification documents had not been received and thus a workout plan would not be offered.

19    192.   Bank of America's next letter, dated August 7, 2010, told the homeowners to
20  disregard the July 27 letter and promised that the homeowners should receive "the permanent
21  modification packet with [sic] the next 7 to 10 business days."

22    193.   Instead, the Bank sent the homeowners a Notice of Intent to Accelerate dated
23  August 18, 2010, demanding payment of $15,862.28 by September 17, 2010 or "foreclosure
24  proceedings will be initiated."

25    194.   Finally, Bank of America offered the homeowners a permanent modification,
26  which they accepted on or about August 24, 2010.

195. The homeowners had been on a trial modification for more than 12 months before they were offered a permanent modification.

## COUNT I – VIOLATIONS OF THE CONSENT JUDGMENT

196. The State re-alleges all preceding paragraphs in their entirety.

197. The Consumer Fraud Act provides that:

> A person who violates any order or injunction issued pursuant to this article shall forfeit and pay to the general fund of the state of Arizona a civil penalty of not more than twenty-five thousand dollars per violation.

A.R.S. § 44-1532 ("Violation of order or injunction; penalty").

198. As alleged herein, Bank of America has violated multiple provisions of the Consent Judgment approved by the Court on March 13, 2009.

199. Bank of America's violations of the Consent Judgment have been material.

200. Pursuant to Paragraph 10.4 of the Consent Judgment, on April 9, 2010, the State gave written notice to the Countrywide Defendants and Bank of America of their violations of the Consent Judgment and advised them that if such violations were not cured, then the State intended to seek enforcement of the Consent Judgment.

201. By letter dated June 4, 2010, and multiple subsequent communications, Bank of America responded by contending that the State had failed to identify any material violations of the Consent Judgment.

202. As of the date of filing this Complaint, the Countrywide Defendants and Bank of America have not cured their violations of the Consent Judgment.

## COUNT II – VIOLATIONS OF THE ARIZONA CONSUMER FRAUD ACT

203. The State re-alleges all preceding paragraphs in their entirety.

204. A.R.S. § 44-1522(A) of the Consumer Fraud Act provides:

> The act, use, or employment by any person of any deception, deceptive act or practice, fraud, false pretense, false promise, misrepresentation, or concealment, suppression or omission of any material fact with intent that others rely upon such concealment, suppression or

-33-

omission, in connection with the sale or advertisement of any merchandise whether or not any person has in fact been misled, deceived, or damaged thereby, is declared to be an unlawful practice.

205.    As alleged herein, the Defendants engaged in unlawful practices in violation of the Consumer Fraud Act, A.R.S. §§ 44-1521, *et seq.*, in that they made false promises and used deception, deceptive practices, and/or misrepresentations in connection with the sale or advertisement of modified mortgage loans and other loss mitigation options.

206.    In all matters alleged herein, the Defendants acted willfully in violation of A.R.S. § 44-1531(A).

## RELIEF REQUESTED

**WHEREFORE**, the State respectfully requests that the Court:

1.    Hold Defendants in contempt and order them to comply immediately with all provisions of the Consent Judgment pursuant to Paragraph III.10.4 of the Consent Judgment.

2.    Order Defendants to pay restitution to consumers pursuant to A.R.S. § 44-1528 and Paragraph III.10.4 of the Consent Judgment.

3.    Extend the Termination Date established in the Consent Judgment and impose additional reporting requirements to allow the State to evaluate Defendants' compliance.

4.    Require Defendants to pay a $25,000 penalty for each violation of the Consent Judgment pursuant to A.R.S. § 44-1532.

5.    Prohibit Defendants from violating the Arizona Consumer Fraud Act, A.R.S. §§ 44-1521, *et seq.* as written now or amended in the future.

6.    Prohibit Defendants from engaging in the course of conduct alleged herein as violating A.R.S. § 44-1522(A).

7.    Order Defendants to pay restitution to consumers injured by their unlawful practices.

8.    Order Defendants to pay the State civil penalties of up to $10,000 per willful

-34-

1 | violation of the Consumer Fraud Act pursuant to A.R.S. § 44-1531.

2 |     9.    Order Defendants to pay the State's costs of investigation and reasonable
3 | attorney's fees pursuant to A.R.S. § 44-1534.

4 |     10.    Order such other and further relief as the Court may deem just and proper.

5 | DATED this 17th day of December, 2010.

TERRY GODDARD
ATTORNEY GENERAL

By _____
Susan P. Segal
Carolyn R. Matthews
Assistant Attorneys General
Attorneys for Plaintiff

Exhibit "9"

www.michigan.gov
(To Print: use your browser's print function)
**Contact:** John Sellek or Joy Yearout 517-373-8060

Release Date: January 28, 2011
Last Update: January 28, 2011

# Schuette Sues Countrywide Financial To Recover Taxpayer-Funded Investment Losses

January 28, 2011

    **LANSING** - Attorney General Bill Schuette and Treasurer Andy Dillon today announced that the State of Michigan has taken legal action against Countrywide Financial Corporation, its underwriters, auditor and some of its former executives and directors to recover $65 million in taxpayer-funded state pension funds. Schuette filed the lawsuit in the U.S. District Court for the Central District of California, accusing the defendants of participating in a massive corporate fraud scheme that depleted State of Michigan pension funds by millions of dollars.

    "Protecting the hard-earned dollars of Michigan taxpayers from fraud is one of my top priorities," said Schuette.

    In the complaint, the Attorney General's office alleges Countrywide had effectively become a subprime lender while telling investors that it continued to maintain stringent mortgage loan underwriting standards that differentiated it from its competitors and subprime lenders. Throughout the March 12, 2004 through March 7, 2008 time period, Countrywide assured the market that it should not be affected by a downturn in the housing market. However, during that period, Countrywide's stock price dropped about 90%, from over $35 per share to about $5 per share. This came as a result of disclosures revealing Countrywide's lax mortgage underwriting guidelines, cascading mortgage defaults, and an increased use of "pay option" adjustable rate mortgages, no documentation mortgages and other risky loan types. This represented a loss of market capitalization of approximately $17 billion. The State of Michigan Retirement Systems lost over $65 million.

    Countrywide's stock was artificially inflated during the class period because defendants made these false and misleading statements, which concealed their fundamental shift in core mortgage-related business strategy. In addition, Countrywide also misstated their financial statements because reserves for loan losses, representation and warranty liability were materially understated.

    "Nearly 540,000 participants and beneficiaries are depending on State Pension Funds to secure their retirement," said State Treasurer Andy Dillon. "We take our obligation to protect those funds very seriously."

    The State of Michigan Retirement Systems (SMRS), which invests on behalf of Michigan Public School Employees, State Employees, State Police and Michigan Judges, hold combined assets of approximately $47.5 billion, making the SMRS one of the largest pension systems in the nation.

-30-

Copyright © 2012 State of Michigan

Exhibit "10"

## Oregon Department of Justice
## Attorney General John Kroger

Oregon DOJ Home | Media | Current Releases | 2011 | January 26, 2011 Media Release

## OREGON FILES SECURITIES LAWSUIT AGAINST COUNTRYWIDE FOR MISLEADING FILINGS THAT CAUSED $14 MILLION IN LOSSES TO STATE

**January 26, 2011**

Oregon Treasurer Ted Wheeler and Attorney General John Kroger today announced a securities lawsuit against Countrywide Financial Corp. to recover losses to the state pension and workers' compensation funds caused by false statements that improperly inflated the prices of Countrywide's stock and bonds.

A class action lawsuit previously reached a settlement with Countrywide that may have netted the state less than $500,000 on $14 million in losses. So Treasurer Wheeler and Attorney General Kroger decided it was in the state's best interest to opt out and file their own lawsuit.

"It is time to foreclose on Countrywide's effort to pay so little for costing Oregonians so much," said Treasurer Wheeler, who sits on the Oregon Investment Council and has a fiduciary duty to protect public assets and maximize the returns for beneficiaries of trust funds including the Oregon Public Employees Retirement Fund.

"Oregon will not accept pennies on the dollar when Wall Street defrauds Oregonians," said Attorney General Kroger.

"It is important that we protect the interests of SAIF's policyholders and injured workers," said Brenda Rocklin, SAIF Corporation president and CEO.

Countrywide was among the nation's largest mortgage lenders. In 2005, Countrywide originated over $490 billion in mortgage loans.

The Office of State Treasurer and the Oregon Investment Council bought and sold shares in Countrywide stock and bonds between 2004 and March 2008 on behalf of Oregon Public Employees Retirement Fund (OPERF) and the Industrial Accident Fund (IAF), the SAIF workers' compensation investment fund.

- Complaint AIF (pdf)
- Complaint OPREF (pdf)

**Contact:**

Tony Green, (503) 378-6002 tony.green@doj.state.or.us
James Sinks, Office of the State Treasurer, 503-508-0737 or James.sinks@state.or.us
Chris Davie, SAIF, 503.373.8006 or chrdav@saif.com

prosecute significant financial crimes, ensure just and effective punishment for those who perpetrate financial crimes, combat discrimination in the lending and financial markets, and recover proceeds for victims of financial crimes.  For more information on the task force, visit www.StopFraud.gov.

A copy of the complaint and proposed settlement order, as well as additional information about fair lending enforcement by the Justice Department, can be obtained from the Justice Department website at www.justice.gov/fairhousing.

The proposed settlement provides for an independent administrator to contact and distribute payments of compensation at no cost to borrowers whom the Justice Department identifies as victims of Countrywide's discrimination.  The department will make a public announcement and post contact information on its website once an administrator is chosen.  Borrowers who are eligible for compensation from the settlement will then be contacted by the administrator.  Individuals who believe that they may have been victims of lending discrimination by Countrywide and have questions about the settlement may email the department at countrywide.settlement@usdoj.gov.

11-1694

Attorney General

Home » Briefing Room » Justice News

JUSTICE NEWS

### Attorney General Eric Holder Speaks at the Countrywide Financial Corporation Settlement Announcement

Washington, D.C.~Wednesday, December 21, 2011

Good afternoon. Today, I'm proud to join with these critical partners – Assistant Attorney General for the Civil Rights Division, Tom Perez; the United States Attorney for the Central District of California, Andre Birotte; Illinois Attorney General, Lisa Madigan; the Secretary for the U.S. Department of Housing and Urban Development, Shaun Donovan; and Governor Sarah Bloom Raskin of the Federal Reserve – in announcing the largest residential fair lending settlement ever reached in the history of our nation's Department of Justice.

In today's settlement with Countrywide Financial Corporation, we resolved the government's allegations that Countrywide and its subsidiaries – which are now owned by Bank of America – engaged in discriminatory mortgage lending practices against more than 200,000 qualified African-American and Hispanic borrowers from 2004 through 2008. The settlement provides $335 million in compensation to victims of Countrywide's discrimination during a period when Countrywide served as one of the nation's largest single-family mortgage lenders and originated more than 4 million residential mortgage loans.

In this thorough investigation, the Department uncovered a pattern or practice of discrimination involving victims in more than 180 geographic markets across 41 states and the District of Columbia. These discriminatory acts allegedly included widespread violations of the Fair Housing Act and the Equal Credit Opportunity Act, and resulted in African-American and Hispanic borrowers being charged higher rates for mortgage loans – solely because of their race or national origin.

