## FIRST CLAIM FOR RELIEF

### FRAUD IN THE OFFER OR SALE OF SECURITIES

#### Violations of Section 17(a) of the Securities Act

#### (Against All Defendants)

125. The Commission realleges and incorporates by reference ¶¶ 1 through 124 above.

126. Defendants, and each of them, by engaging in the conduct described above, directly or indirectly, in the offer or sale of securities by the use of means or instruments of transportation or communication in interstate commerce or by the use of the mails:

      a.    with scienter, employed devices, schemes, or artifices to defraud;

      b.    obtained money or property by means of untrue statements of a material fact or by omitting to state a material fact necessary in order to make the statements made, in light of the circumstances under which they were made, not misleading; or

      c.    engaged in transactions, practices, or courses of business which operated or would operate as a fraud or deceit upon the purchaser.

127. By engaging in the conduct described above, Defendants violated, and unless restrained and enjoined will continue to violate, Section 17(a) of the Securities Act, 15 U.S.C. § 77q(a).

///
///
///
///
///
///

1

2

3

4

5

6

### SECOND CLAIM FOR RELIEF

### FRAUD IN CONNECTION WITH THE PURCHASE

### OR SALE OF SECURITIES

**Violations and Aiding and Abetting Violations of Section 10(b) of the**

**Exchange Act and Rule 10b-5 thereunder**

**(Against All Defendants)**

7    128. The Commission realleges and incorporates by reference ¶¶ 1 through

8  124 above.

9    129. Defendants, and each of them, by engaging in the conduct described

10  above, directly or indirectly, in connection with the purchase or sale of a security,

11  by the use of means or instrumentalities of interstate commerce, of the mails, or of

12  the facilities of a national securities exchange, with scienter:

13       a.    employed devices, schemes, or artifices to defraud;

14       b.    made untrue statements of a material fact or omitted to state a

15             material fact necessary in order to make the statements made,

16             in the light of the circumstances under which they were made,

17             not misleading; or

18       c.    engaged in acts, practices, or courses of business which

19             operated or would operate as a fraud or deceit upon other

20             persons.

21    130. By engaging in the conduct described above, Defendants violated, and

22  unless restrained and enjoined will continue to violate, Section 10(b) of the

23  Exchange Act, 15 U.S.C. § 78j(b), and Rule 10b-5 thereunder, 17 C.F.R. §

24  240.10b-5.

25  ///

26  ///

27  ///

28  ///

### THIRD CLAIM FOR RELIEF

### VIOLATIONS OF COMMISSION PERIODIC REPORTING

### REQUIREMENTS

#### Aiding and Abetting Violations of Section 13(a) of the Exchange Act, and

#### Rules 12b-20, 13a-1, and 13a-13 thereunder

#### (Against All Defendants)

131.   The Commission realleges and incorporates by reference ¶¶ 1 through 124 above.

132.   Countrywide violated Section 13(a) of the Exchange Act and Rules 12b-20, 13a-1, and 13a-13 thereunder, by filing with the Commission annual reports on Form 10-K for fiscal years 2005, 2006, and 2007 and quarterly reports on Form 10-Q for each quarter in 2005, 2006, and 2007 that were materially false and failed to include material information necessary to make the required statements, in light of the circumstances under which they were made, not misleading.

133.   Mozilo, Sambol, and Sieracki knowingly provided substantial assistance to Countrywide in its violation of Section 13(a) of the Exchange Act and Rules 12b-20, 13a-1, and 13a-13 thereunder in connection with Countrywide's annual reports for fiscal years 2005, 2006, and 2007 and its quarterly reports for each quarter in 2005, 2006, and 2007.

134.   By engaging in the conduct described above and pursuant to Section 20(e) of the Exchange Act, 15 U.S.C. § 78t(e), Mozilo, Sambol, and Sieracki aided and abetted Countrywide's violations, and unless restrained and enjoined will continue to aid and abet violations, of Section 13(a) of the Exchange Act, and Rules 12b-20, 13a-1, and 13a-13 thereunder.

///

///

///

# FOURTH CLAIM FOR RELIEF
## CERTIFICATION VIOLATIONS
### Violations of Rule 13a-14 of the Exchange Act
### (Against Defendants Mozilo and Sieracki)

135.    The Commission realleges and incorporates by reference ¶¶ 1 through 124 above.

136.    Mozilo and Sieracki violated Rule 13a-14 by signing the certifications included with Countrywide fiscal year 2005, 2006, and 2007 Forms 10-K, certifying, among other things, that the forms fully complied with the requirements of the Exchange Act and fairly presented, in all material respects, the financial condition and results of operations of the company, when, in fact, the reports contained untrue statements of material fact and omitted material information necessary to make the reports not misleading.

137.    By engaging in the conduct described above, defendants Mozilo and Sieracki violated Exchange Act Rule 13a-14, 17 C.F.R. § 240.13a-14.  Unless restrained and enjoined, defendants Mozilo and Sieracki will continue to violate Rule 13a-14, 17 C.F.R. § 240.13a-14.

## PRAYER FOR RELIEF

WHEREFORE, the Commission respectfully requests that the Court:

### I.

Issue findings of fact and conclusions of law that the defendants committed the alleged violations.

### II.

Issue judgments, in a form consistent with Fed. R. Civ. P. 65(d), permanently enjoining Defendant Mozilo and his agents, servants, employees, attorneys, and those persons in active concert or participation with any of them, who receive actual notice of the order by personal service or otherwise, from violating Section 17(a) of the Securities Act, Section 10(b) of the Exchange Act,

1 | and Rules 10b-5 and 13a-14 thereunder, and from aiding and abetting violations of

2 | Section 13(a) of the Exchange Act, and Rules 12b-20, 13a-1, and 13a-13

3 | thereunder.

4 | ### III.

5 |     Issue judgments, in a form consistent with Fed. R. Civ. P. 65(d),

6 | permanently enjoining Defendant Sambol and his agents, servants, employees,

7 | attorneys, and those persons in active concert or participation with any of them,

8 | who receive actual notice of the order by personal service or otherwise, from

9 | violating Section 17(a) of the Securities Act, and Section 10(b) of the Exchange

10 | Act, and Rule 10b-5 thereunder, and from aiding and abetting violations of Section

11 | 13(a) of the Exchange Act, and Rules 12b-20, 13a-1, and 13a-13 thereunder.

12 | ### IV.

13 |     Issue judgments, in a form consistent with Fed. R. Civ. P. 65(d),

14 | permanently enjoining Defendant Sieracki and his agents, servants, employees,

15 | attorneys, and those persons in active concert or participation with any of them,

16 | who receive actual notice of the order by personal service or otherwise, from

17 | violating Section 17(a) of the Securities Act, Section 10(b) of the Exchange Act,

18 | and Rules 10b-5 and 13a-14 thereunder, and from aiding and abetting violations of

19 | Section 13(a) of the Exchange Act, and Rules 12b-20, 13a-1, and 13a-13

20 | thereunder.

21 | ### V.

22 |     Enter an order, pursuant to Section 21(d)(2) of the Exchange Act, 15 U.S.C.

23 | § 78u(d)(2), prohibiting defendants Mozilo, Sambol, and Sieracki from acting as

24 | officers or directors of any issuer that has a class of securities registered pursuant

25 | to Section 12 of the Exchange Act, 15 U.S.C. § 78l, or that is required to file

26 | reports pursuant to Section 15(d) of the Exchange Act, 15 U.S.C. § 78o(d).

27 | ///

28 | ///

- 51 -

## VI.

Order defendants Mozilo and Sambol to disgorge all ill-gotten gains from their illegal conduct, together with prejudgment interest thereon.

## VII.

Order defendants Mozilo, Sambol, and Sieracki to pay civil penalties under Section 21(d)(3) of the Exchange Act, 15 U.S.C. § 78u(d)(3).

## VIII.

Order defendant Mozilo to pay a civil penalty under Section 21A(a) of the Exchange Act, 15 U.S.C. § 78u-1(a).

## IX.

Retain jurisdiction of this action in accordance with the principles of equity and the Federal Rules of Civil Procedure in order to implement and carry out the terms of all orders and decrees that may be entered, or to entertain any suitable application or motion for additional relief within the jurisdiction of this Court.

## X.

Grant such other and further relief as this Court may determine to be just and necessary.