These allegations represent alarming conduct – by one of the largest mortgage lenders in this country, during the height of the housing market boom. For example, in 2007, a qualified African American customer in Los Angeles borrowing $200,000 paid an average of roughly $1200 more in fees than a similarly qualified white borrower.

This settlement will compensate the more than 200,000 African-American and Hispanic borrowers who were victims of discriminatory conduct, including more than 10,000 African-American or Hispanic borrowers who – despite the fact that they qualified for prime loans – were steered into subprime loans.

Subprime borrowers are often subjected to penalties and higher interest rates, and have a greater likelihood of default and foreclosure than those who have prime loans. Often, the impact of discriminatory lending practices can reach even farther – potentially harming borrowers' credit; inhibiting their ability to find quality housing, employment, or access to higher education; and depriving entire communities of economic opportunities.

Today's settlement makes clear that today's Justice Department – and our law enforcement and government partners – will not hesitate to move aggressively in holding lenders – including the nation's largest – accountable for discrimination and financial misconduct. We are committed to protecting the sacred rights, and best interests, of the American people – and to ensuring equal opportunity through the vigorous enforcement of our civil rights laws.

Nowhere is this commitment more evident than in the work of the Civil Rights Division's Fair Lending Unit, which has filed or resolved 10 fair lending matters since its formation last February. An additional seven lawsuits, and more than 10 open investigations, are currently pending – and the Department stands ready to hold financial institutions accountable to remedy and prevent discriminatory conduct.

Through critical interagency partnerships like the Financial Fraud Enforcement Task Force – and particularly its Non-Discrimination Working Group; through the diverse network of relationships we have forged with the Department of Housing and Urban Development, the Federal Reserve Board, the Consumer Financial Protection Bureau, state and local officials, and our law enforcement and regulatory partners – the Justice Department will continue to vigorously pursue those who would take advantage of certain Americans because of their race, national origin, gender, or disability.

Such conduct undercuts the notion of a level playing field for all consumers. It betrays the promise of equal opportunity that is enshrined in our Constitution and our legal framework. And, under this Administration, these harmful and discriminatory practices will not be tolerated. As we have done through this settlement, the Department will pursue remedies and reforms that preserve and protect equal opportunity for all.

I'd like to thank the many professionals, attorneys, and support staff whose hard work has made today's announcement possible – and whose dedicated efforts help to advance the core missions of this Department every single day. And, now, I'd like to turn things over to another key leader in this work – Assistant Attorney General Tom Perez.

Exhibit "12"

# Attorney General Bill McCollum News Release

July 1, 2008
Media Contact: Jenn Meale
Phone: (850) 245-0150

### Florida Attorney General Files Lawsuit Against Countrywide Financial
*~ Lawsuit alleges deceptive marketing of loans to boost company profits ~*

**TALLAHASSEE, FL –** Attorney General Bill McCollum today announced that his office has filed a lawsuit against Countrywide Financial, one of the nation's largest mortgage companies, for allegedly engaging in deceptive and unfair trade practices. The Attorney General's lawsuit claims Countrywide put borrowers into mortgages they couldn't afford or loans with rates and penalties that were misleading. Chief Executive Angelo Mozilo was also named in the lawsuit.

"It is unthinkable that a company would try to take advantage of someone's dream of homeownership," said Attorney General McCollum. "Florida homeowners who are trying to protect their homes from foreclosures shouldn't have to worry about their mortgage brokers or lenders unfairly profiting at their expense."

Similar to other mortgage lenders, Countrywide attempted to generate large numbers of mortgage loans for resale on the secondary mortgage market. In doing so, the company purportedly originated loans with little concern about whether the borrower could afford and maintain payments on these loans. In the process, the company allegedly eased or ignored its own underwriting standards and encouraged borrowers to enter into "teaser" rates while concealing or misrepresenting that much larger payments would become due.

"Our legal services programs throughout the state have seen a large number of clients who are now in default on mortgages written by Countrywide. It appears to us Countrywide did no due diligence and accepted applications which were patently fraudulent and reflected no ability on the part of the borrowers to make the required payments," said Marc Taps with Legal Services of North Florida. "We cannot help but conclude that the most financially unsophisticated segment of the population was targeted by the brokers who knew Countrywide would write these mortgages."

The lawsuit also claims Countrywide hid any potentially negative effects of these "teaser" loans, including rising rates, prepayment penalties and negative amortization, which borrowers would inevitably face if they were making minimum payments or trying to refinance. Traditionally, lenders require borrowers to document income and assets, but investigators with the Attorney General's Office believe Countrywide offered reduced or no documentation loan programs to increase its loan sales. Countrywide also allegedly paid greater compensation to brokers for loans with higher interest rates and prepayment penalties because it could sell those loans for higher prices on the secondary market.

The company's deceptive marketing practices were supposedly designed to sell costly loans while hiding or misrepresenting the terms and dangers. Countrywide's deceptive sales practices resulted in a large number of loans ending in default and foreclosure, with the company reporting earlier this year that more than 25 percent of its subprime loans were delinquent. The Attorney General's Office received more than 150 complaints about Countrywide, prompting a subpoena in February and ultimately leading to today's lawsuit.

Consumers who believe they have been victimized by Countrywide should call the Attorney General's fraud hotline at 1-866-966-7226 or may file a complaint online at: http://myfloridalegal.com.

A copy of the lawsuit, filed last night in Broward County Circuit Court, is available online at: http://myfloridalegal.com/webfiles.nsf/WF/MRAY-7G5G7L/ $file/CountrywideComplaint.pdf.

Exhibit "13"



June 29, 2010

### MADIGAN SUES COUNTRYWIDE FOR DISCRIMINATION AGAINST AFRICAN AMERICAN AND LATINO BORROWERS

#### *Alleges African American and Latino Homeowners Paid More for Their Mortgages than They Should Have*

Chicago—Attorney General Lisa Madigan announced today that she has filed a lawsuit against Countrywide, a subsidiary of Bank of America, for unlawfully discriminating against African American and Latino borrowers in home mortgage sales, in violation of the Illinois Human Rights Act and the Illinois Fairness in Lending Act. The Attorney General filed her complaint in Cook County Circuit Court against Countrywide Financial Corporation; Countrywide Home Loans, Inc.; and Full Spectrum Lending, Inc., an arm of Countrywide that mostly sold subprime loans.

Madigan's complaint alleges that the former mortgage giant steered African American and Latino borrowers into risky subprime mortgages more often than similarly-situated white borrowers. The complaint also alleges that minority borrowers paid more for mortgages across Countrywide's product line, including its prime loans. Significantly, Madigan's analysis of Countrywide loan data found that the racial disparities could not be explained by objective factors, such as borrowers' credit scores or debt-to-income ratios.

At the height of the housing bubble, Countrywide was the largest mortgage lender in the country and in Illinois. Countrywide was also the state's top seller of subprime loans. Bank of America bought Countrywide in 2008.

The failure of millions of higher-cost, or subprime, mortgages nationwide is largely responsible for triggering the ongoing foreclosure crisis and resulting economic recession.

"Countrywide's illegal discriminatory lending practices destroyed the wealth and dreams of thousands of African American and Latino homeowners," Madigan said. "Bank of America needs to be held accountable by taking financial responsibility for cleaning up the devastation of the predatory company that it chose to take over."

Madigan's lawsuit is the result of a two-year investigation of Countrywide's lending policies and practices that were in place during the years directly preceding the collapse of the housing market. The Attorney General issued a fair lending subpoena to Countrywide in March 2008, after a Chicago Reporter study of federally collected mortgage lending data for the Chicago area found that, in 2006, Countrywide Financial Corporation sold higher-cost loans to 50.9 percent of its African American borrowers and 33.8 percent of its Latino borrowers, while only 19.5 percent of the company's white borrowers received high-cost loans.

The Attorney General's investigation included a statistical analysis of data from over 83,000 Countrywide mortgages originated in Illinois from 2005 through 2007. Madigan's office also interviewed former Countrywide employees and mortgage brokers, and spoke with Countrywide borrowers about their home loans.

As outlined in the complaint, Madigan's analysis of Countrywide's loan data found that the odds that African American and Latino borrowers would receive a higher-cost subprime mortgage from Countrywide were three times greater than those of white borrowers. In addition, Madigan's investigation found that Countrywide charged African American and Latino borrowers higher interest rates and fees on loans spanning the company's range of products, including its prime products, as compared with similarly -situated white borrowers.

Madigan's investigation further found that the disparities in Countrywide's subprime sales and loan pricing were the result of Countrywide policies that gave employees and mortgage brokers almost unlimited discretion in the selection and pricing of loans.

"It's disturbingly clear that if you were an African American or Latino borrower who walked into a Countrywide store, you likely paid more for your mortgage than a white borrower," Madigan said. "Countrywide effectively imposed a surcharge on mortgage loans based on race and ethnicity."

The Attorney General's lawsuit asks the court to find that Countrywide engaged in a pattern and practice of discrimination, enter an injunction against Countrywide to permanently prohibit the company from discriminatory acts as described in the complaint, make restitution to all victims of Countrywide's discrimination, pay civil penalties of $25,000 for each violation of the Illinois Human Rights Act, and order any other relief that the court deems equitable.

Today's filing is the second lawsuit Madigan has brought against Countrywide. In 2008, she filed a consumer fraud lawsuit against the lender for its major role in driving the foreclosure crisis, and in November 2008, she led negotiations that resulted in an $8.7 billion settlement of that lawsuit with Bank of America.

Today's filing is also the second fair lending lawsuit Madigan has brought against a major mortgage lender. In July 2009, Madigan filed a lawsuit against Wells Fargo for violating the state's fair lending and civil rights laws, becoming the first state attorney general in the nation to sue a federally-chartered lender for its role in creating the foreclosure crisis. The Wells Fargo litigation is ongoing.

**Countrywide Steered Minority Borrowers to Subprime Loans**
Specifically, Madigan's complaint alleges that Countrywide's retail employees and mortgage brokers had the discretion to choose the type of products offered to borrowers and to manipulate borrowers' financial information that was entered into the company's automated underwriting system. As a result of this discretion, the complaint alleges, minority borrowers were steered into subprime mortgages when they qualified for prime loans.

The Attorney General further alleges that Countrywide failed to institute an adequate system for automatically referring eligible borrowers from subprime to prime. Although the company added an "Uplift" protocol to its underwriting system in 2002 to supposedly prevent prime-eligible borrowers from being placed into subprime loans, Madigan alleges that the Uplift program failed as a safeguard because it depended on a combination of automated underwriting and human discretion. When interviewed by Madigan's office, former Countrywide employees and brokers reported that they had rarely or never seen subprime loans uplifted to prime.

**Minority Borrowers Paid More for Countrywide Loans**
Madigan's complaint alleges similar abuses of discretion in the pricing of Countrywide's loans. As outlined in the lawsuit, Countrywide provided employees and brokers with rate sheets that spelled out the mortgage interest rates borrowers qualified for, based on certain credit factors. However, Madigan found that Countrywide gave employees and brokers discretion to sell borrowers loans with higher interest rates than those indicated by the rate sheets.