DATED: June 4, 2009

_Lynn M. Dean_
JOHN M. McCOY, III
SPENCER E. BENDELL
LYNN M. DEAN
SAM PUATHASNANON
PARIS WYNN
Attorneys for Plaintiff
Securities and Exchange Commission

1  **DEMAND FOR JURY TRIAL**

2     Plaintiff hereby demands trial by jury.

3

4  DATED: June 4, 2009

5                                              JOHN M. McCOY, III
                                               SPENCER E. BENDELL
6                                              LYNN M. DEAN
                                               SAM PUATHASNANON
7                                              PARIS WYNN
                                               Attorneys for Plaintiff
8                                              Securities and Exchange Commission

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28



U.S. Securities and Exchange Commission

**U.S. Securities and Exchange Commission**

**Litigation Release No. 21068A / June 4, 2009**

**Accounting and Auditing Enforcement Release No. 3023 / June 4, 2009**

*Securities and Exchange Commission v. Angelo Mozilo, David Sambol, and Eric Sieracki, (C.D. Cal.), Civil Action No. CV 09-03994 (VBF)*

### SEC Files Securities Fraud Charges Against Former Countrywide Executives

On June 4, 2009, the Securities and Exchange Commission announced the filing of securities fraud charges against former Countrywide Financial CEO Angelo Mozilo, former chief operating officer and president David Sambol, and former chief financial officer Eric Sieracki. They are charged with deliberately misleading investors about the significant credit risks being taken in efforts to build and maintain the company's market share.

The Commission has additionally charged Mozilo with insider trading for selling his Countrywide stock based on non-public information for nearly $140 million in profits.

In its complaint filed in federal district court in Los Angeles, the SEC alleges that Mozilo, Sambol, and Sieracki misled the market by falsely assuring investors that Countrywide was primarily a prime quality mortgage lender that had avoided the excesses of its competitors.

According to the SEC's complaint, Countrywide's credit risks were so alarming that Mozilo internally issued a series of increasingly dire assessments of various Countrywide loan products and the resulting risks to the company. In one internal e-mail, Mozilo referred to a profitable subprime product as "toxic." In another internal e-mail regarding the performance of its heralded Pay-Option ARM loan, he acknowledged that the company was "flying blind."

The SEC's complaint alleges that Countrywide's annual reports for 2005, 2006, and 2007 misled investors in claiming that Countrywide "manage[d] credit risk through credit policy, underwriting, quality control and surveillance activities." Its annual reports for 2005 and 2006 falsely stated that the company ensured its "access to the secondary mortgage market by consistently producing quality mortgages." The annual report for 2006 also falsely claimed that Countrywide had "prudently underwritten" its Pay-Option ARM loans.

The SEC alleges that Mozilo, Sambol, and Sieracki actually knew, and

acknowledged internally, that Countrywide was writing increasingly risky loans and that defaults and delinquencies would rise as a result, both in loans that Countrywide serviced and loans that the company packaged and sold as mortgage-backed securities.

According to the SEC's complaint, Countrywide developed what was internally referred to as a "supermarket" strategy that widened underwriting guidelines to match any product offered by its competitors. By the end of 2006, Countrywide's underwriting guidelines were as wide as they had ever been, and Countrywide made an increasing number of loans based on exceptions to those already wide guidelines, even though exception loans had a higher rate of default.

The SEC's complaint alleges that Mozilo believed that the risk was so high that he repeatedly urged that Countrywide sell its entire portfolio of Pay-Option loans. Despite these severe concerns about the increasing risks that Countrywide was undertaking, Mozilo, Sambol, and Sieracki hid these risks from the investing public.

The SEC further alleges that Mozilo engaged in insider trading of Countrywide stock that he owned. Mozilo established four executive stock sale plans for himself in October, November, and December 2006 while he was aware of material, non-public information concerning Countrywide's increasing credit risk and the expected poor performance of Countrywide-originated loans. From November 2006 through August 2007, Mozilo exercised more than 5.1 million stock options and sold the underlying shares for total proceeds of nearly $140 million, pursuant to written trading plans adopted in late 2006 and early 2007.

The SEC's complaint alleges that each of the defendants violated Section 17 (a) of the Securities Act of 1933, Section 10(b) of the Securities Exchange Act of 1934 and Rule 10b-5 thereunder, and aided and abetted violations of Sections 13(a) of the Exchange Act and Rules 12b-20, 13a-1, and 13a-13 thereunder. The complaint further alleges that Mozilo and Sieracki violated Rule 13a-14 under the Exchange Act. The SEC's complaint seeks permanent injunctive relief, officer and director bars, and financial penalties against all of the defendants and the disgorgement of ill-gotten gains with prejudgment interest against Mozilo and Sambol.

➤ SEC Complaint in this matter

http://www.sec.gov/litigation/litreleases/2009/lr21068a.htm

Exhibit "17"

U.S. Securities and Exchange Commission

# Former Countrywide CEO Angelo Mozilo to Pay SEC's Largest-Ever Financial Penalty Against a Public Company's Senior Executive

## Settlement Permanently Bars Mozilo from Future Officer or Director Service

### FOR IMMEDIATE RELEASE
### 2010-197

*Washington, D.C., Oct. 15, 2010* — The Securities and Exchange Commission today announced that former Countrywide Financial CEO Angelo Mozilo will pay a record $22.5 million penalty to settle SEC charges that he and two other former Countrywide executives misled investors as the subprime mortgage crisis emerged. The settlement also permanently bars Mozilo from ever again serving as an officer or director of a publicly traded company.

Mozilo's financial penalty is the largest ever paid by a public company's senior executive in an SEC settlement. Mozilo also agreed to $45 million in disgorgement of ill-gotten gains to settle the SEC's disclosure violation and insider trading charges against him, for a total financial settlement of $67.5 million that will be returned to harmed investors.

Former Countrywide chief operating officer David Sambol agreed to a settlement in which he is liable for $5 million in disgorgement and a $520,000 penalty, and a three-year officer and director bar. Former chief financial officer Eric Sieracki agreed to pay a $130,000 penalty and a one-year bar from practicing before the Commission. In settling the SEC's charges, the former executives neither admit nor deny the allegations against them.

The penalties and disgorgement paid by Sambol and Sieracki will also be returned to harmed investors.

"Mozilo's record penalty is the fitting outcome



High-Res Photo

"Mozilo's record penalty is the fitting outcome for a corporate executive who deliberately disregarded his duties to investors by concealing what he saw from inside the executive suite — a looming disaster in which Countrywide was buckling under the weight of increasing risky mortgage underwriting, mounting defaults and delinquencies, and a deteriorating business model."

**Robert Khuzami
Director
SEC Enforcement
Division**

for a corporate executive who deliberately
disregarded his duties to investors by
concealing what he saw from inside the executive suite — a looming disaster
in which Countrywide was buckling under the weight of increasing risky
mortgage underwriting, mounting defaults and delinquencies, and a
deteriorating business model," said Robert Khuzami, Director of the SEC's
Division of Enforcement.

John McCoy, Associate Regional Director of the SEC's Division of
Enforcement, added, "This settlement will provide affected shareholders
significant financial relief, and reinforces the message that corporate officers
have a personal responsibility to provide investors with an accurate and
complete picture of known risks and uncertainties facing a company."

The settlement was approved by the Honorable John F. Walter, United States
District Judge for the Central District of California in a court hearing held
today.

The SEC filed charges against Mozilo, Sambol, and Sieracki on June 4, 2009,
alleging that they failed to disclose to investors the significant credit risk that
Countrywide was taking on as a result of its efforts to build and maintain
market share. Investors were misled by representations assuring them that
Countrywide was primarily a prime quality mortgage lender that had avoided
the excesses of its competitors. In reality, Countrywide was writing
increasingly risky loans and its senior executives knew that defaults and
delinquencies in its servicing portfolio as well as the loans it packaged and
sold as mortgage-backed securities would rise as a result.

The SEC's complaint further alleged that Mozilo engaged in insider trading in
the securities of Countrywide by establishing four 10b5-1 sales plans in
October, November, and December 2006 while he was aware of material,
non-public information concerning Countrywide's increasing credit risk and
the risk regarding the poor expected performance of Countrywide-originated
loans.

In addition to the financial penalties, Mozilo and Sambol consented to the
entry of a final judgment that provides for a permanent injunction against
violations of the antifraud provisions of the Securities Act of 1933 and the
Securities Exchange Act of 1934. Mozilo also consented to the entry of a
permanent officer and director bar, and Sambol consented to the entry of a
three-year bar.

Sieracki agreed to a permanent injunction from further violations of Sections
17(a)(2) and 17(a)(3) of the Securities Act, and consented to a one-year bar
under the Commission's Rule of Practice 102(e)(3).

The SEC investigation that led to the filing and settlement of this enforcement
action was conducted by Michele Wein Layne, Spencer E. Bendell, Lynn M.
Dean, Paris Wynn, and Sam Puathasnanon. Together with Associate Regional
Director John M. McCoy, that same team has been handling the SEC's
litigation.