The complaint also alleges that Countrywide's broad discretionary pricing policies allowed employees and brokers to use a number of devices to increase the interest rates on loans. These included manipulating the amount of cash a borrower took out on a refinance, which would increase the loan-to-value ratio, and adding features to the loan such as a prepayment penalty or an adjustable interest rate.

**Countrywide's Compensation Structure Incentivized the Sale of Subprime and High-Cost Loans**
In addition to Countrywide's discretionary policies, the Attorney General alleges that the company's compensation structure provided employees and mortgage brokers with incentives to steer prime-eligible borrowers into subprime loans and to sell loans with the highest interest rates possible. As cited in the complaint, Countrywide provided those incentives by linking compensation to volume of sales, paying employees more for originating subprime loans, basing compensation in part on the interest rate of the loan, and paying brokers a premium for loans with features associated with subprime mortgages.

**Countrywide Aggressively Marketed its Loans to Minority Borrowers**
Additionally, Madigan alleges that early in the last decade Countrywide began aggressively marketing its services and products to a so-called "emerging market" of untapped borrowers, namely African Americans and Latinos. Minority borrowers thus became the targets of Countrywide's new marketing strategy at a time when the company's compensation structure was increasingly incentivizing the sale of risky subprime loans. The complaint alleges that as a result of these events, African American and Latino borrowers disproportionately suffered the harmful effects of Countrywide's toxic loans, and these effects were magnified by Countrywide's discretionary product selection and pricing policies.

Illinois homeowners who believe they may be victims of Countrywide's discriminatory lending practices should contact the Attorney General's office via a special e-mail address at CountrywideDiscrimination@atg.state.il.us or by calling the Attorney General's Homeowners Helpline at 1-866-544-7151.

Case 8:12-cv-00242-CJC-AN   Document 44   Filed 03/23/12   Page 18 of 60   Page ID #:1329

Madigan also reminded homeowners that her Web site, at www.IllinoisAttorneyGeneral.gov, provides resources to assist homeowners in crisis including her Illinois Mortgage Lending Guide, a resource manual containing step-by-step instructions for those struggling to make their loan payments and a list of HUD-certified counseling agencies that offer default counseling services. Homeowners who do not have easy access to the Internet should call the Attorney General's Helpline, to quickly receive the guide by mail.

-30-

Return to June 2010 Press Releases



© 2010 Illinois Attorney General                         Home • Privacy Policy • Contact Us

Exhibit "14"

STATE OF INDIANA )
) SS:
COUNTY OF STEUBEN )

IN THE STEUBEN CIRCUIT COURT

CAUSE NO: **76C01- 0808 -PL- 0652**

STATE OF INDIANA, )
)
Plaintiff, )
)
v. )
)
COUNTRYWIDE FINANCIAL )
CORPORATION, a Delaware corporation, )
COUNTRYWIDE HOME LOANS, INC., a )
New York corporation a/k/a AMERICA'S )
WHOLESALE LENDER, and )
JOHN DOES 1-20, )
)
Defendants. )

**FILED**

AUG 2 2 2008

Diana Pauck
CLERK, STEUBEN CIRCUIT COURT

## COMPLAINT

The State of Indiana, by Attorney General Steve Carter and Deputy Attorneys General Gabrielle J. Owens and Paula J. Beller, petitions the Court pursuant to the Indiana Home Loan Practices Act, Ind. Code § 24-9 *et seq.*, and the Indiana Deceptive Consumer Sales Act, Ind. Code § 24-5-0.5-1 *et seq.*, for injunctive relief, restitution, civil penalties, costs, and other relief.

## PARTIES

1.     The Plaintiff, State of Indiana, is authorized to bring this action and to seek injunctive and other statutory relief pursuant to Ind. Code § 24-5-0.5-4(c) and Ind. Code § 24-9-8-3.

2.     Defendant Countrywide Financial Corporation, a Delaware corporation with a principal place of business in North Carolina, is a wholly owned subsidiary of Bank of America Corporation and is the successor corporation to another entity also named Countrywide Financial Corporation ("Old Countrywide"). Effective July 1, 2008, Old Countrywide merged with and

1

into Red Oak Merger Corporation, the surviving corporation and a wholly owned subsidiary of Bank of America Corporation. On or about the effective date of the merger, Red Oak Merger Corporation changed its name to Countrywide Financial Corporation. All references to Countrywide Financial Corporation in this complaint shall mean and refer to Countrywide Financial Corporation and its predecessor corporation, Old Countrywide.

3.    At all times relevant hereto, Defendant Countrywide Financial Corporation has operated as a thrift holding company. It has numerous subsidiaries that originate, purchase, securitize, sell and service residential and commercial loans, and it provides loan closing services such as credit reports, appraisals and flood determinations among other activities. Defendant Countrywide Financial Corporation owns and operates its wholly owned subsidiary Countrywide Home Loans, Inc.

4.    At all times relevant hereto, Defendant Countrywide Home Loans, Inc. ("Countrywide") is registered as a for-profit foreign corporation in the State of Indiana, with a principal business address of 4500 Park Granada, Calabasas, California 91302. Defendant Countrywide Home Loans, Inc. operates under the assumed name, America's Wholesale Lender.

5.    The term "Defendants" as used in this Complaint means Countrywide Financial Corporation and Countrywide Home Loans, Inc. a/k/a America's Wholesale Lender.

## GENERAL ALLEGATIONS

6.    In the ordinary course of business, Defendants have originated and funded real estate secured loans for borrowers in the State of Indiana. These real estate secured loans were made during the period July 1, 2005, until present.

7.    Defendants solicited these real estate secured loans using their own employees and loan brokers acting as agents for Defendants.

8.      Plaintiff alleges that Defendants created an environment which incentivized the sale of pay option adjustable rate mortgages.

9.      Plaintiff alleges that Defendants knowingly made deceptive or misleading representations or omissions regarding loan terms and charges including, but not limited to, the interest rate of the loan, the presence or the mechanics of the adjustable rate features of the loan, and the interest rate or the material costs of the proposed loan.

10.     Plaintiff alleges that Defendants engaged in a practice of misleading borrowers about the presence, the significance, and/or meaning of a prepayment penalty, and/or the duration of a prepayment penalty on their loans.

11.     Plaintiff alleges that Defendants engaged in acts and practices which resulted in fabricated and/or inflated income information for prospective borrowers.  Plaintiff alleges that those borrowers would have failed to qualify for said loans without the fabricated or inflated income.

12.     At this time, it is unknown how many Indiana consumers have been affected by the deceptive practices of Defendants.

### Duane and Petra Carter

13.     The following subparagraphs describe Duane and Petra Carter's ("Carters") experience with Defendants, which is illustrative of Defendants' business practices as alleged in this Complaint:

        a.      At all times relevant to this Complaint, the Carters are the owners of record for real property located at 1856 Rooses Lane, Indianapolis, Indiana 46217 ("Rooses Lane").

b.     As of September 2006, the Carters had obtained two real estate secured loans on Rooses Lane. The first loan for eighty percent (80%) of the initial purchase price had a fixed interest rate of five point two percent (5.2%); the second loan for twenty percent (20%) of the initial purchase price had a variable interest rate.

c.     As of September 2006, Petra Carter lost her job and began to draw state unemployment insurance benefits.

d.     As a result of the Carters' reduced income, they were concerned that they might not be able to make the variable rate loan payment on Rooses Lane and wanted to refinance their two real estate secured loans into one.

e.     In or about September 2006, the Carters contacted NMC Mortgage ("NMC") regarding the possibility of refinancing Rooses Lane.

f.     On or about September 8, 2006, the Carters met with Nathan Kluger ("Kluger"), an employee of NMC, to discuss the possibility of refinancing Rooses Lane.

g.     On or about September 8, 2006, the Carters provided Kluger with documentation evidencing their income including Petra Carter's unemployment benefits and Duane Carter's bimonthly salary of $1,400.

h.     On or about September 9, 2006, Kluger completed a no-documentation loan application dated September 9, 2006, for a real estate secured loan with America's Wholesale Lender. On the application, Kluger identifies himself as the interviewer, and the interviewer's employer as America's Wholesale Lender.

i.     The September 9, 2006 loan application indicates that Duane Carter's income is $14,000 per month.

j.     The September 9, 2006 loan application indicates that Duane Carter has been employed for 28 years, but fails to identify Duane Carter's employer or in what capacity Duane Carter is employed.

k.     Upon information and belief on multiple occasions from September 8, 2006, to September 14, 2006, Kluger made verbal representations to the Carters that the real estate secured loan would have a 1.75% interest rate for the first twelve (12) months and then vary thereafter.

l.     On multiple occasions from September 8, 2006, to September 14, 2006, upon information and belief Kluger assured the Carters that the real estate secured loan did not have a prepayment penalty and that the Carters would be able to refinance after the initial interest rate period ended.

m.     Upon information and belief, Kluger counseled the Carters not to shop around for any other loans as another broker would verify their credit which would adversely affect their credit score.

n.     Upon information and belief, Kluger failed to explain the pay option feature of the Carters' real estate secured loan.

o.     Upon information and belief, Kluger failed to explain the negative amortization feature of the Carters' real estate secured loan.

p.     Upon information and belief, Kluger failed to explain that the 1.75% interest rate was in reality a qualifying rate only, and that the interest rate would adjust upward on the first payment date.

q.     On or about September 14, 2006, the Duane Carter closed on the real estate secured loan for Rooses Lane.

493710.1                                        5

r.     The Carters did not receive copies of their loan documents until after the closing occurred and they were walking out of the room.

s.     The Carters did not discover the true nature of their real estate secured loan until the second month when the interest payment adjusted up.

t.     Some time after September 2006, the Carters attempted to refinance their new real estate secured loan and discovered the prepayment penalty.

u.     NMC received $7,261.72 in fees from the Carters as a result of the Carters' real estate secured loan.

v.     NMC received $12,601.56 from Countrywide in the form of a yield spread premium as a result of placing the Carters in this particular loan product.