The SEC has filed many other enforcement actions involving mortgage-
related securities and mortgage-related products linked to the financial crisis,
including:

Format: Countrywide CEO Angelo Mozilo to Pay SEC's Largest-Ever Fine... Public Company Executives, Page 1 of 1 ... October 15, 2010 12:23 AM

Case 8:12-cv-00242-CJC-AN Document 40 Filed 08/28/12 Page 13 of 60 Page ID #:1403

- <u>American Home Mortgage</u> (4/28/2009)
- <u>Reserve Fund</u> (5/05/2009)
- <u>Evergreen</u> (6/08/2009)
- <u>New Century</u> (12/07/2009)
- <u>Brookstreet</u> (12/08/2009)
- <u>State Street</u> (2/04/2010)
- <u>Morgan Keegan</u> (4/07/2010)
- <u>Goldman Sachs</u> (4/16/2010)
- <u>Farkas/Taylor, Bean & Whitaker</u> (6/16/2010)
- <u>ICP</u> (6/21/2010)
- <u>Citigroup</u> (7/29/2010)

# # #

For more information about this enforcement action, contact:

Robert S. Khuzami
Director, SEC Enforcement Division
(202) 551-4500

Lorin L. Reisner
Deputy Director, SEC Enforcement Division
(202) 551-4787

Rosalind Tyson
Regional Director, SEC Los Angeles Regional Office
(323) 965-3893

John M. McCoy III
Associate Regional Director, SEC Los Angeles Regional Office
(323) 965-4561

*http://www.sec.gov/news/press/2010/2010-197.htm*

Exhibit "18"

FOR PUBLICATION

## UNITED STATES BANKRUPTCY COURT
## DISTRICT OF NEW JERSEY

In the Matter of                              :        Case No. 08-18700-JHW

John T. Kemp                                  :

        Debtor                       :

_____

John T. Kemp                                  :        Adversary No. 08-2448

        Plaintiff                    :

v.                                            :

Countrywide Home Loans, Inc.                  :        **OPINION**

        Defendant                    :

_____

APPEARANCES:  Bruce H. Levitt, Esq.
              Levitt & Slafkes, PC
              76 South Orange Avenue, Suite 305
              South Orange, New Jersey   07079
              Counsel for the Debtor

              Harold Kaplan, Esq.
              Dori L. Scovish, Esq.
              Frenkel, Lambert, Weiss, Weisman & Gordon, LLP
              80 Main Street, Suite 460
              West Orange, New Jersey   07052
              Counsel for the Defendant

**FILED**

JAMES J. WALDRON, CLERK

November 16, 2010

U.S. BANKRUPTCY COURT
CAMDEN, N.J.

BY: Theresa O'Brien, Judicial
Assistant to Chief Judge Wizmur

      Before the court for resolution is the debtor's adversary complaint

seeking to expunge the proof of claim filed on behalf of the Bank of New York

by Countrywide Home Loans, Inc. as servicer.  The debtor challenges the

creditor's opportunity to enforce the obligation alleged to be due, based

primarily on the fact that the underlying note executed by the debtor was not properly indorsed to the transferee, and was never placed in the transferee's possession. Under the New Jersey Uniform Commercial Code, the note, as a negotiable instrument, is not enforceable by the Bank of New York under these circumstances. The plaintiff/debtor's challenge to the proof of claim is sustained on this record.

## PROCEDURAL HISTORY

On May 9, 2008, the debtor, John T. Kemp, filed a voluntary petition for relief under Chapter 13 of the Bankruptcy Code. The debtor scheduled an ownership interest in several properties, including one located at 1316 Kings Highway, Haddon Heights, New Jersey, the property at issue in this proceeding. Schedule D of the debtor's petition, listing creditors holding secured claims, listed Countrywide Home Loans as both the first and second mortgagee, with claims of $167,000 and $42,000, respectively, against the 1316 Kings Highway property. The debtor's Chapter 13 plan proposed to make payments over 60 months to satisfy priority claims and to cure arrearages on three separate mortgages, including the two Countrywide mortgages.[1]

---

[1]     The debtor filed an amended plan on October 3, 2008 which was confirmed on December 11, 2008 at $2,081 for 54 months. The modified plan increased the arrearage to be paid to Countrywide from $18,000 to $34,000,

-2-

On June 11, 2008, the defendant herein, Countrywide Home Loans, Inc.

(hereinafter "Countrywide"), identifying itself as the servicer for the Bank of

New York, filed a secured proof of claim in the amount of $211,202.41,

including $40,569.69 in arrears, noting the property at 1316 Kings Highway as

the collateral for the claim.[2] The debtor filed this adversary complaint on

October 16, 2008 against Countrywide, seeking to expunge its proof of claim.[3]

The debtor asserts that the Bank of New York cannot enforce the underlying

obligation.

---

and maintained the second Countrywide mortgage arrears at $6,000. A second
modified plan was filed on April 15, 2010 and is currently scheduled for
confirmation on December 8, 2010. The latest modified plan does not list
Countrywide as a creditor to be treated under the plan.

[2]     Although the debtor listed two mortgages held by Countrywide
against 1316 Kings Highway in his schedules, Countrywide only filed one proof
of claim regarding one mortgage and note.

[3]     In 2008, Countrywide Financial Corporation, the umbrella
organization for Countrywide Home Loans, Inc., was purchased by the Bank of
America Corporation. Effective April 27, 2009, Countrywide Home Loans, Inc.
changed its name to BAC Home Loan Servicing, L.P. ("BAC Servicing"). Motion
to Dismiss, Van Beveren Certif. at 1. On July 1, 2010, a "Transfer of Claim for
Security" was filed on the debtor's claim register, transferring the claim from
"Countrywide Home Loans, Inc., servicer for Bank of New York" to "BAC Home
Loan Servicing, LP". In this opinion, I will continue to refer to the defendant as
Countrywide.

## FACTS

In his complaint, the debtor does not dispute that he signed the original mortgage documents in question. The note and mortgage were executed by the debtor on May 31, 2006. The note, designated as an "Interest Only Adjustable Rate Note", listed the lender as "Countrywide Home Loans, Inc." No indorsement appeared on the note. Accompanying the note was an unsigned "Allonge to Note" dated the same day, May 31, 2006, in favor of "America's Wholesale Lender", directing that the debtor "Pay to the Order of Countrywide Home Loans, Inc., d/b/a America's Wholesale Lender."[4]

The mortgage, in the amount of $167,000, listed the lender as "America's Wholesale Lender". Mortgage Electronic Registration Systems, Inc., or "MERS", is named as "the mortgagee", and is authorized to act "solely as the nominee" for the lender and the lender's successors and assigns. The mortgage references the promissory note signed by the borrower on the same date. The mortgage was recorded in the Camden County Clerk's Office on July 13, 2006.

Shortly after the execution by the debtor of the note and mortgage, the

---

[4]     The record does not reflect whether the unsigned allonge was physically affixed to the note.

-4-

instruments executed by the debtor were apparently pooled with other similar instruments and sold as a package to the Bank of New York as Trustee. On June 28, 2006, a Pooling and Servicing Agreement ("PSA" or "the Agreement") was executed by CWABS, Inc. as the depositor, with Countrywide Home Loans, Inc., Park Monaco, Inc. and Park Sienna, LLC as the sellers, Countrywide Home Loans Servicing LP ("Countrywide Servicing") as the master servicer, and the Bank of New York as the Trustee. Pursuant to the Agreement, the depositor was directed to transfer the Trust Fund, consisting of specified mortgage loans and their proceeds, including the debtor's loan, to the Bank of New York as Trustee, in return for certificates referred to as Asset-backed Certificates, Series 2006-8. The sellers sold, transferred or assigned to the depositor "all the right, title and interest of such Seller in and to the applicable Initial Mortgage Loans, including all interest and principal received and receivable by such Seller." PSA § 2.01(a) at 52. In turn, the depositor immediately transferred "all right title and interest in the Initial Mortgage Loans," including the debtor's loan, to the Trustee, for the benefit of the certificate holders. Id.

The Agreement expressly provided that in connection with the transfer of each loan, the depositor was to deliver "the original Mortgage Note, endorsed by manual or facsimile signature in blank in the following form: 'Pay to the order

-5-

of _____ without recourse', with all intervening endorsements that show

a complete chain of endorsement from the originator to the Person endorsing

the Mortgage Note." PSA § 2.01(g)(i) at 56. Most significantly for purposes of

this discussion, the note in question was never indorsed in blank or delivered

to the Bank of New York, as required by the Pooling and Servicing Agreement.


On March 14, 2007, MERS, as the nominee for America's Wholesale

Lender, assigned the debtor's mortgage to the Bank of New York as Trustee for

the Certificateholders CWABs, Inc. Asset-backed Certificates, Series 2006-8.

The assignment purported to assign "a certain mortgage dated May 31, 2006 . .

. [t]ogether with the Bond, Note or other obligation described in the Mortgage,

and the money due and to become due thereon, with the interest." The

assignment provided further that the "Assignor covenants that there is now

due and owing upon the Mortgage and the Bond, Note or other obligation

secured thereby, the sum of $167,199.92 Dollars principal with interest

thereon to be computed at the rate of 9.530 percent per year." The assignment

was recorded with the County Clerk on March 24, 2008.