### Gary and Laurel Agin

14.    The following subparagraphs describe Gary and Laurel Agin's ("Agins") experience with Defendants, which is illustrative of Defendants' business practices as alleged in this Complaint:

a.     At all times relevant, the Agins are the owners of record of real estate located at 13152 Duval Drive, Fishers, Indiana ("Duval Drive").

b.     In or about December 2005, the Agins met with Bud Sirbu ("Sirbu"), a loan officer from Huntington Mortgage Group, to discuss the possibility of a new mortgage on Duval Drive.

c.     Sirbu informed the Agins that Huntington Mortgage Group did not have a product which would meet their needs, but Sirbu stated that he knew of a product offered by Countrywide that he could arrange for the Agins.

d.     Sirbu introduced Agins to John Stainbrook ("Stainbrook") of First American Mortgage Corporation ("First American") whom the Agins believed to be a representative of Countrywide.

e.     Upon information and belief, the Agins were told by Sirbu and Stainbrook that the real estate secured loan would have a fixed rate of 1.75% for five years and then convert to an adjustable rate mortgage with an interest rate based upon prime rate plus three points.

f.     On or about December 9, 2005, the Agins closed on their real estate secured loan.

g.     Upon information and belief, at the December 9th closing, the Agins were again told that the rate would not adjust until year five of the loan.

h.     At the December 9th closing, the Agins discovered the existence of a complex prepayment penalty addendum.

i.     On or about December 12, 2005, the Agins contacted Countrywide to get clarification on what constituted a prepayment and to understand the size of the prepayment penalty.

j.     On or about December 13, 2005, Stainbrook contacted the Agins on the last day the real estate secured loan could be rescinded.  Stainbrook and the Agins discussed the prepayment penalty and concluded that the fee would be small compared to the amount that the Agins would save over the five year period.

k.     On or after December 14, 2005, Scott Long ("Long") of Huntington Bank, at the urging of Sirbu, contacted the Agins regarding the possibility of a home equity

loan.   During the conversation, it was discovered that Long was unaware of the recent real estate secured loan.

l.      After the conversation with Long, the Agins became concerned and decided to review their loan documents.  The Agins discovered that the 1.75% rate was applicable until April 1, 2006 (three months), and not for five years as they had been promised.

m.      On or about December 20, 2005, upon information and belief the Agins met with Sirbu who confirmed that the Agins were in fact told that the 1.75% rate was good for five years.

n.      At the December 20 meeting, upon information and belief Stainbrook was contacted by phone and he confirmed that the Agins were in fact told that the 1.75% rate was good for five years and that Stainbrook would have documents drawn up to correct the error.

o.      On or about December 2, 2005, Buddy Henn ("Henn"), account executive for Countrywide, and Stainbrook contacted the Agins to explain the terms of the loan. Henn and Stainbrook insisted that Agins had misunderstood the initial offer.

p.      On or about December 31, 2005, the Agins notified The Huntington National Bank of the misrepresentation that had occurred with regard to their Countrywide real estate secured loan.  The Huntington National Bank responded by refunding both the closing costs and prepayment penalty related to the loan.

q.      The Agins immediately refinanced the Duval Drive property and paid off the Defendants' loan.

### Anthony and Beverly Judson

15. The following subparagraphs describe Anthony and Beverly Judson's ("Judsons") experience with Defendants, which is illustrative of Defendants' business practices as alleged in this Complaint:

     a.   On or about September 14, 2005, the Judsons purchased real estate located at 275 Lane 650B Snow Lake, Fremont, Indiana 46737 ("Snow Lake") using a real estate secured loan.

     b.   The Judsons obtained their loan in Angola, Indiana, through Countrywide's local agent, Patti Wilson ("Wilson").

     c.   Upon information and belief on multiple occasions, Wilson assured the Judsons that their loan had a "soft" prepayment penalty which would allow them to sell their home without paying the penalty.

     d.   The Judsons discovered that their loan has a "hard" prepayment penalty which applies regardless of the reason the loan is paid.

### COUNT I: VIOLATIONS OF THE HOME LOAN PRACTICES ACT

16. Plaintiff realleges and incorporates by reference the allegations contained in paragraphs one (1) through fifteen (15) above.

17. By making deceptive and/or misleading representations and/or omissions regarding loan terms and charges including, but not limited to, the interest rate of the loan, the presence or mechanics of the adjustable rate feature of the loan, and the interest rate or the material costs of the proposed loan, Defendants committed a "deceptive act" as defined by Ind. Code § 24-9-2-7.

18.     By misleading borrowers about the presence, the significance, and/or meaning of a prepayment penalty and/or the duration of a prepayment penalty on their loans, Defendants committed a "deceptive act" as defined by Ind. Code § 24-9-2-7.

19.     By engaging in acts and practices which resulted in fabricated and/or inflated income information for prospective borrowers, many of whom would have failed to qualify for said loans without the fabricated or inflated income, Defendants committed a "deceptive act" as defined by Ind. Code § 24-9-2-7.

20.     Because the loans described in paragraphs thirteen (13), fourteen (14), and fifteen (15) are secured by a mortgage and are single family dwellings located in Indiana which are the principal residence of Indiana consumers, the loans referred to in paragraphs thirteen (13), fourteen (14), and fifteen are "home loans" as defined by Ind. Code § 24-9-2-9.

21.     By engaging in a "deceptive act" in connection with a "home loan," Defendants have violated Ind. Code § 24-9-3-7.

## COUNT II: KNOWING VIOLATIONS OF THE

## HOME LOAN PRACTICES ACT

22.     The Plaintiff realleges and incorporates by reference the allegations contained in paragraphs one (1) through twenty-one (21) above.

23.     The misrepresentations and deceptive acts set forth above were committed by the Defendants with knowledge at the time of the transactions.

## COUNT III: VIOLATIONS OF THE DECEPTIVE CONSUMER SALES ACT

24.     The Plaintiff realleges and incorporates by reference the allegations contained in paragraphs one (1) through twenty-three (23) above.

25. The transactions referred to in paragraphs thirteen (13), fourteen (14), and fifteen (15) are "consumer transactions" as defined by Ind. Code § 24-5-0.5-2(a)(1).

26. Defendants are a "supplier" as defined by Ind. Code § 24-5-0.5-2(a)(3).

27. The violations of the Home Loan Practices Act referred to in paragraphs sixteen (16) through twenty-three (23) constitute deceptive acts pursuant to Ind. Code § 24-9-8-1 and are actionable under the Deceptive Consumer Sales Act, Ind. Code § 25-5-0.5.

## COUNT IV: KNOWING VIOLATIONS OF THE

## DECEPTIVE CONSUMER SALES ACT

28. The Plaintiff realleges and incorporates by reference the allegations contained in paragraphs one (1) through twenty-seven (27) above.

29. The misrepresentations and deceptive acts set forth above were committed by the Defendants with knowledge at the time of the transactions.

## RELIEF

WHEREFORE, the Plaintiff, State of Indiana, requests the Court enter judgment against the Defendants and its successors and assigns, enjoining the Defendants and its successors and assigns from but not limited to the following:

a. In the course of originating loans, making deceptive or misleading representations and/or omissions regarding loan terms and charges.

b.. In the course of originating loans, misleading borrowers about the presence, the significance, and/or meaning of a prepayment penalty, and/or the duration of a prepayment penalty on their loans.

c. In the course of originating loans, engaging in acts and practices which result in fabricated and/or inflated income information for prospective borrowers.

49371C-1                                11

d.      In the course of exercising its rights as mortgagee, perfecting any foreclosure where the loan may have been originated by means violative of Indiana law.

AND WHEREFORE, the Plaintiff, State of Indiana, further requests the Court enter judgment against the Defendant and its successors and assigns for the following:

a.      Costs pursuant to Ind. Code § 24-5-0.5-4(c)(3), awarding the Office of the Attorney General its reasonable expenses incurred in the investigation and prosecution of this action;

b.      On Count I of the Plaintiff's complaint, civil penalties pursuant to Ind. Code § 24-9-8-3(a)(4) for the Defendant's violations of the Home Loan Practices Act, in the amount of Ten Thousand Dollars ($10,000.00) per violation, payable to the State of Indiana;

c.      On Count III of the Plaintiff's complaint, civil penalties pursuant to Ind. Code 24-5-0.5-4(g) for the Defendant's knowing violations of the Deceptive Consumer Sales Act, in the amount of Five Thousand Dollars ($5,000.00) per violation, payable to the State of Indiana;

d.      On Count IV of the Plaintiff's complaint, civil penalties pursuant to Ind. Code 24-5-0.5-8 for the Defendant's intentional violations of the Deceptive Consumer Sales Act, in the amount of Five Hundred Dollars ($500.00) per violation, payable to the State of Indiana;

e.      Pursuant to Ind. Code § 24-5-0.5-4(d), the Court void or limit the application of contracts or clauses resulting from deceptive acts;

f.      Pursuant to Ind. Code § 24-5-0.5-4(d), order restitution to be paid to aggrieved consumers as determined at trial.

g.    All other just and proper relief.

Respectfully submitted,

STEVE CARTER
Attorney General of Indiana
Attorney No. 4150-64

By: _____
Gabrielle J. Owens
Deputy Attorney General
Attorney No. 26207-49

By: _____
Paula J. Beller
Deputy Attorney General
Attorney No. 26255-49

Office of the Indiana Attorney General
302 W. Washington Street, 5th Floor
Indianapolis, IN  46204
(317) 233-0878

13

Exhibit "15"

Translate Website | Traducir Sitio Web

Connect With Us

Search News Releases

## Press Release

Subscriptions

Subscribe to the News

February 02, 2011
For Immediate Release
Contact: (415) 703-5837

Print Version | Attachments

### *Attorney General Kamala D. Harris Establishes California Foreclosure Relief Fund with $6.5 Million Settlement from Former Countrywide Financial Executives*

LOS ANGELES - Attorney General Kamala D. Harris today announced a $6.5 million settlement of a predatory lending case against Angelo Mozilo and David Sambol, former officers of Countrywide Financial Corporation. Attorney General Harris announced the settlement money will be used to establish an innovative statewide California Foreclosure Crisis Relief Fund to combat the effects of California's high rates of foreclosure and mortgage delinquency.

"Our prior settlement with Countrywide provided restitution for foreclosed homeowners and set in motion loan modification programs that have helped tens of thousands of consumers," Attorney General Harris said. "We will use the current settlement to help Californians affected by the mortgage crisis by providing grants to agencies that help homeowners facing foreclosure with relocation assistance and providing money to state and local agencies to prosecute mortgage fraud."

During the 18 months ending last September, 262,000 California homes went into foreclosure, and in the last three months of 2010, notices of default were filed on another 70,000 homes in the state.

This settlement concludes litigation filed by Attorney General Edmund G. Brown Jr. in June 2008 against Countrywide Financial Corp., Countrywide Home Loans and Full Spectrum Lending, as well as Mozilo and Sambol. The financial relief provided under the current settlement augments the Attorney General's October 2008 settlement with Countrywide to provide loan modifications and other foreclosure relief valued at $8.68 billion nationwide, with $3.5 billion provided to California borrowers.

According to the lawsuit, leading up to the mortgage crisis, Countrywide lured borrowers with low "teaser" rates often as low as 1 percent adjustable rate loans. Its loan officers obscured the downsides of these loans, which included rapidly rising rates after teaser rates expired, big prepayment penalties, and negative amortization in which a borrower's total loan costs rose even as additional payments were made. Countrywide also loosened its mortgage standards and verification procedures in order to write more loans.

As a result of these practices, tens of thousands of homeowners with Countrywide loans ended up in default and foreclosure. The Attorney General's lawsuit alleged that Mozilo and Sambol knew of these practices and allowed them to continue.

The complaint alleged that Countrywide sought to increase its share of the nationwide mortgage market to 30 percent through a deceptive scheme to mass produce loans - with little concern about borrowers' long-term ability to afford them. It then would sell the loans on the secondary market to earn the highest possible premiums.

The settlement with Mozilo, the CEO of Countrywide, and Sambol, its president, was filed today in Los Angeles Superior Court. Mozilo and Sambol left Countrywide when it was purchased by Bank of America in July 2008.