At the trial of this matter, Countrywide produced a new undated "Allonge

to Promissory Note", which directed the debtor to "Pay to the Order of Bank of

New York, as Trustee for the Certificateholders CWABS, Inc., Asset-backed

Certificates, Series 6006-8."[5]  The new allonge was signed by Sharon Mason,

Vice President of Countrywide Home Loans, Inc., in the Bankruptcy Risk

Litigation Management Department.  Linda DeMartini, a supervisor and

operational team leader for the Litigation Management Department for BAC

Home Loans Servicing L.P. ("BAC Servicing"),[6] testified that the new allonge

was prepared in anticipation of this litigation, and that it was signed several

weeks before the trial by Sharon Mason.

As to the location of the note, Ms. DeMartini testified that to her

knowledge, the original note never left the possession of Countrywide, and that

the original note appears to have been transferred to Countrywide's foreclosure

unit, as evidenced by internal FedEx tracking numbers.  She also confirmed

that the new allonge had not been attached or otherwise affixed to the note.

She testified further that it was customary for Countrywide to maintain

---

[5]     The allonge misidentifies the Asset-backed Certificates as "Series
6006-8" rather than "Series 2006-8."

[6]     Ms. DeMartini testified that Countrywide Home Loans, Inc., the
originator of the note and mortgage at issue here, and Countrywide Home
Loans Servicing LP, the servicer of the loan both before and after the sale of the
loan, were and are two different legal entities under one corporate umbrella.
Her understanding that the entity known as Countrywide Home Loans
Servicing LP became BAP Home Loans Servicing LP when Bank of America took
over the Countrywide entities differs from the representation made in papers
submitted by the defendant herein that the entity known as Countrywide Home
Loans, Inc. became BAP Home Loan Servicing LP.  See n. 3.

-7-

possession of the original note and related loan documents.

In a supplemental submission dated September 9, 2009, the defendant
asserted that "the Defendant/Secured Creditor located the original Note. The
original Note with allonge and Pooling and Servicing Agreement are available
for inspection."[7]  When the matter returned to the court on September 24,
2009, counsel for the defendant represented to the court that he had the
original note, with the new allonge now attached, in his possession. No
additional information was presented regarding the chain of possession of the
note from its origination until counsel acquired possession.

In sum, we have established on this record that at the time of the filing of
the proof of claim, the debtor's mortgage had been assigned to the Bank of New

_____

[7]      In a bizarre twist, in the same September 9, 2009 submission,
Countrywide produced a copy of a "Lost Note Certification," dated February 1,
2007, which indicated that the original note had been delivered to the lender
on the origination date and thereafter "misplaced, lost or destroyed, and after a
thorough and diligent search, no one has been able to locate the original Note."
The defendant asserted for the first time that the "whereabouts of the Note
could not be determined" at the time that the proof of claim was filed. Def.
Suppl. Subm. at 6. As a result, Countrywide claimed that it was unable to affix
the allonge to the note until after the original note had been rediscovered. At
the next hearing on September 24, 2009, counsel was not able to explain the
inconsistencies between the lost note certification, Ms. DeMartini's testimony,
and the "rediscovery" of the note, and asked that the lost note certification be
disregarded. T13-15 to 16 (9/24/2009).

-8-

York, but that Countrywide did not transfer possession of the associated note
to the Bank. Shortly before trial in this matter, the defendant executed an
allonge to transfer the note to the Bank of New York; however, the allonge was
not initially affixed to the original note, and possession of the note never
actually changed. The Pooling and Servicing Agreement required an
indorsement and transfer of the note to the Trustee, but this was not
accomplished prior to the filing of the proof of claim. The defendant has now
produced the original note and has apparently affixed the new allonge to it, but
the original note and allonge still have not been transferred to the possession of
the Bank of New York. Countrywide, the originator of the loan, filed the proof
of claim on behalf of the Bank of New York as Trustee, claiming that it was the
servicer for the loan. Pursuant to the PSA, Countrywide Servicing, and not
Countrywide, Inc., was the master servicer for the transferred loans.[8] At all
relevant times, the original note appears to have been either in the possession

---

[8]   According to a Prospectus Supplement dated June 30, 2006, filed
by Countrywide, Inc. with the Securities and Exchange Commission, see
www.sec.gov, Countrywide Servicing was created to service the loans originated
by Countrywide, Inc. The Prospectus notes that "Countrywide Home Loans
expects to continue to directly service a portion of its loan portfolio," while
transferring new mortgage loans to Countrywide Servicing. Prospectus
Supplement at 40. In addition, because "certain employees of Countrywide
Home Loans became employees of Countrywide Servicing, Countrywide
Servicing has engaged Countrywide Home Loans as a subservicer to perform
certain loan servicing activities on its behalf." Id. Because Countrywide Home
Loans, Inc. designated itself as the servicer for the Bank of New York on the
proof of claim at issue here, I assume for these purposes that it is acting in
that capacity on this loan.

of Countrywide or Countrywide Servicing.[9]

## DISCUSSION

With this factual backdrop, we turn to the issue of whether the challenge

to the proof of claim filed on behalf of the Bank of New York, by its servicer

Countrywide, can be sustained.  Under the Bankruptcy Code, a claim is

deemed allowed unless a party in interest objects.  11 U.S.C. § 502(a).  If an

objection to a claim is made, the claim is disallowed "to the extent that . . .

such claim is unenforceable against the debtor and property of the debtor,

under any agreement or applicable law for a reason other than because such

claim is contingent or unmatured."  11 U.S.C. § 502(b)(1).

Countrywide's claim here must be disallowed, because it is

unenforceable under New Jersey law on two grounds.  First, under New

Jersey's Uniform Commercial Code ("UCC") provisions, the fact that the owner

---

[9]    The record is unclear about whether the original note has been in
the possession of Countrywide Home Loans, Inc. or Countrywide Home Loans
Servicing LP.  Ms. DeMartini testified both that the original note was always
located in the Countrywide origination file (presumably at Countrywide Home
Loans, Inc.) and that the servicer actually retained possession of the original
note (presumably Countrywide Home Loans Servicing LP).  She also testified
that the "Documents Department" was charged with imaging and storing the
original documents, but the record is not clear about which of the two entities
housed the Documents Department.

-10-

of the note, the Bank of New York, never had possession of the note, is fatal to its enforcement.  Second, upon the sale of the note and mortgage to the Bank of New York, the fact that the note was not properly indorsed to the new owner also defeats the enforceability of the note.

Under New Jersey law, the enforcement of a promissory note that is secured by a mortgage is governed by the UCC.  The note, at issue here, made payable to Countrywide, providing for interest and an unconditional promise to pay the lender, is a "negotiable instrument" under the New Jersey UCC, which defines a negotiable instrument as "an unconditional promise or order to pay a fixed amount of money, with or without interest or other charges described in the promise or order, if it: (1) is payable to bearer or to order at the time it is issued or first comes into possession of a holder; (2) is payable on demand or at a definite time." N.J.S.A. 12A:3-104.  A party is entitled to enforce a negotiable instrument if it is "the holder of the instrument, a nonholder in possession of the instrument who has the rights of a holder, or a person not in possession of the instrument who is entitled to enforce the instrument pursuant to 12A:3-309 or subsection d. of 12A:3-418." N.J.S.A. 12A:3-301.  In this case, the creditor may not enforce the instrument under any of the three statutory qualifiers.

-11-

i.    Holder.

A "holder" is defined as "the person in possession if the instrument is

payable to bearer or, in the case of an instrument payable to an identified

person, if the identified person is in possession." N.J.S.A. 12A:1-201(20).

"Mere ownership or possession of a note is insufficient to qualify an individual

as a 'holder'." Adams v. Madison Realty & Dev. Inc., 853 F.2d 163, 166 (3d

Cir. 1988). Where, as here, the ownership of an instrument is transferred, the

transferee's attainment of the status of "holder" depends on the negotiation of

the instrument to the transferee. N.J.S.A. 12A:3-201(a). The two elements

required for negotiation, both of which are missing here, are the transfer of

possession of the instrument to the transferee, and its indorsement by the

holder. N.J.S.A. 12A:3-201(b).

As to the issue of possession, we are not certain on this record whether

the party in possession of the note is Countrywide or Countrywide Servicing.[10]

What we do know is that the note was purchased by the Bank of New York as

Trustee, but never came into the physical possession of the Bank. Because the

Bank of New York never had possession of the note, it can not qualify as a

"holder" under the New Jersey UCC. See Dolin v. Darnall, 115 N.J.L. 508, 181

---

[10]    See n. 9.

A. 201 (E&A 1935) ("Since the plaintiff was not 'in possession of' the notes in question, he was neither the 'holder' nor the 'bearer' thereof.").[11]

The second element required to negotiate an instrument to the transferee, i.e., indorsement of the instrument by the holder, is also missing here. An indorsement means "a signature, other than that of a signer as maker, drawer, or acceptor, that alone or accompanied by other words is made on an instrument for the purpose of negotiating the instrument, restricting payment of the instrument, or incurring indorser's liability on the instrument." N.J.S.A. 12A:3-204. The indorsement may be on the instrument itself, or it may be on "a paper affixed to the instrument." Id. Such a paper is called an "allonge", defined as "[a] slip of paper sometimes attached to a negotiable instrument for the purpose of receiving further indorsements when the original paper is filled with indorsements." See Black's Law Dictionary at 88 (9th Ed. 2009).