Bank of America acquired Countrywide's loan portfolio and assumed responsibility to make restitution to mortgage holders who qualify under the terms of the Attorney General's 2008 settlement. Since that settlement, Countrywide has made more than 32,000 modifications, worth more than $1.3 billion, on loans made to California borrowers and has paid $28 million in cash to Californians who lost their homes to foreclosure.

A copy of the Countrywide complaint and today's settlement are attached to the online copy of this press release at ag.ca.gov.

### # #

---

Related Attachments

countrywide complaint [PDF 2473 kb / 52 pg]
settlement [PDF 93 kb / 6 pg]

Exhibit "16"

1   JOHN M. McCOY, III, Cal. Bar No. 166244
    Email: mccoyj@sec.gov
2   SPENCER E. BENDELL, Cal. Bar No. 181220
    Email: bendells@sec.gov
3   LYNN M. DEAN, Cal. Bar. No. 205562
    Email: deanl@sec.gov
4   SAM PUATHASNANON, Cal. Bar No. 198430
    Email:  puathasnanons@sec.gov
5   PARIS WYNN, Cal. Bar No. 224418
    Email: wynnp@sec.gov
6
    Attorneys for Plaintiff
7   Securities and Exchange Commission
    Rosalind R. Tyson, Regional Director
8   Michele Wein Layne, Associate Regional Director
    5670 Wilshire Boulevard, 11th Floor
9   Los Angeles, California 90036
    Telephone: (323) 965-3998
10  Facsimile: (323) 965-3908

11                  UNITED STATES DISTRICT COURT

12              CENTRAL DISTRICT OF CALIFORNIA

13                                    Case No. CV09-03994 VBF AJWx

14  SECURITIES AND EXCHANGE
    COMMISSION,
15                                    COMPLAINT FOR VIOLATIONS
         Plaintiff,                   OF THE FEDERAL SECURITIES
16                                    LAWS
         vs.
17                                    DEMAND FOR JURY TRIAL
    ANGELO MOZILO, DAVID SAMBOL,
18  AND ERIC SIERACKI,

19       Defendants.

20

21

22

23

24

25

26

27

28

FILED
2009 JUN -4  AM 11:50
CLERK U.S. DISTRICT COURT
CENTRAL DIST. OF CALIF.
LOS ANGELES
BY___

1    Plaintiff Securities and Exchange Commission ("Commission") alleges as

2 follows:

### JURISDICTION AND VENUE

4       1.      This Court has jurisdiction over this action pursuant to Sections 20(b),

5 20(d)(1), 20(e) and 22(a) of the Securities Act of 1933 ("Securities Act"), 15

6 U.S.C. §§ 77t(b), 77t(d)(1), 77t(e), and 77v(a), and Sections 21(d)(1), 21(d)(2),

7 21(d)(3)(A), 21(e), and 27 of the Securities Exchange Act of 1934 ("Exchange

8 Act"), 15 U.S.C. §§ 78u(d)(1), 78u(d)(2), 78u(d)(3)(A), 78u(e) & 78aa.

9 Defendants have directly or indirectly made use of the means or instrumentalities

10 of interstate commerce, of the mails, or of the facilities of a national securities

11 exchange in connection with the transactions, acts, practices and courses of

12 business alleged in this complaint.

13      2.      Venue is proper in this district pursuant to Section 22(a) of the

14 Securities Act, 15 U.S.C. § 77v(a), and Section 27 of the Exchange Act, 15 U.S.C.

15 § 78aa, because defendants reside and transact business within this district and

16 certain of the transactions, acts, practices and courses of conduct constituting

17 violations of the federal securities laws alleged in this complaint occurred within

18 this district.

### SUMMARY

20      3.      This matter involves a disclosure fraud by the three most senior

21 executives of Countrywide Financial Corporation, a mortgage lender formerly

22 based in Calabasas, California, and insider trading by Countrywide's former

23 chairman of the board and chief executive officer, Angelo Mozilo.

24      4.      From 2005 through 2007, Mozilo, along with David Sambol, chief

25 operating officer and president, and Eric Sieracki, chief financial officer, held

26 Countrywide out as primarily a maker of prime quality mortgage loans,

27 qualitatively different from competitors who engaged primarily in riskier lending.

28 To support this false characterization, Mozilo, Sieracki, and Sambol hid from

1 investors that Countrywide, in an effort to increase market share, engaged in an
2 unprecedented expansion of its underwriting guidelines from 2005 and into 2007.
3 Specifically, Countrywide developed what was referred to as a "supermarket"
4 strategy, where it attempted to offer any product that was offered by any
5 competitor. By the end of 2006, Countrywide's underwriting guidelines were as
6 wide as they had ever been, and Countrywide was writing riskier and riskier loans.
7 Even these expansive underwriting guidelines were not sufficient to support
8 Countrywide's desired growth, so Countrywide wrote an increasing number of
9 loans as "exceptions" that failed to meet its already wide underwriting guidelines
10 even though exception loans had a higher rate of default.

11      5.    Countrywide was more dependent than many of its competitors on
12 selling loans it originated into the secondary mortgage market, an important fact it
13 disclosed to investors. But Mozilo expected that the deteriorating quality of the
14 loans that Countrywide was writing, and the poor performance over time of those
15 loans, would ultimately curtail the company's ability to sell those loans in the
16 secondary mortgage market. Mozilo and the company's chief risk officer warned
17 Sambol and Sieracki about the increased risk that Countrywide was assuming.
18 Thus, each of the defendants was aware, but failed to disclose, that Countrywide's
19 current business model was unsustainable.

20      6.    Mozilo, Sambol, and Sieracki were responsible for Countrywide's
21 fraudulent disclosures. From 2005 through 2007, these senior executives misled
22 the market by falsely assuring investors that Countrywide was primarily a prime
23 quality mortgage lender which had avoided the excesses of its competitors.
24 Countrywide's Forms 10-K for 2005, 2006, and 2007 falsely represented that
25 Countrywide "manage[d] credit risk through credit policy, underwriting, quality
26 control and surveillance activities," and the 2005 and 2006 Forms 10-K falsely
27 stated that Countrywide ensured its continuing access to the mortgage backed
28 securities market by "consistently producing quality mortgages."

1      7.    In fact, the credit risk that Countrywide was taking was so alarming to

2  Mozilo that he internally issued a series of increasingly dire assessments of various

3  Countrywide loan products and the risks to Countrywide in continuing to offer or

4  hold those loans, while at the same time he, Sambol, and Sieracki continued to

5  make public statements obscuring Countrywide's risk profile and attempting to

6  differentiate it from other lenders. In one internal email, Mozilo referred to a

7  particularly profitable subprime product as "toxic," and in another he stated that

8  the company was "flying blind," and had "no way" to predict the performance of

9  its heralded product, the Pay-Option ARM loan. Mozilo believed that the risk was

10  so high and that the secondary market had so mispriced Pay-Option ARM loans

11  that he repeatedly urged that Countrywide sell its entire portfolio of those loans.

12  Despite their awareness of, and Mozilo's severe concerns about, the increasing risk

13  Countrywide was undertaking, Mozilo, Sambol, and Sieracki hid these risks from

14  the investing public.

15      8.    Defendants misled investors by failing to disclose substantial negative

16  information regarding Countrywide's loan products, including:

17
18     • the increasingly lax underwriting guidelines used by the company in
       originating loans;

19
20     • the company's pursuit of a "matching strategy" in which it matched the
       terms of any loan being offered in the market, even loans offered by
21       primarily subprime originators;

22     • the high percentage of loans it originated that were outside its own already
       widened underwriting guidelines due to loans made as exceptions to
23       guidelines;

24     • Countrywide's definition of "prime" loans included loans made to
25       borrowers with FICO scores well below any industry standard definition
       of prime credit quality;
26
27     • the high percentage of Countrywide's subprime originations that had a
       loan to value ratio of 100%, for example, 62% in the second quarter of
28       2006; and

- Countrywide's subprime loans had significant additional risk factors, beyond the subprime credit history of the borrower, associated with increased default rates, including reduced documentation, stated income, piggyback second liens, and LTVs in excess of 95%.

Mozilo, Sambol, and Sieracki knew this negative information from numerous reports they regularly received and from emails and presentations prepared by the company's chief credit risk officer. Defendants nevertheless hid this negative information from investors.

9.     During the course of this fraud, Mozilo engaged in insider trading in Countrywide's securities. Mozilo established four sales plans pursuant to Rule 10b5-1 of the Securities Exchange Act in October, November, and December 2006 while in possession of material, non-public information concerning Countrywide's increasing credit risk and the risk that the poor expected performance of Countrywide-originated loans would prevent Countrywide from continuing its business model of selling the majority of the loans it originated into the secondary mortgage market. From November 2006 through August 2007, Mozilo exercised over 5.1 million stock options and sold the underlying shares for total proceeds of over $139 million, pursuant to 10b5-1 plans adopted in late 2006 and amended in early 2007.

## DEFENDANTS

10.     **Angelo Mozilo**, age 70, is a resident of Thousand Oaks, California. Mozilo was a founder of Countrywide and was its chairman and chief executive officer ("CEO") from its formation in 1969 until Countrywide was acquired by Bank of America in 2008.

11.     **David Sambol**, age 49, is a resident of Hidden Hills, California. He was Countrywide's president and chief operating officer ("COO") from September 2006 until its acquisition by Bank of America in 2008. Sambol was Countrywide's executive managing director, business segment operations from April 2006 until September 2006, and executive managing director and chief of mortgage banking

-5-

1 │ and capital markets from January 2004 until April 2006. Sambol was a member of

2 │ the Countrywide board of directors from 2007 until July 2008. Sambol also held

3 │ executive positions at certain Countrywide subsidiaries, including Countrywide

4 │ Bank.

5 │      12.  **Eric Sieracki**, age 52, is a resident of Lake Sherwood, California.

6 │ Sieracki was Countrywide's chief financial officer ("CFO") from the first quarter

7 │ of 2005 until its acquisition by Bank of America in 2008.

8 │ **RELATED PARTY**

9 │      13.  **Countrywide Financial Corporation**, a Delaware corporation, was a

10 │ mortgage lender based in Calabasas, California. During all times relevant to this

11 │ complaint, its stock was registered pursuant to Section 12(b) of the Exchange Act

12 │ and was listed on the New York Stock Exchange, and, until the demise of the

13 │ Pacific Stock Exchange, it was listed on that Exchange as well. On July 1, 2008,

14 │ Countrywide merged with Bank of America and is now a wholly owned subsidiary

15 │ of Bank of America. Countrywide's remaining operations and employees have

16 │ been transferred to Bank of America, and Bank of America ceased using the

17 │ Countrywide name in April 2009. On July 1, 2008, the NYSE filed a Form 25 to

18 │ deregister and delist Countrywide's common stock, and on July 22, 2008

19 │ Countrywide filed a Form 15 deregistering its common stock under Section 12(g)

20 │ of the Exchange Act.

21 │ **FACTS**

22 │      14.  From 2005 through 2007, in Countrywide's periodic filings with the

23 │ Commission and in other public statements, Mozilo, Sambol, and Sieracki held

24 │ Countrywide out as primarily a maker of prime quality mortgage loans,

25 │ qualitatively different from competitors who engaged primarily in riskier lending.