The significance of indorsement and affixation requirements to achieve

---

[11]   If Countrywide was in possession of the note, then it would have had "holder" status as of the date of the petition filing date, because the note was payable to Countrywide, no indorsement or allonge had been executed, and Countrywide was in possession of the original note. However, Countrywide did not file the claim on its own behalf. Rather, it filed the claim as "servicer for Bank of New York." The qualification of the Bank of New York, rather than Countrywide, to enforce the note is at issue.

holder status, and thereby qualify to enforce a note against the maker, was

explained by the Third Circuit in <u>Adams v. Madison Realty & Dev. Inc.</u>, <u>supra</u>.

The court explained that the maker of the note must have certainty regarding

the party who is entitled to enforce the note.

> From the maker's standpoint, therefore, it becomes essential to
> establish that the person who demands payment of a negotiable
> note, or to whom payment is made, is the duly qualified holder.
> Otherwise, the obligor is exposed to the risk of double payment, or
> at least to the expense of litigation incurred to prevent duplicative
> satisfaction of the instrument. These risks provide makers with a
> recognizable interest in demanding proof of the chain of title.
> Consequently, plaintiffs here, as makers of the notes, may properly
> press defendant to establish its holder status.

853 F.2d at 168.


At the time of the <u>Adams'</u> decision, the New Jersey UCC provided in

relevant part that "[a]n indorsement must be written by or on behalf of the

holder and on the instrument or on a paper so firmly affixed thereto as to

become a part thereof." N.J.S.A. 12A:3-202(2) (1961).[12] The UCC Commentary

explained that this language was in conformance with those

> decisions holding that a purported indorsement on a mortgage or
> other separate paper pinned or clipped to an instrument is not

---

[12]  The New Jersey Study Comment noted that the "wording in
reference to indorsements [was] changed from 'or upon a paper attached
thereto', to 'so firmly affixed thereto as to become a part thereof'. This change
merely implement[ed] the ancient doctrine of allonge."

sufficient for negotiation. The indorsement must on the
instrument itself or on a paper intended for the purpose is so
firmly affixed to the instrument as to become an extension or part
of it. Such a paper is called an allonge.

In 1995, Chapter 3 of Title 12A was amended and subsection 2 of 12A:3-202

was revised, renumbered, and included as the last sentence in N.J.S.A. 12A:3-

204(a). As revised, the provision now states that "[f]or the purpose of

determining whether a signature is made on an instrument, a paper affixed to

the instrument is a part of the instrument." N.J.S.A. 12A:3-204(a).


In this case, we had neither a proper indorsement on the note itself, nor

an allonge that was executed at the time the proof of claim was filed. An

allonge purporting to negotiate the note to the Bank of New York was not

executed until shortly before the original trial date, and was not affixed to the

original note until the second trial date. Even if the newly executed allonge is

recognized as a valid indorsement of the note, under these circumstances, the

Bank of New York does not qualify as a holder, because it never came into

possession of the note.[13]

---

[13]     As an additional argument in support of the proposition that the
Bank of New York qualifies as a holder who may enforce the note, the claimant
cites to Mulert v. National Bank of Tarentum, 210 F. 857, 860 (3d Cir. 1913)
for the proposition that it had constructive possession of the note because
Countrywide intended to transfer possession, and that constructive possession
is sufficient to permit the transferee to enforce the note. This proposition is not
sustainable in light of the actual possession required under the New Jersey

2.    Nonholder in Possession.


Nor does the claimant qualify as a non-holder in possession who has the

rights of a holder.  "A person may be a person entitled to enforce the

instrument even though the person is not the owner of the instrument or is in

wrongful possession of the instrument."  N.J.S.A. 12A:3-301.  The Official

Comment to section 3-301 adds that this definition:

> includes a person in possession of an instrument who is not a
> holder.  A nonholder in possession of an instrument includes a
> person that acquired rights of a holder by subrogation or under
> Section 3-203(a).  It also includes both a remitter that has received
> an instrument from the issuer but has not yet transferred or
> negotiated the instrument to another person and also any other
> person who under applicable law is a successor to the holder or
> otherwise acquires the holder's rights.

Id. at UCC Comment to § 3-301.  Countrywide, the originator of the loan and

the original "holder" of the note, sold the note to the Bank of New York as

Trustee.  In this way, the Bank of New York is a successor to the holder.  As a

successor to the holder of the note, the Bank of New York would qualify as a

non-holder in possession who could enforce the note by its servicer if it had

possession of the note.  Because the Bank of New York does not have

possession of the note, and never did, it may not enforce the note as a

---

UCC.  See N.J.S.A. 12A:1-201(20).

-16-

nonholder in possession.


3.     Non-holder Not in Possession.


The third category that would enable a claimant to enforce the note

would be a person not in possession of the note who is entitled to enforce the

note pursuant to N.J.S.A. 12A:3-309 or subsection d. of N.J.S.A. 12A:3-418.

Section 12A:3-309 concerns the enforcement of lost, destroyed or stolen

instruments.[14]  The defendant presented a lost note certification to this court,

---

[14]     N.J.S.A. 12A:3-309 provides:

a. A person not in possession of an instrument is entitled to
enforce the instrument if the person was in possession of the
instrument and entitled to enforce it when loss of possession
occurred, the loss of possession was not the result of a transfer by
the person or a lawful seizure, and the person cannot reasonably
obtain possession of the instrument because the instrument was
destroyed, its whereabouts cannot be determined, or it is in the
wrongful possession of an unknown person or a person that
cannot be found or is not amenable to service of process.

b. A person seeking enforcement of an instrument under
subsection a. of this section must prove the terms of the
instrument and the person's right to enforce the instrument. If that
proof is made, 12A:3-308 applies to the case as if the person
seeking enforcement had produced the instrument. The court may
not enter judgment in favor of the person seeking enforcement
unless it finds that the person required to pay the instrument is
adequately protected against loss that might occur by reason of a
claim by another person to enforce the instrument. Adequate
protection may be provided by any reasonable means.

-17-

but the factual predicate of the certificate conflicted with other facts presented

on this record, and we have determined to disregard the certificate.[15] Section

12A:3-418, concerning payment or acceptance by mistake, does not apply here.


. In a recent District Court decision from the District of Massachusetts,

the court rejected the enforcement of a note where the assignee of the note and

accompanying mortgage did not have possession of the note. Marks v.

Braunstein, No. 09-11402-NMG, 2010 WL 3622111 (D.Mass. Sept. 14, 2010).

In Marks, the assignee of the note and mortgage purchased the collateral for

the note, a commercial building, from the Chapter 7 trustee, filed a secured

proof of claim, and sought to enforce the note and mortgage against the

proceeds from the sale. When the matter first came on to be heard, the

claimant confirmed that he was not in possession of the note and was unaware

of who was in possession of it.[16] Because the claimant acknowledged that he

was never in possession of the note, he was precluded from reliance on Section

3-309A of the Massachusetts UCC, which permits enforcement of a lost,

destroyed or stolen instrument, but requires possession of the instrument at

---

[15]   See n. 7.

[16]   Following the disallowance of the proof of claim by the court, the
claimant discovered the location of the note. However, the bankruptcy court
denied his motion for reconsideration of the disallowance. The denial was
affirmed by the District Court. Marks v. Braunstein, 2010 WL 3622111 at *5.

some point.  Citing to <u>Premier Capital. LLC v. Gavin</u>, 319 B.R. 27, 33 (1st Cir.

BAP 2004), the <u>Marks</u> court reflected that "[t]he purpose of the possession

requirement in Article 3 is to protect the Debtor from multiple enforcement

claims to the same note." <u>Id</u>. at *3.  Acknowledging that conflicting

enforcement claims were not a concern in the case before it, the court

nevertheless applied the statutory requirements to hold that the note could not

be enforced by the claimant to collect proceeds otherwise due to the claimant

from the sale of the collateral on account of his secured claim.


       Similarly, in this case, the purchaser of the note and mortgage, the Bank

of New York, never had possession of the note.  Therefore, under the Uniform

Commercial Code as adopted in New Jersey, the Bank of New York as Trustee

may not enforce the instrument.


       On behalf of the Bank of New York, Countrywide contends that the

written mortgage assignment in this case, which purports to assign both the

note and mortgage in this case, and which was properly executed and recorded

with the appropriate county clerk's office, serves to properly transfer the note

to the new owner, enabling the new owner to enforce both the note and the

mortgage.  The recorded assignment of mortgage does include provision for the

assignment of the note as well.  However, the recorded assignment of the

-19-

mortgage does not establish the enforceability of the note. As discussed above,
the UCC governs the transfer of a promissory note. See 29 Myron C. Weinstin,
New Jersey Practice, Law of Mortgages, § 11.2 at 749. The attempted
assignment of the note in the assignment of mortgage document, together with
the terms of the Pooling and Servicing Agreement, created an ownership issue,
but did not transfer the right to enforce the note.