26 │ To support this false characterization, the proposed defendants hid from investors

27 │ that Countrywide was engaged in an effort to increase market share and sustain

28 │

- 6 -

1    revenue generation through unprecedented expansions of its underwriting
2    guidelines, taking on ever-increasing credit risk.

3         **A.    Countrywide's Business**

4         15.    Countrywide originated, sold, and serviced both prime and subprime
5    (which Countrywide's periodic filings referred to as "nonprime") mortgage loans.
6    By 2005, Countrywide was the largest U.S. mortgage lender in the United States,
7    originating over $490 billion in mortgage loans in 2005, over $450 billion in 2006,
8    and over $408 billion in 2007. Countrywide recognized pre-tax earnings of $2.4
9    billion and $2 billion in its loan production divisions in 2005 and 2006,
10   respectively, and a pre-tax loss of $1.5 billion in its loan production division in
11   2007.

12        16.    Countrywide pooled most of the loans it originated and sold them in
13   secondary mortgage market transactions. Countrywide sold the pooled loans either
14   through whole loan sales or securitization. In whole loan sales, Countrywide sold
15   the loans to investors and recorded gains on the sales. In securitizations,
16   Countrywide sold interests in the pooled loans, i.e., mortgage-backed securities.
17   Countrywide's loan sales were run out of its capital markets division. In 2005,
18   Countrywide reported $451.6 million in pre-tax earnings from capital market sales,
19   representing 10.9% of its pre-tax earnings; in 2006, it recognized $553.5 million in
20   pre-tax earnings from that division, representing 12.8% of its pre-tax earnings, and
21   in 2007 it recognized a mere $14.9 million in pre-tax earnings from that division,
22   reporting a pre-tax loss overall.

23        17.    Historically, Countrywide's primary business had been originating
24   prime conforming loans that were saleable to the Government Sponsored Entities
25   ("GSEs"). In the fiscal years 2001, 2002, and 2003, Countrywide's prime
26   conforming originations were 50%, 59.6%, and 54.2% of its total loan originations,
27   respectively. In 2003, United States residential mortgage production reached a
28   record level of $3.8 trillion. Countrywide experienced record earnings in that year,

**B.   Countrywide's Deceptive Description of Its Loans**

20.   Countrywide's Form 10-Ks deceptively described the types of loans upon which the Company's business depended.  While Countrywide provided statistics about its originations which reported the percentage of loans in various categories, such as those noted in the table in paragraph 18, the information was misleading because its descriptions of "prime non-conforming" and "nonprime" loans in its periodic filings were insufficient to inform investors what types of loans were included in those categories.  "Prime" loans were described in Countrywide's 2005, 2006, and 2007 Forms 10-K as follows:

> Prime Mortgage Loans include conventional mortgage loans,
> loans insured by the Federal Housing Administration ("FHA")
> and loans guaranteed by the Veterans Administration ("VA").
> A significant portion of the conventional loans we produce
> qualify for inclusion in guaranteed mortgage securities backed
> by Fannie Mae or Freddie Mac ("conforming loans").  Some of
> the conventional loans we produce either have an original loan
> amount in excess of the Fannie Mae and Freddie Mac loan limit
> for single-family loans ($417,000 for 2006) or otherwise do not
> meet Fannie Mae or Freddie Mac guidelines.  Loans that do not
> meet Fannie Mae or Freddie Mac guidelines are referred to as
> "nonconforming loans."

21.   Nothing in that description informed investors that Countrywide's "prime non-conforming" category included loan products with increasing amounts of credit risk.  While guidance issued by the banking regulators referenced a credit score ("FICO score") at 660 or below as being an indicator of a subprime loan, some within the banking industry drew the distinction at a score of 620 or below. Countrywide, however, did not consider **any** FICO score to be too low to be categorized within "prime."  Nor did Countrywide's definition of "prime" inform

-9-

1   investors that its "prime non-conforming" category included so-called "Alt-A"
2   loan products with increasing amounts of credit risk, such as (1) reduced or no
3   documentation loans; (2) stated income loans; and (3) loans with loan to value or
4   combined loan to value ratios of 95% and higher. Finally, it did not disclose that
5   Pay-Option ARM loans, including reduced documentation Pay-Option ARM loans,
6   were included in the category of prime loans. Moreover, to the extent these
7   extremely risky loans were below the loan limits established by the government
8   sponsored entities that purchased these loans ("GSEs"), they would have been
9   reported by Countrywide as prime conforming loans. In 2005 and 2006,
10  Countrywide's Pay-Option ARMs ranged between 17% and 21% of its total loan
11  originations. It maintained the majority of these loans in the held for investment
12  portfolio at Countrywide Bank.

13      22.   Significantly, the Countrywide periodic filings do not define
14  "nonprime" in any way, and Countrywide's periodic filings failed to disclose that
15  loans in the category of subprime were not merely issued to borrowers with
16  blemished credit, but that this category included loans with significant additional
17  layered risk factors, such as (1) subprime piggyback seconds, also known as 80/20
18  loans; (2) reduced or no documentation loans; (3) stated income loans; (4) loans
19  with loan to value or combined loan to value ratios of 95% and higher; and (5)
20  loans made to borrowers with recent bankruptcies and late mortgage payments.

21      23.   By increasing its origination of non-conforming and subprime loans
22  between 2003 and 2006, Countrywide was able to originate many more loans in
23  those years and increase its market share, even as the residential real estate market
24  declined in the United States. As of December 31, 2003, based on its own internal
25  estimates, Countrywide had an 11.4% share of the United States mortgage market.
26  By September 30, 2006, it had a 15.7% share of the market. While Countrywide
27  boasted to investors that its market share was increasing, company executives did
28  not disclose that its market share increase came at the expense of prudent

- 10 -

1  underwriting guidelines.  As a result, Countrywide's share price rose from $25.28

2  on December 31, 2003 to $42.45 on December 29, 2006, the last trading day of

3  that year.

4       **C.**   **Countrywide's Market Strategy Caused it To Take On**

5             **Increasing Credit Risk**

6            **1.**   **Countrywide's Undisclosed Expansion of Underwriting**

7                **Guidelines and the Matching Strategy**

8      24.  By the end of 2006, Countrywide's underwriting guidelines were

9  wider and more aggressive than they had ever been.  The company's aggressive

10  guideline expansion was deliberate, and began as early as 2003.  Indeed, from

11  January 2003 until well into 2006, Countrywide's credit risk management

12  department ("Risk Management") spent approximately 90% of its time processing

13  requests for expansions of Countrywide's underwriting guidelines.

14      25.  Countrywide's "matching strategy," also known as the "supermarket

15  strategy," was a key driver of the company's aggressive expansion of underwriting

16  guidelines.  The strategy committed the company to offering any product and/or

17  underwriting guideline available from at least one "competitor," which included

18  subprime lenders.  Thus, if Countrywide did not offer a product offered by a

19  competitor, Countrywide's production division invoked the matching strategy to

20  add the product to Countrywide's menu.  For example, if Countrywide's minimum

21  FICO score for a product was 600, but a competitor's minimum score was 560, the

22  production division invoked the matching strategy to reduce the minimum required

23  FICO score at Countrywide to 560.

24      26.  The impact of the matching strategy was intensified by Countrywide's

25  "no-brokering" policy, which precluded Countrywide's loan officers from referring

26  loan applicants to other brokers and/or institutions.  Prior to its implementation,

27  loan officers could engage in a practice known as "brokering," in which the loan

28  officer would refer those borrowers deemed too risky for Countrywide to another

1   lender, which in turn paid a commission to the Countrywide loan officer. The no-
2   brokering policy increased the incentives for Countrywide's retail sales force to be
3   aggressive in finding ways for Countrywide to underwrite a loan, regardless of
4   whether the loan satisfied the underwriting guidelines Countrywide repeatedly
5   touted to investors.

6       27.   Mozilo, Sambol, and Sieracki knew that the company was taking on
7   increased risk of defaults and delinquencies as a result of its widened underwriting
8   guidelines and matching strategy, yet Countrywide's periodic filings concealed the
9   unprecedented expansion of underwriting guidelines and the attendant increased
10  credit risk.

11          **2.   Exception Loans Magnified Countrywide's Credit Risk**

12      28.   Though Countrywide proclaimed in its Forms 10-K for 2005, 2006,
13  and 2007 that it managed credit risk through its loan underwriting, the company's
14  increasingly wide underwriting guidelines and exceptions process materially
15  increased Countrywide's credit risk during that time. Countrywide used an
16  automated underwriting system known as "CLUES" to actually underwrite loans.
17  The CLUES system applied the principles and variables set forth in the
18  Countrywide underwriting manuals and its loan program guide. CLUES applied a
19  device known as the "underwriting scorecard," which assessed borrower credit
20  quality by analyzing several variables, such as FICO scores, loan to value ratios,
21  documentation type (e.g., full, reduced, stated) and debt-to-income ratios. These
22  variables were weighted differently within the scorecard, depending upon their
23  perceived strength in predicting credit performance. In underwriting a loan,
24  Countrywide loan officers entered an applicant's information into CLUES, which
25  would (1) approve the loan; (2) approve the loan with caveats; or (3) "refer" the
26  loan to a loan officer for further consideration and/or manual underwriting.

27      29.   The CLUES program typically did not "reject" a loan if a requirement
28  of Countrywide's guidelines had not been met or if CLUES calculated that the loan

1   presented an excessive layering of risk. Instead, CLUES "referred" the loan,

2   indicating that the loan application would have to be reviewed manually prior to

3   approval. In these circumstances, to proceed with the loan, the loan officer would

4   request an "exception" from the guidelines from more senior underwriters at

5   Countrywide's structured lending desk ("SLD"). Countrywide's level of

6   exceptions was higher than that of other mortgage lenders. The elevated number

7   of exceptions resulted largely from Countrywide's use of exceptions as part of its

8   matching strategy to introduce new guidelines and product changes.

9        30.   Further, the actual underwriting of exceptions was severely

10  compromised. According to Countrywide's official underwriting guidelines,

11  exceptions were only proper where "compensating factors" were identified which

12  offset the risks caused by the loan being outside of guidelines. In practice,

13  however, **Countrywide used as "compensating factors" variables such as**

14  **FICO and loan to value, which had already been assessed by CLUES in**

15  **issuing a "refer" finding.** Countrywide underwriting manuals were amended to

16  explicitly prohibit this practice in mid-2007, but this serious deficiency was in

17  place from early 2006 through early 2007, when a large volume of obviously

18  deficient exception loans were originated by Countrywide.