> The right to enforce an instrument and ownership of the
> instrument are two different concepts. . . . Moreover, a person who
> has an ownership right in an instrument might not be a person
> entitled to enforce the instrument. For example, suppose X is the
> owner and holder of an instrument payable to X. X sells the
> instrument to Y but is unable to deliver immediate possession to Y.
> Instead, X signs a document conveying all of X's right, title, and
> interest in the instrument to Y. Although the document may be
> effective to give Y a claim to ownership of the instrument, Y is not a
> person entitled to enforce the instrument until Y obtains
> possession of the instrument. No transfer of the instrument
> occurs under Section 3-203(a) until it is delivered to Y.

N.J.S.A. 12A:3-203 (UCC Cmt. 1). Accordingly, the Bank of New York has a
valid claim of ownership, but may not enforce the note on the basis of the
reference to the note in the recorded assignment of the mortgage.

The fact that the proof of claim in question was filed by "Countrywide
Home Loans, Inc., as servicer for Bank of New York, Trustee" does not alter the
enforceability of the note. Bankruptcy Rule 3001(b) provides that a proof of
claim may be filed by either the creditor "or the creditor's agent."

-20-

FED.R.BANKR.P. 3001(b). Here, Countrywide, Inc. was the originator of the
note and mortgage, but sold both the note and mortgage to the Bank of New
York as Trustee, and filed the proof of claim as the "servicer" for the Bank of
New York. A servicer has standing to file a proof of claim on behalf of a
creditor. See, e.g., Greer v. O'Dell, 305 F.3d 1297, 1302 (11th Cir. 2002) ("A
servicer is a party in interest in proceedings involving loans which it services.");
In re Viencek, 273 B.R. 354, 358 (N.D.N.Y. 2002); In re Gulley, No.
07-33271-SGJ-13, 2010 WL 3342193, *9 (Bankr. N.D.Tex. Aug. 23, 2010)
("many courts have held that a mortgage servicer has standing to participate in
a debtor's bankruptcy case by virtue of its pecuniary interest in collecting
payments under the terms of a note"); In re Minbatiwalla, 424 B.R. 104, 109
(Bankr. S.D.N.Y. 2010); In re Conde- Dedonato, 391 B.R. 247, 250 (Bankr.
E.D.N.Y. 2008) ("A servicer of a mortgage is clearly a creditor and has standing
to file a proof of claim against a debtor pursuant to its duties as a servicer.").
But Countrywide, as the servicer, acts only as the agent of the owner of the
instrument, and has no greater right to enforce the instrument than its
principal. See, e.g., Greer v. O'Dell, 305 F.3d at 1303. Because the Bank of
New York has no right to enforce the note, Countrywide as its agent and
servicer cannot enforce the note.[17]

_____

[17]    As noted, Countrywide Home Loans, Inc. is listed as the servicer
on the debtor's loan. However, there is serious question raised about the
authority of that entity to file a proof of claim on behalf of the Bank of New

-21-

## CONCLUSION

Because the claim filed by "Countrywide Home Loans, Inc., servicer for
Bank of New York" cannot be enforced under applicable state law, the claim
must be disallowed under 11 U.S.C. § 502(b)(1).


Dated:   November 16, 2010

_____
JUDITH H. WIZMUR
CHIEF JUDGE
U.S. BANKRUPTCY COURT

---

York.  A Power of Attorney dated November 15, 2005 was submitted, affording
Countrywide Home Loans Servicing LP, not Countrywide Home Loans, Inc., the
limited opportunity to perform all necessary acts to foreclose mortgage loans,
dispose of properties and modify or release mortgages, presumably including
the authority to file a proof of claim in a bankruptcy case.

Exhibit "19"



# Countrywide®

## AMERICA'S WHOLESALE LENDER®

Exhibit "20"



**4closureFraud**
Fighting Foreclosure Fraud
by Sharing the Knowledge

HOME   ABOUT   CONTACT   DEPOSITIONS   JUDICIAL FORECLOSURE   MESSAGE BOARD   RADIO SHOW   RESOURCES   SECURITIZATION   VIDEOS

**BANK OF AMERICA FACES NEW PROBE; NEW YORK ATTORNEY GENERAL LAUNCHES INVESTIGATION INTO MORTGAGE SECURITIZATION**
Posted by 4closureFraud on June 13, 2011 · 18 Comments





CIVIL JUSTICE Advocates

**Florida Foreclosure Defense**
**954.677.8888**

Auto Title Loans
Save 50%
Member BBB - In Bus. Since 1987
No Extra Fees - Professional Svc

**BANK OF AMERICA FACES NEW PROBE; NEW YORK ATTORNEY GENERAL LAUNCHES INVESTIGATION INTO MORTGAGE SECURITIZATION**

New York Attorney General Eric Schneiderman has targeted Bank of America, the biggest U.S. bank by assets, in a new probe that questions the validity of potentially thousands of mortgage securities and their associated foreclosures, two people familiar with the matter said.

The investigation, which began quietly in recent weeks, is part of a larger inquiry that is scrutinizing whether mortgage companies and Wall Street firms took the necessary steps under New York state law when creating mortgage-backed securities, these people said, who requested anonymity because they weren't authorized to speak publicly about the probe.

**SUBSCRIBE TO 4CLOSUREFRAUD.ORG VIA EMAIL**

Enter your email address to subscribe to this blog and receive notifications of new posts by email.

Email Address

[Subscribe]

**Subscription Options**
$Good Faith $10.00 USD – monthly

[Subscribe]

# EXHIBIT '21"



## United States Patent and Trademark Office

Home | Site Index | Search | FAQ | Glossary | Guides | Contacts | eBusiness | eBiz alerts | News | Help

# Trademarks > Trademark Electronic Search System (TESS)

*TESS was last updated on Tue Mar 20 04:35:50 EDT 2012*

| TESS HOME | NEW USER | STRUCTURED | FREE FORM | BROWSE DICT | SEARCH OG |
| BOTTOM | HELP | | | | |

( Logout )  Please logout when you are done to release system resources allocated for you.

# Record 1 out of 1

| TARR Status | ASSIGN Status | TDR | TTAB Status |

*( Use the "Back" button of the Internet Browser to return to TESS)*

## Typed Drawing

| | |
|---|---|
| **Word Mark** | **AMERICA'S WHOLESALE LENDER** |
| **Goods and Services** | IC 036. US 102. G & S: financial services; namely, mortgage banking and mortgage lending services. FIRST USE: 19930201. FIRST USE IN COMMERCE: 19930201 |
| **Mark Drawing Code** | (1) TYPED DRAWING |
| **Serial Number** | 74358690 |
| **Filing Date** | February 8, 1993 |
| **Current Filing Basis** | 1A |

| | |
|---|---|
| **Original Filing Basis** | 1B |
| **Published for Opposition** | October 18, 1994 |
| **Registration Number** | 1872784 |
| **Registration Date** | January 10, 1995 |
| **Owner** | (REGISTRANT) Countrywide HOME LOANS, INC. CORPORATION NEW YORK 4500 PARK GRANADA CALABASAS CALIFORNIA 91302 |
| | (LAST LISTED OWNER) BANK OF AMERICA CORPORATION CORPORATION DELAWARE 100 NORTH TRYON STREET CHARLOTTE NORTH CAROLINA 28255 |
| **Assignment Recorded** | ASSIGNMENT RECORDED |
| **Attorney of Record** | Randel S. Springer |
| **Disclaimer** | NO CLAIM IS MADE TO THE EXCLUSIVE RIGHT TO USE "WHOLESALE LENDER" APART FROM THE MARK AS SHOWN |
| **Type of Mark** | SERVICE MARK |
| **Register** | PRINCIPAL-2(F)-IN PART |
| **Affidavit Text** | SECT 15. SECT 8 (6-YR). SECTION 8(10-YR) 20050402. |
| **Renewal** | 1ST RENEWAL 20050402 |
| **Live/Dead Indicator** | LIVE |
| **Distinctiveness Limitation Statement** | as to "AMERICA'S" |

**TESS HOME**   **NEW USER**   **STRUCTURED**   **FREE FORM**   **BROWSE DICT**   **SEARCH OG**

**TOP**   **HELP**

|.HOME | SITE INDEX| SEARCH | eBUSINESS | HELP | PRIVACY POLICY

# EXHIBIT '22"

News Release – Washington DFI Commends Justice Department For Their Fair-Lending Settlement With Bank Of America/Countrywide Financial     3/21/12 12:01 AM

Case 8:12-cv-00242-CJC-AN   Document 46   Filed 03/23/12   Page 46 of 60   Page ID #:1436

# Washington State Department of Financial Institutions

# News Release

Share     **Tweet** ⟨ 7

## Thursday, December 22, 2011

## Contact

Lyn Peters, Director of Communications
PH (360) 902-8731 lyn.peters@dfi.wa.gov

Deborah Bortner, Director, Division of Consumer Services
PH (360) 902-0511 dbortner@dfi.wa.gov

## FOR IMMEDIATE RELEASE:

# Washington DFI Commends Justice Department For Their Fair-Lending Settlement With Bank Of America/Countrywide Financial

**DFI Division of Consumer Services filed statement of charges in 2008 against Countrywide Home Loans alleging discriminatory lending. Washington consumers received restitution checks in 2010.**

OLYMPIA – The Washington State Department of Financial Institutions (DFI) commends the United States Department of Justice for their fair-lending settlement with Bank of America regarding allegations of discriminatory lending practices in their Countrywide Financial unit.