19        **D.   Countrywide's Business Model Became Unsustainable**

20        31.   As described above, Countrywide depended on its sales of mortgages

21  into the secondary market as an important source of revenue and liquidity. As a

22  result, Countrywide was not only directly exposed to credit risk through the

23  mortgage-related assets on its balance sheet, but also indirectly exposed to the risk

24  that the increasingly poor quality of its loans would prevent their continued

25  profitable sale into the secondary mortgage market and impair Countrywide's

26  liquidity. Rather than disclosing this increasing risk, Mozilo, Sambol, and Sieracki

27  gave false comfort, again touting Countrywide's loan quality. For example,

28  Countrywide stated in its 2005 Form 10-K: "We ensure our ongoing access to the

1   secondary mortgage market by consistently producing quality mortgages. . . . We

2   make significant investments in personnel and technology to ensure the quality of

3   our mortgage loan production." A virtually identical representation appears in

4   Countrywide's 2006 Form 10-K. Accordingly, Countrywide's failure to disclose

5   its widening underwriting guidelines and the prevalence of exceptions to those

6   guidelines in 2005 and 2006 constituted material omissions from Countrywide's

7   periodic reports.

8        **E.**    **Mozilo, Sambol, and Sieracki Were Aware of the Increased**

9               **Credit Risk Created By Expanded Underwriting Guidelines and**

10              **Exception Loans**

11       32.    Countrywide's increasingly wide underwriting guidelines materially

12  increased the company's credit risk from 2004 through 2007, but this increased

13  risk was not disclosed to investors. In 2007, as housing prices declined,

14  Countrywide began to suffer extensive credit problems as the inherent credit risks

15  manifested themselves.

16            **1.**   **The September 2004 Warning**

17       33.    The credit losses experienced by Countrywide in 2007 not only were

18  **foreseeable** by the proposed defendants, they were in fact **foreseen** at least as early

19  as September 2004.  Risk Management warned Countrywide's senior officers that

20  several aggressive features of Countrywide's guidelines (e.g., high loan to value

21  programs, ARM loans, interest only loans, reduced documentation loans, and loans

22  with layered risk factors) significantly increased Countrywide's credit risk.

23       34.    Countrywide was taking on more risk as a direct result of the lower

24  credit quality of the loans it was originating. Countrywide's strategy of reducing

25  risk through loan sales was being frustrated as the company produced smaller

26  percentages of loans eligible for sale on a nonrecourse basis (e.g., FHA, VA and

27  conforming loans), and larger percentages of loans (e.g., subprime and

28

-14-

1  nonconforming loans) where it retained credit risk in the form of residual interests.
2  By September 2004, defendants knew the following trends:

3      • 66% of Countrywide's production was conforming in July 2003,
4        but conforming originations **had fallen** to 35% by July 2004;

5      • 21% of Countrywide's production was nonconforming in July
6        2003, but non-conforming originations **had risen** to 40% by July
        2004; and
7
8      • 2% of Countrywide's July 2003 production was subprime, but
        subprime originations **had risen** to 10% by July 2004.
9

10     35.   The credit risk described in the September 2004 warning **worsened**
11  from September 2004 to August 2007.  Risk Management continuously had
12  discussions with Countrywide's loan production division, which reported to
13  Sambol, about the credit concerns identified in the September 2004 warning.  In
14  fact, Risk Management conducted studies to identify relationships among certain
15  credit variables and their effect upon the probability that a loan would go into
16  serious delinquency or default.  One finding of these studies, the results of which
17  were shared with Sambol and Sieracki, was that the less documentation associated
18  with a loan, the higher the probability of default.  Nevertheless, Countrywide
19  continued to expand its underwriting guidelines, and to liberally make exceptions
20  to those guidelines, through the end of 2006.  These facts were never disclosed to
21  investors.

22     2.   **Credit Risk Management Repeatedly Alerted the**
23          **Defendants to Increases in Credit Risk**

24     36.   Both Sambol and Sieracki were members of the Countrywide credit
25  risk committee.  The credit risk committee had quarterly meetings.  At these
26  meetings, the members were provided with detailed presentations highlighting
27  Countrywide's increased credit risk.  For example, at an April 6, 2005 meeting of
28  the credit risk committee attended by Sambol, McMurray reported that (1)

- 15 -

1  Countrywide non-conforming loans originated in May 2002 were twice as likely to
2  default as loans originated in January 2000; (2) the risk of home equity lines of
3  credit defaulting had doubled over the past year, mainly due to the prevalence of
4  reduced documentation in those loans; and (3) Countrywide was now a leader in
5  the subprime market in four of six categories, whereas in December 2004
6  Countrywide had only been a leader in two of six categories.

7       37.    Similarly, Sieracki attended a June 28, 2005 meeting at which the
8  chief operating officer noted that Countrywide was taking on "too much" balance
9  sheet risk in home equity lines of credit ("HELOCs") and subprime loans, and had
10 taken on "unacceptable risk" from non-owner occupied loans made at 95%
11 combined loan to value ratios, which were an exception to Countrywide's then-
12 existing underwriting guidelines. Risk Management also reported at that meeting
13 that non-conforming loan programs accounted for 40% of Countrywide's loan
14 originations and that subprime production had tripled, rising from 4% to 14% of
15 total production. Finally, at that same meeting, Risk Management reported to the
16 committee on evidence of borrowers misrepresenting their income and occupation
17 on reduced documentation loan applications, and the increasing credit risks
18 associated with Pay-Option ARM loans, for example, negative amortization,
19 payment shock, and the necessity of raising the initial interest rate to reduce the
20 speed of negative amortization on the loans.

21       38.    Sambol and Sieracki also learned of the risks associated with the
22 company's aggressive guideline expansion in meetings of other company
23 committees. For example, Sieracki was a member of the asset and liability
24 committee, and Sambol attended certain of its meetings. If a proposed guideline
25 expansion had a modeled expected default rate in excess of 8%, the proposal had to
26 be submitted to this committee for approval. All proposed expansions to
27 Countrywide's subprime menu from late 2005 through 2006 presented an expected
28 default rate in excess of 8% and required approval of that committee. In June

1   2005, Sambol and McMurray engaged in a lengthy email exchange regarding the

2   impact of Countrywide's underwriting guideline expansion related to requests for

3   subprime product expansions that had been taken up by the asset and liability

4   committee in the first and second quarters of 2005.   In that exchange, McMurray

5   warned Sambol that "as a consequence of [Countrywide's] strategy to have the

6   widest product line in the industry, we are clearly out on the 'frontier' in many

7   areas."  McMurray went on to note that the frontier had "high expected default

8   rates and losses."

9       39.    Additionally, proposals with high expected defaults or that were

10  otherwise controversial were referred to the Countrywide responsible conduct

11  committee for approval.  Sambol was a member of this committee, which had

12  repeatedly approved guideline expansions.  For instance, in late 2006

13  Countrywide's production divisions proposed expanding Countrywide's guidelines

14  to match certain guidelines offered by Bear Stearns and Lehman Brothers,

15  programs that were known within Countrywide as "Extreme Alt-A."  Risk

16  Management was concerned about the risks associated with these guidelines, and

17  referred the request to the responsible conduct committee.  Sambol, in his capacity

18  as a member of that committee, approved the expansion.

19      40.    Finally, both Mozilo and Sambol were aware as early as June 2006

20  that a significant percentage of borrowers who were taking out stated income loans

21  were engaged in mortgage fraud.  On June 1, 2006, Mozilo advised Sambol in an

22  email that he had become aware that the Pay-Option ARM portfolio was largely

23  underwritten on a reduced documentation basis and that there was evidence that

24  borrowers were lying about their income in the application process.  On June 2,

25  2006, Sambol received an email reporting on the results of a quality control audit

26  at Countrywide Bank that showed that **50%** of the stated income loans audited by

27  the bank showed a variance in income from the borrowers' IRS filings of greater

28

- 17 -

1  than 10%. Of those, 69% had an income variance of greater than 50%. These

2  material facts were never disclosed to investors.

3          **3.    Warnings Regarding the Matching Strategy**

4          41.    McMurray repeatedly provided explicit and ominous warnings about

5  Countrywide's matching strategy. In a June 25, 2005 email to Sambol concerning

6  guideline expansion and the company's growing credit risks, McMurray addressed

7  the matching strategy and explained that "because the matching process includes

8  comparisons to a variety of lenders, our [guidelines] will be a composite of the

9  outer boundaries across multiple lenders[,]" and that because comparisons are only

10 made to competitor guidelines where they are more aggressive and not used where

11 they are less aggressive, Countrywide's **"composite guides [sic] are likely**

12 **among the most aggressive in the industry."** (emphasis added.)

13         42.    On November 2, 2006, McMurray sent an email to Countrywide's

14 chief investment officer ("CIO"), which the CIO forwarded to Sambol, stating that

15 the matching strategy had caused Countrywide to cede its underwriting standards

16 to the most aggressive lenders in the market. In the email, McMurray asked: **"Do**

17 **we want to effectively cede our policy and is this approach "saleable" from a**

18 **risk perspective to those constituents who may worry about our risk profile?"**

19 (emphasis added.)

20         43.    In a November 16, 2006 email to Sambol, McMurray complained

21 about guidelines and products being introduced in contravention of credit policy.

22 As an example, McMurray cited the fact that Extreme Alt-A loans were being

23 offered by the loan production divisions, even though that program had not been

24 officially approved in the guideline review process. The proposed guidelines

25 would have permitted 100% financing, layered with additional credit risk factors

26 such as stated income, lower than average FICO scores, or non-owner occupied

27 investment properties.

28

44.   In a February 11, 2007 email to Sambol, McMurray noted that the production divisions continued to advocate for, and operated pursuant to, an approach based upon the matching strategy alone, and repeated his concern that the strategy would cause Countrywide's guidelines to be a composite of the riskiest offerings the market.  Additionally, McMurray warned that, "**I doubt this approach would play well with regulators, investors, rating agencies etc.**  To some, this approach might seem like **we've simply ceded our risk standards and balance sheet to whoever has the most liberal guidelines.**"  (emphasis added.)

### 4.   Warnings Regarding Guideline Expansion and Disruptions in the Secondary Market

45.   By no later than 2006, Mozilo and Sambol were on notice that Countrywide's exotic loan products might not continue to be saleable into the secondary market, yet this material risk was not disclosed in Countrywide's periodic filings.

46.   In September 2006 Mozilo wrote an email to Sambol warning that he believed that the Pay-Option loan was "mispriced" in the secondary market and that the pricing spread could disappear quickly if there were a negative event in the market.  On February 2, 2007, Risk Management warned Sambol that guideline expansions could disrupt the secondary market for subprime mortgage backed securities ("MBS").  Later in that quarter, the MBS market for subprime loans experienced a disruption that forced Countrywide to write down loans that it had previously intended to sell into that market.  Then, in August 2007, the entire market for MBS experienced a severe disruption, which effectively crippled the ability of Countrywide, as well as other mortgage lenders, to sell non-GSE securitizations into the secondary markets and contributed to Countrywide's liquidity problems.

-19-

5.   **Warnings Regarding 100% (a.k.a. 80/20 loans) Financing**

47.   The seriousness of Risk Management's warnings on guideline expansion and the consequences of Countrywide's failure to heed such warnings are vividly demonstrated by the company's experience with "80/20" subprime loans. An 80/20 subprime loan is a loan where a borrower with a subprime FICO score simultaneously takes out two loans to purchase a home: a first lien loan (typically 80% of the purchase price), and a second lien loan (typically 20% of the purchase price). As a result of having 100% financed the purchase, the borrower has no initial equity in the home. Pursuant to Risk Management's "Policy on High Risk Products," subprime 80/20 loans could not be originated via the exceptions process, and could only be originated if Countrywide could totally extinguish the credit risks (*e.g.*, residual interests or corporate guarantees) resulting from such loans. But the policy was ignored by the production divisions.