Yesterday's announcement by the Justice Department finding more than 200,000 minority borrowers nationwide were given loans with higher fees and

News Release – Washington DFI Commends Justice Department For Their Fair–Lending Settlement With Bank Of America/Countrywide Financial     3/21/12 12:01 AM

Case 8:12-cv-00242-CJC-AN   Document 46   Filed 03/23/12   Page 47 of 60   Page ID #:1437

rates than white borrowers with similar credit backgrounds reinforces DFI's findings in Washington State. On June 23, 2008 DFI became the first and only state regulator to file a Statement of Charges against Countrywide Home Loans alleging the company was discriminating against ethnic and racially protected classes by offering loan products that were less favorable than those offered to non-protected classes.

"DFI's examination, investigation and legal teams, understand the importance of protecting vulnerable citizens and know all too well the thousands of hours required to fully investigate and prosecute this type of case," DFI Director Scott Jarvis said. "We take very seriously our charge to protect Washington's residents, which is why DFI launched our own investigation four years ago and filed a Statement of Charges against Countrywide Home Loans more than three years ago for discriminatory lending practices. We're proud to say Washington residents received compensation this time last year in a settlement resulting from that investigation."

"Our job is to protect hard-working Washingtonians, and we did," Gov. Chris Gregoire said. "We saw more than three years ago the damage of discriminatory lending, and took every step to stop it – ending Countrywide's ability to operate in our state. I commend our Department of Financial Institutions, which led a full investigation to ensure impacted home buyers received the compensation they deserve. And I'm pleased the federal government is following our lead to protect the American dream."

On July 1, 2008, Bank of America purchased Countrywide Home Loans. As a result, Countrywide Home Loans became a subsidiary of the national bank and DFI lost jurisdiction over any loans made after that time.

The DFI Consumer Services unit conducted more than 2,400 hours of examination and investigation to determine the extent of the problem. DFI examiners evaluated more than 30,000 loans and discovered more than 100 alleged victims of predatory pricing based upon comparisons with statistically significant control group members.

In addition to the complex nature of DFI's allegations, the case was

News Release – Washington DFI Commends Justice Department For Their Fair–Lending Settlement With Bank Of America/Countrywide Financial    3/21/12 12:01 AM

Case 8:12-cv-00242-CJC-AN   Document 46   Filed 03/23/12   Page 48 of 60   Page ID #:1438

complicated with numerous changes in the Washington State Consumer Loan Act over the period of time our allegations covered.

In the settlement, DFI identified 123 victims of alleged discriminatory pricing. Each of these Washington residents received a settlement ranging from $997 to $26,176 depending on the type of loan, number of predatory features in the loan and whether or not the consumer was foreclosed upon. Consumers received the full $650,000 of the settlement. DFI did not retain any of the settlement.

View the DFI Consent Order at www.dfi.wa.gov/cs%20orders/countrywide-consent.pdf.

---

## About DFI
www.dfi.wa.gov • 360.902-8700 • 877.746-4334
The Washington State Department of Financial Institutions regulates a variety of financial service providers such as banks, credit unions, mortgage brokers, consumer loan companies, payday lenders and securities brokers and dealers. The department also works to improve financial education throughout Washington through its outreach programs and online clearinghouse www.dfi.wa.gov/financial-education. In addition to posting information about licensees and administrative actions, DFI uses the Web and social media to provide financial education information: http://www.twitter.com/FinEd4All, www.twitter.com/DFIConsumers, www.finlit.blogspot.com, www.youtube.com/user/WADFI, www.homeownership.wa.gov.

## About the Division of Consumer Services
www.dfi.wa.gov/cs • 360.902-8703
The mission of the Division of Consumer Services is to protect consumers from illegal and fraudulent lending practices. The division accomplishes its mission through licensing, licensee examinations, investigations, and enforcing selected state and federal statutes and rules. Consumer Services regulates the business activities of consumer loan companies, mortgage brokers, money transmitters and currency exchangers, as well as check

News Release – Washington DFI Commends Justice Department For Their Fair–Lending Settlement With Bank Of America/Countrywide Financial          3/21/12 12:01 AM

Case 8:12-cv-00242-CJC-AN    Document 46    Filed 03/23/12    Page 49 of 60    Page ID #:1439

cashers and sellers, also known as "payday lenders." The Division is entirely self-supporting, with funding provided by licensing, auditing, and policing of regulated businesses and individuals. No money is received from the state General Fund or other public revenue source.

[Top]

# EXHIBIT '23"



United States Patent and Trademark
Office

Home | Site
Index | Search | Guides | Contacts | eBusiness | eBiz
alerts | News | Help



## Assignments on the Web > __Trademark Query__

# Trademark Assignment Abstract of Title

## Total Assignments: 2

**Serial #:** 74358690      **Filing Dt:** 02/08/1993      **Reg #:** 1872784      **Reg. Dt:** 01/10/1995

**Registrant:** Countrywide HOME LOANS, INC.

**Mark:** AMERICA'S WHOLESALE LENDER

## Assignment: 1

**Reel/Frame:** 1455/0802      **Received:** 07/16/1996      **Recorded:** 03/20/1996      **Pages:** 7

**Conveyance:** CHANGE OF NAME

**Assignor:** COUNTRYWIDE FUNDING CORPORATION      **Exec Dt:** 03/11/1996
                                                   **Entity Type:** CORPORATION
                                                   **Citizenship:** NEW YORK

**Assignee:** COUNTRYWIDE HOME LOANS, INC.      **Entity Type:** CORPORATION
             155 NORTH LAKE AVE. MS 10-11        **Citizenship:** NEW YORK
             PASADENA, CALIFORNIA 91101

**Correspondent:** COUNTRYWIDE HOME LOANS, INC.
                   LILI K. SAGE
                   155 NORTH LAKE AVE., MS 10-11
                   PASADENA, CA 91101

## Assignment: 2

**Reel/Frame:** 3917/0827      **Received:** 01/13/2009      **Recorded:** 01/13/2009      **Pages:** 6

**Conveyance:** ASSIGNS THE ENTIRE INTEREST

**Assignor:** COUNTRYWIDE HOME LOANS, INC.      **Exec Dt:** 11/08/2008
                                                **Entity Type:** CORPORATION
                                                **Citizenship:** NEW YORK

**Assignee:** BANK OF AMERICA CORPORATION       **Entity Type:** CORPORATION

             100 NORTH TRYON STREET             **Citizenship:** DELAWARE
             CHARLOTTE, NORTH CAROLINA 28255

**Correspondent:** RANDEL S. SPRINGER

USPTO Assignments on the Web
3/20/12 11:29 PM
Case 8:12-cv-00242-CJC-AN   Document 46   Filed 03/23/12   Page 52 of 60   Page ID #:1442

ONE WEST FOURTH STREET
WOMBLE CARLYLE SANDRIDGE & RICE, PLLC

WINSTON-SALEM, NY 27101

Search Results as of: 03/21/2012 02:26 AM
If you have any comments or questions concerning the data displayed, contact PRD / Assignments at 571-272-3350. v.2.3.1
Web interface last modified: Jan 26, 2012 v.2.3.1

| .HOME | INDEX| SEARCH | eBUSINESS | CONTACT US | PRIVACY STATEMENT



# United States Patent and Trademark Office

Home | Site
Index | Search | Guides | Contacts | eBusiness | eBiz
alerts | News | Help



## Assignments on the Web > **Trademark Query**

# Trademark Assignment Details

**Reel/Frame:** 3917/0827    View Recorded Assignment    **Pages:** 6

**Received:** 01/13/2009    **Recorded:** 01/13/2009
**Attorney Dkt #:** 50195.1254.3
**Conveyance:** ASSIGNS THE ENTIRE INTEREST

## Total properties: 8

**1**   **Serial #:** 74358690    **Filing Dt:** 02/08/1993    **Reg #:** 1872784    **Reg. Dt:** 01/10/1995
   **Mark:** AMERICA'S WHOLESALE LENDER

**2**   **Serial #:** 74450014    **Filing Dt:** 10/22/1993    **Reg #:** 1874183    **Reg. Dt:** 01/17/1995
   **Mark:** HOUSE AMERICA