48.   Mozilo knew of the risks Countrywide incurred by originating subprime 80/20 loans and repeatedly questioned the wisdom of continuing to offer the product. Mozilo became concerned about the loans in the first quarter of 2006, when HSBC, a purchaser of Countrywide's 80/20 loans, began to contractually force Countrywide to "buy back" certain of these loans that HSBC contended were defective. On March 28, 2006, Mozilo sent an e-mail to Sambol and others, directing them to implement a series of corrective measures to "avoid the errors of both judgment and protocol that have led to the issues that we face today caused by the buybacks mandated by HSBC." Mozilo further stated that the 100% loan-to-value (also known as 80/20) subprime product is **"the most dangerous product in existence and there can be nothing more toxic** and therefore requires that no deviation from guidelines be permitted irrespective of the circumstances."

49.   Then, in an April 13, 2006 email, Mozilo informed Sambol, Sieracki, and others that there were numerous issues that they must address relating to the 100% subprime second business in light of the losses associated with the HSBC

1    buyback.  One issue in particular that Mozilo identified was the fact that the loans
2    had been originated "through our channels with disregard for process [and]
3    compliance with guidelines."  Mozilo went on to write that he had **"personally**
4    **observed a serious lack of compliance within our origination system as it**
5    **relates to documentation and generally a deterioration in the quality of loans**
6    **originated** versus the pricing of those loan [sic]."  Mozilo noted that, **"[i]n my**
7    **conversations with Sambol he calls the 100% sub prime seconds as the 'milk'**
8    **of the business.  Frankly, I consider that product line to be the poison of**
9    **ours**." (emphasis added.)

10          50.    Furthermore, in an April 17, 2006 email to Sambol concerning
11   Countrywide's subprime 80/20 loans, Mozilo fumed:

12               In all my years in the business I have never seen a more toxic prduct.
13               [sic] It's not only subordinated to the first, but the first is subprime.  In
14               addition, the FICOs are below 600, below 500 and some below 400[.]
15               With real estate values coming down...the product will become
16               increasingly worse.  There has [sic] to be major changes in this
17               program, including substantial increases in the minimum FICO. . . .
18               Whether you consider the business milk or not, I am prepared to go
19               without milk irrespective of the consequences to our production.

20          51.    Echoing Mozilo's criticisms of the 80/20 product, in April 2006 Risk
21   Management recommended increasing the minimum FICO score on the product by
22   20 points.  Sambol, then still the head of the production divisions, opposed this
23   recommendation, and noted that such an increase would make Countrywide
24   uncompetitive with subprime lenders such as New Century, Option One, and
25   Argent.

26          52.    On December 7, 2006, Mozilo circulated a memorandum drafted for
27   him by McMurray to the board of directors and all Countrywide managing
28

1    directors, including Sambol and Sieracki. In the memorandum, Mozilo made the

2    following observations, among others:

3    • Countrywide had expanded its subprime
4      underwriting guidelines in every conceivable area,
       lowering minimum FICOs, raising maximum loan
5      size and LTV, and making interest only, stated
6      income, and piggyback second loans available to
       subprime borrowers;
7

8    • Countrywide expected that subprime loans
       originated in 2006 (the "2006 Vintage") would be
9      the worst performing on record, driven by wider
       guidelines and the worsening economic
10     environment, which included rising interest rates and
11     declining home values;

12   • the percentage of 60- and 90-day delinquencies in
13     the 2006 Vintage (at 8.11% and 4.03% respectively),
       exceeded the percentages from each of the previous
14     six years, and the company expected these
       percentages to rise; and
15

16   • 62% of Countrywide's subprime originations in the
17     second quarter of 2006 had a loan to value ratio of
       100%.
18

19        53.    In April 2006, Mozilo wrote that no premium, no matter how high,

20   could justify underwriting a loan for a borrower whose FICO score was below 600.

21   Yet Countrywide failed to disclose to investors the serious deficiencies in its

22   underwriting of these "toxic" loans.

23        6.    **Warnings Regarding Exception Loans**

24        54.    Mozilo, Sambol, and Sieracki were aware of significant lapses in

25   Countrywide's underwriting processes and the resulting risk to Countrywide. On

26   May 22, 2005, McMurray warned Sambol of the likelihood of significantly higher

27   default rates in loans made on an exception basis: "[t]he main issue is to make sure

28   everyone's aware that we will see higher default rates." McMurray explained that

-22-

1   "exceptions are generally done at terms more aggressive than our guidelines," and

2   continued that "[g]iven the expansion in guidelines and the growing likelihood

3   that the real estate market will cool, this seems like an appropriate juncture to

4   revisit our approach to exceptions." (emphasis added.) McMurray also warned

5   that increased defaults would cause repurchase and indemnification requests to rise

6   and the performance of Countrywide-issued MBS to deteriorate.

7       55.   The poor quality of the loans originated through the exception process

8   became even more obvious in the first quarter of 2007.  In fact, in materials

9   distributed at a March 12, 2007 meeting of the credit risk committee attended by

10  Sambol and Sieracki, Risk Management reported that nearly 12% of the loans

11  reviewed by Countrywide in an internal quality control process were rated

12  "severely unsatisfactory" or "high risk." The causes for such a rating included

13  findings that such loans had debt-to-income, loan to value, or FICO scores outside

14  of Countrywide's already wide underwriting guidelines.  By the second quarter of

15  2007, Risk Management began to report a serious deterioration in the performance

16  of exception loans.

17      56.   In a December 13, 2007 memo that was sent to Mozilo in his capacity

18  as Countrywide's chairman of the board, Countrywide's enterprise risk assessment

19  officer noted that:

20              Countrywide had reviewed limited samples of first- and

21              second-trust-deed mortgages originated by Countrywide

22              Bank during the fourth quarter of 2006 and the first

23              quarter of 2007 in order to get a sense of the quality of

24              file documentation and underwriting practices, and to

25              assess compliance with internal policies and procedures.

26              The review resulted in . . . the finding that borrower

27              repayment capacity was not adequately assessed by

28              the bank during the underwriting process for home

- 23 -

1       equity loans.  More specifically, **debt-to-income (DTI)**

2       **ratios did not consider the impact of principal**

3       **[negative] amortization or an increase in interest.**

4       (emphasis added)

5     57.    These material deficiencies in Countrywide's underwriting were never

6 disclosed to investors in Countrywide's Forms 10-Q or 10-K for 2005 through

7 2007.

8     F.   **Pay-Option Arms and the Discrepancy Between the Internal and**

9       **External Portrayals of Credit Risk**

10        **1.**   **The External Story**

11    58.   Countrywide began originating Pay-Option ARM loans in 2004; by

12 the second quarter of 2005 21% of Countrywide's loan production was Pay-Option

13 ARMS. Pay-Option ARMs allowed borrowers to choose between four payment

14 options: (1) a minimum payment which was insufficient to cover accruing interest;

15 (2) an interest-only payment; (3) a fully amortizing payment with a 30 year pay-

16 off; and (4) a fully amortizing payment with a 20 year pay-off. If the minimum

17 payment was selected, then the accruing interest would be added to the loan's

18 principal balance, a phenomenon known as negative amortization. Countrywide's

19 Pay-Option ARM loans typically allowed for negative amortization until the

20 principal balance reached 115% of the original loan balance, at which time the

21 payment would reset to the amount necessary to repay principal and interest in the

22 term remaining on the loan. This resulted in a much higher monthly payment and

23 "payment shock" to many borrowers. Even if the borrower never reached the

24 115% threshold, the loan would typically reset after five years to a fully amortizing

25 payment. Because Countrywide began to offer Pay-Option loans in 2004,

26 Countrywide's first wave of automatic resets were scheduled to occur in 2009.

27 Unlike many other loans that Countrywide originated, most of the Pay-Option

28 loans were held for investment by Countrywide Bank.

-24-

59.    Countrywide publicly heralded Pay-Option loans as a safe product offering. For instance, in its 2006 Form 10-K, Countrywide proclaimed that it had "prudently underwritten" its Pay-Option ARMs. On May 31, 2006, Mozilo gave a speech in which he stated, "Pay-Option loans represent the best whole loan type available for portfolio investment from an overall risk and return perspective," that, "[t]he performance profile of this product is well understood because of its twenty year history, which includes stress tests in difficult environments[,]" and that Countrywide "actively manages credit risk through prudent program guidelines…and sound underwriting."

## 2.    The Internal View

60.    Contrary to such public statements extolling the virtues of the Pay-Option ARM product, Mozilo, along with several of Countrywide's senior executives, had concluded that the product's risks to the company were severe, and they were scrambling to identify ways to mitigate them. Sambol and Sieracki were aware of these concerns.

### a.    Negative Amortization and Payment Shock

61.    In June 2005, Risk Management warned senior executives, including Sieracki, that action was needed to address the increasing pace of negative amortization and the potential for payment shock associated with Pay-Option ARMs. Specifically, in a June 28, 2005 meeting of the credit risk committee, which was attended by Sieracki, Risk Management recommended that the rate used to calculate the minimum payment on Pay-Option ARMs ("start rate") be raised to reduce negative amortization and the severity of payment shock. Risk Management explained that while the start rate remained constant at 1%, short term rates (upon which borrowers' fully amortizing payments were based) had risen steadily, thereby increasing the pace of negative amortization and the severity of the resulting payment shock.

-25-

62.   At a June 22, 2006 credit risk committee meeting, attended by Sambol and Sieracki, Risk Management noted that the median time to reset on the pay option loans was getting shorter as negative amortization was accruing at a faster than expected pace.

b.   **Mozilo's Pointed Concerns About**
**Pay-Option ARMs**

63.   On April 4, 2006, Mozilo received an e-mail regarding Pay-Option loans which informed him that "72% of [Pay-Option] customers chose Minimum Payment selection in February 06, up from 60% in August 05." In response to this information Mozilo sent an email to Sambol that reflected how well he understood the negative ramifications of the information for Countrywide: "Since over 70% have opted to make the lower payment it appears that **it is just a matter of time that we will be faced with much higher resets and therefore much higher delinquencies."**

64.   About six weeks later, on May 18, 2006, Mozilo sent another e-mail to Sambol and Sieracki again sounding the alarm about the Pay-Option portfolio. Stating that "the Bank faces potential unexpected losses because higher [interest] rates will cause the loans to reset much earlier than anticipated and as a result causing mortgagors to default due to the substantial increase in their payments," Mozilo directed the management team to reduce "balance sheet risk" by refinancing Pay-Options into interest-only loans and improving consumer education about the consequences of resets.   Mozilo concluded his e-mail by stating that "there is much more that we can do to manage risk much more carefully during this period of uncertainty both as to the rate environment and untested behavior of payoptions." The very next day, May 19, 2006, Mozilo wrote another email to Sambol and Sieracki, noting that Pay-Options loans presented a long term problem "unless [interest] rates are reduced dramatically from this level and there are no indications, absent another terrorist attack, that this will happen."