**3**   **Serial #:** 74592396    **Filing Dt:** 10/31/1994    **Reg #:** 2006878    **Reg. Dt:** 10/08/1996
   **Mark:** LOCK N' SELL

**4**   **Serial #:** 75013470    **Filing Dt:** 10/23/1995    **Reg #:** 2004450    **Reg. Dt:** 10/01/1996
   **Mark:** FULL SPECTRUM

**5**   **Serial #:** 75046382    **Filing Dt:** 01/22/1996    **Reg #:** 2073400    **Reg. Dt:** 06/24/1997
   **Mark:** 1-800-877-POWER

**6**   **Serial #:** 75210501    **Filing Dt:** 11/27/1996    **Reg #:** 2121562    **Reg. Dt:** 12/16/1997
   **Mark:** THE FASTER WAY TO CLOSE

**7**   **Serial #:** 78326197    **Filing Dt:** 11/11/2003    **Reg #:** 3154741    **Reg. Dt:** 10/10/2006
   **Mark:** WE HOUSE AMERICA

**8**   **Serial #:** 78601012    **Filing Dt:** 04/04/2005    **Reg #:** 3604353    **Reg. Dt:** 04/07/2009
   **Mark:** CLOUT

## Assignor

**1**   COUNTRYWIDE HOME LOANS, INC.    **Exec Dt:** 11/08/2008
**Entity Type:** CORPORATION
**Citizenship:** NEW YORK

## Assignee

1   BANK OF AMERICA CORPORATION
    100 NORTH TRYON STREET
    CHARLOTTE, NORTH CAROLINA 28255

**Entity Type:** CORPORATION
**Citizenship:** DELAWARE

## Correspondence name and address

RANDEL S. SPRINGER
ONE WEST FOURTH STREET
WOMBLE CARLYLE SANDRIDGE & RICE, PLLC
WINSTON-SALEM, NY 27101

Search Results as of: 03/21/2012 03:05 AM
If you have any comments or questions concerning the data displayed, contact PRD / Assignments at 571-272-3350. v.2.3.1
Web interface last modified: Jan 26, 2012 v.2.3.1

| .HOME | INDEX| SEARCH | eBUSINESS | CONTACT US | PRIVACY STATEMENT

# TRADEMARK ASSIGNMENT

Electronic Version v1.1
Stylesheet Version v1.1

| SUBMISSION TYPE: | NEW ASSIGNMENT |
|---|---|
| NATURE OF CONVEYANCE: | ASSIGNS THE ENTIRE INTEREST AND THE GOODWILL |

**CONVEYING PARTY DATA**

| Name | Formerly | Execution Date | Entity Type |
|---|---|---|---|
| Countrywide Home Loans, Inc. | | 11/08/2008 | CORPORATION: NEW YORK |

**RECEIVING PARTY DATA**

| | |
|---|---|
| Name: | Bank of America Corporation |
| Street Address: | 100 North Tryon Street |
| City: | Charlotte |
| State/Country: | NORTH CAROLINA |
| Postal Code: | 28255 |
| Entity Type: | CORPORATION: DELAWARE |

**PROPERTY NUMBERS Total: 8**

| Property Type | Number | Word Mark |
|---|---|---|
| Serial Number: | 78601012 | CLOUT |
| Registration Number: | 2073400 | 1-800-877-POWER |
| Registration Number: | 1872784 | AMERICA'S WHOLESALE LENDER |
| Registration Number: | 2004450 | FULL SPECTRUM |
| Registration Number: | 1874183 | HOUSE AMERICA |
| Registration Number: | 2006878 | LOCK N' SELL |
| Registration Number: | 2121562 | THE FASTER WAY TO CLOSE |
| Registration Number: | 3154741 | WE HOUSE AMERICA |

**CORRESPONDENCE DATA**

Fax Number: (336)733-8473
*Correspondence will be sent via US Mail when the fax attempt is unsuccessful.*
Phone: (336) 721-3747
Email: trademarkswinston@wcsr.com
Correspondent Name: Randel S. Springer
Address Line 1: One West Fourth Street

**900124502**

**TRADEMARK
REEL: 003917 FRAME: 0827**

Address Line 2:          Womble Carlyle Sandridge & Rice, PLLC
Address Line 4:          Winston-Salem, NEW YORK   27101

| ATTORNEY DOCKET NUMBER: | 50195.1254.3 |
| --- | --- |
| NAME OF SUBMITTER: | Randel S. Springer |
| Signature: | /Randy Springer/ |
| Date: | 01/13/2009 |

Total Attachments: 4
source=COUNTRYWIDE HOME LOANS#page1.tif
source=COUNTRYWIDE HOME LOANS#page2.tif
source=COUNTRYWIDE HOME LOANS#page3.tif
source=COUNTRYWIDE HOME LOANS#page4.tif

## ASSIGNMENT OF TRADEMARKS

This ASSIGNMENT OF TRADEMARKS ("Assignment"), dated as of <u>Nov. 8</u>, 2008, is from COUNTRYWIDE HOME LOANS, INC., a corporation organized under the laws of the State of New York and having a principal place of business at 4500 Park Granada, Calabasas, California 91302 ("Assignor"), to BANK OF AMERICA CORPORATION, a Delaware corporation having a place of business at 100 North Tryon Street, Charlotte, North Carolina 28255 ("Assignee").

### W I T N E S S E T H :

*WHEREAS*, Assignor is the owner of, and desires to assign to Assignee, all right, title and interest in and to: (i) all trademark applications and registrations in the United States for the mark in the attached Schedule A, (ii) any and all trademark, service mark and intellectual property rights, including rights of priority, in said mark, ((i) and (ii) collectively the "Trademark") and (iii) any and all goodwill of the business associated with the Trademark;

*WHEREAS*, Assignee, is successor to the business of Assignor, or that portion of the ongoing and existing business to which the Trademark pertains and desires to acquire the Trademark and any and all goodwill of the business associated therewith from Assignor, subject to the terms and conditions of this assignment; and

*WHEREAS*, Assignor and Assignee desire to confirm of record the assignment of the Trademark and goodwill to Assignee;

*NOW, THEREFORE*, in consideration of the foregoing recitals, the mutual covenants and conditions contained herein, and other good and valuable consideration, the receipt and sufficiency of which are hereby acknowledged, Assignor and Assignee hereby agree as follows:

1.   Assignor hereby assigns, transfers and conveys to Assignee the entire right, title and interest in and to (i) the Trademark, and (ii) the goodwill of the business symbolized by the Trademark, and (iii) all causes of action, claims and demands and other rights for, or arising from, any infringement, including past infringements, of any of the rights granted by this Assignment, including all claims for injunctive or declaratory relief, restitution, damages (including any statutory, enhanced or punitive damages), profits, costs (including attorneys' fees) and for other monetary award, with the right to sue for and collect the same in any court of competent jurisdiction, for Assignee's sole benefit.

2.   Assignor further agrees, without further consideration, to cause to be performed such other lawful acts and to be executed such further assignments and other lawful documents as Assignee may from time to time reasonably request to effect fully this Assignment and to permit Assignee to be duly recorded as the registered owner of the Trademark, the Trademark registration and application thereof, and all other rights hereby conveyed.

3.   The expression "the Assignor" and "the Assignee" shall where the context so admits include their respective legal successors, representative, and assigns.

IN WITNESS WHEREOF, the parties have caused this Agreement to be duly executed by their respective authorized officers, all as of the day and year first written above.

ASSIGNOR:                                    ASSIGNEE:

COUNTRYWIDE HOME LOANS, INC.                 BANK OF AMERICA CORPORATION

By: _Anne D McCallion_____               By:_____

    Anne D. McCallion
    Senior Managing Director and
Its:_Chief Financial Officer_____          Its:_____

IN WITNESS WHEREOF, the parties have caused this Agreement to be duly executed by their respective authorized officers, all as of the day and year first written above.

ASSIGNOR:                                ASSIGNEE:

COUNTRYWIDE HOME LOANS, INC.             BANK OF AMERICA CORPORATION

By:_____             By:_____

Its:_____            Its: _SECRETARY_____

## EXHIBIT A

### Applications

| Mark | Serial No. | Filing Date |
|------|-----------|-------------|
| CLOUT | 78/601,012 | April 4, 2005 |

### Registrations

| Mark | Reg. No. | Issued |
|------|---------|--------|
| 1-800-877-POWER | 2,073,400 | June 24, 1997 |
| AMERICA'S WHOLESALE LENDER | 1,872,784 | January 10, 1995 |
| FULL SPECTRUM | 2,004,450 | October 1, 1996 |
| House America (Stylized) | 1,874,183 | January 17, 1995 |
| LOCK N' SELL | 2,006,878 | October 8, 1996 |
| THE FASTER WAY TO CLOSE | 2,121,562 | December 16, 1997 |
| We House America & Design | 3,154,741 | October 10, 2006 |

WCSR 4004926v1